## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1] | Case No. 24-12574 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE(S) OF SOME, ALL, OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (D) AUTHORIZING THE DEBTORS TO ENTER INTO THE PURCHASE AGREEMENT(S), (E) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING THE MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER OR ORDERS (A) AUTHORIZING THE SALE OF SOME, ALL, OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE POTENTIALLY ASSIGNED AGREEMENTS, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state the following in support of this motion (the "<u>Motion</u>"):[2]

### RELIEF REQUESTED

1.      The Debtors seek entry of :

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of John Shepherd in Support of Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration, as applicable.

a.  an order substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), granting, among other things, the following relief:

    i.  approving proposed bidding procedures (the "Bidding Procedures") in connection with the sale or sales (collectively, the "Sale(s)") of some, all, or substantially all of the Debtors' assets or any portion thereof (the "Assets"), in the form attached to the Bidding Procedures Order as Exhibit 1, and approving the form and manner of notice thereof in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice");

    ii.  authorizing the Debtors to designate the Stalking Horse Bidder (as defined below) in accordance with the Bidding Procedures Order and enter into the Stalking Horse Purchase Agreement (as defined below);

    iii.  scheduling an auction (the "Auction") and a sale hearing (the "Sale Hearing") in connection with the Sale(s);

    iv.  subject to final court approval at the Sale Hearing (as defined below), authorizing and approving the Debtors to enter into and perform under a purchase agreement or purchase agreements consistent with the Bidding Procedures (the "Purchase Agreement(s)");

    v.  establishing procedures for the assumption and assignment (the "Assumption and Assignment Procedures") of the executory contracts and unexpired leases identified in the Cure Schedule (as defined below) (each, a "Potentially Assigned Agreement," and collectively, the "Potentially Assigned Agreements") and the form and manner of notice thereof in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Cure Notice"); and

    vi.  granting related relief; and

b.  an order or orders (each such order, a "Sale Order"):

    i.  authorizing and approving the Debtors' entry into the Purchase Agreement(s) with the Successful Bidder(s) (as defined below) or Back-Up Bidder(s) (as defined below), as applicable;

    ii.  authorizing the Sale(s) of the Assets to the party or parties that are the Successful Bidder(s) at the Auction, free and clear of all liens, claims, and encumbrances (collectively, the "Encumbrances"), except for certain assumed liabilities;

    iii.  authorizing and approving the assumption and assignment of the Potentially Assigned Agreements in connection with the Sale(s), including proposed Cure Amounts (as defined below) (if any); and

iv.  granting related relief.

2.       In support of this Motion, the Debtors incorporate the statements contained in the First Day Declaration, filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

3.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.       The statutory and legal bases for the relief requested in this Motion are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

## BACKGROUND OF THE DEBTORS

6.       The Debtors own a portfolio of operating solar projects and projects in various stages of development in North America. The Debtors deliver distributed energy and smart long-term renewable energy solutions to local communities. The Debtors' objective is to provide the

economic and environmental benefits of solar power, working closely with landowners, municipalities, utilities, and local communities.

7.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under sections 101–1532 of the Bankruptcy Code in the Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

8.      Additional information regarding the Debtors' businesses, capital structures and circumstances preceding the Petition Date may be found in the First Day Declaration.

## RELEVANT BACKGROUND

### I.      The Debtors' Prepetition Sale and Marketing Efforts

9.      Since recognizing their potential liquidity challenges, the Debtors have proactively pursued a broad range of potential strategic transactions to address their continuing liquidity needs. In August 2022, the Debtors' non-Debtor parent hired BMO and Piper Sandler to raise capital for the Debtors in a process that ran through September 2023, but was not successful. In February of 2024, the Debtors' non-Debtor parent retained Agentis Capital and SenaHill Partners (the "Investment Bankers") to explore a potential sale of certain of the Debtors' Assets. The Investment Bankers conducted a fulsome sale process, contacting 73 potential buyers, with 22 executing Non-Disclosure Agreements and four submitting final offers, including the Initial Buyer (as defined below) and the Stalking Horse Bidder (as defined below). All four parties who submitted final offers were third-party, arm's-length bidders, unaffiliated in any way with the Debtors.

10.     During this period in early 2024, the Debtors' liquidity position was more strained than ever, resulting in a default under the Prepetition GDEV Facility and the Prepetition Carval

32363065.1

Facility. After the expiration of a period of forbearance, on April 17, 2024, the Prepetition GDEV Secured Parties and the Prepetition Carval Secured Parties exercised their rights to appoint Eric Millard and John Shepherd to serve as independent managers on the Debtors' board of directors. John Shepherd eventually resigned as an independent manager and is now only serving as the Chief Restructuring Officer of the Debtors.

11.     As the Debtors actively continued to pursue a sale of certain of their assets, their efforts bore significant fruit when the Debtors entered into an exclusivity agreement with a third-party buyer (the "Initial Buyer") contemplating a series of transactions. The first of the transactions was consummated under a certain membership interest purchase agreement, dated as of July 10, 2024. However, subsequent to such sale, the Initial Buyer did not consummate the remainder of the contemplated transactions.

12.     In July 2024, the Debtors, with assistance of the Investment Bankers, recontacted interested buyers from the sales process and ultimately re-engaged with the Stalking Horse Bidder at the beginning of August 2024, based on a revised offer that was superior to the final offer of the Initial Buyer. Initially, the sale to the Stalking Horse Bidder was intended to be consummated outside of court, but, as the Debtors' circumstances evolved, it became clear that an out-of-court sale was not feasible; as such, the Debtors worked with the Stalking Horse Bidder to pivot to an in-court transaction. Even though the Debtors' sale and marketing efforts have been robust, with arm's-length negotiations with prospective bidders spanning over eight months, the Bidding Procedures will allow the Debtors to briefly continue to pursue overbids to yet again confirm that the third-party Sale to the Stalking Horse Bidder represents the highest and best value to all stakeholders for the Assets included in the Stalking Horse Bid.

32363065.1

13.     Accordingly, shortly before filing, the Debtors entered into the Stalking Horse Purchase Agreement (as defined below) with the Stalking Horse Bidder for the sale of the assets of ORECO, ORCH 2, and ORCH 3, for a cash purchase price at the Sale closing of approximately $30 million, plus potential future earnout and contingent payments totaling $1 million, and the assumption or satisfaction of various liabilities. In addition to serving as the Stalking Horse Bidder and having its bid be subject to a competitive sale process described herein, the Stalking Horse Bidder (in such capacity, the "<u>DIP Lender</u>") has agreed to finance such process and these Chapter 11 Cases by providing a DIP Facility (as defined in the proposed order approving such facility, the "<u>DIP Order</u>") on a junior basis with respect to certain Prepetition Collateral (as defined in the DIP Order), while certain of the Prepetition Secured Lenders (as defined in the DIP Order) consented to the priming of their Prepetition Liens (as defined in the DIP Order) on the terms set forth in the DIP Loan Documents (as defined in the DIP Order). The Debtors intend to continue to market their Assets, including the Remaining Assets (as defined in the First Day Declaration), and consummate Sale(s) during these Chapter 11 Cases. Under the terms of the proposed DIP Order, the DIP Lender is permitted to apply the DIP Obligations (as defined in the DIP Order) towards the purchase price of any purchase of DIP Collateral (as defined in the DIP Order), subject to certain caps set forth in the DIP Order or be repaid in cash if the Debtors default under the DIP Facility or the Stalking Horse Bidder is not selected as a Successful Bidder.

## II.     The Debtors' Proposed Sale Process

14.     Through the Bidding Procedures outlined in this Motion, the Debtors intend to continue the process to sell all, substantially all, or any portion of their Assets by building upon the prepetition marketing process and expeditiously selling their Assets to the highest and best bidder(s) via the Auction.

15.     As set forth in the First Day Declaration, the prepetition sale process resulted in the choice of Radial Power LLC ("Radial") as the stalking horse bidder (the "Stalking Horse Bidder") for certain of the Debtors' Assets as the Debtors continue their efforts to sell the remaining Assets, including through the process described herein.

16.     The Debtors commenced these Chapter 11 Cases with committed postpetition financing with the Stalking Horse Bidder as lender, granting the Debtors a short runway to consummate a sale transaction while in bankruptcy. However, given the Debtors' limited liquidity, time is of the essence. Additionally, pursuant to the DIP Loan Documents, the Debtors must satisfy certain milestones (the "DIP Milestones") for the Sale(s) of their Assets. The Debtors understand the DIP Milestones are a key factor in the Stalking Horse Bidder's willingness to enter into the Stalking Horse Purchase Agreement and the DIP Lender's willingness to provide the DIP Facility.

17.     Conducting a thorough yet expedited bidding process and consummating a Sale are vitally important to the Debtors' efforts to maximize value by selling the Assets. Given the Debtors' liquidity situation and the robust prepetition marketing process, the Debtors have determined that their best opportunity to maximize the value of their estates for the benefit of their stakeholders relies on their ability to expeditiously proceed through these Chapter 11 Cases and complete the Sale(s) in a manner that minimizes administrative expenses.

18.     The Bidding Procedures provide substantial flexibility with respect to the structure of any transaction and allow the Debtors to consider all viable options in accordance with the Bidding Procedures before determining if selling the Assets will, in their business judgment, maximize value for the Debtors' estates.

19.     In light of the substantial prepetition marketing efforts, the Bidding Procedures establish an appropriate timeline for conducting a market-test of the bid of the Stalking Horse

Bidder (the "Stalking Horse Bid"). Any delay would hinder the Debtors' efforts to maximize value. Additionally, the Bidding Procedures were negotiated with the Stalking Horse Bidder, and approval of the Bidding Procedures and the timeline therein is a condition to that certain *Stock and Asset Purchase Agreement*, dated November 6, 2024, between certain of the Debtors and Radial (the "Stalking Horse Purchase Agreement") and the DIP Loan Documents. Accordingly, the proposed Bidding Procedures should be approved.

## THE PROPOSED SALE PROCESS AND SELECTION OF THE STALKING HORSE BIDDER

**I.      The Bidding Procedures**

20.      The Debtors seek approval of the Bidding Procedures to establish a controlled, fair, and open process for the solicitation, receipt, and evaluation of Bids (as defined in the Bidding Procedures) in a fair, accessible, and expeditious manner. The Bidding Procedures describe, *inter alia*: (a) the Assets available for sale; (b) the manner in which bids become "qualified"; (c) the coordination of diligence efforts among the bidders and the Debtors; (d) the receipt and negotiation of bids received; (e) the conduct of the Auction (if any); and (f) the process for the selection and approval of the bid or bids that constitute the highest or otherwise best bid (the "Successful Bid(s)," and the maker(s) of the Successful Bid, the "Successful Bidder(s)") and the next-highest bid(s) (the "Back-Up Bid(s)," and the maker(s) of the Back-Up Bid(s), the "Back-Up Bidder(s)").

21.      The following is a summary of the proposed Bidding Procedures, as required by Local Rule 6004-1.[3]

> a.    **Public Announcement of the Auction**: As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall: (i) serve the Sale Notice

---

[3] Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order. To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Bidding Procedures reflected in Exhibit 1 to the Bidding Procedures Order, the terms and conditions of the Bidding Procedures shall control in all respects.

32363065.1

by email, if available, or otherwise by first-class mail upon the Sale Notice Parties (as defined below); *provided, however*, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; *provided, further* that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence; (ii) publish the Sale Notice (as defined in the Bidding Procedures Motion), with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition) or another publication with similar national circulation as soon as practicable after entry of the Bidding Procedures Order; and (iii) post the Sale Notice on their case website, https://cases.ra.kroll.com/oya. Further, the Debtors propose that within **1 business day** of the entry of the Bidding Procedures Order, the Debtors shall serve the initial Cure Notice in accordance with the Bidding Procedures Order.

b. **Participation Requirements**:

   i. To participate in the Bidding Process (as defined below) or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets must deliver or have previously delivered to the Debtors and their advisors the following preliminary documentation (collectively, the "Preliminary Bid Documents"): (1) an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance reasonably acceptable to the Debtors; (2) sufficient information, as reasonably determined by the Debtors and their advisors in their sole discretion, to allow the Debtors to determine that such person or entity (a) has or can reasonably obtain the financial wherewithal to consummate the applicable Sale, and (b) intends to access the Data Room (as defined below) for a purpose consistent with the Bidding Procedures; and (3) a statement detailing whether the person or entity is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

   ii. After provision of the Preliminary Bid Documents, the adequacy of which the Debtors and their advisors shall determine in their sole discretion, such submitting person or entity shall be deemed a "Potential Bidder."

   iii. The Debtors shall promptly inform the Consultation Parties of any entity that becomes a Potential Bidder. For the avoidance of doubt, the DIP

Lender, the Prepetition Lenders, the Stalking Horse Bidder, and any of their respective designees shall each be a Potential Bidder.

c. **Determination by the Debtors**:

    i.    As appropriate throughout the Bidding Process, the Debtors will consult with: (1) any statutory committee appointed in the Chapter 11 Cases, if any (each, a "<u>Committee</u>") and such Committee's counsel; (2) the Prepetition GDEV Agent; (3) the Prepetition CarVal Agent; and (4) any other party the Debtors deem appropriate (collectively, the "<u>Consultation Parties</u>" and each, a "<u>Consultation Party</u>"); *provided that*, notwithstanding anything to the contrary in the Bidding Procedures, the Debtors shall not consult with a Consultation Party (or its advisors) that is actively participating as a Potential Bidder for the Assets, including, for the avoidance of doubt, by pursuing a Credit Bid (as defined below).

    ii.    For the avoidance of doubt, if one of the Consultation Parties (or its affiliates, as applicable) is actively participating as a Potential Bidder for the Assets (a "<u>Bidding Party</u>"), then the remaining Consultation Parties and their respective counsel shall continue to be Consultation Parties but shall not provide any information they receive as Consultation Parties to a Bidding Party. Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any party that is not a Potential Bidder or a Consultation Party.

d. **Due Diligence**:

    i.    The Debtors have established a confidential electronic data room concerning the Assets (the "<u>Data Room</u>") and will grant each Potential Bidder or Consultation Party, as applicable, access to such Data Room. ***No Potential Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***.

    ii.    Up to and including the Bid Deadline, the Debtors shall afford any Potential Bidder or Consultation Party such due diligence access or additional information as may be reasonably requested by the Potential Bidder or the Consultation Party that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances. The Debtors may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders and/or Consultation Parties, as applicable. In the event that any such due diligence materials are prepared by the Debtors in written form and have not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide access to such materials to: (1) all Potential

Bidders; and (2) all Consultation Parties. Each Potential Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

iii.  Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person or entity who is not a Potential Bidder or a Consultation Party who does not otherwise comply with the participation requirements set forth above.

e.  **Bid Deadline**: A Potential Bidder that desires to make a Bid shall deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) to the following **by no later than Tuesday, December 17, 2024, at 12:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>"): (i) John Shepherd, Chief Restructuring Officer (john.shepherd@ankura.com); (ii) Duston McFaul (dmcfaul@sidley.com), Maegan Quejada (mquejada@sidley.com), and Ian Ferrell (iferrell@sidley.com); and (iii) Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com). The Debtors shall provide to the Consultation Parties copies of each Bid received by the Debtors as soon as reasonably practicable following receipt of such Bid. The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, in consultation with the Consultation Parties, for all or certain Potential Bidders.

f.  **Qualified Bid Requirements**: To participate in the Auction, a Potential Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of all, substantially all, or some of the Assets (each, a "<u>Bid</u>"), and shall meet the following criteria (collectively, the "<u>Qualified Bid Requirements</u>"), in each case, on or prior to the Bid Deadline:

i.  **Bid Description and Representations**: Each Bid (other than, for the avoidance of doubt, the Stalking Horse Bid) must be accompanied by a letter or email:

1.  fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or their advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating a proposed Sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

2.  setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price;

3.  identifying separately the cash and non-cash components of the purchase price;

4.  if such Bid relates to the Assets contemplated to be sold under the Stalking Horse Purchase Agreement, providing for consideration to the Debtors of at least the sum of: (a) the Stalking Horse Bid, (b) the amount of any Stalking Horse Bid Protections, and (c) an incremental overbid of $500,000, which may be adjusted for any Bid relating to Assets not contemplated to be sold under the Stalking Horse Purchase Agreement (such incremental overbid, the "Incremental Overbid"); *provided that* any such Bid must include a cash component sufficient to satisfy the DIP Obligations and any Stalking Horse Bid Protections in full;

5.  specifying whether the Bid is conditioned on purchasing all Assets included in the Bid or whether the Bid should be viewed as separate Bids for one or more sets of Assets;

6.  indicating the allocation of the purchase price among the applicable Assets; *provided that*, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation;

7.  stating with specificity the Assets (including any specific Potentially Assigned Agreements) such Potential Bidder wishes to bid on and the liabilities and obligations (including any applicable cure costs) to be assumed by the Potential Bidder in the Sale;

8.  indicating, as applicable, whether the Potential Bidder intends to operate the Debtors' business as a going-concern or to liquidate the Assets;

9.  providing that the Bid is not subject to any bidding fee, break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of reimbursement, and including an express waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets;

10. containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than **January 31, 2025**, contingent upon receiving the necessary Consent Rights (as defined below), if any;

11. providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

32363065.1

12. providing that such Potential Bidder has procured and provided all necessary information required to procure any necessary approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights (including, without limitation, if applicable, any consent that may be necessary from GPC HP II, LLC for the purchase of equity interests in OYA-GPC 2021 Holdco LLC held by ORY-1 and the release of any credit support provided by or on behalf of the seller Debtor parties or their affiliates) (collectively, the "Consent Rights") required for the sale or purchase of Assets contemplated in the Bid, or, in the alternative, the Potential Bidder will endeavor to procure and provide all necessary information required for such Consent Rights by no later than **January 24, 2025**;

13. containing an acknowledgement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets, has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid;

14. agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until after the Debtors and the Successful Bidder(s) consummate the applicable Sale(s); and

15. providing that the Potential Bidder agrees to serve as a Back-Up Bidder if the Potential Bidder's Qualified Bid (as defined below) is a Back-Up Bid with respect to the relevant Assets through the Closing Date.

ii.   **Qualified Bid Purchase Agreement**: Each Bid must be accompanied by: (1) an executed purchase agreement in form and substance reasonably satisfactory to the Debtors (a "Qualified Bid Purchase Agreement"); and (2) a redline of the executed Qualified Bid Purchase Agreement to reflect any proposed amendments and modifications to the Stalking Horse Purchase Agreement (as defined in the Bidding Procedures Motion) or the form purchase agreement (if provided by the Debtors), as applicable, and the applicable schedules and exhibits.

iii.  **Adequate Assurance Information**: Each Bid must be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), which may include:

1. information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate a proposed Sale;

2.  evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid;

3.  identify any Potentially Assigned Agreements to be assumed or assumed and assigned in connection with the proposed Sale;

4.  provide for the payment of all Cure Amounts (as defined below) related to such Potentially Assigned Agreements by the Potential Bidder;

5.  provide the following documentation: (a) the legal name of the proposed assignee of Unexpired Leases (the "Proposed Assignee") and any guarantors, as applicable; and (b) financial statements for the calendar or fiscal years ended 2022, 2023 and, if available, 2024 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

6.  such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.

7.  By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any Potentially Assigned Agreement being assumed and assigned in connection with the Sale(s) and the Consultation Parties in the event that the Debtors determine such bid to be a Qualified Bid.

iv.  **Good Faith Deposit**: Each Bid must be accompanied by:

1.  a deposit in the form of a certified check or wire transfer, payable to the order of the Debtors, in the amount of the greater of (a) ten percent (10%) of the cash consideration of the Bid or (b) $500,000, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "Good Faith Deposit"); *provided that*, to the extent a Bid is modified at or prior to the Auction in any manner that increases the proposed purchase price contemplated by such Bid, the Debtors reserve the right, after consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals the greater of:

    a.  ten percent (10%) of the increased aggregate purchase price or

b. $500,000 promptly and in no event no later than one (1) business day following the conclusion of the Auction; and

2. the Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties, including by requiring Qualified Bidders to provide a Good Faith Deposit for any non-cash consideration based on such Qualified Bidder's estimate of the value of any such non-cash consideration.

v. **Acknowledgement of Compliance with the Bidding Procedures, the Bidding Order, the Bankruptcy Code, and Non-Bankruptcy Law**: Each Bid must acknowledge its compliance in all respects with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, and any applicable non-bankruptcy law.

vi. **No Collusion**: The Potential Bidder must acknowledge in writing: (1) that it has not engaged in any collusion with respect to any Bid(s) or any Sale(s); (2) that it did not agree with any Potential Bidders to control price; and (3) that it will not engage in any collusion with respect to any Bids, the Auction, or the Sale(s). For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (e-mail shall suffice), in consultation with the Consultation Parties.

vii. **Irrevocable**: Each Bid must state that in the event such Bid is chosen as a Back-Up Bid, it shall remain irrevocable until after the Debtors and the Successful Bidder(s) consummate the applicable Sale(s), or, in the event that the Stalking Horse Bid is selected as a Back-Up Bid, then thirty days after entry of the applicable Sale Order.

viii. **Regulatory Approvals and Covenants**: A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to after **January 24, 2025**, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

ix. **Expected Closing Date**: Each Bid must state the Potential Bidder's expected date of closing of the applicable Sale(s) and be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as a Successful Bid, by no later than **January 31, 2025**.

g. **Right to Credit Bid**:

i. The DIP Lender, the Prepetition GDEV Agent, the Prepetition CarVal Agent, and any other party who has a valid and perfected lien on any Assets of the Debtors' estates (each a "Secured Creditor") and is a Qualified Bidder (as defined below) shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code (a "Credit Bid"); *provided that* a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; *provided further that* a Credit Bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full all claims for which there are valid, perfected, and unavoidable liens on any assets included in such bid that are senior in priority to those of the Secured Creditor seeking to credit bid.

ii. Any Credit Bid made by a Secured Creditor will be evaluated by the Debtors and the Consultation Parties as a cash Bid solely for purposes of evaluating Bids (including evaluating Qualified Bids and Subsequent Bids (as defined below)). Notwithstanding anything to the contrary contained herein or the Bidding Procedures Order, all Secured Creditors: (1) shall not be subject to the Good Faith Deposit requirement (whether for a Credit Bid or otherwise); (2) are hereby deemed Qualified Bidders; and (3) shall have their Bids (including, for the avoidance of doubt, any credit bids) deemed Qualified Bids with respect to the Assets; *provided that* such Credit Bid submitted by a Secured Party for Assets included in the Stalking Horse Bid must provide for cash payment of the Stalking Horse Bid Protections and the DIP Obligations.

iii. The DIP Lender shall be authorized, and have the unqualified right, to credit the outstanding DIP Obligations (as defined in the DIP Order) towards the purchase price to be paid by it (or any of its affiliates) in connection with the purchase of any Assets; *provided* that the amount of DIP Obligations that may be credited towards the purchase price (1) shall not exceed $4,500,000 with respect to the purchase of any Assets that constitute Prepetition Carval Collateral (as defined in the DIP Order) and (2) shall not exceed $1,500,000 with respect to the purchase of any Assets that constitute Prepetition GDEV Collateral (as defined in the DIP Order).

h. **Evaluation of Qualified Bids**:

i. The Debtors, in consultation with the Consultation Parties, will review each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above. A bid received from a Potential Bidder for any portion of the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid," and each Potential

Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder." The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than **Thursday, December 19, 2024, at 6:00 p.m. (prevailing Eastern Time)**. For the avoidance of doubt, the Stalking Horse Bid is deemed a Qualified Bid, and the Stalking Horse Bidder is deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder. The Debtors shall inform the Stalking Horse Bidder of the Qualified Bids received and shall provide copies of the Starting Bid(s) (as defined below) no later than **Thursday, December 19, 2024, at 9:00 p.m. (prevailing Eastern Time)**.

ii. A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent in their reasonable business judgment (in consultation with the Consultation Parties), including, among other things: (1) the amount of the Qualified Bid; (2) the risks and timing associated with consummating the transaction(s) with the Qualified Bidder; (3) any excluded Assets or Potentially Assigned Agreements; (4) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement; (5) the net benefit to the Debtors' estates (including after taking account of the Stalking Horse Bid Protections); (6) the tax consequences of such Qualified Bid; and (7) any other factors that the Debtors, in consultation with the Consultation Parties, reasonably may deem relevant.

iii. The Debtors, in their business judgment, reserve the right to reject any Bid if such Bid, among other things: (1) requires any indemnification of the Potential Bidder in any Qualified Bid Purchase Agreement submitted as part of the Bid; (2) is not received by the Bid Deadline; (3) does not comport with the Qualified Bid Requirements; (4) is subject to any contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets; or (5) does not, in the Debtors' determination (after consultation with the Consultation Parties), include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtors' estates or the Auction.

iv. Any Bid rejected pursuant to the foregoing shall not be deemed to be a Qualified Bid; *provided that* the Debtors may work with the parties to any rejected Bid to cure any such defect(s). In the event that any Bid is so rejected, the Debtors shall cause the Good Faith Deposit of such Potential Bidder (including all accumulated interest thereon) to be refunded to such Potential Bidder as soon as reasonably practicable, but no later than five (5) business days after the Bid Deadline unless a later date is agreed between the Debtors and the applicable Potential Bidder.

v. The Debtors may, in consultation with the Consultation Parties, among other things: (1) extend such Bid Deadline with respect to the subject Assets; (2) postpone the Auction; (3) cancel the Auction; or (4) terminate the proposed Sale(s) for the subject Assets.

i. **Stalking Horse Bid Protections**: Pursuant to the Stalking Horse Purchase Agreement and as detailed further herein, the Debtors are authorized to provide the Stalking Horse Bid Protections. Except for the Stalking Horse Bidder, and as otherwise set forth herein, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, or similar fee or payment.

j. **No Qualified Bids**:

i. If no Qualified Bids other than the Stalking Horse Bid (as defined below) are received for the Assets included in the Stalking Horse Bid by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may cancel the Auction with respect to such Assets. If the Stalking Horse Bid is the only Qualified Bid received by the Bid Deadline, the Debtors may decide, in their reasonable business judgment, after consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid as to the applicable Assets and pursue entry of an order approving a Sale with respect to such Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and/or designation of the Stalking Horse Bid, where applicable, as the Successful Bid with the Court and request the Sale Hearing as set forth herein.

ii. If only one Qualified Bid is received for the Assets not included in the Stalking Horse Bid by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may designate such Qualified Bidder as the Successful Bidder with respect to such Assets and pursue entry of an order approving a Sale with respect to such Assets. The Debtors shall promptly file notice of any such designation and request approval of such Sale at the Sale Hearing.

k. **Auction**:

i. Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets by the Bid Deadline, the Debtors shall conduct the Auction to determine the Successful Bidder(s) in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Assets or portion of the Assets. If the Debtors do not receive a Qualified Bid for any particular Asset by the Bid Deadline, the Debtors will not conduct the Auction with respect to such Asset. If one or more Qualified

Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to the applicable Assets, then the Debtors shall conduct the Auction with respect to such Assets. In addition, the Debtors, in consultation with the Consultation Parties, shall determine which Qualified Bid is the highest or other best Qualified Bid for purposes of constituting the opening bid at the Auction for the relevant Assets (the "Starting Bid(s)"). The determination of which Qualified Bid(s) constitutes the Starting Bid(s) shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates. The Starting Bid(s) will be provided to the Qualified Bidders on or before **Thursday, December 19, 2024, at 9:00 p.m. (prevailing Eastern Time)**.

ii. The Auction, if required, will be conducted on **Friday, December 20, 2024, starting at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time)** at the offices of Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, Texas 77002, or, if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline in accordance with the Bidding Procedures, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Each Qualified Bidder participating in the Auction will be required to confirm, in writing and on the record at the Auction, that (1) it has not engaged in any collusion with respect to the Bidding Process, (2) its Qualified Bid is a good-faith, *bona fide* offer, and (3) that it intends to consummate the applicable Sale(s) if selected as a Successful Bidder. For the avoidance of doubt, the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these Chapter 11 Cases.

iii. Bidding at the Auction for the Assets (or subset thereof) that are subject to Qualified Bids will begin with the Starting Bid(s) and continue, in one or more rounds of bidding, so long as during each round: (1) at least one Qualified Bidder submits a Qualified Bid that improves on such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid"); and (2) the Debtors reasonably determine, in consultation with the Consultation Parties, that such Subsequent Bid is (a) for the first round, a higher or otherwise better offer than the Starting Bid, and (b) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).

32363065.1

iv.    Each Subsequent Bid at the Auction shall provide additional net value to the estates over the Starting Bid or the Leading Bid (as defined below) in an amount equal to or greater than the Incremental Overbid amount. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or otherwise best offer for the subject Assets (the "<u>Leading Bid</u>"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures as set forth below. In any Subsequent Bid by the Stalking Horse Bidder, the amount of the Stalking Horse Bid Protections shall be considered additional consideration being provided in such Bid.

v.    The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bidding Procedures; *provided that* such rules are disclosed to each Qualified Bidder during the Auction. The bidding at the Auction shall be transcribed and the Debtors shall maintain a transcript of all Bids made and announced at the Auction.

vi.    Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, will, for the Assets (or subset thereof) that were subject to the Auction: (1) determine, consistent with the Bidding Procedures, which bid(s) constitutes Successful Bid(s); and (2) notify all Qualified Bidders at the Auction of the subject Assets, prior to its conclusion, of the name(s) of the Successful Bidder(s) with respect to the subject Assets, and the amount and other material terms of the Successful Bid(s).

vii.    The Debtors may, in consultation with the Consultation Parties, designate the Back-Up Bid(s) and the Back-Up Bidder(s) with respect to the subject Assets in the event that the Successful Bidder(s) does not close the Sale(s). Unless the Court orders otherwise upon application by the Debtors, the Debtors shall not consider any Bids or Subsequent Bids submitted after the conclusion of the Auction, and any and all such Subsequent Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

viii.    **<u>One business day</u>** following the conclusion of the Auction, the Debtors shall file a notice on the Court's docket identifying (with specificity) the Successful Bidder(s) for the Assets (or subset thereof) and any applicable Back-Up Bidder(s) (the "<u>Notice of Successful Bidder(s)</u>").

      ix.    All bidders at the Auction will be deemed to have consented to the core jurisdiction and constitutional authority of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale(s), and all agreements entered into in connection with any proposed Sale(s).

l.   **Sale Hearing**:

      i.    Each Successful Bid and Back-Up Bid (or if no Qualified Bid other than that of one Qualified Bidder is received with respect to the Assets (or subset thereof), then the Qualified Bid of such Qualified Bidder) shall be subject to approval by the Court. The Debtors propose that a hearing to approve a Successful Bid and Back-Up Bid (or if no Qualified Bid other than that of one Qualified Bidder is received with respect to the Assets (or subset thereof), then the Qualified Bid of such Qualified Bidder) shall take place on (1) **Monday, December 30, 2024, at a time TBD (subject to Court availability)** in the event the Auction is cancelled, (2) on **Monday, January 13, 2025, at a time TBD (subject to Court availability)** in the event the Auction is held, or (3) as soon as thereafter as counsel and interested parties may be heard (as applicable, the "Sale Hearing").

     ii.    The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of these Chapter 11 Cases.

    iii.    For the avoidance of doubt, the Debtors' presentation to the Court for approval of a selected Qualified Bid as a Successful Bid (or a Back-Up Bid) does not constitute the Debtors' acceptance of such Bid. The Debtors will have accepted a Successful Bid only when such Successful Bid has been approved by the Court at the Sale Hearing.

m.  **Return of the Good Faith Deposit**: The Good Faith Deposits of all Qualified Bidders shall be held in escrow, but shall not become property of the Debtors' estates absent further order of the Court. The Debtors shall retain any Good Faith Deposit submitted by each Successful Bidder. At the closing of a Sale contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposit of any Back-Up Bidder shall be retained until three (3) business days after the date of consummation of the applicable Sale (the "Closing Date"). The Good Faith Deposits of any other Qualified Bidders will be returned as soon as reasonably practicable, but no later than seven (7) business days following the Auction. If a Successful Bidder (or, if a Sale is to be closed with a Back-Up Bidder, then such Back-Up Bidder) fails to consummate the applicable Sale(s)

because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the applicable Qualified Bid Purchase Agreement (as such agreement may be amended or modified at the Auction) or any other form of purchase agreement reasonably satisfactory to the Debtors, the Debtors and their estates shall be entitled to retain the Good Faith Deposit of such Successful Bidder (or, if a Sale is to be closed with a Back-Up Bidder, then such Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

n. **Reservation of Rights and Modifications**:

    i.    Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, reserves the right to modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Qualified Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Sale Hearing; *provided that* the Debtors may not amend the Bidding Procedures or the Bidding Process to reduce or otherwise modify its obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court; *provided further that* notwithstanding anything to the contrary herein, any such modification (including, for the avoidance of doubt, extension of the Bid Deadline, postponement of the Auction, cancellation of the Auction, or termination of the proposed Sale) shall not override any milestones set forth in any order approving the DIP Motion (the "<u>DIP Order</u>") or the DIP Loan Documents.

    ii.    The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bidding Procedures; *provided, however,* that the Debtors shall not be required to consult with any Consultation Party (or its advisors) regarding any particular issue, selection, or determination if the Debtors determine in good faith on advice of counsel that such consultation would be inconsistent with the exercise of their fiduciary duties.

    iii.    Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith.

    iv.    Further, for the avoidance of doubt, any rights that the Consultation Parties may have pursuant to the terms of other agreements, any orders of the Court, or the Bankruptcy Code are hereby reserved and shall not in any way be affected by these Bidding Procedures. All rights of the Consultation Parties with respect to the proposed Sale are fully reserved.

## II.    The Stalking Horse Purchase Agreement and the Bid Protections

22.    Following arm's-length and good-faith negotiations, the Debtors and the Stalking Horse Bidder have agreed upon the Stalking Horse Purchase Agreement, including the Stalking Horse Bid Protections (as defined herein), whereby the Stalking Horse Bidder will purchase certain of the Assets. A true and correct copy of the Stalking Horse Purchase Agreement is attached hereto as **Exhibit B**. The Debtors submit that the Stalking Horse Purchase Agreement promotes competitive bidding and maximizes value by establishing a baseline bid for the Assets, which is subject to higher or otherwise better offers at the Auction.

23.    The material terms of the Stalking Horse Purchase Agreement are summarized in the following table:[4]

| Summary of the Stalking Horse Purchase Agreement[5] | |
|---|---|
| **Parties**<br><br>*See* **Preamble** | Sellers: (a) OYA Renewables Construction Holdings 2 LLC; (b) OYA Renewables Construction Holdings 3 LLC; and (c) OYA Renewables EquipmentCo LLC<br><br>Buyer: Radial Power LLC |
| **Consideration**<br><br>*See* § 2.8(a) | The consideration for the sale and transfer of the Transferred Assets from the Sellers to the Buyer shall be as follows:<br><br>a.    a cash amount equal to $30,000,000, *plus* the Closing Cash Amount, if any, *less* the amount of Indebtedness incurred and outstanding under the DIP Credit Agreement immediately prior to Closing (the "Purchase Price");<br><br>b.    if payable in accordance with Section 2.8(b) of the Stalking Horse Purchase Agreement, the Contingent Payments; and<br><br>c.    in addition to the Purchase Price, the Contingent Payment, the direct assumption of the Assumed Liabilities, including the payment of all Cure Costs and the indirect assumption of the Liabilities held by the Transferred Subsidiaries. |
| **Transferred Assets**<br><br>*See* § 2.1 | The "Transferred Assets" mean all of the properties, rights, interests and other assets of the Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, relating to the Business, including all right, title and interest of the Sellers in, to or under certain properties, rights, interests, and other assets, including, |

---

[4] Any summary of the Stalking Horse Purchase Agreement contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse Purchase Agreement attached hereto as **Exhibit B**. to the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Stalking Horse Purchase Agreement, the terms and conditions of the Stalking Horse Purchase Agreement shall control in all respects. Further, solely with respect to usage in this table (and not elsewhere in this Motion), capitalized terms used but not defined in this table shall have the meanings ascribed to such terms in the Stalking Horse Purchase Agreement.

[5] Section references included in this table relate to those sections in the Stalking Horse Purchase Agreement unless otherwise indicated.

| | |
|---|---|
| | among other things, certain Transferred Contracts, Seller Leased Real Property, Equipment, Inventory, Business Permits, certain cash and cash equivalents, certain Tax assets, Tax Returns, Avoidance Actions, Accounts Receivables, Transferred Equity, certain agreement rights, certain claims, goodwill, telephone and facsimile numbers and e-mail accounts, Intellectual Property, and Books and Records. A full description of the Transferred Assets is included in the Stalking Horse Purchase Agreement. |
| **Excluded Assets**<br><br>*See* § 2.2 | The "Excluded Assets" include the Sellers' right, title, and interest to, in, and under certain assets, including, among other things, certain papers prepared in connection with the Stalking Horse Purchase Agreement or related transactions, insurance policies, claims and causes of action relating to the Excluded Assets and any Excluded Liability, certain shares of capital stock or other Equity Interests, the Excluded Contracts, retainers or other prepaid amounts to professionals, the Sellers' rights under the Stalking Horse Purchase Agreement, certain cash, certain Tax Returns, certain Tax assets, and other specified assets. A full description of the Excluded Assets is included in the Stalking Horse Purchase Agreement. |
| **Assumed Liabilities**<br><br>*See* § 2.3 | The "Assumed Liabilities" consist of, among other things: (a) all Liabilities of the Sellers under the Transferred Contracts to the extent arising from and after the Closing; (b) all Liabilities arising from the ownership or operation of the Transferred Assets after the Closing and relating solely to events first occurring after the Closing Date; (c) the Cure Costs; (d) Inter-Company Payables; and (e) certain Liabilities arising from Taxes.<br><br>The transactions contemplated by the Stalking Horse Purchase Agreement shall in no way expand the rights or remedies of any third party against the Buyer or the Sellers as compared to the rights and remedies that such third party would have had against the Sellers or the Buyer absent the Bankruptcy Case or the Buyer's assumption of such Assumed Liabilities. Notwithstanding the foregoing and for the avoidance of doubt, Assumed Liabilities shall not include (i) any Excluded Liability or (ii) any Liability relating to or arising out of any violation of Law by, or any Action against, any Seller or any breach, default or violation by any Seller or any of its Affiliates of or under any Transferred Contracts, all of which shall constitute Excluded Liabilities. Other than the Assumed Liabilities, the Buyer is not assuming and shall not be liable for any Liabilities of the Sellers. |
| **Excluded Liabilities**<br><br>*See* § 2.4 | The "Excluded Liabilities" include, among other things: (a) Liabilities for Seller Taxes, (b) Liabilities under the Excluded Contracts; (c) Liabilities for failure to comply with applicable bulk sale or bulk transfer or similar Laws; (d) indebtedness of the Sellers; (e) Liabilities to distribute to any of the Seller's shareholders; (f) Liabilities arising under any Environmental Law or with respect to Hazardous Materials arising from the Sellers' ownership or operation of the Business or the Transferred Assets prior to the Closing Date; (g) Liabilities relating to the administration of the Chapter 11 Cases, negotiation of the Stalking Horse Purchase Agreement, and/or third-party claims against the Sellers; (h) Liabilities under the Stalking Horse Purchase Agreement; or (i) Liabilities relating to the Excluded Assets. |
| **Sale Free and Clear**<br><br>*See* §§ 2.1, 6.13 | Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, subject to approval by the Court and upon the terms and subject to the conditions of the Stalking Horse Purchase Agreement, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver to the Buyer all of the Sellers' right, title and interest in, to and under the Transferred Assets, and the Buyer shall purchase, acquire and accept the Transferred Assets free and clear of all Encumbrances (other than Permitted Encumbrances). |
| **Transfer Taxes**<br><br>*See* § 7.1 | Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services, value-added or other similar Taxes payable as a result of or with respect to the sale or transfer of the Transferred Equity or the Transferred Assets and the assumption of the Assumed Liabilities pursuant to the Stalking Horse Purchase Agreement ("Transfer Taxes") shall be borne and paid one-half by the Sellers and one-half by the Buyer. The Sellers and the Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes. Each Party shall prepare |

| | and file all necessary Tax Returns or other documents required to be filed by it with respect to such Transfer Taxes. |
|---|---|
| **Representations and Warranties of Sellers**<br><br>*See* **Art. III** | The Stalking Horse Purchase Agreement contains customary representations and warranties, including, but not limited to, representations of Sellers regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts and consents; (d) contracts; (e) litigation; (f) permits and compliance with laws; (g) intellectual property; and (h) title to property. |
| **Representations and Warranties of Buyer**<br><br>*See* **Art. IV** | The Stalking Horse Purchase Agreement contains customary representations and warranties including, but not limited to, representations of the Buyer regarding: (a) organization and qualification; (b) authorization of agreement; (c) conflicts and consents; and (d) financial ability. |
| **Employee Matters**<br><br>*See* § 3.10 | None of the Sellers or Transferred Subsidiaries currently have, or have ever had, any employees or any Benefit Plan or any Liability with respect to any employee or Benefit Plan. No Transferred Subsidiary is an employer or co-employer of any individuals who provide services to any Transferred Subsidiary (each such individual, a "<u>Service Provider</u>"). The consummation of the transactions contemplated by the Stalking Horse Purchase Agreement will not result in any Transferred Subsidiary or Buyer incurring any Liability with respect to any Benefit Plan or directly or indirectly to any Service Provider. |
| **Stalking Horse Bid Protections**<br><br>*See* § 5.1 | In the event that, under certain circumstances set forth in the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement is terminated, the Buyer is entitled to a Break-Up Fee of $930,000. In addition, under certain circumstances set forth in the Stalking Horse Purchase Agreement, the Buyer is entitled to an Expense Reimbursement Amount not to exceed $500,000. Further, in the event the Break-Up Fee and Expense Reimbursement Amount are not paid as set forth in the Stalking Horse Purchase Agreement, the Buyer is entitled to the Collection Costs incurred to collect such unpaid portion of the Break-Up Fee and Expense Reimbursement Amount. |
| **Covenants Regarding Information**<br><br>*See* § 6.2 | From the date of the Stalking Horse Purchase Agreement's execution until the Closing Date or earlier valid termination of the Stalking Horse Purchase Agreement in accordance with its terms, upon reasonable request, the Sellers shall afford the Buyer and its Affiliates and each of their respective Representatives (at the Buyer's cost) reasonable access to make investigation of the properties, offices, plants and other facilities, Books and Records (including Tax Books and Records) of the Sellers (solely to the extent related to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Assumed Liabilities) and the Transferred Subsidiaries, and shall furnish the Buyer with such financial, operating and other data and information, and access to all the officers, accountants and other Representatives of the Sellers (solely to the extent related to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Assumed Liabilities) and the Transferred Subsidiaries as the Buyer may reasonably request and to make extracts and copies of such Books and Records. Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement, the Sellers shall not be required to disclose any information to the Buyer or its Representatives or provide such access (i) if such disclosure would cause the forfeiture of any attorney-client or other legal privilege or contravene any applicable Laws, and any such information shall not be included as Books and Records or a Transferred Asset, (ii) if such disclosure would disclose information regarding other bidders or bids in the Auction or any pre-Bankruptcy Case sales process (except to the extent provided under the Sale Procedures Order); (iii) such access or related activities would cause a violation of any Contract to which any Seller is a party, (iv) such disclosure would violate any applicable Laws related to privacy or data privacy, or (v) legal counsel for the Sellers reasonably concludes such disclosure would reasonably be expected to violate applicable antitrust or competition Laws or a protective order or would cause significant competitive harm to the Sellers or the Transferred Subsidiaries if the transactions contemplated by the Stalking Horse Purchase Agreement are not consummated; <u>provided</u> that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the |

|  | good faith belief of the Sellers after consultation with outside counsel) reasonably be likely to cause such violation to occur or such privilege to be undermined with respect to such information; <u>provided</u> <u>further</u> that, (A) the Sellers shall have the right to have one or more of its Representatives present at all times during any visits, examinations, discussions or contacts contemplated hereby, (B) such access to the properties, offices, plants and other facilities shall not materially interfere with the ongoing use and operation of such properties, offices, plants and other facilities of the Sellers or the Transferred Subsidiaries, and (C) the Buyer shall not, without the prior written consent of the Sellers, to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media, including of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing. |
|---|---|

24.     As set forth above, the Stalking Horse Purchase Agreement contains certain key provisions, each of which were specifically negotiated by the Stalking Horse Bidder and which are a condition required by the Stalking Horse Bidder for the deal encapsulated in the Stalking Horse Purchase Agreement. The Stalking Horse Purchase Agreement contains: (a) a break-up fee in an amount equal to $930,000 (the "Break-Up Fee"), payable as set forth in the Stalking Horse Purchase Agreement; (b) reimbursement for reasonable and documented out-of-pocket costs, fees, and expenses incurred by the Stalking Horse Bidder and its affiliates (including fees and expenses of legal, accounting, financial, and other advisors) in an amount not to exceed $500,000 (the "Expense Reimbursement Amount" and, with the Break-Up Fee, the "Termination Payment"), payable as set forth in the Stalking Horse Purchase Agreement; and (c) in the event the Termination Payment is not paid as set forth in the Stalking Horse Purchase Agreement or the Bidding Procedures Order, reimbursement for all reasonable, documented, out-of-pocket fees, costs, and expenses incurred by the Stalking Horse Bidder or its affiliates to collect such unpaid portion of the Termination Payment, together with interest on such amount as set forth in the Stalking Horse Purchase Agreement (the "Collection Costs" and, with the Termination Payment, the "Stalking Horse Bid Protections"). Based on the marketing process and the arm's-length negotiations between the Debtors and the Stalking Horse Bidder, the Debtors determined that the key provisions set forth above, including the Stalking Horse Bid Protections, were necessary to

secure the Stalking Horse Bidder's commitment to the consummation of the Sale according to the terms of the Stalking Horse Purchase Agreement. Further, the payment of the Stalking Horse Bid Protections will not diminish the Debtors' estates as any competing bid must exceed the bid set forth in the Stalking Horse Purchase Agreement by an amount that exceeds the sum of the Stalking Horse Bid Protections, increasing the ultimate value of the Sale(s) to the benefit of the Debtors' key stakeholders and parties in interest.

25.     The Debtors submit that the terms set forth above and in the Stalking Horse Purchase Agreement are the result of extensive, good-faith, arm's-length negotiations, and the Stalking Horse Purchase Agreement is currently the highest and best proposal. Accordingly, the Debtors' proposed entry into the Stalking Horse Purchase Agreement is in the best interest of the Debtors' estates, constitutes a sound exercise of the Debtors' business judgment, and should be approved.

### III.    The Sale(s) and Auction Dates and Deadlines Schedule

26.     The Debtors are seeking approval of the Bidding Procedures and the following proposed timeline for the sale process (the dates set forth below, respectively, the "Sale Schedule") to establish a clear and open process for the solicitation, receipt, and evaluation of third-party Bids on a timeline that allows the Debtors to consummate a Sale. Moreover, the Debtors, in their sound business judgment, reserve the right, in consultation with the Consultation Parties, to alter the timing of the Sale Schedule as necessary under the circumstances, or to conduct multiple Sales across one or more Auctions in order to maximize the value of the Debtors' estates, in each case in accordance with the Bidding Procedures; *provided that*, for the avoidance of doubt, that any such alteration will not alter any DIP Milestones set forth in any DIP Order. The Debtors respectfully request that the Court approve the Sale Schedule as set forth herein.

| Dates | All Scenarios – Deadline/Event |
|---|---|

32363065.1

| Tuesday, December 3, 2024 at a time TBD (subject to Court availability) | Bidding Procedures Hearing |
|---|---|
| 1 business day after entry of the Bidding Procedures Order | Deadline for Debtors to file the initial Cure Notice and the initial Cure Schedule |
| 14 calendar days after service of the Cure Notice (or the Supplemental Cure Notice) at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the Debtors' proposed assumption and assignment of the Potentially Assigned Agreements and related Cure Costs |
| Tuesday, December 17, 2024 at 12:00 p.m. (prevailing Eastern Time) | Bid Deadline |

| Dates | No Auction Scenario – Deadline/Event |
|---|---|
| Thursday, December 19, 2024 | Deadline to file a notice canceling the Auction and a proposed order approving the Sale to the Stalking Horse Bidder |
| Tuesday, December 24, 2024 at 4:00 p.m. (prevailing Eastern Time) | Deadline to file objections to the proposed order approving the Sale to the Stalking Horse Bidder or the ability of the Stalking Horse Bidder to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance |
| Monday, December 30, 2024 at a time TBD (subject to Court availability) | Sale Hearing |

| Dates | Auction Scenario – Deadline/Event |
|---|---|
| Thursday, December 19, 2024 at 6:00 p.m. (prevailing Eastern Time) | Deadline to notify Potential Bidders of whether their Bids are Qualified Bids |
| Friday, December 20, 2024 at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time) | Auction |
| 1 business day after conclusion of the Auction | Deadline to file the Notice of Successful Bidder(s) |
| 2 business day after conclusion of the Auction | Deadline to file the proposed order(s) approving the Sale(s) |
| Monday, January 6, 2025 at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the (a) conduct of the Auction, (b) proposed Sale(s) to the Successful Bidder(s), and/or (c) the ability of the Successful Bidder(s) to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance |
| Monday, January 13, 2025 at a time TBD (subject to Court availability) | Sale Hearing |

27.     The timeline contemplated in the foregoing Sale Schedule, which builds on the months'-long prepetition marketing process, will allow Potential Bidders (as defined in the Bidding Procedures) sufficient time to evaluate the Assets and formulate bids, and it is essential to maximize value for the Debtors' estates. The Debtors will continue to actively market the Assets

(including, for the avoidance of doubt, Assets that are not contemplated to be purchased under the Stalking Horse Purchase Agreement) postpetition, including by contacting additional potential purchasers that may be interested in purchasing all or certain business segments or Assets instead of a going-concern sale. Moreover, relevant information regarding the Debtors' business has been made available on a non-confidential basis prepetition and (subject to the execution of a confidentiality agreement) in the Data Room (as defined in the Bidding Procedures), allowing Potential Bidders immediately to conduct due diligence on the Assets.

28.     The Debtors believe that the relief sought by this Motion appropriately balances the need to provide all parties in interest with notice and due process, affords the Debtors sufficient time to generate interest in any or all of the Assets, and provides the Debtors with an expeditious process commensurate with the Debtors' liquidity constraints. In short, the relief sought by this Motion is the Debtors' best chance to preserve and maximize value to stakeholders. Accordingly, the Debtors believe the relief requested herein is in the best interests of the Debtors' estates, will provide interested parties with sufficient opportunity to participate in the process, and should be approved.

**IV.    Notice Procedures**

29.     The Debtors also request approval of the Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2.

30.     As soon as practicable after the entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by email, if available, or otherwise by first-class mail upon the following; *provided*, *however*, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; *provided*, *further* that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to

32363065.1

the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtors; (c) CVI CEF Master Fund I LP, as administrative agent and collateral agent; (d) counsel to the Prepetition CarVal Agent; (e) GDEV OYA Lender I, LLC, in its capacity as administrative agent and collateral agent; (f) counsel to the Prepetition GDEV Agent; (g) counsel to the DIP Lender and the Stalking Horse Bidder; (h) co-counsel to the DIP Lender and the Stalking Horse Bidder; (i) CNB, in its capacity as administrative agent and collateral agent; (j) counsel to CNB; (k) counsel to GREC; (l) the United States Attorney's Office for the District of Delaware; (m) the Internal Revenue Service; (n) all parties who are known by the Debtors to assert liens against the Assets; (o) all non-Debtor parties to the Potentially Assigned Agreements; (p) any party known or reasonably believed to have expressed an interest in acquiring some, all, or substantially all of the Assets; (q) all known and reasonably identifiable creditors of the Debtors; and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

31.    In addition, as soon as practicable after entry of the Bidding Procedures Order, but no later than three (3) business days after entry of the proposed Bidding Procedures Order, the Debtors will post the Sale Notice on their restructuring website, https://cases.ra.kroll.com/oya and publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition) or another publication with similar national circulation to provide notice to any potentially interested parties.

32.     The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale(s), including the date, time, and place of the Auction (if any), the Bidding Procedures, and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Auction be required.

## V.     Assumption and Assignment Procedures

33.     To facilitate the Sale, the Debtors seek authority to assume and assign the Potentially Assigned Agreements to any Successful Bidder(s) in accordance with the Assumption and Assignment Procedures provided herein and the form and manner the Cure Notice.

34.     By no later than **1 business day** after the entry of the Bidding Procedures Order, the Debtors will file the Cure Notice, which shall include a schedule of cure obligations (the "Cure Schedule") for the Potentially Assigned Agreements. The Cure Schedule will include a description of each Potentially Assigned Agreement potentially to be assumed and assigned by a potential buyer and the amount, if any, necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). A copy of the Cure Notice, including the Cure Schedule, will be served on each of the non-Debtor parties listed on the Cure Schedule by email, where available, or otherwise by first-class mail on the date that the Cure Notice is filed with the Court.

35.     The Debtors propose that to the extent the Debtors, at any time after the filing of the Cure Notice (a) identify additional Potentially Assigned Agreements that may be assumed and assigned to the Successful Bidder(s), (b) remove any Potentially Assigned Agreement from the Cure Notice, and/or (c) modify the previously stated Cure Costs associated with any Potentially Assigned Agreement, the Debtors shall promptly file with this Court and serve such Cure Notice (the "Supplemental Cure Notice") on each of the affected non-Debtor parties therein by email, where available, or otherwise by first-class mail on the date the Supplemental Cure Notice is filed

32363065.1

with this Court. Each Supplemental Cure Notice will include the same information with respect to listed Potentially Assigned Agreements as was included in the Cure Notice.

36.     The Debtors propose that any objections to the assumption and assignment of any Potentially Assigned Agreement identified on the Cure Schedule, including, but not limited to, the Cure Costs set forth on such Cure Schedule, must be filed with Court no later than 4:00 p.m. (prevailing Eastern Time) on the date that is **14 calendar days** from the date of service of the Cure Notice, and be served on the following parties (collectively, the "Cure Notice Parties"):

a.  proposed co-counsel to the Debtors, Sidley Austin LLP, 1000 Louisiana Street, Suite 900, Houston, Texas 77002 (Attn: Duston McFaul (dmcfaul@sidley.com) and Maegan Quejada (mquejada@sidley.com)), and Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603 (Attn: Ian Ferrell (iferrell@sidley.com));

b.  proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801 (Attn: Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com));

c.  counsel to the DIP Lender and the Stalking Horse Bidder, White & Case LLP, 609 Main Street, Houston, Texas 77002 (Attn: Charles Koster (ckoster@whitecase.com) and Amanda Parra Criste (aparracriste@whitecase.com));

d.  counsel to the Prepetition GDEV Agent, Locke Lord LLP, 111 South Wacker Drive, Suite 4100, Chicago, Illinois 60606 (Attn: Aaron C. Smith (asmith@lockelord.com)), and Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 (Attn: Christopher A. Ward (cward@polsinelli.com));

e.  counsel to the Prepetition CarVal Agent, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Brian Greene (brian.greene@kirkland.com), Elizabeth H. Jones (elizabeth.jones@kirkland.com), and Christopher Marcus (christopher.marcus@kirkland.com));

f.  the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: John Schanne (john.schanne@usdoj.gov)); and

g.  counsel to any statutory committee that has been appointed in these Chapter 11 Cases.

37.     Any such objections shall: (a) be in writing; (b) state with specificity the nature of the objection, and, if the objection pertains to the proposed Cure Amount, state the amount alleged to be to owed, together with any applicable and appropriate documentation in support thereof; (c) be filed with the Clerk of the Court; and (d) be served upon the Cure Notice Parties.

38.     If no objection is timely and properly received with respect to a Potentially Assigned Agreement, then any non-Debtor counterparty to the Potentially Assigned Agreement shall be: (a) forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to the Potentially Assigned Agreement, and the Debtors and Successful Bidder(s) shall be entitled to rely solely upon the Cure Costs set forth in the Cure Schedule; (b) deemed to have consented to the assumption and assignment of such Potentially Assigned Agreement; and (c) forever barred, estopped, and permanently enjoined from asserting or claiming against the Debtors, the Successful Bidder(s), or their respective property that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Potentially Assigned Agreement, or that there is any objection or defense to the assumption and assignment of such Potentially Assigned Agreement. In addition, the Cure Costs set forth in the Cure Schedule shall be binding upon the non-Debtor parties to the Potentially Assigned Agreement for all purposes in the Chapter 11 Cases and will constitute a final determination of the Cure Costs required to be paid by the Debtors in connection with the assumption and assignment of the Potentially Assigned Agreement.

39.     Where a non-Debtor counterparty to a Potentially Assigned Agreement timely and properly files an objection asserting a cure amount higher or different than the proposed Cure Costs (the "Disputed Cure Amount"), then: (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount, the cure amount (the "Cure Amount") shall be as agreed

between the parties; or (b) to the extent the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court. All other objections to the proposed assumption and assignment of the Potentially Assigned Agreements will be heard at the Sale Hearing, unless adjourned by agreement of the parties.

## VI.    The Proposed Sale Order(s)

40.    The Debtors anticipate that the Sale Order(s) will contain certain provisions that require disclosure under Local Rule 6004-1. At this time, the Debtors make the following statements:

a.  Local Rule 6004-1(b)(iv)(A): To the extent a proposed purchaser is an insider (within the meaning of section 101(31) of the Bankruptcy Code), the Debtors will make the necessary disclosures to the Court and take measures to ensure the fairness of the sale process and the proposed transaction.

b.  Local Rule 6004-1(b)(iv)(B): The Debtors do not presently have any agreement between any interested bidder and the Debtors' management or key employees. If any agreements are reached, the Debtors will make the necessary disclosures.

c.  Local Rule 6004-(b)(iv)(C): To the extent that the Sale Order(s) includes a release in favor of any entity, the Debtors will make the necessary disclosures.

d.  Local Rule 6004-1(b)(iv)(D): The Debtors intend on holding the Auction with respect to the Assets unless the only Qualified Bid for the Assets included in the Stalking Horse Bid received is that of the Stalking Horse Bidder and there is no more than one Qualified Bid for Assets not included in the Stalking Horse Bid.

e.  Local Rule 6004-1(b)(iv)(E): The contemplated closing date for the Sale(s) is no later than **January 31, 2025**.

f.  Local Rule 6004-1(b)(iv)(F): The Debtors are requiring Qualified Bids to include the Good Faith Deposit; *provided that*, to the extent a Bid is modified at or prior to the Auction in any manner that increases the proposed purchase price contemplated by such Bid, the Debtors reserve the right, after consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals the greater of ten percent (10%) of the increased aggregate purchase price or $500,000 promptly and in no event no later than one (1) business day

following the conclusion of the Auction. Further, the Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties, including by requiring Qualified Bidders to provide a Good Faith Deposit for any non-cash consideration based on such Qualified Bidder's estimate of the value of any such non-cash consideration.

g.  Local Rule 6004-1(b)(iv)(G): The Debtors do not currently have any interim management or other agreement with any party. If any agreements are reached, the Debtors will make the necessary disclosures.

h.  Local Rule 6004-1(b)(iv)(H): Other than with respect to a potential credit bid under section 363(k) of the Bankruptcy Code, the Debtors are not seeking to release or allocate any sale proceeds without further order of the Court.

i.  Local Rule 6004-1(b)(iv)(I): The Debtors are not seeking to have the Sale(s) declared exempt from taxes under section 1146(a) of the Bankruptcy Code pursuant to this Motion.

j.  Local Rule 6004-1(b)(iv)(J): The Debtors will retain necessary books and records, copies thereof, or include as part of the Purchase Agreement(s) appropriate access to such information, to enable the Debtors to administer the Chapter 11 Cases following any Sale.

k.  Local Rule 6004-1(b)(iv)(K): The Debtors may seek to sell avoidance actions.

l.  Local Rule 6004-1(b)(iv)(L): The Debtors are seeking to sell the Assets free and clear of successor liability claims. The Debtors may have unpaid prepetition unsecured claims after the closing of the Sale(s). Likely, no party would be willing to purchase the Debtors' assets if it were at risk of liability for those claims under principles of successor liability.

m.  Local Rule 6004-1(b)(iv)(M): The Debtors are seeking to sell the Assets free and clear of all liens, claims, and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

n.  Local Rule 6004-1(b)(iv)(N): The Stalking Horse Bid contemplates that the sale of certain of the Debtors' Assets will be subject to the Bidding Procedures, which provide for credit bidding pursuant to section 363(k) of the Bankruptcy Code by any secured creditor.

o.  Local Rule 6004-1(b)(iv)(O): The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any Sale(s), as further described below.

## BASIS FOR RELIEF REQUESTED

**I.      Approval of the Sale(s) Is Warranted Under Section 363(b) of the Bankruptcy Code.**

41.      Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Debtors must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

42.      Courts typically consider the following factors in determining whether a proposed sale meets this standard:

      a.   whether a sound business justification exists for the sale;

      b.   whether adequate and reasonable notice of the sale was given to interested parties;

      c.   whether the sale will produce a fair and reasonable price for the property; and

      d.   whether the parties have acted in good faith.

*In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

43.      When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

44.     The Debtors submit that their decision to pursue a Sale on the terms set forth in this Motion represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale(s) should be approved under section 363(b) of the Bankruptcy Code.

45.     The Debtors will continue to conduct an extensive and fulsome process to market the Assets. The open and fair Auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Successful Bidder(s), and establish that the Debtors and the Successful Bidder(s) proceeded in good faith.

46.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances. Bankruptcy Rules 2002(a) and 2002(c) require the Debtors to notify creditors of the Sale(s), the terms and conditions of the Sale(s), the time and place of the Auction, and the deadline for filing any objections. The Debtors assert that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Sale(s), the Auction, and the Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

47.     The Sale(s), conducted in accordance with the Bidding Procedures, will provide the Debtors with the best opportunity to generate maximum value for the Debtors' estates, and represents the best path forward for maximizing recoveries. The Debtors submit that ample

business justification exists for the consummation of the Sale(s), and therefore request that the

Court approve the Bidding Procedures.

## II.     The Sale(s) of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code.

48.     The Debtors request approval to sell the Assets free and clear of any and all liens,

claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell estate property

"free and clear of any interest in such property of an entity other than the estate" if any one of the

following conditions is satisfied:

a.  applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.  such entity consents;

c.  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.  such interest is in bona fide dispute; or

e.  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

49.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus,

satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale

of the Assets free and clear of all Encumbrances, except with respect to any interest that may be

assumed liabilities under the applicable Purchase Agreement(s). *See In re Kellstrom Indus., Inc.*,

282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has

the authority to conduct the sale free and clear of all liens."); *see also Citicorp Homeowners Servs.,*

*Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 354 (E.D. Pa. 1988) (holding that a sale "free and clear"

may be approved provided the requirements of at least on subsection of section 363(f) of the Bankruptcy Code are met).

50.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of the Debtors' assets free and clear of any claims against the Debtors. *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f) of the Bankruptcy Code); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

51.     The Debtors submit that the Sale(s) of the Assets free and clear of the Encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code. The Debtors also assert that the service of the Sale Notice in accordance with the terms set forth in this Motion will afford creditors sufficient notice of the Stalking Horse Bidder, the Stalking Horse Purchase Agreement, and the Sale(s) and therefore provides additional justification for approval of the Sale(s) free and clear of all Encumbrances.

### III.    The Sale(s) Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code.

52.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m).

53.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in good faith. While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made. *See, e.g.*, *In re Abbots Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

54. The Debtors submit that the Stalking Horse Bidder or any Successful Bidder(s) will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Purchase Agreement with the Stalking Horse Bidder is a good-faith, arm's-length agreement entitled to the protections of section 363(m) of the Bankruptcy Code.[6] *First*, as detailed above, the consideration to be received by the Debtors from a Successful Bidder will be substantial, fair, and reasonable. *Second*, any sale agreement with a Successful Bidder will presumably be the culmination of a competitive Auction process in which all parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, at the Sale Hearing, the facts will demonstrate no fraud, collusion between the purchaser and other bidders or

---

[6] The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder(s). Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as a Successful Bidder or a Back-Up Bidder any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

the trustee, or an attempt to take grossly unfair advantage of other bidders or similar conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code. Further, with respect to Potential Bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. *Fourth*, any Bids that the Debtors ultimately determine to a Successful Bid will have been evaluated and approved by the Debtors in consultation with their advisors and the Consultation Parties. Accordingly, the Debtors believe that a Successful Bidder, if any, and any Purchase Agreement associated with a Successful Bid should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

55.    In approving the Sale free and clear of Encumbrances, the Debtors request that the Court find and hold that any Successful Bidder of the Assets purchased in accordance with the Bidding Procedures is entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that the selection of the Successful Bidder(s) will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) of the Bankruptcy Code where notice is provided to lienholders).

IV.    **Entry Into the Stalking Horse Purchase Agreement and the Stalking Horse Bid Protections Have a Sound Business Purpose and Should Be Approved.**

56.    The Debtors seek authority to enter into the Stalking Horse Purchase Agreement and offer customary bid protections, consisting of the Termination Payment and the Collection Costs. The use of a stalking horse bidder in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a

framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum LLC*, No. 11-CV-219, 2011 WL 2671254, at *1 (E.D. Wis. Jul. 7, 2011).

57.     Generally bidding protections, such as break-up fees and expense reimbursement, are a normal and, in many cases, necessary component of significant sales under the Bankruptcy Code. *See Integrated Res.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value.") (emphasis added). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate") (internal quotations omitted) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999).

58.     In the Third Circuit, bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 (citing *O'Brien*, 181 F.3d at 535); *Reliant Energy*, 594 F.3d at 206 (holding that the general standard for all administrative expenses applies to break-up fees). Thus, "the allowability of break-up fees like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (quoting *O'Brien*, 181 F.3d at 535) (internal quotations omitted).

59.     The Debtors believe that the allowance of the Stalking Horse Bid Protections are in the best interests of the Debtors' estates and their creditors. Granting authority to the Debtors to enter into the Stalking Horse Purchase Agreement and provide the Stalking Horse Bid Protections sends a strong signal to the market that the Debtors are serious about running a competitive sale process to generate the best result for the Debtors and their estates. The Stalking Horse Purchase Agreement sets the floor from which other Potential Bidders can submit higher or better offers. As a baseline bid, the Stalking Horse Bid and the Stalking Horse Bid Protections fosters competitive bidding, increasing the likelihood that the purchase price for the Assets will increase, allowing the Debtors to maximize value for the benefit of all stakeholders. *See In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (recognizing that bid protections "encourage a prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the prospective bidder that it will receive compensation for that undertaking if it is unsuccessful"). Without the Stalking Horse Bid Protections, the Stalking Horse Bidder would not be willing to serve as DIP Lender nor Stalking Horse Bidder and have its bid subject to the open and competitive sale process outlined in the Bidding Procedures. *See In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer"). This would be detrimental to the Debtors' estates, as the participation of the Stalking Horse Bidder is necessary to foster a competitive bidding process that will maximize the value of the Debtors' estates. and greatly outweigh the cost of the Stalking Horse Bid Protections.

60.     Accordingly, for the reasons set forth above, the Debtors respectfully request that the Court grant the Debtors the authority to enter into the Stalking Horse Purchase Agreement and

incur and pay the Stalking Horse Bid Protections in order to preserve and maximize the value of the Debtors' estates.

## V.     The Court Should Approve the Bidding Procedures.

61.     The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtors "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm.*, 330 F.3d at 573 (same); *see also* John J. Jerome & Robert D. Drain, *Bankruptcy Court Is Newest Arena for M&A Action*, N.Y.L.J., Jun. 3, 1991 ("When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold."). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the Debtor's assets").

62.     The Debtors and their professional advisors have designed the Bidding Procedures to balance the goals of promoting a competitive and fair bidding process and maximizing value for the Debtors' estates by running an efficient process that results in a sale before the end of the year.

63.     The Bidding Procedures will allow the Debtors to extend and enhance the prepetition marketing process to a broader universe of potential buyers and conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets. *See, e.g.*, *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that bidding procedures "intended

to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"). The Bidding Procedures ensure efficiency and maximize value for the Debtors' estates.

64.     Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors and their independent fiduciaries and professional advisors, in consultation with the Consultation Parties, to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtors' estates and their stakeholders.

65.     The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or best Bids for the Assets. Therefore, the Debtors request that the Court approve the Bidding Procedures

## VI.     The Assumption and Assignment of the Potentially Assigned Agreements Satisfies Section 365 of the Bankruptcy Code.

66.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market*

*Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

67.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

68.    Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party. 11 U.S.C. § 365(f); *see also In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the Debtor's estate."); *In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtors' assets). Section 365(f)(2)(B) of the Bankruptcy Code requires that the non-debtor contract counterparty be given adequate assurance of future performance by an assignee. 11 U.S.C. § 365(f)(2)(B). The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract

that may occur after an assignment. *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001). Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant. *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

69.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from a debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

70.    The assumption and assignment of certain executory contracts and unexpired leases is an appropriate exercise of the Debtors' business judgment. Additionally, the Debtors submit that the notice provisions and the objection deadline for counterparties to raise objections to the assumption and assignment of the Potentially Assigned Agreements as proposed in this Motion are adequate to protect the rights of counterparties to the Debtors' contracts and leases. Furthermore, the Debtors will demonstrate adequate assurance of future performance at the Sale Hearing.

## VII.    Relief Under Bankruptcy Rules 6004(h) and 6004(d) Is Appropriate.

71.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Additionally, Bankruptcy Rule 6006(d)

provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

72.     The Debtors request that the Sale Order(s) be effective immediately upon its (or their) entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

73.     To maximize the value received for the Assets, the Debtors seek to close the Sale(s) as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

74.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtors; (c) CVI CEF Master Fund I LP, as administrative agent and collateral agent; (d) counsel to the Prepetition CarVal Agent; (e) GDEV OYA Lender I, LLC, in its capacity as administrative agent and collateral agent; (f) counsel to the Prepetition GDEV Agent; (g) counsel

32363065.1

to the DIP Lender and the Stalking Horse Bidder; (h) co-counsel to the DIP Lender and the Stalking Horse Bidder; (i) CNB, in its capacity as administrative agent and collateral agent; (j) counsel to CNB; (k) counsel to GREC; (l) the United States Attorney's Office for the District of Delaware; (m) the Internal Revenue Service; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated: November 6, 2024
Wilmington, Delaware

*/s/ Edmon L. Morton*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Rebecca L. Lamb (Del. Bar No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
emorton@ycst.com
kenos@ycst.com
rlamb@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIDLEY AUSTIN LLP**
Duston K. McFaul (*pro hac vice* pending)
Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone:     (713) 495-4500
Facsimile:     (713) 495-7799
Email:          dmcfaul@sidley.com
mquejada@sidley.com

Nathan C. Elner (*pro hac vice* pending)
Chelsea M. McManus (*pro hac vice* pending)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:          nelner@sidley.com
cmcmanus@sidley.com

Ian C. Ferrell (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:     (312) 853-7000
Facsimile:     (312) 853-7036
Email:          iferrell@sidley.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Bidding Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1] | Case No. 24-12574 (___) |
| Debtors. | (Jointly Administered) |
|  | Ref: Docket No. _____ |

**ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF SOME, ALL, OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (D) AUTHORIZING THE DEBTORS TO ENTER INTO THE PURCHASE AGREEMENT(S), (E) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING THE MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF**

Upon the motion ("Motion")[2] of OYA Renewables Development LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"): (a) approving the Bidding Procedures in connection with the Sale of some, all, or substantially all of the Assets and approving the form and manner of notice thereof; (b) authorizing the Debtors to designate the Stalking Horse Bidder and enter into the Stalking Horse Purchase Agreement; (c) scheduling the Auction and the Sale Hearing in conjunction with the Sale; (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtors to enter into and perform under the Purchase Agreement(s); (e) establishing the Assumption and

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Motion.

Assignment Procedures for the Potentially Assigned Agreements and the form and manner of notice thereof; and (f) granting related relief; and this Court having reviewed the Motion and held a hearing to consider the relief requested therein (the "Hearing"); and the Court having considered the arguments of counsel made and the evidence adduced at the Hearing; and upon consideration of the First Day Declaration and the record of the Hearing; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Jurisdiction & Venue**. This Court has jurisdiction to consider the Motion and the relief requested pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) as to which the Court has authority to issue a final order consistent with Article III of the United States Constitution. Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates**. The predicates for the relief granted herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9007, and Local Rule 6004-1.

C.    **Notice**. Notice of the Motion and the Hearing as provided therein shall be deemed good and sufficient notice of such Motion, Hearing, and the relief granted herein under the circumstances, and no other or further notice thereof is required.

D.    **Stalking Horse Bidder**. The Debtors have demonstrated compelling and sound business reasons for this Court to approve (i) Radial Power LLC as the Stalking Horse Bidder for

32363065.1

2

the Assets set forth in the Stalking Horse Bid, (ii) the Debtors' entry into the Stalking Horse

Purchase Agreement, and (iii) the Stalking Horse Bid Protections and the payment of any amounts

owed to the Stalking Horse Bidder on account of such Stalking Horse Bid Protections on the terms

set forth in the Stalking Horse Purchase Agreement. The Stalking Horse Purchase Agreement and

the Staking Horse Bid Protections were negotiated in good faith and at arm's-length by the Debtors

and the Stalking Horse Bidder.

        E.      **<u>Stalking Horse Bid Protections</u>**. The Stalking Horse Bid Protections are material

inducements for, and conditions of, the Stalking Horse Bidder's entry into the Stalking Horse

Purchase Agreement and agreement to remain obligated to consummate the applicable Sale on the

terms set forth therein, or otherwise be bound under the Stalking Horse Purchase Agreement

(including the obligations to maintain its committed offer while such offer is subject to higher or

better offers as contemplated by the Bidding Procedures). The Stalking Horse Bid Protections, to

the extent payable under the Stalking Horse Purchase Agreement: (i) are an actual and necessary

cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy

Code; (ii) are of substantial benefit to the Debtors' estates; (iii) are reasonable and appropriate,

including in light of the size and nature of the proposed Sale contemplated under the Stalking

Horse Purchase Agreement and the efforts that have been and will be expended by the Stalking

Horse Bidder; (iv) have been negotiated by the parties and their respective advisors at arm's-length

and in good faith; and (v) are necessary to ensure that the Stalking Horse Bidder will continue to

pursue its Stalking Horse Purchase Agreement and the proposed Sale contemplated thereby.

**NOW, THEREFORE,** this Court having determined that the relief requested in the Motion is in

the best interests of the Debtors' estates, their creditors, and other parties in interest; and that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.        The relief requested in the Motion is GRANTED as set forth herein. All objections

to the entry of this Order or to the relief provided herein that have not been withdrawn, waived,

resolved, or settled are hereby denied and overruled. All withdrawn objections are deemed

withdrawn with prejudice.

2.        The Bidding Procedures, attached as **Exhibit 1** to this Order, are hereby approved

in their entirety, incorporated by reference as if fully set forth herein, and shall govern all Bids and

Bid proceedings relating to the Assets. The Debtors and Kroll Restructuring Administration LLC,

the Debtors' claims and noticing agent, are authorized to take any and all actions necessary or

appropriate to implement the Bidding Procedures.

3.        The Debtors will file and serve a proposed Sale Order or proposed Sale Orders on

or before:

    a.   in the event the Auction is cancelled, **Thursday, December 19, 2024**; or

    b.   in the event the Auction proceeds, **2 business days after the conclusion of the Auction**.

4.        **Bid Deadline**. **Tuesday, December 17, 2024, at 12:00 p.m. (prevailing Eastern Time)**, unless extended by the Debtors pursuant to the Bidding Procedures, is the deadline by

which all Qualified Bids must be **actually received** by the parties specified in the Bidding

Procedures (the "Bid Deadline").

5.        **Stalking Horse Bidder and Stalking Horse Bid Protections**. Radial Power LLC

(or such affiliate(s) as it may designate in writing) is hereby designated the Stalking Horse Bidder

for the applicable Assets. The Debtors are authorized to enter into the Stalking Horse Purchase

Agreement and comply with any and all obligations set forth in the Stalking Horse Purchase Agreement that are intended to be performed prior to entry of the Sale Order(s).

6.      The Stalking Horse Bid Protections are hereby approved in their entirety and shall be payable by the Debtors in accordance with, and subject to the terms of, the Stalking Horse Purchase Agreement. The Debtors are authorized to pay the Stalking Horse Bid Protections in accordance with, and subject to the terms of, the Stalking Horse Purchase Agreement without further order of the Court.

7.      The Stalking Horse Bid Protections, to the extent payable under the Stalking Horse Purchase Agreement, shall constitute an allowed superpriority administrative expense claim against the Debtors' estates pursuant to sections 105(a), 364(c)(1), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code but junior to the professional fee claims.

8.      The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Bid shall be deemed a Qualified Bid for purposes of the Bidding Procedures, which status cannot be abrogated by subsequent amendment or modification by the Debtors of the Bidding Procedures; *provided that* the Stalking Horse Bid may only be considered a Qualified Bid for a subset of the Assets included in the Stalking Horse Purchase Agreement with the Stalking Horse Bidder's consent.

9.      **The Bidding Procedures, the Auction, and the Sale Hearing**. All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court and waived any right to a jury trial with respect to all matters related to the Auction, the Sale(s), the Bidding Procedures, any written indications of interest, preliminary bid documents, the Bids, the Bid documents, and any and all other agreements entered into in connection with any proposed

Sale, as applicable, and consented to the entry of a final order or judgment in any way related to the Bidding Procedures, the bidding process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the Sale(s) if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent consent of the parties. Any party raising a dispute relating to the Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

10.     The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than **Thursday, December 19, 2024, at 6:00 p.m. (prevailing Eastern Time)**.

11.     If no Qualified Bids other than the Stalking Horse Bid is submitted on or before the Bid Deadline, the Debtors will not hold an Auction with respect to the Assets included in the Stalking Horse Bid and will request that this Court approve the Stalking Horse Purchase Agreement at the accelerated Sale Hearing.

12.     If at least two Qualified Bids are received by the Bid Deadline with regard to any particular Assets (whether those Assets are included in the Stalking Horse Bid or not), the Debtors will conduct the Auction. The Auction will take place on **Friday, December 20, 2024, starting at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time)** at the offices of Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, Texas 77002, or, if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline in accordance with the Bidding Procedures, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. For the avoidance of doubt,

the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these Chapter 11 Cases.

13.    Each Qualified Bidder participating at the Auction will be required to confirm in writing and on the record at the Auction that: (a) it has not engaged in any collusion with respect to the bidding process; (b) its Qualified Bid is a good-faith, *bona fide* offer; and (c) that it intends to consummate the transaction(s) if selected as a Successful Bid.

14.    Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid(s) is the Successful Bid(s) for the applicable Assets or subsets thereof. The Debtors, in consultation with the Consultation Parties, may also determine the Back-Up Bid(s) for the applicable Assets or subsets thereof.

15.    Following the Auction, the Debtors will file the proposed form Purchase Agreement(s) and proposed Sale Order(s) of the Successful Bidder(s) and any Back-Up Bidder(s) with this Court.

16.    All objections to approval of the Sale(s), including, for the avoidance of doubt, the ability of the Stalking Horse Bidder or the Successful Bidder(s), as applicable, to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance, must be in writing, state the basis of such objection with specificity, and be filed with this Court and served on or before, in the event the Auction is not held, **4:00 p.m. (prevailing Eastern Time) on Tuesday, December 24, 2024**, or, in the event the Auction proceeds, **4:00 p.m. (prevailing Eastern Time) on Monday, January 6, 2025** (either such date, as applicable, the "Sale Objection Deadline") on the following parties (collectively, the "Notice Parties"):

a. proposed co-counsel to the Debtors, Sidley Austin LLP, 1000 Louisiana Street, Suite 900, Houston, Texas 77002 (Attn: Duston McFaul (dmcfaul@sidley.com) and Maegan Quejada (mquejada@sidley.com)), and Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603 (Attn: Ian Ferrell (iferrell@sidley.com));

b. proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801 (Attn: Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com));

c. counsel to the DIP Lender and the Stalking Horse Bidder, White & Case LLP, 609 Main Street, Houston, Texas 77002 (Attn: Charles Koster (ckoster@whitecase.com) and Amanda Parra Criste (aparracriste@whitecase.com));

d. counsel to the Prepetition GDEV Agent, Locke Lord LLP, 111 South Wacker Drive, Suite 4100, Chicago, Illinois 60606 (Attn: Aaron C. Smith (asmith@lockelord.com)), and Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 (Attn: Christopher A. Ward (cward@polsinelli.com));

e. counsel to the Prepetition CarVal Agent, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Brian Greene (brian.greene@kirkland.com), Elizabeth H. Jones (elizabeth.jones@kirkland.com), and Christopher Marcus (christopher.marcus@kirkland.com));

f. the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: John Schanne (john.schanne@usdoj.gov));

g. counsel to any statutory committee that has been appointed in these Chapter 11 Cases; and

h. if applicable, any identified Successful Bidder(s).

17. This Court shall convene the Sale Hearing on (a) **Monday, December 30, 2024, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction is cancelled, (b) **Monday, January 13, 2025, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction proceeds, or (c) or as soon as thereafter as counsel and interested parties may be heard.

18. At the Sale Hearing, this Court will consider approval of the Sale(s) to the Successful Bidder(s) or Back-Up Bidder(s) and the entry of the Sale Order(s). At the Sale Hearing, the Debtors will seek the entry of the Sale Order(s) approving and authorizing the Sale(s) to the

Successful Bidder(s) or the Back-Up Bidder(s). Subject to consultation with the Consultation Parties, the Debtors may adjourn the Sale Hearing from time to time without further notice to creditors or other parties in interest other than by announcement of said adjournment at the Sale Hearing or in notice or agenda filed with this Court.

19.    **Assumption and Assignment Procedures**. **Within 1 business day of the entry of this Order**, the Debtors will file a Cure Notice, substantially in the form attached hereto as **Exhibit 3**, which shall include a schedule of cure obligations (the "Cure Schedule") for the Potentially Assigned Agreements, and shall serve such Cure Notice on each of the non-Debtor parties listed therein by email, where available, or otherwise by first-class mail on the date the Cure Notice is filed with this Court. The Cure Schedule will include a description of each Potentially Assigned Agreement potentially to be assumed and assigned by a potential buyer and the amount, if any, necessary to cure or compensate the non-Debtor parties for any defaults under such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs").

20.    To the extent the Debtors, at any time after the filing of the Cure Notice: (a) identify additional Potentially Assigned Agreements that may be assumed and assigned to the Successful Bidder(s); (b) remove any Potentially Assigned Agreement from the Cure Notice; and/or (c) modify the previously stated Cure Costs associated with any Potentially Assigned Agreement, the Debtors shall promptly file with this Court and serve such Cure Notice (the "Supplemental Cure Notice") on each of the affected non-Debtor parties therein by email, where available, or otherwise by first-class mail on the date the Supplemental Cure Notice is filed with this Court. Each Supplemental Cure Notice will include the same information with respect to listed Potentially Assigned Agreements as was included in the Cure Notice.

21.     Objections to the Cure Costs set forth in the Cure Schedule or the assumption and assignment of any Potentially Assigned Agreement (excluding, for the avoidance of doubt, the ability of the Stalking Horse Bidder or the Successful Bidder(s), as applicable, to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance), identified in the Cure Schedule must: (a) be in writing; (b) state with specificity the nature of the objection, and, if the objection pertains to the proposed Cure Amount, state the amount alleged to be to owed, together with any applicable and appropriate documentation in support thereof; (c) be filed with the Clerk of the Court; and (d) be served on the Cure Notice Parties by no later than **4:00 p.m. (prevailing Eastern Time) on the date that is 14 calendar days after the service of the Cure Notice (or the applicable Supplemental Cure Notice)**.

22.     Unless a non-Debtor party to a Potentially Assigned Agreement has timely and properly filed and served an objection to the assumption and assignment of its Potentially Assigned Agreement, such non-Debtor counterparty shall: (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Potentially Assigned Agreement, and the Debtors and the Successful Bidder(s) shall be entitled to rely solely upon the Cure Amount; (b) be deemed to have consented to any assumption and assignment of such Potentially Assigned Agreement; and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder(s) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Potentially Assigned Agreement, or that there is any objection or defense to the assumption and assignment of such Potentially Assigned Agreement. In addition, the Cure Amounts set forth in the Cure Schedule shall be binding upon the non-Debtor parties to the Potentially Assigned Agreements for all purposes in these Chapter 11 Cases and will constitute a final determination of the Cure

Amounts required to be paid by the Debtors in connection with any assumption and assignment of the Potentially Assigned Agreements.

23.      Where a non-Debtor counterparty to a Potentially Assigned Agreement timely and properly files an objection asserting a cure amount higher or different than the proposed Cure Amount (the "Disputed Cure Amount"), then: (a) the cure amount shall be as agreed between the parties; or (b) to the extent the parties are unable to consensually resolve the dispute, then such objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court. All other objections to the proposed assumption and assignment of a Potentially Assigned Agreement will likewise be heard at the Sale Hearing, unless adjourned by agreement of the parties.

24.      **Notice Procedures**. The forms of the Sale Notice and the Cure Notice attached hereto as **Exhibit 2** and **Exhibit 3**, respectively, are hereby approved and are appropriate and sufficient for all purposes, and no other or further notice shall be required. No finding or ruling is made in this Order as to the merits of any motion for approval of the Sale(s).

25.      As soon as practicable after the entry of this Order, the Debtors will serve the Sale Notice by email, if available, or otherwise by first-class mail upon the following; *provided*, *however*, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of this Order; *provided*, *further* that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence: (a) the Office of the United States Trustee for the District of

32363065.1

Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtors; (c) CVI CEF Master Fund I LP, as administrative agent and collateral agent; (d) counsel to the Prepetition CarVal Agent; (e) GDEV OYA Lender I, LLC, in its capacity as administrative agent and collateral agent; (f) counsel to the Prepetition GDEV Agent; (g) counsel to the DIP Lender and the Stalking Horse Bidder; (h) co-counsel to the DIP Lender and the Stalking Horse Bidder; (i) CNB, in its capacity as administrative agent and collateral agent; (j) counsel to CNB; (k) counsel to GREC; (l) the United States Attorney's Office for the District of Delaware; (m) the Internal Revenue Service; (n) all parties who are known by the Debtors to assert liens against the Assets; (o) all non-Debtor parties to the Potentially Assigned Agreements; (p) any party known or reasonably believed to have expressed an interest in acquiring some, all, or substantially all of the Assets; (q) all known and reasonably identifiable creditors of the Debtors; and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

26.     In addition, the Debtors shall publish the Sale Notice once in *The New York Times* (National Edition) or another publication with similar national circulation as soon as practicable after entry of this Order, but no later than three (3) business days after entry of this Order, and post the Sale Notice and this Order on the website of the Debtors' claims and noticing agent: https://cases.ra.kroll.com/oya. Publication of the Sale Notice as described in this Order conforms to the requirements of Bankruptcy Rules 2002(l) and 9008 and is reasonably calculated to provide notice to any affected party, including any Potential Bidder(s), and to afford the affected party the opportunity to exercise any rights affected by the Motion and the relief granted by this Order.

27.     **Other Provisions**. Failure to timely file an objection in accordance with the deadlines set forth in this Order, or any subsequent order of this Court, shall forever bar the assertion of any objection to the Motion, entry of the Sale Order(s), or consummation of the

32363065.1

Sale(s), and shall be deemed to constitute consent to entry of the Sale Order(s) and consummation of the Sale(s) and all transactions related thereto, including, without limitation, for purposes of section 363(f) of the Bankruptcy Code.

28.      All parties (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily: (a) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes relating to the bidding process, the Auction, and/or the Sale(s)) to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution; and (b) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

29.      The Debtors are authorized to revise the Bidding Procedures, the bidding process, and the proposed schedule for the Sale(s) in consultation with the Consultation Parties and as otherwise set forth in this Order and the Bidding Procedures. The Debtors are further authorized, but not directed, in consultation with the Consultation Parties, to conduct multiple Sales and/or Auctions as necessary in substantial conformity with the Bidding Procedures and schedule for the Sale(s) established through this Order.

30.      Notwithstanding anything to the contrary herein or elsewhere, the Debtors are authorized to direct Kroll Restructuring Administration LLC to establish a separate segregated escrow account to hold Good Faith Deposit amounts, which such escrow account will not subject to the control of the DIP Lender or the Prepetition Secured Parties.

31.      The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

32.     In the event there is any conflict between this Order and the Bidding Procedures, the terms and conditions of this Order shall control and govern in all respects.

33.     The requirements set forth in Local Rules 6004-1 and 9013-1 are hereby satisfied, modified, or waived.

34.     Notwithstanding the applicability of Bankruptcy Rules 6004(h), 6006(d), 7052, or 9014, this Order shall be immediately effective and enforceable upon its entry. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.     Nothing in this Order shall be construed as this Court determining or allowing any fees or expenses incurred or requested in connection with the Auction and/or Sale(s), including any fees or expenses of any professionals retained in the Chapter 11 Cases, and the rights of all parties in interest to object to any such fees and expenses are expressly reserved.

36.     This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

32363065.1

**Exhibit 1**

**Bidding Procedures**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1] | Case No. 24-12574 (___) |
| Debtors. | (Jointly Administered) |

## BIDDING PROCEDURES FOR THE
## SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS
## IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS

On November 6, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors are authorized to continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Set forth below are the bidding procedures (the "Bidding Procedures")[2] to be used with respect to the sale(s) and/or disposition(s) (collectively, the "Sale") of all, substantially all, or any portion of the Debtors' assets (the "Assets").

**Any party interested in bidding on the Assets should contact John Shepherd, Chief Restructuring Officer of the Debtors in these chapter 11 cases (the "Chapter 11 Cases").**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Debtors' Motion for Entry of (I) An Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (C) Scheduling an Auction and a Hearing on the Approval of the Sale(s) of Some, All, or Substantially All of the Debtors' Assets, (D) Authorizing the Debtors to Enter Into the Purchase Agreement(s), (E) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (F) Granting Related Relief; and (II) An Order or Orders (A) Authorizing the Sale of Some, All, or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (B) Approving the Assumption and Assignment of the Potentially Assigned Agreements, and (C) Granting Related Relief* (the "Bidding Procedures Motion") or an order approving the Bidding Procedures Motion (such order, the "Bidding Procedures Order"), as applicable.

Copies of the Bidding Procedures Order or any other documents in the Chapter 11 Cases are available upon request to Kroll Restructuring Administration by calling 844.974.2131 (Toll-Free) or 646.937.7796 (International) or by visiting the Debtors' restructuring website at https://cases.ra.kroll.com/oya.

## I.    Summary of Key Sale Process Dates

| Dates | All Scenarios – Deadline/ Event |
|---|---|
| Tuesday, December 3, 2024 at [●] [a.m. / p.m.] (prevailing Eastern Time) (subject to Court availability) | Bidding Procedures Hearing |
| 1 business day after entry of the Bidding Procedures Order | Deadline for Debtors to file the initial Cure Notice and the initial Cure Schedule (each as defined in the Bidding Procedures Motion) |
| 14 calendar days after service of the Cure Notice (or the Supplemental Cure Notice) at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the Debtors' proposed assumption and assignment of the Potentially Assigned Agreements and related Cure Costs (each as defined in the Bidding Procedures Motion) |
| Tuesday, December 17, 2024 at 12:00 p.m. (prevailing Eastern Time) | Bid Deadline (as defined below) |

| Dates | No Auction Scenario – Deadline/ Event |
|---|---|
| Thursday, December 19, 2024 | Deadline to file a notice canceling the Auction (as defined in the Bidding Procedures Motion) and a proposed order approving the Sale (as defined in the Bidding Procedures Motion) to the Stalking Horse Bidder (as defined in the Bidding Procedures Motion) |
| Tuesday, December 24, 2024 at 4:00 p.m. (prevailing Eastern Time) | Deadline to file objections to the proposed order approving the Sale to the Stalking Horse Bidder or the ability of the Stalking Horse Bidder to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance |
| Monday, December 30, 2024 at [●] [a.m. / p.m.] (prevailing Eastern Time) (subject to Court availability) | Sale Hearing (as defined below) |

| Dates | Auction Scenario – Deadline/ Event |
|---|---|
| Thursday, December 19, 2024 at 6:00 p.m. (prevailing Eastern Time) | Deadline to notify Potential Bidders (as defined below) of whether their Bids (as defined below) are Qualified Bids (as defined below) |
| Friday, December 20, 2024 at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time) | Auction |
| 1 business day after conclusion of the Auction | Deadline to file the Notice of Successful Bidder(s) (as defined below) |
| 2 business days after conclusion of the Auction | Deadline to file the proposed order(s) approving the Sale(s) |
| Monday, January 6, 2025 at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the (a) conduct of the Auction, (b) proposed Sale(s) to the Successful Bidder(s) (as defined below), and/or (c) the ability of the Successful Bidder(s) to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance |
| Monday, January 13, 2025 at [●] [a.m. / p.m.] (prevailing Eastern Time) (subject to Court availability) | Sale Hearing |

## II.    Assets to Be Auctioned

The Debtors are seeking to sell all or substantially all of their Assets, or any portion thereof, either as a going concern or as a liquidation. These Assets include, but are not limited to, the Debtors' going-concern business, unexpired leases (the "Unexpired Leases"), executory contracts (the "Executory Contracts" and, with the Unexpired Leases, the "Potentially Assigned Agreements"), equipment, inventory, supplies, intellectual property, insurance proceeds, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances.

The Sale of the Assets shall be subject to a competitive bidding process (the "Bidding Process") as set forth herein and approval by the Court pursuant to sections 105, 363, and 365 of the Bankruptcy Code, rules 2002, 6003, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure, and rules 2002-1, 6004-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. The

Debtors may consider bids for the Assets (or any portion thereof) in a single bid from a single bidder or in multiple bids from multiple bidders.

### III.    Public Announcement of Auction

As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall: (a) serve the Sale Notice by email, if available, or otherwise by first-class mail upon the Sale Notice Parties (as defined in the Bidding Procedures Order); provided, however, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; provided, further that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence; (b) publish the Sale Notice (as defined in the Bidding Procedures Motion), with any modifications necessary for ease of publication, on one occasion in The New York Times (National Edition) or another publication with similar national circulation as soon as practicable after entry of the Bidding Procedures Order; and (c) post the Sale Notice on their case website, https://cases.ra.kroll.com/oya. Further, the Debtors propose that within **1 business day** of the entry of the Bidding Procedures Order, the Debtors shall serve the initial Cure Notice in accordance with the Bidding Procedures Order.

### IV.    Participation Requirements

To participate in the Bidding Process (as defined below) or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets must deliver or have previously delivered to the Debtors and their advisors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

   a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance reasonably acceptable to the Debtors;

   b.    sufficient information, as reasonably determined by the Debtors and their advisors in their sole discretion, to allow the Debtors to determine that such person or entity (i) has or can reasonably obtain the financial wherewithal to consummate the applicable Sale, and (ii) intends to access the Data Room (as defined below) for a purpose consistent with these Bidding Procedures; and

   c.    a statement detailing whether the person or entity is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

After provision of the Preliminary Bid Documents, the adequacy of which the Debtors and their advisors shall determine in their sole discretion, such submitting person or entity shall be deemed a "Potential Bidder."

The Debtors shall promptly inform the Consultation Parties of any entity that becomes a Potential Bidder. For the avoidance of doubt, the DIP Lender, the Prepetition Lenders, the Stalking Horse Bidder, and any of their respective designees shall each be a Potential Bidder.

## V.    Determination by the Debtors

As appropriate throughout the Bidding Process, the Debtors will consult with: (a) any statutory committee appointed in the Chapter 11 Cases, if any (each, a "Committee") and such Committee's counsel; (b) the Prepetition GDEV Agent; (c) the Prepetition CarVal Agent; and (d) any other party the Debtors deem appropriate (collectively, the "Consultation Parties" and each, a "Consultation Party"); provided that, notwithstanding anything to the contrary in these Bidding Procedures, the Debtors shall not consult with a Consultation Party (or its advisors) that is actively participating as a Potential Bidder for the Assets, including, for the avoidance of doubt, by pursuing a Credit Bid (as defined below).

For the avoidance of doubt, if one of the Consultation Parties (or its affiliates, as applicable) is actively participating as a Potential Bidder for the Assets (a "Bidding Party"), then the remaining Consultation Parties and their respective counsel shall continue to be Consultation Parties but shall not provide any information they receive as Consultation Parties to a Bidding Party. Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any party that is not a Potential Bidder or a Consultation Party.

## VI.    Due Diligence

The Debtors have established a confidential electronic data room concerning the Assets (the "Data Room") and will grant each Potential Bidder or Consultation Party, as applicable, access to such Data Room. ***No Potential Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***.

Up to and including the Bid Deadline, the Debtors shall afford any Potential Bidder or Consultation Party such due diligence access or additional information as may be reasonably requested by the Potential Bidder or the Consultation Party that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances. The Debtors may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders and/or Consultation Parties, as applicable. In the event that any such due diligence materials are prepared by the Debtors in written form and have not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide access to such materials to: (a) all Potential Bidders; and (b) all Consultation Parties. Each Potential Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person or entity who is not a Potential Bidder or a Consultation Party who does not otherwise comply with the participation requirements set forth above.

## VII.    Bid Deadline

A Potential Bidder that desires to make a Bid shall deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) to the following **by no later than Tuesday, December 17, 2024, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"):

   a.    John Shepherd, Chief Restructuring Officer (john.shepherd@ankura.com);

   b.    Duston    McFaul    (dmcfaul@sidley.com),    Maegan    Quejada (mquejada@sidley.com), and Ian Ferrell (iferrell@sidley.com); and

   c.    Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com).

The Debtors shall provide to the Consultation Parties copies of each Bid received by the Debtors as soon as reasonably practicable following receipt of such Bid.

The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, in consultation with the Consultation Parties, for all or certain Potential Bidders.

## VIII.   Qualified Bid Requirements[3]

To participate in the Auction, a Potential Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of all, substantially all, or some of the Assets (each, a "Bid"), and shall meet the following criteria (collectively, the "Qualified Bid Requirements"), in each case, on or prior to the Bid Deadline:

   a.    **Bid Description and Representations**: Each Bid (other than, for the avoidance of doubt, the Stalking Horse Bid (as defined in the Bidding Procedures Motion)) must be accompanied by a letter or email:

      (i)    fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or their advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating a proposed Sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

      (ii)   setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price;

---

[3] The Debtors will also consider proposals to acquire any and all of the Assets through a chapter 11 plan. Should any such proposal be received prior to the Bid Deadline that the Debtors, in consultation with the Consultation Parties, conclude is in the best interests of the estates and their stakeholders, the Debtors reserve the right to postpone the Auction and proceed toward confirmation of a chapter 11 plan.

(iii)    identifying separately the cash and non-cash components of the purchase price;

(iv)    if such Bid relates to the Assets contemplated to be sold under the Stalking Horse Purchase Agreement, providing for consideration to the Debtors of at least the sum of: (a) the Stalking Horse Bid, (b) the amount of any Stalking Horse Bid Protections, and (c) an incremental overbid of $500,000, which may be adjusted for any Bid relating to Assets not contemplated to be sold under the Stalking Horse Purchase Agreement (such incremental overbid, the "Incremental Overbid"); provided that any such Bid must include a cash component sufficient to satisfy the DIP Obligations (as defined in the DIP Order) and any Stalking Horse Bid Protections in full;

(v)    specifying whether the Bid is conditioned on purchasing all Assets included in the Bid or whether the Bid should be viewed as separate Bids for one or more sets of Assets;

(vi)    indicating the allocation of the purchase price among the applicable Assets; provided that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation;

(vii)    stating with specificity the Assets (including any specific Potentially Assigned Agreements) such Potential Bidder wishes to bid on and the liabilities and obligations (including any applicable cure costs) to be assumed by the Potential Bidder in the Sale;

(viii)    indicating, as applicable, whether the Potential Bidder intends to operate the Debtors' business as a going-concern or to liquidate the Assets;

(ix)    providing that the Bid is not subject to any bidding fee, break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of reimbursement, and including an express waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets;

(x)    containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than **January 31, 2025**, contingent upon receiving the necessary Consent Rights (as defined below), if any;

(xi)    providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(xii)    providing that such Potential Bidder has procured and provided all necessary information required to procure any necessary approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights (including,

without limitation, if applicable, any consent that may be necessary from GPC HP II, LLC for the purchase of equity interests in OYA-GPC 2021 Holdco LLC held by ORY-1 and the release of any credit support provided by or on behalf of the seller Debtor parties or their affiliates) (collectively, the "Consent Rights") required for the sale or purchase of Assets contemplated in the Bid, or, in the alternative, the Potential Bidder will endeavor to procure and provide all necessary information required for such Consent Rights by no later than **January 24, 2025**;

(xiii)   containing an acknowledgement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets, has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid;

(xiv)   agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until after the Debtors and the Successful Bidder(s) consummate the applicable Sale(s); and

(xv)   providing that the Potential Bidder agrees to serve as a back-up bidder (the "Back-Up Bidder") if the Potential Bidder's Qualified Bid (as defined below) is the next highest or best bid after the Successful Bid (as defined below) (the "Back-Up Bid") with respect to the relevant Assets through the Closing Date.

b.   **Qualified Bid Purchase Agreement**: Each Bid must be accompanied by:

(i)   an executed purchase agreement in form and substance reasonably satisfactory to the Debtors (a "Qualified Bid Purchase Agreement"); and

(ii)   a redline of the executed Qualified Bid Purchase Agreement to reflect any proposed amendments and modifications to the Stalking Horse Purchase Agreement (as defined in the Bidding Procedures Motion) or the form purchase agreement (if provided by the Debtors), as applicable, and the applicable schedules and exhibits.

c.   **Adequate Assurance Information**: Each Bid must be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), which may include:

(i)   information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate a proposed Sale;

(ii)   evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid;

(iii)  identify any Potentially Assigned Agreements to be assumed or assumed and assigned in connection with the proposed Sale;

(iv)  provide for the payment of all cure amounts (the "Cure Amounts") related to such Potentially Assigned Agreements by the Potential Bidder;

(v)  provide the following documentation: (1) the legal name of the proposed assignee of Unexpired Leases (the "Proposed Assignee") and any guarantors, as applicable; and (2) financial statements for the calendar or fiscal years ended 2022, 2023 and, if available, 2024 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

(vi)  such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.

By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale(s) and the Consultation Parties in the event that the Debtors determine such bid to be a Qualified Bid (as defined below).

d.  **Good Faith Deposit**: Each Bid must be accompanied by:

(i)  a deposit in the form of a certified check or wire transfer, payable to the order of the Debtors, in the amount of the greater of (1) ten percent (10%) of the cash consideration of the Bid or (2) $500,000, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "Good Faith Deposit"); provided that, to the extent a Bid is modified at or prior to the Auction in any manner that increases the proposed purchase price contemplated by such Bid, the Debtors reserve the right, after consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals the greater of (x) ten percent (10%) of the increased aggregate purchase price or (y) $500,000 promptly and in no event no later than one (1) business day following the conclusion of the Auction; and

(ii)  the Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties, including by requiring Qualified Bidders to provide a Good Faith Deposit for any non-cash consideration based on such Qualified Bidder's estimate of the value of any such non-cash consideration.

e.  **Acknowledgement of Compliance with the Bidding Procedures, the Bidding Order, the Bankruptcy Code, and Non-Bankruptcy Law**: Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the

Bidding Procedures Order, the Bankruptcy Code, and any applicable non-bankruptcy law.

f.   **No Collusion**: The Potential Bidder must acknowledge in writing: (i) that it has not engaged in any collusion with respect to any Bid(s) or any Sale(s); (ii) that it did not agree with any Potential Bidders to control price; and (iii) that it will not engage in any collusion with respect to any Bids, the Auction, or the Sale(s). For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (e-mail shall suffice), in consultation with the Consultation Parties.

g.   **Irrevocable**: Each Bid must state that in the event such Bid is chosen as a Back-Up Bid, it shall remain irrevocable until after the Debtors and the Successful Bidder(s) consummate the applicable Sale(s), or, in the event that the Stalking Horse Bid is selected as a Back-Up Bid, then thirty days after entry of the applicable Sale Order.

h.   **Regulatory Approvals and Covenants**: A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to after **January 24, 2025**, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

i.   **Expected Closing Date**: Each Bid must state the Potential Bidder's expected date of closing of the applicable Sale(s) and be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as a Successful Bid, by no later than **January 31, 2025**.

## IX.   Right to Credit Bid

The DIP Lender, the Prepetition GDEV Agent, the Prepetition CarVal Agent, and any other party who has a valid and perfected lien on any Assets of the Debtors' estates (each a "Secured Creditor") and is a Qualified Bidder (as defined below) shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code (a "Credit Bid"); provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; provided further that a Credit Bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full all claims for which there are valid, perfected, and unavoidable liens on any assets included in such bid that are senior in priority to those of the Secured Creditor seeking to credit bid.

Any Credit Bid made by a Secured Creditor will be evaluated by the Debtors and the Consultation Parties as a cash Bid solely for purposes of evaluating Bids (including evaluating Qualified Bids and Subsequent Bids (as defined below)). Notwithstanding anything to the contrary contained herein or the Bidding Procedures Order, all Secured Creditors: (a) shall not be subject

to the Good Faith Deposit requirement (whether for a Credit Bid or otherwise); (b) are hereby deemed Qualified Bidders; and (c) shall have their Bids (including, for the avoidance of doubt, any credit bids) deemed Qualified Bids with respect to the Assets; provided that, such Credit Bid submitted by a Secured Party for Assets included in the Stalking Horse Bid must provide for cash payment of the Stalking Horse Bid Protections and the DIP Obligations (as defined in the DIP Order).

The DIP Lender shall be authorized, and have the unqualified right, to credit the outstanding DIP Obligations (as defined in the DIP Order) towards the purchase price to be paid by it (or any of its affiliates) in connection with the purchase of any Assets; provided that the amount of DIP Obligations that may be credited towards the purchase price (a) shall not exceed $4,500,000 with respect to the purchase of any Assets that constitute Prepetition Carval Collateral (as defined in the DIP Order) and (b) shall not exceed $1,500,000 with respect to the purchase of any Assets that constitute Prepetition GDEV Collateral (as defined in the DIP Order).

## X.    Evaluation of Qualified Bids

The Debtors, in consultation with the Consultation Parties, will review each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above. A bid received from a Potential Bidder for any portion of the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder." The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than **Thursday, December 19, 2024, at 6:00 p.m. (prevailing Eastern Time)**. For the avoidance of doubt, the Stalking Horse Bid is deemed a Qualified Bid, and the Stalking Horse Bidder is deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder. The Debtors shall inform the Stalking Horse Bidder of the Qualified Bids received and shall provide copies of the Starting Bid(s) (as defined below) no later than **Thursday, December 19, 2024, at 9:00 p.m. (prevailing Eastern Time)**.

A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent in their reasonable business judgment (in consultation with the Consultation Parties), including, among other things: (a) the amount of the Qualified Bid; (b) the risks and timing associated with consummating the transaction(s) with the Qualified Bidder; (c) any excluded Assets or Potentially Assigned Agreements; (d) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement; (e) the net benefit to the Debtors' estates (including after taking account of the Stalking Horse Bid Protections); (f) the tax consequences of such Qualified Bid; and (g) any other factors that the Debtors, in consultation with the Consultation Parties, reasonably may deem relevant.

The Debtors, in their business judgment, reserve the right to reject any Bid if such Bid, among other things:

      a.       requires any indemnification of the Potential Bidder in any Qualified Bid Purchase Agreement submitted as part of the Bid;

b.      is not received by the Bid Deadline;

c.      does not comport with the Qualified Bid Requirements;

d.      is subject to any contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets; or

e.      does not, in the Debtors' determination (after consultation with the Consultation Parties), include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtors' estates or the Auction.

Any Bid rejected pursuant to the foregoing shall not be deemed to be a Qualified Bid; provided that the Debtors may work with the parties to any rejected Bid to cure any such defect(s). In the event that any Bid is so rejected, the Debtors shall cause the Good Faith Deposit of such Potential Bidder (including all accumulated interest thereon) to be refunded to such Potential Bidder as soon as reasonably practicable, but no later than five (5) business days after the Bid Deadline unless a later date is agreed between the Debtors and the applicable Potential Bidder.

The Debtors may, in consultation with the Consultation Parties, among other things: (a) extend such Bid Deadline with respect to the subject Assets; (b) postpone the Auction; (c) cancel the Auction; or (d) terminate the proposed Sale(s) for the subject Assets.

## XI.    Stalking Horse Bid Protections

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder, is entitled to: (a) a break-up fee in an amount equal to $930,000 (the "Break-Up Fee"), payable as set forth in the Stalking Horse Purchase Agreement; (b) reimbursement for reasonable and documented out-of-pocket costs, fees, and expenses incurred by the Stalking Horse Bidder and its affiliates (including fees and expenses of legal, accounting, financial, and other advisors) in an amount not to exceed $500,000 (the "Expense Reimbursement Amount" and, with the Break-Up Fee, the "Termination Payment"), payable as set forth in the Stalking Horse Purchase Agreement; and (c) in the event the Termination Payment is not paid as set forth in the Stalking Horse Purchase Agreement or the Bidding Procedures Order, reimbursement for all reasonable, documented, out-of-pocket fees, costs, and expenses incurred by the Stalking Horse Bidder or its affiliates to collect such unpaid portion of the Termination Payment, together with interest on such amount as set forth in the Stalking Horse Purchase Agreement (the "Collection Costs" and, with the Termination Payment, the "Stalking Horse Bid Protections").

Any such Stalking Horse Bid Protections are authorized pursuant to the Bidding Procedures Order. For the avoidance of doubt, except for the Stalking Horse Bidder, and as otherwise set forth herein, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, "topping" termination, or similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

## XII.    No Qualified Bids

If no Qualified Bids other than the Bid submitted by the Stalking Horse Bidder (the "Stalking Horse Bid"), are received for the Assets included in the Stalking Horse Bid by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may cancel the Auction with respect to such Assets. If the Stalking Horse Bid is the only Qualified Bid received by the Bid Deadline, the Debtors may decide, in their reasonable business judgment, after consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid as to the applicable Assets and pursue entry of an order approving a Sale with respect to such Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and/or designation of the Stalking Horse Bid, where applicable, as the Successful Bid with the Court and request the Sale Hearing as set forth herein.

If only one Qualified Bid is received for the Assets not included in the Stalking Horse Bid by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may designate such Qualified Bidder as the Successful Bidder with respect to such Assets and pursue entry of an order approving a Sale with respect to such Assets. The Debtors shall promptly file notice of any such designation and request approval of such Sale at the Sale Hearing.

## XIII.    Auction

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets by the Bid Deadline, the Debtors shall conduct the Auction to determine the Successful Bidder(s) in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Assets or portion of the Assets. If the Debtors do not receive a Qualified Bid for any particular Asset by the Bid Deadline, the Debtors will not conduct the Auction with respect to such Asset. If one or more Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to the applicable Assets, then the Debtors shall conduct the Auction with respect to such Assets. In addition, the Debtors, in consultation with the Consultation Parties, shall determine which Qualified Bid is the highest or other best Qualified Bid for purposes of constituting the opening bid at the Auction for the relevant Assets (the "Starting Bid(s)"). The determination of which Qualified Bid(s) constitutes the Starting Bid(s) shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates. The Starting Bid(s) will be provided to the Qualified Bidders on or before **Thursday, December 19, 2024, at 9:00 p.m. (prevailing Eastern Time)**.

The Auction, if required, will be conducted on **Friday, December 20, 2024, starting at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time)** at the offices of Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, Texas 77002, or, if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline in accordance with the Bidding Procedures, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Each Qualified Bidder participating in the Auction will be required to confirm, in writing and on the record at the Auction,

that (a) it has not engaged in any collusion with respect to the Bidding Process, (b) its Qualified Bid is a good-faith, *bona fide* offer, and (c) that it intends to consummate the applicable Sale(s) if selected as a Successful Bidder. For the avoidance of doubt, the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these Chapter 11 Cases.

Bidding at the Auction for the Assets (or subset thereof) that are subject to Qualified Bids will begin with the Starting Bid(s) and continue, in one or more rounds of bidding, so long as during each round: (a) at least one Qualified Bidder submits a Qualified Bid that improves on such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid"); and (b) the Debtors reasonably determine, in consultation with the Consultation Parties, that such Subsequent Bid is (i) for the first round, a higher or otherwise better offer than the Starting Bid, and (ii) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).

Each Subsequent Bid at the Auction shall provide additional net value to the estates over the Starting Bid or the Leading Bid (as defined below) in an amount equal to or greater than the Incremental Overbid amount. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or otherwise best offer for the subject Assets (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures as set forth below. In any Subsequent Bid by the Stalking Horse Bidder, the amount of the Stalking Horse Bid Protections shall be considered additional consideration being provided in such Bid.

The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bidding Procedures; provided that such rules are disclosed to each Qualified Bidder during the Auction. The bidding at the Auction shall be transcribed and the Debtors shall maintain a transcript of all Bids made and announced at the Auction.

Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, will, for the Assets (or subset thereof) that were subject to the Auction:

a.   determine, consistent with the Bidding Procedures, which bid(s) constitutes the highest or otherwise best bid (the "Successful Bid(s)"); and

b.   notify all Qualified Bidders at the Auction of the subject Assets, prior to its conclusion, of the name(s) of the maker of the Successful Bid(s) (the "Successful Bidder(s)") with respect to the subject Assets, and the amount and other material terms of the Successful Bid(s).

The Debtors may, in consultation with the Consultation Parties, designate the Back-Up Bid(s) and the Back-Up Bidder(s) with respect to the subject Assets in the event that the Successful Bidder(s) does not close the Sale(s). Unless the Court orders otherwise upon application by the Debtors, the Debtors shall not consider any Bids or Subsequent Bids submitted after the conclusion

of the Auction, and any and all such Subsequent Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

**One business day** following the conclusion of the Auction, the Debtors shall file a notice on the Court's docket identifying (with specificity) the Successful Bidder(s) for the Assets (or subset thereof) and any applicable Back-Up Bidder(s) (the "Notice of Successful Bidder(s)").

All bidders at the Auction will be deemed to have consented to the core jurisdiction and constitutional authority of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale(s), and all agreements entered into in connection with any proposed Sale(s).

## XIV.    Sale Hearing

Each Successful Bid and Back-Up Bid (or if no Qualified Bid other than that of one Qualified Bidder is received with respect to the Assets (or subset thereof), then the Qualified Bid of such Qualified Bidder) shall be subject to approval by the Court. The hearing to approve a Successful Bid and Back-Up Bid (or if no Qualified Bid other than that of one Qualified Bidder is received with respect to the Assets (or subset thereof), then the Qualified Bid of such Qualified Bidder) shall take place on (a) **Monday, December 30, 2024, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction is cancelled, (b) on **Monday, January 13, 2025, at [●] [a.m. / p.m.] (prevailing Eastern Time)**, or (c) as soon as thereafter as counsel and interested parties may be heard (as applicable, the "Sale Hearing").

The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of these Chapter 11 Cases.

For the avoidance of doubt, the Debtors' presentation to the Court for approval of a selected Qualified Bid as a Successful Bid (or a Back-Up Bid) does not constitute the Debtors' acceptance of such Bid. The Debtors will have accepted a Successful Bid only when such Successful Bid has been approved by the Court at the Sale Hearing.

## XV.    Return of the Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in escrow, but shall not become property of the Debtors' estates absent further order of the Court. The Debtors shall retain any Good Faith Deposit submitted by each Successful Bidder. At the closing of a Sale contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposit of any Back-Up Bidder shall be retained until three (3) business days after the date of consummation of the applicable Sale (the "Closing Date"). The Good Faith Deposits of any other Qualified Bidders will be returned as soon as reasonably practicable, but no later than seven (7) business days following the Auction.

If a Successful Bidder (or, if a Sale is to be closed with a Back-Up Bidder, then such Back-Up Bidder) fails to consummate the applicable Sale(s) because of a breach or failure to perform

on the part of such bidder, then, subject to the terms of the applicable Qualified Bid Purchase Agreement (as such agreement may be amended or modified at the Auction) or any other form of purchase agreement reasonably satisfactory to the Debtors, the Debtors and their estates shall be entitled to retain the Good Faith Deposit of such Successful Bidder (or, if a Sale is to be closed with a Back-Up Bidder, then such Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

## XVI.    Reservation of Rights and Modifications

Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, reserves the right to modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Qualified Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Sale Hearing; provided that the Debtors may not amend these Bidding Procedures or the Bidding Process to reduce or otherwise modify its obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court; provided further that notwithstanding anything to the contrary herein, any such modification (including, for the avoidance of doubt, extension of the Bid Deadline, postponement of the Auction, cancellation of the Auction, or termination of the proposed Sale) shall not override any milestones set forth in the DIP Order or the DIP Loan Documents.

The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bidding Procedures; provided, however, that the Debtors shall not be required to consult with any Consultation Party (or its advisors) regarding any particular issue, selection, or determination if the Debtors determine in good faith on advice of counsel that such consultation would be inconsistent with the exercise of their fiduciary duties.

Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith.

Further, for the avoidance of doubt, any rights that the Consultation Parties may have pursuant to the terms of other agreements, any orders of the Court, or the Bankruptcy Code are hereby reserved and shall not in any way be affected by these Bidding Procedures. All rights of the Consultation Parties with respect to the proposed Sale are fully reserved.

## XVII.   Consent to Jurisdiction

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale(s), and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid documents, and any and all other agreements entered into in connection with any proposed Sale, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the Bidding Process, the Auction, the Sale Hearing, or the construction and enforcement of any

agreement or any other document relating to the Sale(s) if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XVIII. Fiduciary Out

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor to take any action or to refrain from taking any action related to any Sale or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

## **Exhibit 2**

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12574 (___)<br><br>(Jointly Administered)<br><br>**Docket Ref. No. __** |

### NOTICE OF AUCTION AND SALE HEARING

    **PLEASE TAKE NOTICE** that on November 6, 2024 (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

    **PLEASE TAKE FURTHER NOTICE** that on the Petition Date, the Debtors filed the *Debtors' Motion for Entry of (I) An Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (C) Scheduling an Auction and a Hearing on the Approval of the Sale(s) of Some, All, or Substantially All of the Debtors' Assets, (D) Authorizing the Debtors to Enter Into the Purchase Agreement(s), (E) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (F) Granting Related Relief; and (II) An Order or Orders (A) Authorizing the Sale of Some, All, or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (B) Approving the Assumption and Assignment of the Potentially Assigned Agreements, and (C) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures and Sale Motion"), pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, *inter alia*, entry of an order (the "Bidding Procedures Order"): (a) scheduling an auction (the "Auction") for the sale(s) of all, substantially all, or any portion of the Debtors' assets (the "Assets") on or about **Friday, December 20, 2024, at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784).  The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

**Central Time)**; (b) approving procedures (the "Bidding Procedures")[2] for submitting competing bids for the Assets; (c) authorizing, but not directing, the Debtors to designate the Stalking Horse Bidder and approving the Stalking Horse Bid Protections in accordance with the Stalking Horse Purchase Agreement; (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtors to enter into and perform under the Stalking Horse Purchase Agreement, subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures; (e) approving the form and manner of the notice of the Auction and the Sale Hearing; and (f) establishing procedures for the assumption and assignment of the Potentially Assigned Agreements to any purchaser(s) of the Assets and approving the manner of notice thereof (the "Cure Notice").

**PLEASE TAKE FURTHER NOTICE** that on [●], 2024, the Court entered the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, if at least two (2) Qualified Bids with regard to any Assets (as defined in the Bidding Procedures Order) are received by the Bid Deadline (as defined below), the Debtors will conduct the Auction. The Auction shall be held on **Friday, December 20, 2024, starting at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time)**, or such other time as the Debtors shall designate and thereafter notify all Qualified Bidders. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than **Tuesday, December 17, 2024, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") may bid at the Auction. Any party that wishes to submit a Bid (as defined in the Bidding Procedures) for all, substantially all, or any portion of the Assets must submit a Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Auction, if required, will be conducted at the offices of Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, Texas 77002, or, if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. For the avoidance of doubt, the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these Chapter 11 Cases.

**PLEASE TAKE FURTHER NOTICE** that the Debtors shall file a notice identifying the Successful Bidder(s) with the Court and serve such notice upon parties in interest by **Thursday, December 19, 2024**, if no Auction is held, or by **1 business day after the conclusion of the Auction** if an Auction is held. The Debtors will file a proposed form of Sale Order or Sale Orders on the docket in these Chapter 11 Cases by **Thursday, December 19, 2024**, if no Auction is held, or by **2 business days after the conclusion of the Auction** if an Auction is held.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures, the Bidding Procedures Order, or the Bidding Procedures and Sale Motion, as applicable.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of the Sale(s) of the Assets to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances will be held before the Honorable [●], United States Bankruptcy Judge, 824 North Market Street, [●], Wilmington, Delaware 19801 on (a) **Monday, December 30, 2024, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction is cancelled, (b) **Monday, January 13, 2025, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction proceeds, or (c) at such other time thereafter as counsel and interested parties may be heard.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by including such adjournment on any agenda filed with the Court or by the filing of a notice with the Court.

**PLEASE TAKE FURTHER NOTICE** that, in the event the Auction is not held, objections to the approval of the Sale(s), including, for the avoidance of doubt, the ability of the Stalking Horse Bidder to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance, must be in writing, state the basis for such objection with specificity, and be filed with the Court and served before **4:00 p.m. (prevailing Eastern Time) on Tuesday, December 24, 2024**, on the following parties (collectively, the "Notice Parties"):

    a.  proposed co-counsel to the Debtors, Sidley Austin LLP, 1000 Louisiana Street, Suite 900, Houston, Texas 77002 (Attn: Duston McFaul (dmcfaul@sidley.com) and Maegan Quejada (mquejada@sidley.com)), and Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603 (Attn: Ian Ferrell (iferrell@sidley.com));

    b.  proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801 (Attn: Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com));

    c.  counsel to the DIP Lender and the Stalking Horse Bidder, White & Case LLP, 609 Main Street, Houston, Texas 77002 (Attn: Charles Koster (ckoster@whitecase.com) and Amanda Parra Criste (aparracriste@whitecase.com));

    d.  counsel to the Prepetition GDEV Agent, Locke Lord LLP, 111 South Wacker Drive, Suite 4100, Chicago, Illinois 60606 (Attn: Aaron C. Smith (asmith@lockelord.com)), and Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 (Attn: Christopher A. Ward (cward@polsinelli.com));

    e.  counsel to the Prepetition CarVal Agent, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Brian Greene (brian.greene@kirkland.com), Elizabeth H. Jones (elizabeth.jones@kirkland.com), and Christopher Marcus (christopher.marcus@kirkland.com));

3

f.   the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: John Schanne (john.schanne@usdoj.gov));

g.   counsel to any statutory committee that has been appointed in these Chapter 11 Cases; and

h.   if applicable, any identified Successful Bidder(s).

**PLEASE TAKE FURTHER NOTICE** that, in the event the Auction is held, objections to the approval of the Sale(s), to the conduct of the Auction, or the ability of the Successful Bidder(s) to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance must be in writing, state the basis for such objection with specificity, and be filed with the Court and served before **4:00 p.m. (prevailing Eastern Time) on Monday, January 6, 2025**, on the Notice Parties.

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.**

**PLEASE TAKE FURTHER NOTICE** that this Sale Notice is subject to the fuller terms and conditions of the Bidding Procedures and Sale Motion, the Bidding Procedures Order, and the Bidding Procedures, with such Bidding Procedures Order controlling in the event of any conflict. The Debtors encourage all parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale(s) of the Asset and/or copies of any related document(s), including the Bidding Procedures and Sale Motion, the Bidding Procedures Order, or the Bidding Procedures, may make a written request to Duston McFaul (dmcfaul@sidley.com), Maegan Quejada (mquejada@sidley.com), and Ian Ferrell (iferrell@sidley.com). In addition, copies of the Bidding Procedures and Sale Motion, the Bidding Procedures Order, and the Bidding Procedures are on file with the Clerk of the Court, Third Floor, 824 North Market Street, Wilmington, Delaware 19801 and are available on the Debtors' claims and noticing agent's website free of charge at https://cases.ra.kroll.com/oya.

*[Remainder of page intentionally left blank]*

4

Dated: [●], 2024
Wilmington, Delaware

/s/ *[Draft]*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Rebecca L. Lamb (Del. Bar No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
        emorton@ycst.com
        kenos@ycst.com
        rlamb@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIDLEY AUSTIN LLP**
Duston K. McFaul (*pro hac vice* pending)
Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone:    (713) 495-4500
Facsimile:    (713) 495-7799
Email:        dmcfaul@sidley.com
              mquejada@sidley.com

Nathan C. Elner (*pro hac vice* pending)
Chelsea M. McManus (*pro hac vice* pending)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        nelner@sidley.com
              cmcmanus@sidley.com

Ian C. Ferrell (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        iferrell@sidley.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

5

## Exhibit 3

**Cure Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1] | Case No. 24-12574 (___) |
| Debtors. | (Jointly Administered) |
| | **Docket Ref. No. __** |

### NOTICE OF (I) POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (II) CURE AMOUNTS

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES MAY BE A COUNTERPARTY TO A CONTRACT OR LEASE WITH OYA RENEWABLES DEVELOPMENT LLC AND/OR ONE OF ITS DEBTOR AFFILIATES. PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE TRANSACTIONS DESCRIBED HEREIN.

**PLEASE TAKE NOTICE** that on November 6, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] filed a motion seeking approval of the Bidding Procedures for the sale of certain of the Debtors' assets (the "Assets") and approval of the sale(s) of such Assets [Docket No. [●]] (the "Bidding Procedures and Sale Motion") to the highest or best-qualified bidder(s) (the "Successful Bidder(s)"). The Debtors sought the approval of the Court (as defined below) of the proposed Bidding Procedures and the form of this notice at a hearing held on **Tuesday, December 3, 2024, at [●] [a.m. / p.m.] (prevailing Eastern Time)**. The Debtors have further requested that a hearing to approve the sale(s) of the Assets (the "Sale Hearing") for (a) **Monday, December 30, 2024, at [●] [a.m./p.m.] (prevailing Eastern Time)** in the event the Auction is cancelled, (b) **Monday, January 13, 2025, at [●] [a.m./p.m.] (prevailing Eastern Time)** in the event the Auction proceeds, or (c) as soon thereafter as counsel and interested parties may be heard in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures and Sale Motion, the Debtors may assume and assign to the Successful Bidder(s) one or more of those

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures and Sale Motion (as defined herein) or the Bidding Procedures Order (as defined herein), as applicable.

executory contracts and/or unexpired leases listed on **Schedule A** annexed hereto (collectively, the "Potentially Assigned Agreements" and each, a "Potentially Assigned Agreement"), pursuant to section 365 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have indicated on **Schedule A** the cure amounts, if any, that the Debtors believe must be paid to cure any prepetition defaults and pay all amounts accrued under the Potentially Assumed Agreements (in each instance, the "Cure Amount").

**PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the validity of the Cure Amount or to a proposed assignment to the Successful Bidder(s) of any Potentially Assigned Agreement (other than on the basis of adequate assurance of future performance) must file an objection (the "Cure Objection") that: (a) is in writing; (b) states with specificity the nature of the objection, and, if the objection pertains to the proposed Cure Amount, state the amount alleged to be to owed, together with any applicable and appropriate documentation in support thereof; (c) is filed with the Clerk of the Court; and (d) is served on the following parties (collectively, the "Cure Notice Parties") by no later than **4:00 p.m. (prevailing Eastern Time) on the date that is 14 calendar days after the service of this Cure Notice** (the "Cure Objection Deadline"):

a. proposed co-counsel to the Debtors, Sidley Austin LLP, 1000 Louisiana Street, Suite 900, Houston, Texas 77002 (Attn: Duston McFaul (dmcfaul@sidley.com) and Maegan Quejada (mquejada@sidley.com)), and Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603 (Attn: Ian Ferrell (iferrell@sidley.com));

b. proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801 (Attn: Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com));

c. counsel to the DIP Lender and the Stalking Horse Bidder, White & Case LLP, 609 Main Street, Houston, Texas 77002 (Attn: Charles Koster (ckoster@whitecase.com) and Amanda Parra Criste (aparracriste@whitecase.com));

d. counsel to the Prepetition GDEV Agent, Locke Lord LLP, 111 South Wacker Drive, Suite 4100, Chicago, Illinois 60606 (Attn: Aaron C. Smith (asmith@lockelord.com)), and Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 (Attn: Christopher A. Ward (cward@polsinelli.com));

e. counsel to the Prepetition CarVal Agent, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Brian Greene (brian.greene@kirkland.com), Elizabeth H. Jones (elizabeth.jones@kirkland.com), and Christopher Marcus (christopher.marcus@kirkland.com));

f. the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: John Schanne (john.schanne@usdoj.gov)); and

g. counsel to any statutory committee that has been appointed in these Chapter 11 Cases.

**PLEASE TAKE FURTHER NOTICE** that the Debtors shall file a notice identifying the Successful Bidder(s) with the Court and serve such notice upon parties in interest by, in the event no Auction is held, **Thursday, December 19, 2024**, or, alternatively, in the event the Auction is held, by **1 business day after the conclusion of the Auction**. The Debtors shall file a proposed form of Sale Order or Sale Orders by **Thursday, December 19, 2024**, in the event no Auction is held, or, alternatively, by **2 business days after the conclusion of the Auction** in the event the Auction is held.

**PLEASE TAKE FURTHER NOTICE** that unless a Cure Objection is timely and properly filed and served before the Cure Objection Deadline, the non-Debtor party to a Potentially Assigned Agreement shall: (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Potentially Assigned Agreement, and the Debtors and the Successful Bidder(s) shall be entitled to rely solely upon the Cure Amount; (b) be deemed to have consented to an assumption and assignment of such Potentially Assigned Agreement; and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder(s) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Potentially Assigned Agreement, or that there is any objection or defense to the assumption and assignment of such Potentially Assigned Agreement. In addition, the proposed Cure Amount set forth in **Schedule A** hereto shall be binding upon the non-Debtor parties to the Potentially Assigned Agreements for all purposes in these Chapter 11 Cases and will constitute a final determination of the Cure Amounts required to be paid by the Debtors in connection with any assumption and assignment of the Potentially Assigned Agreements.

**PLEASE TAKE FURTHER NOTICE** that where a non-Debtor counterparty to a Potentially Assigned Agreement timely and properly files an objection asserting a Cure Amount higher or different than the proposed Cure Amount (the "Disputed Cure Amount"), then: (a) the Cure Amount shall be as agreed between the parties; or (b) to the extent the parties are unable to consensually resolve the dispute, then such objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court. All other objections to the proposed assumption and assignment of a Potentially Assigned Agreement will likewise be heard at the Sale Hearing, unless adjourned by agreement of the parties.

**PLEASE TAKE FURTHER NOTICE** that a Cure Objection shall not constitute an objection to: (a) the relief generally requested in the Bidding Procedures and Sale Motion; (b) the conduct of the Auction (if one is held); (c) a sale to a Successful Bidder or the Successful Bidder's, including, if applicable, the Stalking Horse Bidder's, ability to provide adequate assurance of future performance as to any Potentially Assigned Contract; or (d) the terms of the proposed Sale Order(s). Parties wishing to object on such grounds must file and serve a separate objection stating with particularity such party's grounds for its objection on each of the Cure Notice Parties listed above and any Successful Bidder(s) identified no later than **4:00 p.m. (prevailing Eastern Time) on Tuesday, December 24, 2024**, if the Auction is not held, or **4:00 p.m. (prevailing Eastern Time) on Monday, January 6, 2025**, if the Auction is held.

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount indicated on **Schedule A** and otherwise do not object to the Debtors' assignment of your lease or contract, you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that the Debtors' decision to assume and assign the Potentially Assigned Agreements is subject to the Court's approval and consummation of the Sale(s) of the Assets.

**Inclusion of any document on the list of Potentially Assigned Agreements shall not constitute nor be deemed to be a determination or admission by the Debtors or the Successful Bidder(s) that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved.**

*[Remainder of page intentionally left blank]*

Dated: [●], 2024
Wilmington, Delaware

/s/ *[Draft]*

**YOUNG CONAWAY STARGATT &**
**TAYLOR, LLP**
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Rebecca L. Lamb (Del. Bar No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
         emorton@ycst.com
         kenos@ycst.com
         rlamb@ycst.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**SIDLEY AUSTIN LLP**
Duston K. McFaul (*pro hac vice* pending)
Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone:   (713) 495-4500
Facsimile:   (713) 495-7799
Email:       dmcfaul@sidley.com
             mquejada@sidley.com

Nathan C. Elner (*pro hac vice* pending)
Chelsea M. McManus (*pro hac vice* pending)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:   (214) 981-3300
Facsimile:   (214) 981-3400
Email:       nelner@sidley.com
             cmcmanus@sidley.com

Ian C. Ferrell (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:   (312) 853-7000
Facsimile:   (312) 853-7036
Email:       iferrell@sidley.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

32363067.1

5

## Schedule A

**Potentially Assigned Agreements**

[●]

## Exhibit B

**Stalking Horse Purchase Agreement**

Execution Version

**STOCK AND ASSET PURCHASE AGREEMENT**

by and among

**OYA RENEWABLES CONSTRUCTION HOLDINGS 2 LLC,**

**OYA RENEWABLES CONSTRUCTION HOLDINGS 3 LLC,**

**AND**

**OYA RENEWABLES EQUIPMENTCO LLC,**

as the Sellers

and

**RADIAL POWER LLC,**

as the Buyer

Dated as of November 6, 2024

# TABLE OF CONTENTS

Page

**ARTICLE I.** DEFINITIONS ..................................................................................................2

Section 1.1    Certain Defined Terms ...............................................................2
Section 1.2    Table of Definitions ................................................................17

**ARTICLE II.** PURCHASE AND SALE ...........................................................................19

Section 2.1    Purchase and Sale ....................................................................19
Section 2.2    Excluded Assets. ......................................................................22
Section 2.3    Assumed Liabilities. .................................................................23
Section 2.4    Excluded Liabilities .................................................................24
Section 2.5    Consents to Certain Assignments. ...........................................24
Section 2.6    Assumption/Rejection of Certain Contracts. ...........................25
Section 2.7    Transferred Subsidiaries ..........................................................27
Section 2.8    Consideration. ..........................................................................27
Section 2.9    Closing. ....................................................................................29
Section 2.10   Intended Tax Treatment; Tax Allocation. ................................30
Section 2.11   Exclusion of Transferred Assets or Transferred Subsidiaries....31
Section 2.12   Withholding. ............................................................................32

**ARTICLE III.** REPRESENTATIONS AND WARRANTIES OF THE SELLERS ..................32

Section 3.1    Organization. ............................................................................32
Section 3.2    Authority. .................................................................................32
Section 3.3    No Conflict; Required Filings and Consents. ...........................33
Section 3.4    Transferred Assets. ..................................................................34
Section 3.5    Transferred Subsidiaries. .........................................................35
Section 3.6    Financial Statements; No Undisclosed Liabilities; Schedule of Costs and Commitments. ...............................................................................36
Section 3.7    Absence of Certain Changes or Events .....................................37
Section 3.8    Compliance with Law; Permits .................................................37
Section 3.9    Litigation. .................................................................................39
Section 3.10   Employee Matters. ...................................................................39
Section 3.11   Real Property. ..........................................................................39
Section 3.12   Intellectual Property. ...............................................................42
Section 3.13   Taxes. .......................................................................................43
Section 3.14   Environmental Matters. ...........................................................46
Section 3.15   Material Contracts. ...................................................................47
Section 3.16   Affiliate Transactions. .............................................................49
Section 3.17   Insurance. .................................................................................50
Section 3.18   Brokers. ....................................................................................50
Section 3.19   Working Capital Assets; Equipment .........................................50
Section 3.20   Books and Records. ..................................................................51
Section 3.21   Bank Accounts. ........................................................................51
Section 3.22   Regulatory Status. ....................................................................51
Section 3.23   OFAC and Related Matters. .....................................................53

Section 3.24    Anti-Corruption; Anti-Bribery. ...................................................54
Section 3.25    Project Assets; Studies and Reports. ...........................................55
Section 3.26    NYSERDA Incentive Payments. ................................................55
Section 3.27    Surety Bonds. .............................................................................55
Section 3.28    Exclusivity of Representations and Warranties. .........................56

**ARTICLE IV.** REPRESENTATIONS AND WARRANTIES OF THE BUYER ....................57

Section 4.1    Organization. ..............................................................................57
Section 4.2    Authority. ...................................................................................57
Section 4.3    No Conflict; Required Filings and Consents. .............................57
Section 4.4    Brokers. ......................................................................................58
Section 4.5    Litigation. ...................................................................................58
Section 4.6    Purchase for Investment. ............................................................58
Section 4.7    Inspections; No Other Representations. ......................................58
Section 4.8    Exclusivity of Representations and Warranties. .........................58

**ARTICLE V.** BANKRUPTCY COURT MATTERS .................................................59

Section 5.1    Bankruptcy Actions. ...................................................................59

**ARTICLE VI.** COVENANTS...............................................................................63

Section 6.1    Conduct of Business Prior to the Closing ..................................63
Section 6.2    Covenants Regarding Information ..............................................66
Section 6.3    Notification of Certain Matters. .................................................67
Section 6.4    Consents and Filings; Further Assurances. ................................67
Section 6.5    Refunds and Remittances. ..........................................................68
Section 6.6    Public Announcements. ..............................................................69
Section 6.7    Seller Confidentiality. ................................................................69
Section 6.8    Buyer Confidentiality. ................................................................70
Section 6.9    Intercompany Arrangements. .....................................................70
Section 6.10    No Regulatory Impediments .....................................................70
Section 6.11    Replacement of Credit Support ..................................................70
Section 6.12    Sale Free and Clear ...................................................................71

**ARTICLE VII.** TAX MATTERS .........................................................................71

Section 7.1    Transfer Taxes. ..........................................................................71
Section 7.2    Tax Cooperation. ........................................................................71
Section 7.3    Allocation. ..................................................................................71
Section 7.4    Tax Returns. ...............................................................................72
Section 7.5    Tax Allocation Contracts. ..........................................................72
Section 7.6    Bulk Sales. .................................................................................72

**ARTICLE VIII.** CONDITIONS TO CLOSING......................................................73

Section 8.1    General Conditions. ....................................................................73
Section 8.2    Conditions to Obligations of the Sellers. ...................................73
Section 8.3    Conditions to Obligations of the Buyer .....................................74

**ARTICLE IX.** TERMINATION ..................................................................................74

    Section 9.1    Termination. ...........................................................................74
    Section 9.2    Effect of Termination. .............................................................77

**ARTICLE X.** GENERAL PROVISIONS ....................................................................77

    Section 10.1    Nonsurvival of Representations, Warranties and Covenants. ...................77
    Section 10.2    Fees and Expenses. .................................................................77
    Section 10.3    Amendment and Modification. .................................................77
    Section 10.4    Waiver. ..................................................................................78
    Section 10.5    Notices. .................................................................................78
    Section 10.6    Interpretation. ........................................................................79
    Section 10.7    Entire Agreement. ..................................................................79
    Section 10.8    Parties in Interest. ..................................................................80
    Section 10.9    Governing Law. .....................................................................80
    Section 10.10    Submission to Jurisdiction. ....................................................80
    Section 10.11    Disclosure Generally. ............................................................80
    Section 10.12    No Recourse. .........................................................................81
    Section 10.13    Assignment; Successors. ........................................................81
    Section 10.14    Enforcement. .........................................................................82
    Section 10.15    Currency. ...............................................................................82
    Section 10.16    Severability. ..........................................................................82
    Section 10.17    Waiver of Jury Trial. .............................................................82
    Section 10.18    Counterparts. .........................................................................82
    Section 10.19    No Presumption Against Drafting Party. .................................83

## INDEX OF EXHIBITS

EXHIBIT A          FORM OF SALE PROCEDURES

EXHIBIT B          FORM OF SALE PROCEDURES ORDER

EXHIBIT C          FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
                   AGREEMENT

EXHIBIT D          FORM OF DEWITTVILLE PERMITS UPDATE

## INDEX OF SCHEDULES

SCHEDULE I         TRANSFERRED SUBSIDIARIES

**STOCK AND ASSET PURCHASE AGREEMENT**

**STOCK AND ASSET PURCHASE AGREEMENT**, dated as of November 6, 2024 (this "Agreement"), by and among (i) OYA Renewables Construction Holdings 2 LLC, a Delaware limited liability company ("ORCH 2"), OYA Renewables Construction Holdings 3 LLC, a Delaware limited liability company ("ORCH 3"),  and OYA Renewables EquipmentCo LLC, a Delaware limited liability company ("EquipmentCo" and together with ORCH 2 and ORCH 3, each a "Seller" and collectively, the "Sellers"), and (ii) Radial Power LLC, a Delaware limited liability company (the "Buyer").

## RECITALS

A.      The Sellers directly and indirectly through the Transferred Subsidiaries are engaged in the business of originating, developing, constructing, managing and operating community distributed generation, utility scale solar and energy storage projects (the "Business").

B.      Each of ORCH 2 and ORCH 3 owns the percentage of all of the issued and outstanding shares of capital stock and other equity interests (collectively, the "Transferred Equity") of certain entities set forth on Schedule I hereto (such entities together with their respective Subsidiaries identified on Schedule I, the "Transferred Subsidiaries").

C.      The Sellers and certain of their Affiliates (the "Debtors") are preparing to file voluntary cases (collectively, the "Bankruptcy Case") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

D.      The Sellers desire to sell to the Buyer all of the Transferred Assets, including the Transferred Equity, and transfer to the Buyer the Assumed Liabilities and the Buyer desires to purchase from the Sellers the Transferred Assets, including the Transferred Equity, and assume the Assumed Liabilities in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

E.      The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, as further set forth herein. The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I.
# DEFINITIONS

Section 1.1    <u>Certain Defined Terms</u>. For purposes of this Agreement:

"<u>Accounts Receivable</u>" means any and all (a) accounts receivable, notes receivable, trade accounts, unbilled receivables, contract billings and other amounts owed to any Seller (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all causes of action pertaining to the collection of amounts payable, or that may become payable, to any Seller with respect to products sold or services performed on or prior to the Closing Date, (b) license and royalty receivables, (c) rebate receivables from suppliers or vendors, (d) any other amounts due to any Seller, classified as accounts receivable in accordance with GAAP, and (e) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

"<u>Action</u>" means any claim, charge, investigation, audit, complaint, action, suit, arbitration or proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) by or before any Governmental Authority, other than an Avoidance Action.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise. Notwithstanding the foregoing, except with respect to <u>Section 6.6</u>, <u>Section 10.12</u> and <u>Section 10.13</u>, in no event shall Buyer be considered an Affiliate of Lotus Infrastructure Partners, energyRe, LLC or any portfolio company or project company Affiliated with or managed by Lotus Infrastructure Partners or any of its Affiliates.

"<u>Alternative Transaction</u>" means any proposal, offer or transaction with respect to a plan of reorganization or dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests, financing (debt or equity), refinancing or restructuring, in each case, involving any Project and/or any portion or all or substantially all of the Transferred Assets (other than the transactions contemplated in this Agreement) that competes with or renders consummation of the this Agreement or the transactions contemplated hereby and thereby unable to be consummated or would reasonably be expected to materially frustrate the purposes of this Agreement. For the avoidance of doubt, any proposal, offer, or transaction involving the sale of any of, any portion of or any subset of the Transferred Assets (including any Transferred Subsidiary) shall be deemed to constitute an "Alternative Transaction" for purposes of this Agreement.

2

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment Agreement and Payoff Letter.

"Anti-Bribery and Anti-Corruption Laws" means all Laws of any applicable jurisdiction related to anti-bribery or anti-corruption (governmental or commercial) including, without limitation, the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, and all national and international Laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"Anti-Terrorism and Money Laundering Laws and Regulations" means applicable Laws (a) prohibiting transactions with Persons who (i) commit, threaten to commit, or support terrorism, (ii) engage in transactions or conduct operations that are illegal, nefarious, and/or criminal in nature, and (iii) participate in monetary transactions in property derived from specified unlawful activity, or (b) otherwise relating to prohibitions regarding the illegal laundering of the proceeds of any criminal activity and preventing the funds, proceeds and revenue of the Business, Transferred Assets, the Projects, the Transferred Subsidiaries and their respective Affiliates from being used in connection with the advancement of criminal activity, including the U.S.A PATRIOT Act of 2001 and all "know your customer" rules and other applicable regulations.

"Asset Management Agreement" means those agreements set forth in Section 1.1(a) of the Disclosure Schedules.

"Asset Taxes" means Taxes other than Income Taxes and Transfer Taxes.

"Auction" has the meaning set forth in the Sale Procedures Order.

"Avoidance Actions" means any and all claims for relief of the Sellers under Chapter 5 of the Bankruptcy Code or state fraudulent conveyance, fraudulent transfer, or similar Laws.

"Back-Up Bidder" has the meaning set forth in the Sale Procedures Order.

"Benefit Plan" means any (a) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (b) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life, employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (c) other employment, consulting or other individual agreement, plan, practice, policy, contract, program, and arrangement.

"Books and Records" means, all files, databases, documents, instruments, books and records, plans, advertising and promotional materials, information, data and other similar items maintained by (or on behalf of and in the control of) the Sellers and their Subsidiaries, whether in written or electronic or any other format, including customer and supplier lists, mailing

lists, studies, drawings, draft and final material prepared in connection with obtaining any Permits or submitting any applications for any Permits or to any Governmental Authority having jurisdiction over a Project, sales and promotional literature and other sales related materials, that are related solely to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent, but including each Transferred Subsidiary's Organizational Documents, minute books, membership interest certificates and membership interest transfer ledgers, but excluding emails).

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of New York or the State of Texas.

"Buyer Fundamental Representations" means the representations and warranties of the Buyer set forth in Section 4.1, Section 4.2, and Section 4.4.

"Buyer Material Adverse Effect" means any event, change, occurrence or effect that would materially and adversely affect the ability of the Buyer to perform its obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby.

"CARES Act" means, collectively, the Coronavirus Aid, Relief, and Economic Security Act (P.L. 116-136), enacted March 27, 2020, or any similar applicable federal, state, local or foreign Law, as may be amended and any administrative or other guidance (including "Division N—Additional Coronavirus Response and Relief" of the "Consolidated Appropriations Act, 2021" (H.R. 133), IRS Notices 2020-22, 2020-65, 2021-11 and any Presidential Memoranda or Executive Order (including the Memorandum on Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster issued on August 8, 2020)) published with respect thereto by any Governmental Authority.

"Cash and Cash Equivalents" means, with respect to any Person, all of such Person's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, accounts receivable, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"Cash Cutoff Time" has the meaning set forth in the definition of "Closing Cash Amount."

"Closing Cash Amount" means the Cash and Cash Equivalents of the Transferred Subsidiaries as of 4:00 p.m. New York Time on the date that is one (1) Business Day prior to the Closing Date (the "Cash Cutoff Time"), as set forth in the Cash Statement; provided that the Closing Cash Amount shall not be less than zero.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commercial Operation" means, with respect to any Project, the date by which all of the following have occurred (a)  the application for the applicable Project was formally accepted

by the National Grid, (b) the Transferred Subsidiary for the Project is party to the Interconnection Agreement, and such Interconnection Agreement has not been suspended and is in full force and effect, (c) with regard to participating in the NYISO or any RTO/ISO organized wholesale electric market, such Project and/or applicable Transferred Subsidiary has completed the required asset and market participant registration process(es) has obtained all required Permits and Governmental Approvals necessary under Law and Order for such Project to participate in the NYISO or such RTO/ISO organized wholesale electric market, and (d) if such Project was constructed pursuant to an EPC Agreement, such Project has achieved "substantial completion" (as such term is defined in such EPC Agreement), or the equivalent, in accordance with such EPC Agreement.

"Community Adder Program" means the upfront incentive offered through NYSERDA's NY-Sun program to community distributed generation projects, for which more information can be found here: https://www.nyserda.ny.gov/All-Programs/NY-Sun/Contractors/Dashboards-and incentives/Community-Adder.

"Community Solar Program" means the Community Distributed Generation program in the State of New York as developed by the New York Public Service Commission as updated from time to time.

"Community Solar Rules" means (a) with respect to each Project located in New York, all related tariffs from investor-owned public utilities (including any Transmission Provider) in New York and all related applicable Laws and (b) any Laws, rules, regulations, and interpretative guidance of any Governmental Authority, Local Utility or Transmission Provider or the various agencies, departments or administrative or governmental bodies thereof, and any regulatory guidance, determinations of (or agreements with) a regulatory authority, directions or instructions from (or agreements with) any regulatory authority, and judicial, administrative, or regulatory examiner interpretations, to the extent applicable to the Community Solar Subscription Agreements in effect.

"Community Solar Subscription Agreements" means any and all agreements entered into by and among the Transferred Subsidiaries with customers eligible to participate in the corresponding program with the utility.

"Competing Bid" means any bid contemplating an Alternative Transaction.

"Confidentiality Agreement" means that certain letter agreement, dated as of February 14, 2024, between Radial Development, LLC and OYA Renewables Inc., as may be amended, modified or supplemented from time to time.

"Contract" means any contract, agreement, insurance policy, lease, license, sublicense, sales order, purchase order, instrument, or other commitment (whether written or oral), that is binding on any Person or any part of its assets or properties under applicable Law.

"Copyrights" has the meaning set forth in the definition of "Intellectual Property."

"Data Room" means the electronic data room at the following URL address: https://ankura.sharefile.com/home/shared/foe7c48c-dbc4-4c63-9fbc-994a495d7ca8, established

by the Sellers or any of their Affiliates or Representatives and to which the Buyer or any of its Affiliates or Representatives had access.

"Deferred Payment Agreement" means each of the agreements set forth on Section 1.1(d) of the Disclosure Schedules.

"Dewittville Company" means OMNI Dewittville Solar, LLC, a New York limited liability company.

"Dewittville Project" means the 7,498 kWdc/5,000 kWac solar PV project owned by the Dewittville Company.

"Dewittville Site" means, with respect to the Dewittville Project, the Leased Real Property and Easement Real Property located at 6036 Hartfield-Stockton Road, Dewittville, NY 14728, and held by the Dewittville Company in respect of such Project (but excluding, for the avoidance of doubt, any Option Real Property).

"DIP Credit Agreement" means that certain Debtor-in-Possession Credit Agreement, dated on or about the date hereof, among RenDev, OYA Renewables Construction and Yield Holdings LLC, EquipmentCo, the guarantors party thereto and the Buyer, as the lender.

"Disqualified Person" means (a) the United States, any state or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the foregoing, (b) any organization which is exempt from Tax imposed by the Code (including any former Tax-exempt organization within the meaning of Section 168(h)(2)(E) of the Code and any Tax-exempt controlled entity within the meaning of Section 168(h)(6)(F)(iii) of the Code if such entity has not made the election provided in Section 168(h)(6)(F)(ii) of the Code), (c) any Person who is not a United States Person, (d) any Indian tribal government described in Section 7701(a)(40) of the Code, (e) any Person described in Treasury Regulations Section 1.48-1(j) or (k), or (f) any partnership or other pass-through entity, any direct or indirect partner (or other holder of an equity or profits interest) of which is an organization or entity described in the preceding clauses (a) through (e).

"Disregarded Entity" means an entity that is disregarded as separate from its regarded owner within the meaning of Treasury Regulation Section 301.7701-3.

"Economic Sanctions and Trade Controls Laws and Regulations" means (a) all applicable U.S. and applicable international economic and trade sanctions, including any sanctions or regulations ad-ministered or enforced by the U.S. Department of State, the U.S. Department of Treasury (including the Office of Foreign Assets Control) and any executive orders, rules and regulations relating thereto; (b) all applicable Laws concerning exportation, including rules and regulations administered by the U.S. Department of Commerce, the U.S. Department of State or the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security; and (c) any applicable federal or international anti-boycott Laws, including any executive orders, rules and regulations.

"Encumbrance" means any charge, claim, mortgage, lien, lease, hypothecation, deed of trust, encumbrance, option, pledge, security interest, preemptive right, right of use, first

offer or first refusal, easement, servitude, restrictive covenant or condition, encroachment or other restriction of any kind.

"Environmental Claim" means any action, cause of action, claim, suit, proceeding, investigation, enquiry, Order, demand or written notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up or the costs thereof, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from, or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Material; (b) any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is or may be imposed under any Environmental Law.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment (including natural resources and endangered or threatened species), or the protection of human health and safety (to the extent relating to exposure to Hazardous Material), including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended, and other Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Material; (b) the presence, generation, manufacture, processing, labeling, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Material; or (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Material.

"Environmental Permit" means any Permit required under or issued pursuant to any Environmental Law.

"EPC Agreement" means, with respect to any Project, a Contract for engineering, procurement or construction, a balance of plant agreement or similar agreement pursuant to which a Transferred Subsidiary undertook the construction of such Project (including any conceptual design, detailed design, front end engineering and development, and as built engineering documents and plans related thereto).

"Equity Interest" means, with respect to any Person, any share of capital stock of, or other equity interest in, such Person or any security exercisable or exchangeable for, or convertible into, any share of capital stock of, or other equity interest (including any security exercisable or exchangeable for, or convertible into, any share of capital stock or other equity interest) in, such Person, including any warrant, option, convertible or exchangeable note or debenture, profits interest or phantom equity right, whether voting or non-voting.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Expired Dewittville Permit" means that certain special use permit #2022-1 that was issued to the Dewittville Company by the Town Board of the Town of Chautauqua on March 21, 2022, which permit has expired and is not valid as of the date hereof.

"FERC" means the Federal Energy Regulatory Commission and any successor thereto.

"Final DIP Order" has the meaning ascribed to such term in the DIP Credit Agreement.

"Final Order" means an Order of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (b) if a timely appeal shall have been filed or sought, either (i) no stay of the Order shall be in effect, (ii) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied, or (iii) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that the Buyer in its sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by the Buyer.

"FPA" means the Federal Power Act, as amended, and FERC's implementing regulations thereunder.

"Fraud" means, with respect to any Person, the knowing and intentional misrepresentation of a fact in the making of any representation or warranty set forth in Article III or Article IV, as applicable, that constitutes actual and intentional fraud under Delaware Law; provided, however, that "Fraud" shall not include equitable fraud, promissory fraud, unfair dealings fraud, constructive fraud, any torts (including a claim for fraud) based on negligence (including gross negligence) or recklessness, grossly negligent or negligent misrepresentation, or omission, or knowledge of the fact that the Person making such representation or warranty does not have sufficient information to make the statement contained in the representation and warranty set forth herein but which is nevertheless made as a matter of contractual risk allocation between the Parties.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Approval" means any authorization, approval, consent, license, permit, variance, waiver, certificate of authority, franchise, ruling, tariff, certification, exemption, filing, notice to, declarations of, or registration by or with, any Governmental Authority.

"Governmental Authority" means any United States or non-United States national, federal, municipal, state, provincial, territorial, or local governmental or quasi-governmental, administrative, Taxing or regulatory authority, department, agency, board, bureau, official, court,

commission, quasi-governmental or administrative functions of or pertaining to government or similar powers or authority, including, FERC, NYPSC, NYSERDA, the North American Electric Reliability Corporation and any "regional entity" thereof (as that term is defined in 18 C.F.R. § 39.1), any RTO/ISO (including NYISO) and such RTO/ISO's independent market monitor, or any other judicial or arbitral body or other similar authority or instrumentality (including any self-regulatory authority, securities exchange, court or similar tribunal), including the Bankruptcy Court.

"Government Official" means any officer or employee of a Governmental Authority, or any person acting in an official capacity for or on behalf of any such Governmental Authority, or any political party, party official or candidate thereof.

"Hazardous Material" means any material, substance, chemical, or waste (or combination thereof) (a) that is listed, defined, designated, regulated or classified as hazardous, radioactive, dangerous or toxic or as a pollutant or contaminant under any Environmental Law, including petroleum or petroleum products and byproducts, oil, asbestos, radon, urea-formaldehyde, per- or polyfluoroalkyl substances or other emerging contaminants, explosives, polychlorinated biphenyls (PCBs) or substances containing PCBs, or radioactive materials, or (b) pursuant to which Liability is imposed under any Environmental Law, or which forms the basis of an Environmental Claim.

"Income Taxes" means (i) all Taxes based upon, measured by, or calculated with respect to gross or net income, gross or net receipts or profits (including franchise Taxes and any capital gains, alternative minimum, and net worth Taxes, but excluding ad valorem, property, excise, severance, production, sales, use, real or personal property transfer or other similar Taxes), (ii) Taxes based upon, measured by, or calculated with respect to multiple bases (including corporate franchise, doing business or occupation Taxes) if one or more of the bases upon which such Tax may be based, measured by, or calculated with respect to is included in clause (i) above, or (iii) withholding Taxes measured with reference to or as a substitute for any Tax included in clauses (i) or (ii) above.

"Indebtedness" means, as to any Person as of any date of determination, without duplication, all obligations of such Person (a) for borrowed money, (b) evidenced by notes, bonds, debentures or similar instruments, (c) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business consistent with past practice), (d) any off-balance sheet financings, (e) for amounts drawn with respect to any letter of credit issued on behalf of such Person, (f) in the nature of guaranties by such Person made with respect to the obligations described in clauses (a) through (e) of this definition of any other Person, and (g) all accrued or unpaid interest, premiums, penalties, breakage costs, unwind costs, fees, termination costs, redemption costs, expenses, and other charges with respect thereto, in each case, with respect to the obligations described in clauses (a) through (f) of this definition.

"Intellectual Property" means all intellectual property and intellectual property rights and rights in confidential information of every kind and description throughout the world, including all U.S., foreign, regional and international (a) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any

9

of the foregoing ("Trademarks"); (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions and restorations thereof, including any supplementary protection certificates and the like, ("Patents"); (c) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"); (d) rights in computer programs (whether in source code, object code, or other form) and software systems, algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing ("Software"); (e) any information and materials, whether proprietary or not and whether patentable or not, including ideas, concepts, formulas, methods, procedures, designs, compositions, plans, documents, inventions, discoveries, works of authorship, components, reagents, materials, compounds, biological materials, drawings, specifications, trade secrets and rights in any data ("Know-How"); (f) rights of publicity, privacy rights, and rights to personal information; (g) all rights in the foregoing and in other similar intangible assets; (h) all applications and registrations for any of the foregoing; and (i) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"Inter-Company Payable" means any accounts payable, trade accounts payable and other amounts payable owed by a Seller to a Seller or a Transferred Subsidiary.

"Inter-Company Receivable" means any accounts receivable, trade accounts and other amounts receivable owed to a Seller by a Seller or a Transferred Subsidiary.

"Interconnection Agreement" means for any Transferred Subsidiary, a New York State Standardized Interconnection For New Distributed Generators and Energy Storage Systems 5 MW or Less Connected in Parallel with Utility Distribution Systems Contract for a Project entered into by and between the applicable Transferred Subsidiary and Transmission Provider and the New York Standardized Interconnection Requirements applicable to the Project thereunder.

"Interim DIP Order" has the meaning ascribed to such term in the DIP Credit Agreement.

"IRS" means the Internal Revenue Service of the United States.

"Know-How" has the meaning set forth in the definition of "Intellectual Property."

"Knowledge" with respect to the Sellers, means the actual (but not constructive or imputed) knowledge of the persons listed in Section 1.1(b) of the Disclosure Schedules as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) after reasonable due inquiry.

"Law" means any federal, state, provincial, local, municipal, foreign or other statute, law, legislation, constitution, principle of common law, resolution, ordinance, code, regulation, rule, proclamation, treaty, convention, code, injunction, judgment, decree, ruling, directive, pronouncement, requirement, determination, decision, opinion, order, ordinances and regulations (including binding determinations and interpretations) of any Governmental Authority with jurisdiction over the Parties, including the Community Solar Rules, in each case, to the extent applicable to any Person, its assets or a transaction.

"Lease" means the Seller Leases and the Transferred Subsidiary Leases.

"Leased Real Property" means the Seller Leased Real Property and the Transferred Subsidiary Leased Real Property.

"Liability" means any debt, adverse claim, Loss, claim, lien, damage, demand, fine, judgment, penalty, liability, duty, responsibility, expense or obligation of any kind, character, or description (whether known or unknown, asserted or unasserted, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due).

"Local Utility" means the interconnecting electric utility where the applicable Project is located.

"Loss" or "Losses" means any and all damages, fines, penalties, Liabilities, deficiencies, losses, interest, awards, judgments and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other Action or of any claim, default or assessment).

"Material Adverse Effect" means any event, change, condition, occurrence or effect that individually or in the aggregate has had, or would reasonably be expected to have, a material adverse effect on (a) the business, properties, liabilities, financial condition or results of operations of the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), including the Transferred Subsidiaries, Transferred Assets and Assumed Liabilities, taken as a whole, or (b) the ability of the Sellers to perform their obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby, in each case of the preceding clause (a), other than any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry in which the Business operates, (ii) changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war), (iii) natural disasters or calamities, (iv) changes in any applicable Laws or GAAP after the date of this Agreement, (v) the announcement, of this Agreement or the transactions contemplated hereby, (vi) the commencement of the Bankruptcy Case, (vii) any action taken by the Sellers or the Transferred Subsidiaries at the written request of Buyer, or (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); provided, however, that the events, changes, conditions, occurrences or effects set forth in clauses (i), (ii), (iii) or (iv) may be taken into account in determining whether there has been or is Material Adverse Effect if such event, change, condition, occurrence or effect has a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"<u>Megawatt Block Program</u>" means the NYSERDA NY-Sun Megawatt Block incentive program.

"<u>National Grid</u>" means National Grid USA, a public utility holding company with and its regulated Subsidiaries that are a Transmission Provider and each such Subsidiary.

"<u>NYISO</u>" means the New York Independent System Operator, Inc. or any successor in function.

"<u>NYPSC</u>" means the New York Public Service Commission or any successor thereto.

"<u>NYSERDA</u>" means the New York Energy Research and Development Authority and any successor in function.

"<u>NYSERDA Incentive Payments</u>" means the amounts paid or payable to a Transferred Subsidiary or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) with respect to a Project in accordance with the Megawatt Block Program.

"<u>OFAC</u>" means the U.S. Department of Treasury's Office of Foreign Assets Control.

"<u>OFAC Blocked Parties List</u>" means the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC.

"<u>Off-the-Shelf Software</u>" means non-exclusive licenses for software that are (a) licensed under "shrink-wrap" or "click-through" Contracts, (b) generally commercially available on reasonable nondiscriminatory terms through commercial distributors or in a retail store, or (c) licensed from a third-party for amounts less than $30,000 annually.

"<u>Order</u>" means any award, writ, injunction, judgment, order, decree, rule, ruling, directive, determination, or award entered, issued, made, or rendered by any Governmental Authority, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"<u>Ordinary Course of Business</u>" means the operation of the Business in the ordinary and usual course consistent with past practice of the Sellers and Transferred Subsidiaries in accordance with applicable Law.

"<u>Organizational Documents</u>" means, with respect to any Person that is not a natural person the articles or certificate of incorporation, formation or organization, memorandum of association, articles of association and by-laws, limited partnership agreement, partnership agreement, limited liability company agreement or operating agreement or such other organizational documents of such Person or which establish the legal personality of such Person.

"<u>Party</u>" or "<u>Parties</u>" means, individually or collectively, the Buyer and the Sellers.

"<u>Patents</u>" has the meaning set forth in the definition of "Intellectual Property."

"<u>Permit</u>" means any authorization, approval, consent, license, permit, variance, waiver, certificate of authority, franchise, ruling, tariff, certification, exemption, filing, notice to, declaration of, or registration by or with any Governmental Authority.

"<u>Permitted Encumbrance</u>" means (a) statutory liens for current Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, in each case for which adequate reserves have been established and for which there is no material risk of seizure of any property or asset, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the Ordinary Course of Business relating to obligations (i) as to which there is no default on the part of any of the Sellers or the Transferred Subsidiaries, (ii) for a period with respect to amounts not yet overdue (<u>provided</u> that such amounts arising or accruing prior to Closing remain Excluded Liabilities) and (iii) that are not individually or in the aggregate material to the continued use, value or operation of the Transferred Assets in the conduct of the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) as currently conducted, or pledges, deposits or other liens securing the performance of bids, trade Contracts, leases or statutory obligations, (c) with respect to the Leased Real Property, minor title defects or irregularities that do not, individually or in the aggregate, materially impair the value or the current use of such Leased Real Property, (e) any Encumbrances that will be removed or released by operation of the Sale Order or pursuant to the Payoff Letters on or prior to the Closing Date and (f) any Encumbrance set forth on <u>Section 1.1(e)</u> of the Disclosure Schedules.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"<u>Petition Date</u>" means the date on which the Sellers commence the Bankruptcy Cases.

"<u>Post-Closing Tax Period</u>" means any Tax year or Tax period that begins after the Closing Date, and with respect to the Straddle Period, the portion of such period that begins after the Closing Date.

"<u>Power Purchase Agreement</u>" means, with respect to a Project, any power purchase agreement, energy hedge or other offtake agreement pursuant to which such Project will sell any energy (whether physical, virtual or financial), capacity or ancillary services associated with such energy, or capacity and environmental or other attributes created or that otherwise arise from the generation of electric energy from a renewable energy source, in each case, produced by or attributable to such Project.

"<u>Pre-Closing Tax Period</u>" means any Tax year or Tax period that ends on or before the Closing Date and, with respect to the Straddle Period, the portion of such period that ends on, and including, the Closing Date.

"Project" means each project owned by a Seller or a Transferred Subsidiary identified on Schedule II hereto, excluding any such Project owned by a Transferred Subsidiary that becomes an Excluded Subsidiary in accordance with this Agreement.

"PUHCA" means the Public Utility Holding Company Act of 2005 and FERC's regulations promulgated thereunder.

"QF" means a "qualifying small power production facility" as that term is defined in 16 U.S.C. Section 796 and FERC's implementing regulations thereunder.

"Real Property Document" means any Lease, Easement, Option and any grant deed or other type of deed with respect to the Real Property.

"Regulatory Exemptions" means the exemptions granted in FERC's regulations at 18 C.F.R. Part 292 Subpart F applicable to eligible QFs, including the exemption from PUHCA regulation by FERC, exemption from state Laws and regulations respecting the rates of electric utilities and the financial and organizational regulation of electric utilities, and the exemptions from the requirements of Sections 204, 205 and 206 of the FPA provided under 18 C.F.R. § 292.601(c)(1).

"Related Party" means (a) any Seller; (b) any Affiliate of any Seller; (c) each individual who is or who has been at any time since inception of a Transferred Subsidiary, an officer or director of any such Transferred Subsidiary; (d) each member of the immediate family of each of the Persons referred to in clause (c) of this definition; or (e) any Affiliate of a Person described in clause (c) or (d).

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater, or property.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"RTO/ISO" means, with respect to each Project, the regional transmission organization or independent service provider applicable to such Project, including NYISO.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby in form and substance acceptable to the Buyer and the Sellers.

"Sale Procedures" means the bidding procedures reflected in the Sale Procedures Order, the form of which is attached hereto as Exhibit A.

"<u>Sale Procedures Motion</u>" means the motion filed in the Bankruptcy Court by the Debtors seeking entry of the Sale Procedures Order.

"<u>Sale Procedures Order</u>" means an order of the Bankruptcy Court, that, among other things, approves (a) bidding procedures, (b) bid protections granted to the Buyer including the Termination Payment, (c) the form and manner of notice of Auction(s), sale transaction(s), and Sale Hearing(s), and the conduct of the Auction, (d) the procedures for assumption and assignment of Contracts and Leases, (e) the date for Auction(s), if necessary, and Sale Hearing(s), and (f) affords Buyer the status of a party in interest in the Bankruptcy Cases, the form of which Order is attached hereto as <u>Exhibit B</u>, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to the Buyer and the Sellers.

"<u>Seller Fundamental Representations</u>" means the representations and warranties of the Sellers set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.4(a)</u>, <u>Section 3.5(a)</u> and <u>(b)</u>, and <u>Section 3.18</u>.

"<u>Seller Lease</u>" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which a Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"<u>Seller Leased Real Property</u>" means the leasehold interests held by a Seller under a Seller Lease (other than any Leases withdrawn pursuant to <u>Section 2.6</u>).

"<u>Seller Taxes</u>" means (i) Taxes imposed on any Seller, its direct or indirect owners, or any Affiliate of the foregoing (other than the Transferred Subsidiaries), (ii) Asset Taxes imposed on or with respect to any Transferred Asset, Transferred Subsidiary, Project, or Assumed Liability or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) due and payable on or prior to the Closing Date, (iii) Income Taxes imposed with respect to any Transferred Asset, Transferred Subsidiary, Project, or Assumed Liability or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) relating to a Pre-Closing Tax Period (including (for the avoidance of doubt) any such Income Taxes allocated to the Pre-Closing Tax Period pursuant to <u>Section 7.3(a)</u>), (iv) any Taxes imposed on or with respect to any Excluded Asset or Excluded Liability, (v) any Transfer Taxes for which any Seller is responsible pursuant to <u>Section 7.1</u>, and (vi) any other Taxes incurred by Sellers, their direct or indirect owners, or any Affiliate of the foregoing (other than the Transferred Subsidiaries) with respect to transactions contemplated by this Agreement.

"<u>Site</u>" means, with respect to any Project, the Leased Real Property and Easement Real Property held by a Seller or the applicable Transferred Subsidiary in respect of such Project (but excluding, for the avoidance of doubt, any Option Real Property).

"<u>Software</u>" has the meaning set forth in the definition of "Intellectual Property."

"<u>Straddle Period</u>" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"<u>Subsidiary</u>" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or

indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which (i) such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs or (ii) such Person possesses, directly or indirectly, a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Successful Bidder" has the meaning set forth in the Sale Procedures Order.

"Surety Bonds" means surety bonds, license and permit bonds, financial guarantee bonds, decommissioning bonds, road use bonds, bid bonds, performance bonds, payment bonds and all similar bonds.

"Target of Sanctions" means any Person that is located in, incorporated under the Laws of, or owned or (directly or indirectly) controlled by Persons with which applicable Economic Sanctions and Trade Controls Laws and Regulations prohibit or restrict dealings.

"Tax Equity Documents" means any Contract with respect to which there is a tax equity investment.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, estimation, disclosure, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means (a) any and all U.S. federal, state and local, non-U.S., and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, capital gains, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, unclaimed property, escheat, withholding, payroll, employment, fringe, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property, windfall profits, wealth, net wealth, net worth, payment or fee in lieu of taxes (or similar arrangement), export and import fees and charges, registration fees, tonnage, vessel, deposits, or other taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls, or charges of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed thereon, with respect thereto, or related thereto, or in lieu thereof, wherever and whenever imposed, (b) any and all liability for the payment of any items described in clause (a) above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary, or other similar group or being included (or ceasing to be included) in any Tax Return related to such group, (c) any and all liability for the payment of any amounts as a result of any successor or transferee liability, or by operation of law, in respect of any items described in clause (a) or clause (b) above, and (d) any and all liability for the payment of any items described in clause (a) or clause (b) above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to

any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"Trademarks" has the meaning set forth in the definition of "Intellectual Property."

"Transferred Contracts" means all Contracts and Seller Leases of each Seller that are listed in Section 1.1(c) of the Disclosure Schedules, which schedule shall be provided by Buyer to the Sellers as provided in, and may be adjusted pursuant to, Section 2.6; provided that in no event shall the Deferred Payment Agreements be considered Transferred Contracts.

"Transferred Subsidiary Lease" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which a Transferred Subsidiary is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Transferred Subsidiary Leased Real Property" means the leaseholder interests held by a Transferred Subsidiary under a Transferred Subsidiary Lease.

"Transmission Provider" means, with respect to a Project, the Person that owns, operates and maintains the portion of the electric distribution system to which the Project interconnects or is designed to interconnect.

"Treasury Regulations" means the regulations promulgated by the U.S. Department of the Treasury pursuant to the Code.

"United States Person" means a United States person within the meaning of Section 7701(a)(30) of the Code.

"VDER Program" means the Value of Distributed Energy Resources compensation mechanism established by the NYPSC, as implemented by NYSERDA.

Section 1.2    Table of Definitions. The following terms have the respective meanings set forth in the Sections referenced below:

| Definition | Location |
|---|---|
| Acquired Intellectual Property | Section 2.1(p) |
| Agreement | Preamble |
| Allocation | Section 2.10(b) |
| AML Laws | Section 3.24(b) |
| Applicable Permits | Section 3.8(b) |
| Assignment Agreement | Section 2.9(b)(i) |
| Assumed Liabilities | Section 2.3(a) |
| Balance Sheet Date | Section 3.6(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Break-Up Fee | Section 5.1(a)(i) |
| Building Permit | Section 2.8(b)(i) |

Business ......................................................................Recitals
Business Permits ......................................................Section 2.1(e)
Buyer..........................................................................Preamble
Cash Statement..........................................................Section 2.9(d)
CESIR ........................................................................Section 3.11(j)
CESIR Reports...........................................................Section 3.11(j)
Closing .......................................................................Section 2.9(a)
Closing Date...............................................................Section 2.9(a)
Collection Costs ........................................................Section 5.1(a)(iii)
Consent or Governmental Authorization ..................Section 2.6(c)
Contingent Payment..................................................Section 2.8(b)(i)
Cure Costs..................................................................Section 2.3(a)(iii)
Current Receivables ..................................................Section 3.19(b)
Debtors .......................................................................Recitals
Delivery Date.............................................................Section 2.6(b)
Dewittville Earn-Out Amount...................................Section 2.8(b)(i)
Dewittville Permits ...................................................Section 2.8(b)(i)
Disclosure Limitations ..............................................Section 6.2
Disclosure Schedules ................................................Article III
Easement ....................................................................Section 3.11(b)(ii)
Easement Real Property.............................................Section 3.11(b)(ii)
Enforceability Exceptions..........................................Section 3.2(a)
Environmental Reports ..............................................Section 3.14(f)
Equipment ..................................................................Section 2.1(c)
EquipmentCo .............................................................Preamble
Excluded Assets.........................................................Section 2.2
Excluded Contracts ...................................................Section 2.2(e)
Excluded Liabilities ..................................................Section 2.4
Excluded Subsidiaries...............................................Section 2.11(b)
Expense Reimbursement Amount..............................Section 5.1(a)(i)
Final Allocation ........................................................Section 2.10(b)
Financial Assurances ................................................Section 6.11
Go-Shop Actions .......................................................Section 5.1(b)
Go-Shop Period..........................................................Section 5.1(b)(i)
Insurance Policies .....................................................Section 3.17
Intended Tax Treatment ............................................Section 2.10(a)
Inventory ....................................................................Section 2.1(d)
Latest Balance Sheet .................................................Section 3.6(a)
Legal Restraint ..........................................................Section 8.1(a)
Material Contract .......................................................Section 3.15(a)
New Dewittville Permit .............................................Section 2.8(b)(i)
Non-Party Affiliates ..................................................Section 10.12
OEM............................................................................Section 3.19(c)
OEM Warranties ........................................................Section 3.19(c)
OFAC Rep Party ........................................................Section 3.23(a)
Option ........................................................................Section 3.11(b)(ii)

Option Real Property ...................................................Section 3.11(b)(ii)
ORCH 2 ................................................................Preamble
ORCH 3 ................................................................Preamble
Outside Date..........................................................Section 9.1(b)(iii)
Pending Permits ......................................................Section 3.8(e)
Pre-Closing Tax Return ...............................................Section 7.4
Purchase Price........................................................Section 2.8(a)(i)
QF Status.............................................................Section 3.22(b)
Real Property ........................................................Section 3.11(b)(ii)
Related Orders .......................................................Section 5.1(c)(ii)
Related Party Agreement ..............................................Section 3.16
Renewed Dewittville Permit ...........................................Section 2.8(b)(i)
Schedule of Costs and Commitments ....................................Section 3.6(d)
Seller ...............................................................Preamble
Seller Bonds..........................................................Section 3.27
Seller Financial Statements...........................................Section 3.6(a)
Service Provider......................................................Section 3.10
Studies and Reports...................................................Section 3.25(a)
Tariff Letters .......................................................Section 3.22(j)
Tax Books and Records ................................................Section 7.2
Termination Payment...................................................Section 5.1(a)(i)
Terrorism Order ......................................................Section 3.23(a)
Transfer Taxes .......................................................Section 7.1
Transferred Assets ...................................................Section 2.1
Transferred Equity ...................................................Recitals
Transferred Subsidiaries .............................................Recitals
Voting Company Debt ..................................................Section 3.5(c)

## ARTICLE II.
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale</u>. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver to the Buyer all of the Sellers' right, title and interest in, to and under the Transferred Assets, and the Buyer shall purchase, acquire and accept the Transferred Assets free and clear of all Encumbrances (other than Permitted Encumbrances). "<u>Transferred Assets</u>" shall mean all of the properties, rights, interests and other assets of the Sellers of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, relating to the Business, including all right, title and interest of the Sellers in, to or under the following properties, rights, interests and other assets (but excluding in each case, any Excluded Assets):

(a)    all Transferred Contracts (as may be adjusted pursuant to <u>Section 2.6</u>);

(b)    all Seller Leased Real Property (subject to <u>Section 2.6</u>) and other interests in Real Property, together in each case with the Sellers' right, title and interest in and to all

19

structures, fixtures, facilities or improvements located thereon and all easements, licenses, rights, privileges and appurtenances relating to the foregoing;

(c) all machinery, equipment, consumables, supplies, furniture, furnishings, parts, spare parts, vehicles and other tangible personal property and fixed assets owned, leased (to the extent the underlying lease is a Transferred Contract) or used (or held for use) by the Sellers (the "Equipment");

(d) all inventory (including raw materials, component parts, spare parts, works-in-progress, finished goods and goods in transit, supplies and packaging materials) owned or used (or held for use) by any of the Sellers, wherever located and whether in the Sellers' facilities, held by any third parties or otherwise (the "Inventory");

(e) all Permits issued to, or for the benefit of, any Seller (the "Business Permits"), all rights and benefits thereunder and all pending applications or filings therefor and renewals thereof, which are related to the Transferred Assets or the Business, but only to the extent such Permits may be transferred under applicable Law;

(f) all Cash and Cash Equivalents, all bank accounts, all cash collateral held by third parties as security, all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, in each case, solely as related to any other Transferred Asset or Assumed Liability, excluding Cash and Cash Equivalents and bank accounts of Sellers;

(g) all Tax assets, including any interest in or right to any refund, rebate or credit of Taxes (or other Tax benefit) that relate to the Transferred Assets, Transferred Subsidiaries, Projects, or Assumed Liabilities or the Business, including (for the avoidance of doubt) any such refund, rebate or credit of Taxes (or other Tax benefit) that becomes payable or available to any Seller in the future in respect of a Tax paid or incurred by the Buyer, provided that the foregoing shall not include any refund, rebate or credit of Taxes (or other Tax benefit) that relate to the Income Taxes of the Sellers;

(h) all Tax Returns or copies of thereof, of, with respect to, or related to the Transferred Assets, Transferred Subsidiaries, Projects, or Assumed Liabilities, or the Business (and all Tax Books and Records, including note papers and work papers, related thereto), provided that the foregoing shall not include any Tax Returns relating to Income Taxes of the Sellers;

(i) all Avoidance Actions, including all of the rights and claims of the Sellers available under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, including against the Buyer, any suppliers, vendors, merchants, manufacturers, or other counterparties to any Transferred Contracts, or with respect to trade obligations paid prior to the Petition Date, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

(j) all Accounts Receivable (including Inter-Company Receivables);

(k)        all Transferred Equity;

(l)        all rights under non-disclosure or confidentiality, non-compete, non-solicitation, non-interference, non-disparagement or similar agreements to which any Seller is a party, with respect to which any Seller is a beneficiary or has any rights thereunder, including any such agreement with current or former directors, managers, officers, employees or agents, or with third parties;

(m)        all rights (including lien rights), claims (including commercial tort claims), credits, settlement proceeds, causes of action, choses in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses relating or with respect to the Business, any of the Transferred Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, any of the Transferred Contracts) or any of the Assumed Liabilities, including all rights under vendors', manufacturers' and contractors' representations, warranties, indemnities and guarantees;

(n)        all goodwill, customer and referral relationships, other intangible assets and all privileges associated with, or relating to, the Business, the Transferred Assets or the Assumed Liabilities;

(o)        all rights to the telephone and facsimile numbers and e-mail account contents (to the extent solely related to the Business or the Transferred Assets, including the Transferred Subsidiaries, or the Assumed Liabilities) and addresses used by any Seller, as well as rights to receive mail and other communications addressed to any Seller (including mail and communications to and from Governmental Authorities, Local Utilities and subscribers representing more than 10% of the allocation of credits from any Project, customers, vendors, suppliers, distributors and agents);

(p)        all Intellectual Property owned by or licensed to or purported to be owned by or licensed to any of the Sellers, including the Intellectual Property set forth on <u>Section 2.1(p) of the Disclosure Schedules</u>, all work product developed by employees and contractors of the Sellers related to the Projects (including but not limited to studies, drawings, maps, specifications, plans and operating manuals) and all Intellectual Property rights therein, and all data owned by the Sellers, including such data relating to its products, customers and customer contracts, all rights to collect royalties and proceeds in connection with such Intellectual Property, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations or other violations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world (regardless of whether or not such claims and causes of action have been asserted by Sellers), and all other rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, possessed by Sellers as of Closing (regardless of whether such rights are currently exercisable), and rights to protection of interests in the foregoing under the Laws of all jurisdictions, including all registrations, renewals, extensions, combinations, divisions, or reissues of, and applications for, any of the rights referred to above;

(q)        except as set forth in <u>Section 2.2(a)</u>, all Books and Records related to the Business, the Transferred Assets or Assumed Liabilities;

(r)    the properties, rights, interests and other assets set forth on Section 2.1(r) of the Disclosure Schedules.

Section 2.2    Excluded Assets. Notwithstanding anything contained in Section 2.1 to the contrary, the Sellers are not selling, transferring, assigning, conveying or delivering, and the Buyer is not purchasing, any of the Sellers' right, title and interest to, in and under, the following assets, properties, rights and interests of the Sellers, all of which shall be retained by the Sellers (collectively, the "Excluded Assets"):

(a)    the Sellers' documents, written files, papers, books, reports and records (i) prepared in connection with this Agreement or the transactions contemplated hereby or relating to the Bankruptcy Case or (ii) that any Seller is required by Law to retain; provided that, to the extent not prohibited by applicable Law or any of any Seller's reasonable applicable privacy policies or contractual restrictions and to the extent materially relevant to the Transferred Assets, Assumed Liabilities, or the Business, Buyer shall be entitled to copies of all or any portions of such documents;

(b)    all insurance policies, fiduciary policies (in each case of the foregoing, including any automatic or purchased extended reporting periods, tail policies or coverage thereon), and any of such Seller's rights, benefits, indemnifications, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(c)    all rights, claims and causes of action to the extent relating to any Excluded Asset or any Excluded Liability;

(d)    shares of capital stock or other Equity Interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other Equity Interests of any Seller;

(e)    any Contract to which any of the Sellers is a party that is not a Transferred Contract, including those set forth on Section 2.2(e) of the Disclosure Schedules (the "Excluded Contracts"), including any Accounts Receivable or other amounts owed to Seller or any of its Affiliates under the Excluded Contracts, which schedule shall be provided by Buyer to the Sellers as provided in, and may be adjusted pursuant to, Section 2.6;

(f)    all retainers or similar prepaid amounts paid to the accountants, attorneys, consultants, advisors, investment bankers or other professional service providers of the Sellers;

(g)    the properties, rights, and assets of the Sellers listed in Section 2.2(g) of the Disclosure Schedules;

(h)    all rights of the Sellers under this Agreement and the Ancillary Agreements;

(i)    the projects listed on Section 2.2(i) of the Disclosure Schedules;

(j)    any Transferred Assets that are designated as Excluded Assets in accordance with Section 2.11, and the Equity Interests of any Transferred Subsidiary that is designated as an Excluded Subsidiary in accordance with Section 2.11;

22

(k)        Cash and Cash Equivalents and bank accounts of Sellers;

(l)        all Tax Returns relating to the Income Taxes of the Sellers; and

(m)       all Tax assets, including any interest in or right to any refund, rebate or credit of Taxes (or other Tax benefit) that relate to the Income Taxes of the Sellers.

Section 2.3      <u>Assumed Liabilities</u>.

(a)       On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Buyer shall assume from the Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer, and assign to Buyer, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (the "<u>Assumed Liabilities</u>"):

(i)        all Liabilities of the Sellers under the Transferred Contracts, solely to the extent of facts and circumstances first arising from and after the Closing;

(ii)       all Liabilities arising from the ownership or operation of the Transferred Assets by the Buyer after the Closing and which relate solely to events first occurring after the Closing Date (but excluding those Liabilities specified as Excluded Liabilities);

(iii)      all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Transferred Contracts (the "<u>Cure Costs</u>");

(iv)      all Inter-Company Payables; and

(v)       all Liabilities for (i) Taxes imposed on or with respect to the Transferred Subsidiaries and the operation or ownership of the Transferred Assets relating to a Post-Closing Tax Period (including any Taxes allocated to the Post-Closing Tax Period pursuant to <u>Section 7.3(a)</u> but excluding any Seller Taxes and Transfer Taxes), (ii) Asset Taxes imposed on or with respect to the Transferred Subsidiaries or the Transferred Assets that first become due and payable after the Closing Date, and (iii) Transfer Taxes for which Buyer is responsible pursuant to <u>Section 7.1</u>.

(b)       The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Buyer or the Sellers as compared to the rights and remedies that such third party would have had against the Sellers or the Buyer absent the Bankruptcy Case or the Buyer's assumption of such Assumed Liabilities. Notwithstanding the foregoing and for the avoidance of doubt, Assumed Liabilities shall not include (i) any Excluded Liability or (ii) any Liability relating to or arising out of any violation of Law by, or any Action against, any Seller or any breach, default or violation by any Seller or any of its Affiliates of or under any Transferred Contracts, all of which shall constitute Excluded Liabilities. Other than the Assumed Liabilities, the Buyer is not assuming and shall not be liable for any Liabilities of the Sellers.

Section 2.4    <u>Excluded Liabilities</u>. Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers or the Business or relating to the Transferred Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "<u>Excluded Liabilities</u>"), including but not limited to the following:

(a)    any and all Liabilities for Seller Taxes;

(b)    any and all Liabilities of the Sellers under any Excluded Contract whether accruing prior to, at, or after the Closing Date;

(c)    any and all Liabilities resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

(d)    any Indebtedness of the Sellers;

(e)    any Liability to distribute to any Seller's shareholders (or other equity holders) or otherwise apply all or any part of the consideration received hereunder;

(f)    any and all Liabilities arising under any Environmental Law or with respect to Hazardous Materials arising from or related to the Sellers' ownership or operation of the Business or the Transferred Assets on or before the Closing Date;

(g)    any and all Liability for: (i) costs and expenses incurred by the Sellers or owed in connection with the administration of the Bankruptcy Case (including the U.S. trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Sellers, and any official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); (ii) all costs and expenses of the Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement; and (iii) all costs and expenses arising out of or related to any third party claims against the Sellers, pending or threatened, including any warranty or product claims;

(h)    any Liability of the Sellers under this Agreement or the Ancillary Agreements; and

(i)    any Liability or obligation to the extent relating to an Excluded Asset.

Section 2.5    <u>Consents to Certain Assignments</u>.

(a)    Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, this Agreement and the Ancillary Agreements shall not constitute an agreement to transfer or assign any asset, Permit, claim or right or any benefit arising thereunder or resulting

therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which any Seller is a party or by which it is bound, or materially and adversely affect the rights of the Sellers or, upon transfer, the Buyer under such asset, Permit, claim or right, unless the applicable provisions of the Bankruptcy Code permits and/or the Sale Order authorizes the assumption and assignment of such asset, Permit, claim, or right irrespective of the consent or lack thereof of a third party. If, with respect to any Transferred Asset, such consent is not obtained or such assignment is not attainable pursuant to the Bankruptcy Code or the Sale Order, then such Transferred Asset shall not be transferred hereunder, and, subject to Section 8.3(e), the Closing shall proceed with respect to the remaining Transferred Assets and the Sellers shall, through the earlier of such time as such consent or assignment is so obtained and the six (6) months following the Closing, use their commercially reasonable efforts, and the Buyer shall cooperate with the Sellers, to obtain any such consent and to resolve the impracticalities of assignment after the Closing.

(b)     Except with respect to Transferred Contracts and Business Permits that are governed by Section 2.6(c) below, if (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the reasonable best efforts of the Sellers, any consent is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Transferred Asset intended to be transferred hereunder, (ii) any attempted assignment of a Transferred Asset would adversely affect the rights of the Sellers thereunder so that the Buyer would not in fact receive all the rights and benefits contemplated, or (iii) any Transferred Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Sellers shall, subject to any approval of the Bankruptcy Court that may be required and at the request of the Buyer, cooperate with Buyer in any lawful arrangement under which the Buyer would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer. The Sellers shall as promptly as practicable pay to the Buyer when received all monies received by the Sellers or their Affiliates attributable to such Transferred Asset from and after the Closing Date and the Buyer shall indemnify and promptly pay the Sellers for all Liabilities of the Sellers associated with such arrangement.

Section 2.6      Assumption/Rejection of Certain Contracts.

(a)      Assumption and Assignment of Executory Contracts. The Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Transferred Contracts and take all other actions necessary to cause such Contracts to be assumed by the Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Transferred Contracts at Closing. At the Closing, the Sellers shall, pursuant to the Sale Order and the Assignment Agreement(s), assume and assign to Buyer (the consideration for which is included in the Purchase Price), all Transferred Contracts that may be assigned by any such Seller to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 2.6(b). At the Closing, Buyer shall (i) pay all Cure Costs, (ii) cure any and all other defaults and breaches under the Transferred Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Buyer in accordance with the provisions of

Section 365 of the Bankruptcy Code and this Agreement, and (iii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Transferred Contract pursuant to Section 365 of the Bankruptcy Code.

(b)    <u>Excluding or Adding Transferred Contracts Prior to Closing</u>. On or before the date that is 4 Business Days after the entry of the Sale Procedures Order (the "<u>Delivery Date</u>"), the Sellers shall deliver to the Buyer a schedule which shall contain a list of each Contract (including Seller Leases) of the Sellers (other than the Deferred Payment Agreements) and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the estimated amount of such Cure Cost for such Contract shall be designated as "$0.00"). On or before the Bid Deadline (as defined in the Sales Procedures Order), the Buyer shall provide the Sellers with a list of all Transferred Contracts; provided that in no event may Buyer designate a Deferred Payment Agreement as a Transferred Contract. Notwithstanding anything to the contrary set forth herein, Buyer shall have the right to notify the Sellers in writing of (x) any Transferred Contract that it does not wish to assume up to three (3) Business Days prior to the Closing Date or (y) a Contract to which any Seller is a party (other than a Deferred Payment Agreement) that Buyer wishes to add as a Transferred Contract up to (1) if the Auction is cancelled, the day before the deadline to file the proposed Sale Order under the Sale Procedures Order or (2) otherwise, if the Buyer is a Successful Bidder or Back-Up Bidder, the deadline to file the Notice of the Successful Bidder(s) under the Sale Procedures Order, and (i) any such previously considered Transferred Contract that Buyer no longer wishes to assume shall be automatically deemed removed from <u>Section 1.1(c) of the Disclosure Schedules</u> and automatically deemed added to <u>Section 2.2(e) of the Disclosure Schedules</u>, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Buyer wishes to assume as a Transferred Contract (other than a Deferred Payment Agreement) shall be automatically deemed added to <u>Section 1.1(c) of the Disclosure Schedules</u> related to Transferred Contracts, automatically deemed removed from <u>Section 2.2(e) of the Disclosure Schedules</u>, and assumed by Sellers to sell and assign to Buyer, in each case, without any adjustment to the Purchase Price. Promptly following any such changes to the information set forth on <u>Section 1.1(c) of the Disclosure Schedules</u> or <u>Section 2.2(e) of the Disclosure Schedules</u>, the Sellers shall provide written notice to the Buyer of the updated schedule of the amount of Cure Costs applicable to each Contract set forth on <u>Section 1.1(c) of the Disclosure Schedules</u>, along with a copy thereof.

(c)    <u>Non-Assignment</u>. Notwithstanding the foregoing, a Contract shall not be a Transferred Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Buyer as a Transferred Contract hereunder and is not continued or otherwise extended upon assumption; <u>provided</u>, <u>however</u>, the Buyer may irrevocably designate any such Contract as a Transferred Contract in accordance with <u>Section 2.6(b)</u> and the Sellers shall not move to reject such Contract; or (ii) requires an approval or order from, or consent by, any Governmental Authority or other Person (other than, and in addition to, that of the Bankruptcy Court), except for any such approval, order, or consent that is not required due to the Sale Order ("<u>Consent or Governmental Authorization</u>") in order to permit the sale or transfer to Buyer of the applicable Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by Buyer as a Transferred Contract hereunder or the Bankruptcy

Court has not issued an Order that such Consent or Governmental Authorization is not required. In addition, a Business Permit shall not be assigned to, or assumed by, Buyer to the extent that such Business Permit requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of the applicable Seller's rights under such Permit, and no such Consent or Governmental Authorization has been obtained prior to the Closing or the Bankruptcy Court has not issued an Order that such Consent or Governmental Authorization is not required. In the event that any Transferred Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 2.6(c), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Case, if shorter), Sellers and Buyer shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Buyer, including subcontracting, licensing, or sublicensing to Buyer any or all of any Seller's rights and obligations with respect to any such Transferred Contract, under which (I) Buyer shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Transferred Contract with respect to which the Consent or Governmental Authorization has not been obtained and (II) Buyer shall assume any related burden (taking into account the amount of any related Tax benefit obtained by Sellers or their respective Affiliates) and obligation (including performance) with respect to such Transferred Contract. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Transferred Contract after the Closing, such Transferred Contract shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement.

Section 2.7    Transferred Subsidiaries. Notwithstanding anything to the contrary in this Agreement, none of the Transferred Assets, Excluded Assets, Assumed Liabilities or Excluded Liabilities shall include any assets or Liabilities of any of the Transferred Subsidiaries.

Section 2.8    Consideration.

(a)    The consideration for the sale and transfer of the Transferred Assets from the Sellers to the Buyer shall be as follows:

(i)    a cash amount equal to $30,000,000, *plus* the Closing Cash Amount, if any, *less* the amount of Indebtedness incurred and outstanding under the DIP Credit Agreement immediately prior to Closing in an amount not to exceed $4,500,000 (the "Purchase Price");

(ii)    if payable in accordance with Section 2.8(b), the Contingent Payment; and

(iii)    in addition to the Purchase Price, the Contingent Payment, the direct assumption of the Assumed Liabilities, including the payment of all Cure Costs and the indirect assumption of the Liabilities held by the Transferred Subsidiaries; and

(b)    Contingent Payment.

(i)    To the extent the Dewittville Company has not received either a special use permit with respect to substantially the same site plan submitted with respect to the Expired Dewittville Permit validly issued by the Town Board of the Town of Chautauqua (a "New Dewittville Permit") or confirmation from the Town Board of the Town of Chautauqua of the renewal and validity of the Expired Dewittville Permit (a "Renewed Dewittville Permit" and together with the New Dewittville Permit, the "Dewittville Permits"), as of the Closing Date, then the Buyer shall, during the period commencing on the Closing Date and ending on the date that is eighteen (18) months following the Closing Date, use commercially reasonable efforts to take such actions as may be reasonably required under applicable Law for the Dewittville Company to obtain either a New Dewittville Permit or a Renewed Dewittville Permit; provided, that, neither the Buyer nor the Dewittville Company shall be required to pay any amount, grant any accommodation therefor or incur any material obligation to any Person or to initiate any Action in order to obtain such New Dewittville Permit or Renewed Dewittville Permit; provided, further, that the Buyer shall have no such obligation to pursue or obtain such Permits to the extent that the Buyer or the Dewittville Company are informed by any Town of Chautauqua official that the issuance of a New Dewittville Permit or a Renewed Dewittville Permit are prohibited by applicable Law, including any moratorium imposed by the Town of Chautauqua. The Buyer shall promptly respond, or cause to be responded, to any inquiries, deficiencies or other comments made by the Town Board or Code Enforcement Officer of the Town of Chautauqua with respect to the Expired Dewittville Permit, a New Dewittville Permit, or a Renewed Dewittville Permit, as applicable. If at any time during the eighteen (18)-month period following the Closing Date, the Town Board of the Town of Chautauqua issues either a New Dewittville Permit or a Renewed Dewittville Permit with respect to the Dewittville Project, the Buyer shall pay, or caused to be paid, by wire transfer of immediately available funds, to ORCH 3 (A) an amount equal to $1,000,000.00 or, (B) if immediately following the issuance of such Permit, the capacity of the Dewittville Project that may be constructed consistent with such Permit is less than the capacity anticipated as of the date of this Agreement due to restrictions imposed by such Permit, changes in the permitting process, applicable Law or similar restrictions, an amount equal to $0.20 per Watt AC of capacity that could reasonably be constructed on such reduced site area of the Dewittville Project (the "Contingent Payment").Any Contingent Payment payable under this Section 2.8(b) shall be paid within ten (10) Business Days of any such payment becoming due and payable in accordance with this Section 2.8(b).

(ii)    The Parties hereto agree and acknowledge that the contingent rights to receive any Contingent Payment pursuant to this Section 2.8(b) do not, on their own, constitute an equity or ownership interest in the Dewittville Company or any of its Affiliates.

(iii)    The Parties hereto agree and acknowledge that (x) in no event shall the Contingent Payment be payable more than once, if at all and (y) no interest is payable with respect to the Contingent Payment.

(iv)    Each Seller acknowledges and agrees that the Contingent Payment is subject to numerous factors outside the control of the Buyer or the Dewittville Company. Notwithstanding the foregoing or anything in this Agreement to the contrary, none of Buyer, the Dewittville Company nor any Affiliate of the foregoing shall knowingly and intentionally take or

28

fail to take any action with the express intent of reducing or avoiding the Contingent Payment; provided that nothing shall prohibit Buyer or its Affiliates from taking any action required by applicable Law or Order.

(v)     From and after the Closing Date, within five (5) Business Days following the end of each calendar quarter until the earlier of (x) the date that the Contingent Payment has been paid in full with respect to such Project, and (y) the date that is thirty (30) days following the eighteen (18)-month period set forth in Section 2.8(b)(i), the Buyer shall deliver or cause to be delivered to the Sellers a written update for each Project in substantially the form attached hereto as Exhibit D together with any supporting documentation, including any contract, correspondence, communication, record or other written documentation reasonably requested by the Sellers as evidence of such updates with respect to the Dewittville Permits. The Buyer will make itself reasonably available to meet and confer with the Sellers regarding the content of each such quarterly update. Following (A) the sale, assignment, transfer or other conveyance, in whole or in part, of the Dewittville Company or the Dewittville Project or (B) the acquisition of any Dewittville Permit pursuant to Section 2.8(b)(i), in each case, the Buyer shall promptly, but in any event within two (2) Business Days, provide written notice to the Sellers of such event.

Section 2.9     Closing.

(a)     The sale and purchase of the Transferred Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held by electronic exchange of documents at 10:00 a.m. New York Time on the fourth (4th) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VIII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as the Sellers and the Buyer mutually may agree in writing. The day on which the Closing takes place is referred to as the "Closing Date."

(b)     At or prior to the Closing, the Sellers shall deliver or cause to be delivered to the Buyer:

(i)     the bill of sale, assignment and assumption agreement substantially in the form of Exhibit C (the "Assignment Agreement"), duly executed by the applicable Sellers;

(ii)     a copy of the Sale Order, as entered by the Bankruptcy Court;

(iii)     (y) to the extent the Transferred Equity is certificated, certificates evidencing the Transferred Equity, duly endorsed in blank (or with stock powers in form and substance reasonably satisfactory to Buyer, acting in good faith, duly executed by the Sellers), or (z) instruments of transfer reasonable and customary for the jurisdiction applicable to such Transferred Equity, in each case free and clear of all Encumbrances (except for Encumbrances under applicable securities Laws);

(iv)     an IRS Form W-9 from each Seller duly executed by each such Seller, dated as of the Closing Date, certifying that such Seller (or if such Seller is a Disregarded

Entity, its regarded owner for U.S. federal income Tax purposes) is a United States Person and is not subject to backup withholding;

(v)     a duly executed certificate of a duly authorized officer of each Seller certifying the satisfaction of the conditions set forth in <u>Section 8.3(a)</u> and <u>Section 8.3(b)</u>;

(vi)     resignation letters, in form and substance reasonably satisfactory to Buyer, effective as of the Closing, from the officers, directors and managers of the Transferred Subsidiaries which are identified prior to signing to Sellers; and

(vii)     termination agreements for the agreements listed on <u>Section 2.9(b)(vii) of the Disclosure Schedules</u>;

(c)     At or prior to the Closing, the Buyer shall deliver or cause to be delivered to the Sellers:

(i)     the Assignment Agreement, duly executed by the Buyer;

(ii)     a duly executed certificate of a duly authorized officer of the Buyer certifying the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>;

(iii)     evidence of payment or satisfaction of the Cure Costs; and

(iv)     an amount in cash equal to the Purchase Price by wire transfer of immediately available funds.

(d)     On the Business Day prior to the Closing Date but no later than twenty four (24) hours prior to the Closing, the Sellers shall deliver to the Buyer, a written statement setting forth the Closing Cash Amount (the "<u>Cash Statement</u>"), together with a certificate, duly executed by a duly authorized officer of each of the Sellers, containing the representation and warranty of the Sellers that all information contained in the Cash Statement is accurate and complete as of the Cash Cutoff Time. During the period after the delivery of the Cash Statement and prior to the Closing, the Buyer shall have an opportunity to review the Cash Statement and the Sellers shall provide the Buyer with reasonable access during normal business hours to such information and detail as the Buyer shall reasonably request in connection with its review of such Cash Statement; *provided*, that such access (i) shall not unreasonably disrupt the operations of the Business and (ii) will be conducted in a manner that complies with applicable Laws.

Section 2.10    <u>Intended Tax Treatment; Tax Allocation</u>.

(a)     For U.S. federal income Tax purposes (and applicable state and local income Tax purposes), the sale of the Transferred Assets (including the Transferred Equity) by each Seller to Buyer under this Agreement shall be treated as a taxable asset sale (the "<u>Intended Tax Treatment</u>"). The Parties will, and will cause each of their respective Affiliates to, prepare and file all Tax Returns in a manner consistent with the Intended Tax Treatment, and none of the Parties or their respective Affiliates will take any position with any Governmental Authority or otherwise that is inconsistent with the Intended Tax Treatment, except as required by applicable Law.

(b)      The portion of the Purchase Price paid to any Seller (including the portion of the applicable Assumed Liabilities and any other amounts, to the extent properly taken into account under the Code), shall be allocated among the applicable Transferred Assets and the applicable Transferred Equity (and, to the extent necessary under applicable Tax Law, to the assets of any applicable Transferred Subsidiary) in accordance with the principles of Section 1060 of the Code and the Treasury Regulations promulgated thereunder (any such allocation, an "Allocation"). Each Allocation shall be prepared by the Buyer and delivered to the Sellers as promptly as reasonably practicable following the date hereof, and no later than the Closing Date. The applicable Seller shall have 14 days after receipt of such Allocation to review and comment on such Allocation. If, by the end of such 14 day period, the applicable Seller notifies Buyer of such Seller's disagreement with such Allocation, then Buyer and such Seller shall, during the ensuing 7 days, negotiate in good faith to resolve such disagreement; provided, that, if such disagreement is not so resolved, the Parties shall submit any such disagreement to an accounting firm mutually agreed to by Buyer and Sellers for resolution. The determination by such accounting firm shall be binding on the Parties. The fees and expenses of such accounting firm shall be paid one hundred percent (100%) by the Buyer. Upon any adjustment to the applicable purchase price for U.S. federal income Tax purposes, such final Allocation shall be revised in a manner consistent with therewith. Buyer and Sellers shall, and shall cause their respective Affiliates to, prepare all Tax Returns, including IRS Form 8594 (Asset Acquisition Statement under Section 1060 of the Code), in a manner consistent with the final Allocation, as adjusted, and none of the Sellers or Buyer shall take any position inconsistent therewith on any Tax Return or in connection with any Tax audit, claim or similar proceeding, unless required to do so by a final "determination" within the meaning of Section 1313(a) of the Code or otherwise required by applicable Law, or with Buyer's or the applicable Seller's, as the case may be, prior written consent.

(c)      Except as otherwise required by applicable Law, any Contingent Payment made by Buyer to Seller shall be treated as an adjustment to the Purchase Price for U.S. federal income tax purposes.

Section 2.11   Exclusion of Transferred Assets or Transferred Subsidiaries. Except with respect to the Transferred Contracts (which are subject to Section 2.6), at any time on or prior to the third (3rd) Business Day after the date of the Auction, the Buyer may, in its discretion by written notice to the Sellers, designate any of:

(a)      the Transferred Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Transferred Assets so designated; provided that (i) there shall be no reduction in the Purchase Price if the Buyer elects to designate any Transferred Asset as an Excluded Asset, and (ii) the Liabilities of the Sellers under or related to any Transferred Asset excluded under this paragraph will constitute Excluded Liabilities; or

(b)      the Transferred Subsidiaries directly owned by a Seller as Subsidiaries of the applicable Seller that would not be sold, assigned, transferred, conveyed or delivered to the Buyer pursuant to this Agreement (such designated Transferred Subsidiaries and any of their Subsidiaries, the "Excluded Subsidiaries"), which notice shall set forth the Excluded Subsidiaries, and such Excluded Subsidiaries shall, as of the date of such notice, cease to be Transferred Subsidiaries for all purposes of this Agreement and not be assigned, transferred, conveyed or

delivered to the Buyer at the Closing; provided that there shall be no reduction in the Purchase Price if the Buyer elects to designate any Transferred Subsidiary as an Excluded Subsidiary.

Section 2.12    Withholding. Buyer (and any person who is a withholding agent for Tax purposes) shall be entitled to deduct and withhold from amounts payable pursuant to this Agreement to any Person such amounts as are required by applicable Law to be deducted and withheld from such payment. To the extent that amounts are so deduced or withheld, such deducted or withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made. Buyer shall use commercially reasonable efforts to notify the Sellers of any amounts to be withheld at least three Business Days prior to the Closing Date in order to afford Sellers the opportunity to try and mitigate or eliminate such withholding.

# ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Disclosure Schedules delivered by the Sellers to the Buyer concurrently with the execution of this Agreement (collectively, the "Disclosure Schedules") (with specific reference to the representations and warranties in this Article III to which the information in such schedule relates; provided, however, that, disclosure in the Disclosure Schedules as to a specific representation or warranty shall qualify any other Sections of this Agreement to the extent (notwithstanding the absence of a specific cross reference) it is readily apparent on its face that such disclosure relates to such other Sections), each of the Sellers jointly and severally represents and warrants to the Buyer as follows:

Section 3.1    Organization. Each Seller and each Transferred Subsidiary (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, and (b) has all requisite power and authority to own and operate its properties and assets and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code. Each Seller and each Transferred Subsidiary is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to be material to the Business, taken as a whole.

Section 3.2    Authority.

(a)    Subject to required Bankruptcy Court approvals, (i) each Seller has all requisite legal capacity and the full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (ii) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it is or will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (iii) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties

hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at Law) (the "Enforceability Exceptions").

(b)    Subject to the entry of the Sale Procedures Order, (i) each Transferred Subsidiary has all requisite legal capacity and the full power and authority to execute and deliver each of the Ancillary Agreements to which it will be a party, to perform its obligations thereunder and to consummate the transactions contemplated thereby, (ii) the execution, delivery and performance by each such Transferred Subsidiary of each of the Ancillary Agreements to which it will be a party and the consummation by such Transferred Subsidiary of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (iii) upon its execution each of the Ancillary Agreements to which such Transferred Subsidiary will be a party, each such Ancillary Agreement will have been, duly executed and delivered by such Transferred Subsidiary and, assuming due execution and delivery by each of the other parties thereto, each of the Ancillary Agreements to which such Transferred Subsidiary will be a party will constitute, the legal, valid and binding obligations of such Transferred Subsidiary, enforceable against such Transferred Subsidiary in accordance with their respective terms, except as enforcement may be limited by the Enforceability Exceptions.

Section 3.3    No Conflict; Required Filings and Consents.

(a)    Except as set forth in Section 3.3(a) of the Disclosure Schedules and any required Bankruptcy Court approvals, and assuming that (x) requisite Bankruptcy Court approvals are obtained, (y) the notices, authorizations, approvals, Orders, Permits or consents set forth in Section 3.3(b) of the Disclosure Schedules are made, given or obtained (as applicable), and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by the Sellers and the Transferred Subsidiaries, as applicable, of this Agreement and the Ancillary Agreements to which they are (or will be) a party and the consummation by the Sellers and the Transferred Subsidiaries, as applicable, of the transactions contemplated hereby and thereby, will not: (i) conflict with or result in any violation or breach of or default under or give rise to a right of termination, cancellation, modification or acceleration of any obligation, to any put or call or similar rights or to loss of a benefit under, any provision of the Organizational Documents of any Seller or Transferred Subsidiary; (ii) conflict with or result in a violation or breach of any Community Solar Rule, Law or Order applicable to the Sellers or the Transferred Subsidiaries or by which any Transferred Asset or any property or asset of the Sellers or the Transferred Subsidiaries is bound; (iii) violate or render void or voidable any Permit or Order applicable to the Transferred Subsidiaries or by which any Transferred Asset or any property or asset of the Transferred Subsidiaries is bound or (iv) conflict with or result in a violation or breach of, constitute (with or without notice or lapse of time or both) a default under, require any Seller or Transferred Subsidiary to obtain consent or approval from any Person under the terms of, give rise to any right of termination, cancellation, acceleration or modification under the terms of, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any properties or assets of any Transferred Subsidiary or any Transferred Asset under the

terms of, in each case, any Lease or Contract to which any Seller or Transferred Subsidiary is party; except, with respect to <u>clauses (ii)</u>, <u>(iii)</u> or <u>(iv)</u>, for any such conflicts, violations, breaches, defaults or other occurrences which have not had and would not reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth in <u>Section 3.3(b) of the Disclosure Schedules</u>, no Seller nor any Transferred Subsidiary is required to file, seek or obtain any notice, authorization, approval, Order, Permit, or consent of or with any Governmental Authority, Local Utility or Transmission Provider in connection with the execution, delivery and performance by the Sellers or Transferred Subsidiaries, as applicable, of this Agreement and each of the Ancillary Agreements to which they are or will be a party or the consummation by the Sellers or Transferred Subsidiaries, as applicable, of the transactions contemplated hereby or thereby, except (i) requisite Bankruptcy Court approvals (including the entry of the Sale Procedures Order and the Sale Order), (ii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, or (iii) as would be required solely as a result of the specific identity or the specific legal or regulatory status of the Buyer or any of its Affiliates.

Section 3.4    <u>Transferred Assets</u>.

(a)    Each Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use.

(b)    This Agreement and the instruments and documents to be delivered by the Sellers to the Buyer at the Closing shall be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to the Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), claims, and interests, other than Assumed Liabilities, subject to entry of the Sale Order.

(c)    Except (i) as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) as set forth on <u>Section 3.4(c) of the Disclosure Schedules</u>, and subject to any changes to the Transferred Assets pursuant to <u>Section 2.6</u> or <u>Section 2.7</u>, the right, title and interest of the Sellers in the Transferred Assets constitute substantially all of the assets of Sellers owned or held by, used or intended for use, leased, licensed or accrued in connection with the conduct of the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) as currently conducted, and immediately after the Closing, the Transferred Assets shall be sufficient for Buyer to continue to operate and conduct the Business as currently conducted.

(d)    Except as set forth on <u>Section 3.4(d) of the Disclosure Schedules</u>, all tangible assets of the Transferred Assets and Transferred Subsidiaries are (i) in good working order and condition in all material respects, ordinary wear and tear excepted, (ii) have been reasonably maintained, (iii) are suitable in all material respects for the uses for which they are being utilized in the Transferred Assets and the Businesses as conducted by the Sellers and Transferred Subsidiaries as of the date hereof (excluding with respect to Excluded Assets, and in such case solely to such extent), (iv) do not require more than regularly scheduled maintenance in the

Ordinary Course of Business and the established maintenance policies of Sellers and Transferred Subsidiaries, as applicable, in order to keep them in good operating condition, and (v) comply in all material respects with all requirements under any Laws and any licenses which govern the use and operation thereof.

Section 3.5    Transferred Subsidiaries.

(a)    All of the outstanding Equity Interests in each Transferred Subsidiary (i) are owned directly by a Seller, (ii) are free and clear of any Encumbrance (other than Encumbrances in the Organizational Documents of the Transferred Subsidiaries, restrictions on transfer of Equity Interest under any applicable security Laws, and Encumbrances that will be released at the Closing pursuant to the Sale Order or that will be released pursuant to the Payoff Letter), (iii) have been duly authorized, validly issued and are fully paid and, as applicable, non-assessable, and (iv) have not been issued in violation of any federal or state securities Laws. Section 3.5(a) of the Disclosure Schedules lists all of the Transferred Subsidiaries and the outstanding Equity Interests therein and, in each case, the owner(s) thereof. No Transferred Subsidiary has any Subsidiaries or holds any Equity Interests or Voting Company Debt with respect to any other Person.

(b)    Section 3.5(b) of the Disclosure Schedules contains a true and correct list of the name of each Transferred Subsidiary and its jurisdiction of formation and any jurisdictions in which such Transferred Subsidiary is qualified to do business as a foreign entity. True, correct and complete copies of the Organizational Documents of each Transferred Subsidiary, in such form as currently in effect, have been made available to Buyer.

(c)    Since January 1, 2023, all distributions, dividends, repurchases and redemptions of the Equity Interests of each Transferred Subsidiary have been undertaken in compliance with the Organizational Documents of such Transferred Subsidiary then in effect and in compliance with applicable Law. There are no accumulated, declared or accrued but unpaid dividends or distributions with respect to any of the Transferred Equity, and the Transferred Subsidiaries do not have any obligation to pay any dividends or distributions with respect to their respective Equity Interests. Except as set forth on Section 3.5(c) of the Disclosure Schedules, there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Transferred Equity (other than this Agreement) obligating any Seller or any Transferred Subsidiary to issue or sell any shares of capital stock of, or any other comparable interest in, a Transferred Subsidiary (other than this Agreement). No Transferred Subsidiary owns, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other Equity Interests in any other Person (other than a Transferred Subsidiary). None of the Transferred Subsidiaries has issued and outstanding any bonds, debentures, notes or other obligations the holders of which have the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the equityholders of such Transferred Subsidiary on any matter ("Voting Company Debt"). There are no voting trusts, pledge agreements, buy-sell agreements, rights of first refusal, rights of first offer, preemptive rights, proxies or other agreements or understandings with respect to the Equity Interests of the Transferred Subsidiaries. None of the Transferred Subsidiaries have entered into silent partnership agreements granting the silent partner entitlements to its proceeds.

(d)    No Transferred Subsidiary conducts or has ever conducted (i) any business other than the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or (ii) any operations other than those incidental to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent).

Section 3.6    Financial Statements; No Undisclosed Liabilities; Schedule of Costs and Commitments.

(a)    The Sellers have delivered to the Buyer true, correct and complete copies of (i) the audited consolidated balance sheets of the Sellers and their respective Subsidiaries set forth on Section 3.6(a) of the Disclosure Schedules, (ii) the unaudited consolidated balance sheets of the Sellers and their respective Subsidiaries as of December 31, 2023, together with the related consolidated statements of operations, changes in member's equity and cash flows for each of the periods ended as of December 31, 2023, and (iii) the unaudited consolidated balance sheets of the Sellers and their respective Subsidiaries as of June 30, 2024 (the "Balance Sheet Date", and such balance sheets, the "Latest Balance Sheet"), together with the related consolidated statements of operations, changes in member's equity and cash flows for the six months ended June 30, 2024 (clauses (i) – (iii), collectively, the "Seller Financial Statements"). Except as set forth on Section 3.6(a) of the Disclosure Schedules, the Seller Financial Statements (A) are based on the Books and Records of the Sellers and their Subsidiaries, (B) have been prepared in accordance with GAAP, applied on a consistent basis (except as may be indicated in the notes thereto) and (C) fairly present, in all material respects, the financial position of the Sellers and their Subsidiaries and the Business as of the respective dates therein indicated and the results of operations and cash flows for the periods therein specified (subject to, in the case of interim financial statements, normal year-end adjustments and the absence of notes).

(b)    None of the Transferred Subsidiaries has any Liabilities, whether or not required by GAAP to be disclosed or reflected on or reserved against a consolidated balance sheet (or the notes thereto) of such Sellers and their Subsidiaries, except for Liabilities (i) set forth on Section 3.6(b) of the Disclosure Schedules or otherwise disclosed in a filing with the Bankruptcy Court as part of the Bankruptcy Case, (ii) arising under any Material Contract, Permit, or applicable Law, or otherwise in the Ordinary Course of Business since the Balance Sheet Date (other than Liabilities arising out of any breach or default under any such Material Contract or failure to comply with any such Permit or applicable Law), (iii) which would not reasonably be expected to be material to the Business, taken as a whole, or (iv) which are expressly reflected or reserved against in the Seller Financial Statements.

(c)    Except as set forth on Section 3.6(c) of the Disclosure Schedules, no Transferred Subsidiary has any Indebtedness.

(d)    Sellers have delivered to the Buyer true and complete copies of (i) the schedule of costs and commitments for the Transferred Subsidiaries (the "Schedule of Costs and Commitments") and (ii) the operations and maintenance budgets for each Transferred Subsidiary. The Schedule of Costs and Commitments fairly and accurately reflects all of the unpaid invoices of each Transferred Subsidiary as of the Closing Date. The Schedule of Costs and Commitments has been prepared in accordance with the accrual method of accounting.

Section 3.7    <u>Absence of Certain Changes or Events</u>. From the Balance Sheet Date through the date of this Agreement, (y) each Seller and each Transferred Subsidiary has used the same book or Tax accounting methods, except as required by GAAP, and (z) except as has been disclosed in the Disclosure Schedules, there has not been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had or would reasonably be expected to have, a Material Adverse Effect. Except (i) for the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets, the negotiation and execution of this Agreement, or (ii) as set forth on <u>Section 3.7 of the Disclosure Schedules</u>, from the Balance Sheet Date until the date hereof, no Seller nor any Transferred Subsidiary has:

(a)    amended or modified the Organizational Documents of any Transferred Subsidiary;

(b)    issued or sold any capital stock or other Equity Interests of any Transferred Subsidiary or any options, warrants, convertible or exchangeable securities, subscriptions, rights, stock appreciation rights, calls or commitments with respect to the capital stock or other Equity Interests of any Transferred Subsidiary granted phantom stock or other similar rights with respect to the capital stock or other Equity Interests of any Transferred Subsidiary;

(c)    adopted a plan of liquidation, dissolution, merger, consolidation or other reorganization;

(d)    made any change in its accounting methods, principles or practices that would be material to the Business taken as a whole, except as may be required by GAAP, the Code or applicable Law;

(e)    made any acquisition of all or substantially all of the assets, properties, capital stock or business of any other Person, whether by merger, stock or asset purchase;

(f)    changed, made or revoked any Tax election, changed any method of accounting with respect to Taxes, filed any amended Tax Return, surrendered or compromised any right to claim a Tax refund, settled or compromised any claim, notice, audit, assessment or other proceeding related to Taxes, entered into any agreement affecting any Tax Liability or any refund or filed any request for rulings or special Tax incentives with any Governmental Authority, entered into any Tax allocation, sharing or indemnity agreement, extended or waived the statute of limitations period applicable to any Tax or Tax Return or took or caused (or caused any other Person to take or cause) any action, in each case that could have a material effect on the amount of Taxes due from the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or due as a result of the Transferred Assets for a taxable period (or portion thereof) beginning after the Closing Date; or

(g)    agreed or committed in writing to do any of the foregoing.

Section 3.8    <u>Compliance with Law; Permits</u>.

(a)    The Business (excluding with respect to Excluded Assets, and in such case solely to such extent) is being conducted in material compliance with, and Sellers and the

Transferred Subsidiaries have in all material respects complied with all applicable Laws, Permits, Orders, and Community Solar Rules relating to the operation of the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) and the Transferred Assets. Each Project is, and was constructed, in compliance in all material respects with all applicable Laws, Permits, Orders, and Community Solar Rules. No investigation with respect to actual or alleged noncompliance with applicable Laws, and Orders by any Seller (solely to the extent it relates to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Assumed Liabilities) or any Transferred Subsidiary has been threatened in writing or commenced, and no notice, charge, claim, Action or assertion has been received by any Seller (solely to the extent it relates to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Assumed Liabilities) or any Transferred Subsidiary with respect to any actual or alleged noncompliance with applicable Laws and Orders.

(b)    The Sellers (solely to the extent it relates to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Assumed Liabilities) and the Transferred Subsidiaries are in possession of all material Permits necessary for them to own, lease or otherwise hold their assets and properties and to carry on the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) as currently conducted, including with respect to any Project, the Community Solar Rules, and the Regulatory Exemptions (such Permits, the "Applicable Permits"). All such Applicable Permits, and the holders thereof, are set forth on Section 3.8(b) of the Disclosure Schedules, and such Applicable Permits include all Permits and Orders required to be obtained by the Sellers and the Transferred Subsidiaries pursuant to applicable Law and Order based on the current stage of ownership, construction, development, operation and maintenance of its respective Projects.

(c)    No event has occurred that permits or would permit any material adverse modification, revocation, suspension, or termination of, or any other material adverse change in, or would prevent any Seller or any Transferred Subsidiary from obtaining, or any Seller's or any Transferred Subsidiary's compliance with, any Applicable Permit. Each such Applicable Permit (i) is held in the name of the applicable Seller or Transferred Subsidiary, (ii) is valid and in full force and effect, (iii) is final and, if the statute or regulation pursuant to which such Applicable Permit is issued establishes a limited administrative or judicial appeal period, all such periods have expired and (iv) has not expired or been terminated, suspended, revoked or modified in any material respect, except as noted in Section 3.8(b) of the Disclosure Schedules. No Seller or Transferred Subsidiary is in material breach or default (nor, with the giving of notice or lapse of time or both, would be in material breach or default) under any such Applicable Permit.

(d)    Neither any Seller nor any Transferred Subsidiary has received written, or, to the Knowledge of the Sellers, oral, notice from any Governmental Authority, Local Utility or Transmission Provider regarding (i) any breach or default under any Applicable Permit, (ii) the expiration, revocation, suspension or termination of, or any material modification of the requirements under, any Applicable Permit or (iii) any administrative investigation, administrative appeal, or judicial proceeding with respect to any Applicable Permit (other than rulemaking proceedings of general applicability).

(e) <u>Section 3.8(e) of the Disclosure Schedules</u> identifies all pending applications made by, or on behalf of, any Seller or any Transferred Subsidiary for any Permit (such Permits, the "<u>Pending Permits</u>"). With respect to each such pending application, no Seller nor any Transferred Subsidiary has received notice from any Governmental Authority, Local Utility or Transmission Provider stating that such Governmental Authority, Local Utility or Transmission Provider will not issue the Pending Permit applied for thereunder.

(f) The Sellers have delivered to Buyer a true, correct and complete copy of each Applicable Permit. The factual representations provided to any Governmental Authority, Local Utility or Transmission Provider (A) in the applications made by, or on behalf of, any Seller or any Transferred Subsidiary for each Applicable Permit and (B) in each such pending application for a Pending Permit, in each case, was, at the time such application was made, true, correct, and complete in all material respects, or were subsequently modified as to make such information true, correct and complete in all material respects.

(g) None of the Sellers holds any Applicable Permits or Pending Permits.

Section 3.9 <u>Litigation.</u> Except for the Bankruptcy Case, any Order entered in the Bankruptcy Case, and as otherwise listed on <u>Section 3.9 of the Disclosure Schedules</u>, there is not, and has not been for the three (3) years prior to the date hereof, any Action pending, or to the Knowledge of the Sellers, threatened in writing by or against any Transferred Subsidiary in connection with the Business or against any Seller involving any of the Transferred Assets (including, the Transferred Subsidiaries and any of their assets), the Assumed Liabilities or the Business. There are no Orders currently outstanding to which any of the Transferred Assets (including, the Transferred Subsidiaries and any of their assets), the Assumed Liabilities or the Business is subject, except as has not resulted in and would not reasonably be expected to result in a Material Adverse Effect. None of the Sellers, the Transferred Subsidiaries or any of their respective Affiliates has received written notice of any such Order described in this <u>Section 3.9</u>.

Section 3.10 <u>Employee Matters.</u> None of the Sellers or Transferred Subsidiaries currently have, or have ever had, any employees or any Benefit Plan or any Liability with respect to any employee or Benefit Plan. No Transferred Subsidiary is an employer or co-employer of any individuals who provide services to any Transferred Subsidiary (each such individual, a "<u>Service Provider</u>"). The consummation of the transactions contemplated by this Agreement will not result in any Transferred Subsidiary or Buyer incurring any Liability with respect to any Benefit Plan or directly or indirectly to any Service Provider.

Section 3.11 <u>Real Property.</u>

(a) None of the Sellers or Transferred Subsidiaries owns, or have ever owned, any real property.

(b) (i) <u>Section 3.11(b)(i) of the Disclosure Schedules</u> sets forth a true and complete list of each Seller Lease.

(ii) <u>Section 3.11(b)(ii) of the Disclosure Schedules</u> sets forth a true and complete list of (x) each Transferred Subsidiary Lease, (y) each Contract pursuant to which any Transferred Subsidiary holds, as grantee or assignee, any easement, right-of-way or license for the

39

use of real property (each, an "Easement" and the real property subject to such Easement, the "Easement Real Property") and (z) each Contract pursuant to which any Transferred Subsidiary has an option to acquire or lease an interest in any real property (each such Contract, an "Option" and the real property subject thereto, the "Option Real Property" and, together with the Leased Real Property and Easement Real Property, the "Real Property").

(iii)    Except as set forth on Section 3.11(b)(i) and Section 3.11(b)(ii) of the Disclosure Schedules, the Sellers and Transferred Subsidiaries do not own, lease, license or otherwise have and have not had any interests (including option interests) in any real property other than Real Property.

(c)    Except as set forth on Section 3.11(c) of the Disclosure Schedules, the Seller or Transferred Subsidiary party thereto has a valid leasehold interest in all Leased Real Property, subject to the entry to the Sale Order, free and clear of all Encumbrances, other than Permitted Encumbrances. Each Transferred Subsidiary has good and valid interests in each parcel of Easement Real Property pursuant to which such Transferred Subsidiary has been granted an Easement, subject to the entry to the Sale Order, free and clear of all Encumbrances, other than Permitted Encumbrances. The grantor under each Option has good and marketable fee simple title, or a good and valid leasehold interest, in the Option Real Property subject thereto.

(d)    The Sellers have made available to the Buyer all existing surveys or topographic maps for the Real Property (if any) and title policies in the Sellers' or Transferred Subsidiaries' possession.

(e)    None of Sellers or the Transferred Subsidiaries has received written notification that any Real Property is not in compliance in all material respects with all conditions, restrictions and requirements contained in any zoning or similar ordinances applicable to such Real Property (including any amendments thereto).

(f)    Except as set forth on Section 3.11(f) of the Disclosure Schedules, to the Knowledge of the Sellers, there are no unrecorded interests in any portion of any Site or any Option Real Property for oil, gas or other mineral rights, unrecorded leases, unrecorded easements, options to lease or obtain easements or rights to purchase or other rights of possession that would individually or in the aggregate reasonably be expected to materially and adversely impair the use of any Real Property for its expected purpose in connection with any Project.

(g)    Except as would not reasonably be expected to result in a Material Adverse Effect, there are no zoning or other land use proceedings (including condemnation proceedings) before any Governmental Authority pending or threatened in writing that would reasonably be expected to impair the use of any Real Property for its expected purpose in connection with any Project. None of the Sellers or any of the Transferred Subsidiaries has received written notice from any Governmental Authority regarding any such zoning or other land use proceedings (including condemnation proceedings).

(h)    The Leased Real Property and Easement Real Property, in each case, is being maintained in all material respects in accordance with applicable Law, and none of the Sellers or Transferred Subsidiaries has received any written notification that any such Real

Property is in violation in any material respect of any applicable Law. To the Knowledge of the Sellers, the Option Real Property is being maintained in all material respects in accordance with applicable Law and none of the Sellers or Transferred Subsidiaries has received any written notification that any such Real Property is in violation of any applicable Law.

(i)       Neither any Seller nor any Transferred Subsidiary has collaterally assigned or granted a security interest in any Real Property. Neither any Seller nor any Transferred Subsidiary has subleased, licensed or otherwise granted any person or entity the right to use or occupy, possess or otherwise encumber any of the Real Property, other than as disclosed in a title policy with respect to a Transferred Subsidiary. No Seller or Transferred Subsidiary has vacated or abandoned any portion of the Real Property or given notice to any Person of their intent to do the same.

(j)       The interests created (or to be created, as applicable) by the Real Property Documents (i) provide the applicable Transferred Subsidiary with sufficient real property on which to construct the applicable Project, (ii) provide adequate ingress to and egress from the Real Property and to interconnect the applicable Project at the interconnection point designated in such Project's coordinated electric system interconnect review ("CESIR") report from the Local Utility and (iii) are, collectively, the only real property interests required for the ownership, development, construction, operation and maintenance of the Projects. Each CESIR report issued by a Local Utility with respect to a Project is set forth on Section 3.11(j) of the Disclosure Schedules (the "CESIR Reports"). None of the Sellers or Transferred Subsidiaries, as applicable, is in material default, or is alleged in writing to have materially breached or to be in material default, under any CESIR Report. The Sellers have made available to Buyer complete and correct copies of all CESIR Reports. None of the CESIR Reports has been canceled or otherwise terminated, and none of the Sellers or Transferred Subsidiaries, has received any written notice from any Person regarding any such cancellation or termination.

(k)       Each Seller and each Transferred Subsidiary has enjoyed the continuous and uninterrupted quiet possession, use and operation of the Real Property, without complaint or objection by any Person.

(l)       The Real Property Documents are in full force and effect, all payments due under each such Real Property Document have been paid (except as set forth in Section 3.11(l) of the Disclosure Schedules), no Seller or Transferred Subsidiary has received notice that it is in default under any Real Property Document; and there exists no event, occurrence, condition or act that, with the giving of notice, the lapse of time or the happening of any further event or condition, would give rise to a default under any Real Property Document.

(m)       No Seller or Transferred Subsidiary is a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease any of the Leased Real Property or any portion thereof or interest therein to any Person other than the Buyer.

Section 3.12    <u>Intellectual Property</u>.

(a)     No Seller or Transferred Subsidiary owns, beneficially, of record, or otherwise, any Intellectual Property and no Intellectual Property is registered to or licensed to a Seller or a Transferred Subsidiary, in each case, other than Off-the-Shelf Software.

(b)     The conduct of the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), but including the products and services of the Sellers and Transferred Subsidiaries) does not infringe, misappropriate or otherwise violate (and, in the past three (3) years, has not infringed, misappropriated or otherwise violated), in any material respect, any Person's Intellectual Property rights, and in the past three (3) years there has been no such Action asserted or, to the Knowledge of the Sellers, threatened in writing against any Seller or Transferred Subsidiary or, to the Knowledge of the Sellers, any other Person.

(c)     Each Seller and Transferred Subsidiary has at all times in the past three (3) years complied with all applicable Laws, as well as its own rules, policies, and procedures, relating to privacy, data protection, data security and the collection and use of personal information collected, used, or held for use by the Sellers or Transferred Subsidiaries. In the past three (3) years, no Actions have been asserted or threatened in writing against any Seller or Transferred Subsidiary alleging a violation of any Laws relating to a Person's privacy or personal information or data rights or any information security related incidents. No Seller or Transferred Subsidiary has notified in writing or been required by applicable Law or Contract to notify in writing, any person or entity of any personal data or information security-related incident.

(d)     Each Seller and Transferred Subsidiary has implemented, and required that its third party vendors implement, adequate policies and commercially reasonable security (i) regarding the collection, use, disclosure, retention, processing, transfer, confidentiality, integrity and availability of personal data and business proprietary or sensitive information, in its possession, custody or control, or held or processed on its behalf, and (ii) regarding the integrity and availability of the information technology and software applications owned, operated or outsourced by the Sellers and the Transferred Subsidiaries. Neither any Seller nor any Transferred Subsidiary has experienced any information security incident that has compromised the integrity or availability of the information technology and software applications they own, operate or outsource, and there has been no loss, damage or unauthorized access, disclosure, use or breach of security of any information in the possession, custody or control, or otherwise held or processed behalf of such Seller or Transferred Subsidiary. To the Knowledge of the Sellers, the information technology and software applications of the Sellers and Transferred Subsidiaries do not contain any "time bombs," "Trojan horses," "back doors," "trap doors," worms, viruses, spyware, keylogger software or other vulnerability, faults or malicious code or damaging devices designed or reasonably expected to adversely impact the functionality of or permit unauthorized access or to disable or otherwise harm any information technology or software applications.

(e)     In the past three (3) years, (i) the Sellers and Transferred Subsidiaries have not experienced any defects in the Software used in the Business that have not been remediated as of the date hereof and (ii) there have been no security breaches in the Sellers' or the Transferred Subsidiaries' information technology systems and (iii) been no disruptions in any of the Sellers' or Transferred Subsidiaries' information technology systems that adversely affected the Business

and that have not been remediated as of the date hereof, in each case, except as would not reasonably be expected to result in a Material Adverse Effect.

Section 3.13    Taxes. Except as set forth in Section 3.13 of the Disclosure Schedules:

(a)    (i) The Sellers and Transferred Subsidiaries have filed (taking into account valid extensions) all required Tax Returns relating to each Transferred Subsidiary, the Transferred Assets, the Assumed Liabilities, the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), income and operations of any Transferred Subsidiary, or any Project, in each case, required to be filed by any Transferred Subsidiary or any Seller, as the case may be, (ii) all such Tax Returns are true, correct and complete in all material respects; and (iii) each Seller and each Transferred Subsidiary has paid in full all Taxes (whether or not required to be shown on any Tax Return) relating to each Transferred Subsidiary, the Transferred Assets, the Assumed Liabilities, the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), income and operations of any Transferred Subsidiary, or any Project that were due and payable on or before the Closing Date, except for Taxes not yet due and payable or if not yet due and payable, being contested in good faith by appropriate proceedings and covered by adequate reserves established in accordance with GAAP.

(b)    All material Taxes required to be withheld or collected by any Seller or any Transferred Subsidiary relating to or arising in connection with the Transferred Assets, the Assumed Liabilities or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or any Project, or of or with respect to the Transferred Subsidiaries, the income or operations of any Transferred Subsidiary, or any Project and, to the extent required by applicable Law, paid (including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or other third party), have been timely withheld or collected and remitted to the appropriate Governmental Authority, and all IRS Forms W-2 and 1099 and other applicable forms required with respect thereto have been properly completed and timely filed. Each of the Sellers and Transferred Subsidiaries has timely collected all sales, use and value added Taxes required to be collected by them, and has timely remitted all such Taxes to the appropriate Governmental Authority.

(c)    There is no Action, suit, claim, assessment, or audit pending, or proposed, contemplated, asserted or threatened in writing by any Governmental Authority with respect to Taxes or Tax Returns of or with respect to the Transferred Subsidiaries or with respect to the Transferred Assets, the Assumed Liabilities, the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or any Project, the income or operations of any Transferred Subsidiary, or any Project, and no Governmental Authority has indicated an intent to investigate, commence or open such an Action, suit, claim or audit with respect to any such Tax or Tax Return. No claim has ever been made by a Governmental Authority against any Transferred Subsidiary or Seller solely for Taxes relating to any Transferred Subsidiary, the Transferred Assets, income or operations of any Transferred Subsidiary, or any Project in a jurisdiction where any Transferred Subsidiary or Seller, as applicable, does not file Tax Returns that it is or may be subject to Tax in that jurisdiction.

(d)     There are no Encumbrances for Taxes upon the Transferred Assets or any of the assets, income or operations of the Transferred Subsidiaries or in respect of any Project, in each case other than for Taxes not yet due.

(e)     Neither the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) nor any of the Transferred Assets, Assumed Liabilities or Transferred Subsidiaries is subject to any Tax allocation, indemnity or sharing agreement or similar agreement, arrangement or understanding, other than any such agreement entered into in the Ordinary Course of Business the principal purpose of which is not to address Taxes.

(f)     No Tax election has been made by or with respect to the Transferred Subsidiaries or with respect to any of the Transferred Assets, the Assumed Liabilities or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or any Project, in each case that has, or may have, continuing effect after the Closing Date.

(g)     No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any Taxes or Tax Returns of or with respect to the Transferred Subsidiaries, or with respect to the Transferred Assets, the Assumed Liabilities or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or any Project is outstanding, nor is there pending any request for such an agreement, waiver, extension or consent. No power of attorney has been granted with respect to any matter relating to Taxes payable by or with respect to the Transferred Subsidiaries, or with respect to any of the Transferred Assets, Assumed Liabilities or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or any Project, in each case that is currently in force.

(h)     None of the Sellers or Transferred Subsidiaries has elected under Treasury Regulations Section 301.7701-3 to be classified as a corporation for US federal income Tax purposes, and since its formation each Transferred Subsidiary is and properly has been classified as a Disregarded Entity. Each of the Transferred Subsidiaries has, since its formation, been a United States Person or with respect to each such Transferred Subsidiary that is a Disregarded Entity, owned by a regarded owner that has, since its formation, been a United States Person, in each case, not subject to withholding under Sections 1445 or 1446 of the Code.

(i)     Neither any Seller nor any Transferred Subsidiary (i) has received any ruling from a Governmental Authority relating exclusively to Taxes due in respect of any Transferred Subsidiary or with respect to any of the Transferred Assets, Assumed Liabilities or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or any Project or (ii) has withdrawn a request for such a ruling before the ruling was issued.

(j)     No Transferred Subsidiary has any liability for Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise by operation of applicable Law.

(k)     Neither the Buyer (or its Affiliates) nor any Transferred Subsidiary (nor Buyer, as a result of holding an interest in a Transferred Subsidiary) will be required to include any item of income in, or exclude any item of deduction from, taxable income for any Post-Closing Tax Period as a result of any (i) change in method of accounting for a taxable period ending on or

before the Closing Date, (ii) use of an improper method of accounting for a taxable period ending on or before the Closing Date, (iii) installment sale or open transaction disposition on or before the Closing Date, (iv) prepaid amount or deferred revenue received prior to the Closing Date, or (v) closing agreement under Code Section 7121 (or any corresponding or similar provision of state, local or non-U.S. Law) entered into on or before the Closing Date.

(l)     No Transferred Asset or any portion of any Project or any assets of any Transferred Subsidiary is or will be (i) "tax-exempt use property" within the meaning of Section 168(h) of the Code, (ii) described in Section 50(b)(3) of the Code, (iii) "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, (iv) securing any debt the interest of which is Tax-exempt under Section 103(a) of the Code, (v) subject to a lease, or (vi) subject to the application of Section 197(f)(9) of the Code.

(m)     No Transferred Asset or any portion of any Project or any assets of any Transferred Subsidiary is or will be "public utility property" or property "used predominantly outside the United States" within the meaning of Sections 168(i)(10) or 168(g)(4) of the Code.

(n)     No Transferred Subsidiary is a "related person" to any purchaser of power under the Power Purchase Agreement for purposes of Sections 267 or 707 of the Code.

(o)     No Transferred Subsidiary has benefited from any Tax-exempt bonds or loans under Section 103 of the Code nor have the proceeds of any issue of state or local government obligations been used to provide financing for any Project of any Transferred Subsidiary the interest on which is exempt from Tax under Section 103 of the Code.

(p)     No portion of the cost basis of any property included in any Project is attributable to "qualified rehabilitation expenditures" within the meaning of Section 47(c)(2)(A) of the Code.

(q)     Each Project is designed to use "solar energy to generate electricity" within the meaning of Section 48 of the Code.

(r)     No Project has generated, or is expected to generate, energy for the purposes of heating a swimming pool within the meaning of Section 48 of the Code.

(s)     Each Project is located in its entirety in the United States within the meaning of Sections 50(b)(1) and 638(1) of the Code.

(t)     No person has ever (i) claimed any federal, state or local Tax credit (other than the energy credit pursuant to Section 48 of the Code) with respect to any Project, (ii) elected pursuant to Section 168(g)(7) of the Code to have the alternative depreciation system apply to any Project or any portion thereof or (iii) applied for a cash grant with respect to any Project under Section 1603 of the American Recovery and Reinvestment Act of 2009.

(u)     No Transferred Subsidiary nor any Seller is party to any joint venture, partnership, other arrangement or Contract that reasonably could cause any Transferred Subsidiary to be treated as, or as a partner in, a partnership for U.S. federal income Tax purposes. No Contract

obligates any Project or any Transferred Subsidiary (or any Seller in respect thereof) to make any payments based on net profits or net income.

(v)    No Transferred Subsidiary is a party to or bound by any Tax indemnification, Tax allocation or Tax sharing agreement or any closing agreement, gain recognition agreement or other agreement relating to Taxes (but excluding, for this purpose, any agreement entered into in the ordinary course of business the principal purpose of which is not related to Taxes).

(w)    Neither any Transferred Subsidiary nor any Seller has been subject to the recapture of any federal, state or local Tax credits claimed with respect to any Project within the meaning of Section 50(a) of the Code or any analogous state or local Tax Law.

(x)    None of the Sellers, the Transferred Subsidiaries nor any of their Affiliates is a Disqualified Person.

(y)    No Transferred Asset or any portion of any Project or any assets of any Transferred Subsidiary has benefitted from the proceeds of any grant or rebate program that would cause a reduction in the amount of the energy credit provided under Section 48 of the Code for such Transferred Asset, Project or other assets, and no application with respect to any such grant or rebate has been filed or submitted.

(z)    None of the Sellers or any Transferred Subsidiaries have entered into or are party to or bound by any Tax Equity Document.

(aa)    None of the Transferred Subsidiaries (or any of their Subsidiaries) have claimed any employee retention credits under the CARES Act.

Section 3.14    Environmental Matters.

(a)    The Sellers, the Transferred Subsidiaries, the Transferred Assets and the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) are, and have for the three (3) years prior to the date hereof been, in compliance in all material respects with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Environmental Permits required in connection with the conduct or operation of the Business as currently conducted and the ownership or use of the Transferred Assets.  There is no claim or action currently pending or, to the Knowledge of the Sellers, threatened in writing, that seeks the cancellation, revocation, non-renewal or other material adverse or limiting modification or amendment of any such Environmental Permit.

(b)    There is no material Environmental Claim pending or, to the Knowledge of the Sellers, threatened in writing against any Seller, Transferred Subsidiary or against or affecting any Transferred Asset or the Business. Neither the Sellers, the Transferred Subsidiaries, the Transferred Assets nor the Business is subject or a party to any claim, action, investigation or proceeding relating to an Environmental Claim where there is an outstanding actual or potential material Liability. Other than Orders of general applicability, none of the Transferred Subsidiaries or the Transferred Assets is subject to any Order with respect to it, or any Project or Site, relating to or arising under Environmental Law that would reasonably be expected to impose any material

restriction, value impairment or burdensome requirement on any of the Transferred Subsidiaries or the Transferred Assets after Closing. For the avoidance of doubt and without limitation, there are no pending claims against the Sellers, the Transferred Subsidiaries, the Transferred Assets or the Business from any alleged exposure to asbestos or asbestos-containing materials.

(c)     Neither the Sellers nor the Transferred Subsidiaries has assumed or agreed to assume or otherwise become subject to any Liability of a third party under Environmental Law.

(d)     There has been no Release of any Hazardous Material by the Sellers or any of the Transferred Subsidiaries, or to the Knowledge of the Sellers, any other Person, at any Site, which would reasonably be expected to result in any material Liability of the Business, any Transferred Asset or any Transferred Subsidiary, or any Environmental Claim against or affecting any Seller (solely to the extent related to the Business, the Transferred Assets or the Assumed Liabilities), Transferred Subsidiary or the Business.

(e)     To the Knowledge of the Sellers, no former property, including the ground and groundwater underlying or the surface water at such former property, is or has been contaminated or polluted by any Hazardous Material in circumstances which would reasonably be expected to result in an Environmental Claim against or involving any Seller, Transferred Subsidiary, Transferred Asset or the Business.

(f)     Sellers have made available to the Buyer true, correct and complete copies of all final, third party written environmental assessments (including all Phase I and Phase II Environmental Site Assessments), environmental audits and other material environmental reports or studies, in each case, that are in the possession or reasonable control of any Seller or any Transferred Subsidiary, in relation to any Project, the Site of any Project or any Transferred Subsidiary, including any Transferred Subsidiaries' compliance with Environmental Laws (the "Environmental Reports").

Section 3.15     Material Contracts.

(a)     Section 3.15(a) of the Disclosure Schedules sets forth, as of the date of this Agreement, a true, correct and complete list of the following Contracts to which any Seller or any Transferred Subsidiary is a party or is bound or to which any Transferred Assets are subject and that are not Excluded Contracts (each, a "Material Contract," and collectively, the "Material Contracts"):

(i)     each Contract that creates or evidences any Liabilities or sources of revenue of the Business or of any Transferred Subsidiary in an amount in excess $50,000 in the aggregate;

(ii)     each Community Solar Subscription Agreement;

(iii)     each NYSERDA award letter confirming eligibility in the Megawatt Block Program and Community Adder Program, including any compensation letter for the VDER Program;

(iv)     each Contract with any Governmental Authority requiring the payment of any amounts with respect to a Project to a Governmental Authority, in lieu of Taxes, in connection with or as a condition to the issuance of a Permit, or otherwise;

(v)     each Contract for the operation and maintenance of the Projects;

(vi)     each Interconnection Agreement;

(vii)     each Power Purchase Agreement;

(viii)     each EPC Agreement;

(ix)     each Real Property Document;

(x)     each Asset Management Agreement;

(xi)     each Contract evidencing or relating to Indebtedness for borrowed money (including leases which are or should be, in accordance with GAAP, recorded as capital leases), any extension of credit, or the granting of any Encumbrance (other than any Permitted Encumbrance, except for any Encumbrance that constitutes a Permitted Encumbrance solely by reason of <u>clause (f)</u> of the definition thereof) on any Transferred Asset or any Transferred Subsidiary or asset thereof;

(xii)     each Contract containing any limitation on the freedom or ability of any Transferred Subsidiary to engage in any line of business or compete with any Person or to operate in any geographic area;

(xiii)     each Related Party Agreement;

(xiv)     each Contract with a supplier or lessor of any Transferred Subsidiary requiring aggregate payments by such Transferred Subsidiary in excess of $50,000 in the aggregate;

(xv)     each Tax sharing, allocation, indemnification or similar agreement;

(xvi)     each Contract containing "most-favored-nation," "most-favored-customer" or similar pricing provisions for the benefit of any Person (other than any Transferred Subsidiary);

(xvii)     each Contract that is a conciliation, settlement or similar agreement, in each case, with any Governmental Authority;

(xviii)     each power of attorney that relates to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), any Transferred Asset, any Assumed Liability, any Transferred Subsidiary or any asset of a Transferred Subsidiary;

(xix)     each Contract relating to the acquisition or license of material Intellectual Property from any Person, but excluding Off-the-Shelf Software;

(xx)    each Contract pursuant to which any Transferred Subsidiary has formed or agreed to form a partnership, joint venture or other similar arrangement involving the sharing of profits;

(xxi)    each material Contract necessary or required to install, operate, maintain, test, repair or use any Project that is not otherwise identified in <u>clauses (i)</u> through <u>(xix)</u> of this definition, including any Contract with a Governmental Authority, Local Utility or Transmission Provider;

(xxii)   each any Contract or group of related Contracts for the lease or use of any Equipment by any Seller or for the storage of any Equipment of the Sellers (including any warehousing Contracts);

(xxiii)  each option or hedging Contract;

(xxiv)  each supply Contract pursuant to which the Sellers or Transferred Subsidiaries receive goods or services from a third party;

(xxv)   any assignments, amendments, modifications and supplements of any of the foregoing; and

(xxvi)  each Contract in writing to enter into any of the foregoing.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, each of the Material Contracts (in the case of any Material Contract to which a Seller is a party, that constitutes a Transferred Contract) is in full force and effect and is a valid, binding and enforceable obligation of the applicable Seller and Transferred Subsidiary party thereto and, to the Knowledge of the Sellers, each of the other parties thereto, except as may be limited by the Enforceability Exceptions. Except as set forth on <u>Section 3.15(b) of the Disclosure Schedules</u>, as a result of the commencement of the Bankruptcy Case or as would not reasonably be expected to be material to the Business taken as a whole, none of the Sellers or Transferred Subsidiaries, as applicable, is in material default, or is alleged in writing by the counterparty thereto to have materially breached or to be in material default, under any Material Contract, and, to the Knowledge of the Sellers, the other party to each Material Contract is not in material default thereunder. The Sellers have made available to Buyer complete and correct copies of all Material Contracts. None of the Material Contracts has been canceled or otherwise terminated, and none of the Sellers or Transferred Subsidiaries, has received any written notice from any Person regarding any such cancellation or termination. There are no claims pending or threatened against any Seller or Transferred Subsidiary under any Material Contract.

Section 3.16    <u>Affiliate Transactions.</u> Except as set forth on <u>Section 3.16 of the Disclosure Schedules</u>, no Transferred Subsidiary is party to or otherwise bound by any transaction or Contract with any Related Party (a "<u>Related Party Agreement</u>"), and no Related Party, (a) has any material interest in any material property used by the Sellers and the Transferred Subsidiaries or (b) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is,

or is engaged in business as a material supplier or customer of the Sellers and the Transferred Subsidiaries.

Section 3.17   Insurance. Section 3.17 of the Disclosure Schedules lists, as of the date hereof, a true and complete list of all insurance policies maintained by or covering the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Subsidiaries, the Transferred Assets and the Assumed Liabilities (the "Insurance Policies"), inclusive of insurer, policy holder, coverage type, limits, deductibles and expiry dates for all current claims-made and occurrence-based policies. Each such Insurance Policy is in full force and effect, all premiums due and payable thereunder have been paid in full, and neither any Seller nor any Transferred Subsidiary has received a written notice of cancellation or termination of any such Insurance Policy. There are no pending or unpaid claims under any Insurance Policy.

Section 3.18   Brokers. Except as set forth on Section 3.18 of the Disclosure Schedules, no broker, finder or investment banker, or other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby as a result of an engagement initiated by or on behalf of any Seller or any Transferred Subsidiary that would be payable by the Buyer or any of its Affiliates (including, after the Closing, any Transferred Subsidiary).

Section 3.19   Working Capital Assets; Equipment.

(a)   All Inventory is owned by a Seller or Transferred Subsidiary, as applicable, free and clear of all Encumbrances (other than Permitted Encumbrances) and is valued on the books and records of such Seller or Transferred Subsidiary at the lower of cost or fair market value thereof, based upon the "first in, first out" method of accounting, and is in good condition and consists of a quality and quantity useable and saleable in the Ordinary Course of Business, except for obsolete items and items of below standard quality, all of which have been written off or written down to net realizable value in the Latest Balance Sheet. Except as set forth on Section 3.19(a) of the Disclosure Schedules, all Inventory not written off has been valued in accordance with GAAP and, with respect to Inventory intended for sale, was or will be saleable within a reasonable time. Inventory that was acquired subsequent to the Balance Sheet Date was acquired in the Ordinary Course of Business. To the Knowledge of the Sellers, the quantities of each item of Inventory are not excessive but are adequate in the present circumstances of the Business.

(b)   All of the accounts and notes receivable of the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) (the "Current Receivables") represent amounts receivable for products actually delivered or services actually provided (or, in the case of non-trade accounts or notes represent amounts receivable in respect of other bona-fide business transactions), have arisen in the Ordinary Course of Business and have been or will be billed. All such Current Receivables are fully collectible in the normal and Ordinary Course of Business.

(c)   Section 3.19(c) of the Disclosure Schedules set forth a true, correct and complete list of all Equipment owned, leased, used or held for use by the Sellers. The Sellers have delivered to the Buyer evidence of all original equipment manufacturer ("OEM") warranties (the "OEM Warranties") with respect to all such Equipment, which OEM Warranties are valid and in

full force and effect. All such Equipment have been stored in compliance with all applicable requirements of the OEM. The execution, delivery and performance by the Sellers and the Transferred Subsidiaries, as applicable, of this Agreement and the Ancillary Agreements to which they are (or will be) a party and the consummation by the Sellers and the Transferred Subsidiaries, as applicable, of the transactions contemplated hereby and thereby, will not conflict with or result in a violation or breach of, constitute (with or without notice or lapse of time or both) a default under, require any Seller or Transferred Subsidiary to obtain consent or approval from any Person under the terms of, give rise to any right of termination, cancellation, acceleration or modification of, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any Equipment under the terms of, in each case, any OEM Warranty, in each case, except as would not reasonably be expected to result in a Material Adverse Effect. Pursuant to the terms of the OEM Warranties, all such OEM Warranties survive for at least twelve (12) months following the Outside Date.

Section 3.20    Books and Records. The Sellers have delivered to the Buyer true, correct and complete copies of all the Books and Records of each Transferred Subsidiary required by applicable Law and maintained by or in the possession or control of (or otherwise reasonably accessible to) any Seller or any Transferred Subsidiary, and such Books and Records have been maintained and reported in accordance with applicable Law and GAAP, where applicable. Such Books and Records (a) contain true, correct and complete copies of the Organizational Documents of each Transferred Subsidiary and (b) contain true, correct and complete copies of material meetings and consents in lieu of meetings of the members or managers of each Transferred Subsidiary, and accurately reflect all transactions referred to in such minutes and consents.

Section 3.21    Bank Accounts. Section 3.21 of the Disclosure Schedules sets forth a true and correct list of each bank account, credit line or safety deposit box maintained by or for the benefit of the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) and each Transferred Subsidiary, including the name and location of each bank and the names of all Persons authorized to draw thereon or, with respect to safety deposit boxes, to have access thereto.

Section 3.22    Regulatory Status.

(a)    Neither any Seller nor any Transferred Subsidiary is an "investment company," a company "controlled" by an "investment company" or an "investment advisor" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

(b)    The Sellers and Transferred Subsidiaries have taken all actions required to ensure that each Project will meet or meets the criteria to be a QF (such status as a QF, "QF Status"). There is no pending or threatened, preliminary or formal, public or non-public proceeding, inquiry or enforcement investigation pertaining to the eligibility of (i) a Project's QF Status or (ii) any Regulatory Exemptions for the Transferred Subsidiaries.

(c)    Each Project that has generated electric energy (including test energy) or is otherwise energized and has reached Commercial Operation has made all necessary filings for the Project to establish QF Status under FERC's regulations as set in 18 C.F.R. Part 292 Subpart B.

Each Project at or prior to the time of such Project's first generation of electric energy (including test energy) qualifies for and holds all the Regulatory Exemptions. Any Form 556 Notice of Self-Certification or other filing that is necessary under FERC's regulations to be made with FERC to establish any or all of the Regulatory Exemptions shall have been timely filed and accepted for filing into FERC's eFiling system.

(d)     Any Transferred Subsidiary and any "subsidiary company" thereof (as that term is defined under PUHCA) is either (i) not a "holding company" under PUHCA or (ii) a "holding company" solely of one or more "electric utilities" (as that term is defined under 16 U.S.C. § 796(22)) that own, operate, or own and operate a QF that holds the Regulatory Exemptions.

(e)     The Transferred Subsidiaries are not themselves subject to regulation as a "public utility" under Section 201(e) of the FPA. Other than only any Transferred Subsidiary that owns or operates a Project with QF Status, no Transferred Subsidiary is or is subject to regulation as a "public utility" as defined under Section 201(e) of the FPA, or otherwise is engaged in interstate sales of electric energy, capacity, or ancillary services. No Transferred Subsidiary has any rate, tariff, or agreement that is a "jurisdictional facility" under the FPA on file at FERC, or is a "franchised public utility" (as that term is defined under 18 C.F.R. § 35.36(a)(5)).

(f)     Each Transferred Subsidiary that is required to register in any category with the North American Electric Reliability Corporation or any "regional entity" thereof (as that term is defined in 18 C.F.R. § 39.1) under 18 C.F.R. Part 39 and/or Part 40 with respect to its Project has so registered, and such Transferred Subsidiary is in compliance with the applicable requirements thereunder.

(g)     Except as set forth on <u>Section 3.22(g) of the Disclosure Schedules</u>, each Transferred Subsidiary has obtained a NYSERDA award letter confirming eligibility for its Project to participate in the Megawatt Block Program and Community Adder Program and has a compensation letter for the VDER Program for its respective Project, and each Project remains eligible to participate in the Megawatt Block Program or Community Adder Program as set forth in such letters. Each Project satisfies the requirements of the applicable Community Solar Rules.

(h)     No Transferred Subsidiary is subject to the general jurisdiction of the NYPSC as a "utility company" as such term is defined in Section 2 of the NY Public Service Law or subject to regulation by the NYPSC as an "electric corporation," "public utility," "utility company," "public utility corporation," "electric power supplier," "transmission and distribution company," or similar term.

(i)     Each Project (i) is in compliance with and has satisfied all applicable deadlines and requirements under applicable Law and Permits and for participation in the Community Solar Program, (ii) to the Knowledge of Sellers, has met and is in full compliance with all applicable Law, Permit and Community Solar Program requirements, and (iii) none of the Sellers, any of their Affiliates or any Transferred Subsidiary has received any written communications from any Governmental Authority or the applicable Local Utility indicating that any Project has failed to comply with applicable Law or Permits or meet a Community Solar Program requirement or deadline or any similar written communication indicating that such

Project is in violation of any applicable Law or Permit or potentially ineligible for or subject to withdrawal from the Community Solar Program. <u>Section 3.22(i) of the Disclosure Schedules</u> sets forth the (x) constructed nameplate capacity of each Project, (y) total amount of each type of incentive for which each Project is eligible, and (z) total amount of each type of incentive each Project has received under the Community Solar Program.

(j)     Each Transferred Subsidiary has made all submittals and filings required under applicable Law. <u>Section 3.22(j) of the Disclosure Schedules</u> set forth each letter the Sellers and their Subsidiaries have received from a Local Utility confirming compensation under such Local Utility's tariff with respect to a Project (the "<u>Tariff Letters</u>"). None of the Sellers or Transferred Subsidiaries, as applicable, is in material default, or is alleged in writing to have materially breached or to be in material default, under any Tariff Letter. The Sellers have made available to Buyer complete and correct copies of all Tariff Letters. None of the Tariff Letters has been canceled or otherwise terminated, and none of the Sellers or Transferred Subsidiaries, has received any written notice from any Person regarding any such cancellation or termination.

(k)     No Transferred Subsidiary owes any penalty, fee, unpaid invoice or has any other amount outstanding to any Governmental Authority or Local Utility with respect to any Project.

Section 3.23     <u>OFAC and Related Matters</u>.

(a)     None of the transactions contemplated by this Agreement violate (i) the United States Trading with the Enemy Act, (ii) any of the foreign assets control regulations of the U.S. Department of the Treasury (31 C.F.R., Subtitle B, Chapter V) or any enabling legislation or executive order relating thereto, (iii) Executive Order No. 13,224, 66 Fed. Reg. 49,079 (2001), issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) (the "<u>Terrorism Order</u>"), or (iv) the Uniting and Strengthening America by Providing Ap-propriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Public Law 107-56 (October 26, 2001). For purposes of this <u>Section 3.23</u>, the term "<u>OFAC Rep Party</u>" shall mean (A) each Seller, (B) each Transferred Subsidiary, (C) any Affiliate of any Seller or any Transferred Subsidiary that is counterparty to a Material Contract and (D) the officers, directors or agents of the entities listed in <u>clauses (A)</u> through <u>(C)</u>. No OFAC Rep Party (I) is a "blocked person" as described in Section 1 of the Terrorism Order, (II) engages in any dealings or transactions, or is otherwise associated, with any such blocked person or (III) appears on the OFAC Blocked Parties List. To the Knowledge of Sellers, no OFAC Rep Party: (x) is owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, any of the Persons referred to or described in the OFAC Blocked Parties List; or (y) has conducted business with or engaged in any transaction with any Person named on the OFAC Blocked Parties List. Each OFAC Rep Party has complied with all U.S. and applicable international economic and trade sanctions, including as applicable any sanctions or regulations administered and enforced by the U.S. Department of State, the U.S. Department of Treasury (including the OFAC) and any executive orders, rules and regulations relating thereto.

(b)     Neither any Seller nor any of the Transferred Subsidiaries, nor any of their respective officers, directors, employees or agents, has (i) violated any provision of any applicable

Anti-Bribery and Anti-Corruption Laws or (ii) directly or indirectly offered, paid, promised to pay, or authorized the offer, payment or promise of anything of value to any representative or agent of a Governmental Authority while knowing or having reason to know that all or a portion of such thing of value would be offered, given, or promised to such representative or agent of a Governmental Authority for the purposes of (A)(I) influencing any act or decision of any such representative or agent of a Governmental Authority in his or her official capacity or (II) rewarding the improper performance by any Person of its business or official activities; or (B) assisting any member of any Seller or any member of any Transferred Subsidiary, or any of their respective Affiliates, in obtaining or retaining business or a business advantage for the Business or any member of any Transferred Subsidiary.

(c)     The operations of each Seller and each Transferred Subsidiary have been conducted at all times in compliance with Anti-Terrorism and Money Laundering Laws and Regulations.

(d)     Each OFAC Rep Party has complied with all Economic Sanctions and Trade Controls Laws and Regulations.

(e)     Each OFAC Rep Party is now in compliance with Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations and applicable Economic Sanctions and Trade Controls Laws and Regulations and the Sellers and Transferred Subsidiaries have implemented and maintain in effect policies and procedures designed to ensure compliance by each such Seller and Transferred Subsidiary, and each of their respective directors, officers and agents, with Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations and applicable Economic Sanctions and Trade Controls Laws and Regulations.

(f)     Neither any Seller nor any Transferred Subsidiary, nor any of their respective officers, directors or agents, or any agent that will act in any capacity in connection with the transactions contemplated by this Agreement, is a Target of Sanctions.

(g)     No part of the transactions contemplated by this Agreement will cause any of the Sellers or the Transferred Subsidiaries to violate Anti-Bribery and Anti-Corruption Laws, Anti-Terrorism and Money Laundering Laws and Regulations or applicable Economic Sanctions and Trade Controls Laws and Regulations.

Section 3.24    Anti-Corruption; Anti-Bribery. Neither any Seller nor any Transferred Subsidiary, nor any of their respective Representatives authorized to act, and acting, on behalf of any Seller or any Transferred Subsidiary has, directly or indirectly, in connection with the Business:

(a)     used any corporate funds to make or offer any unlawful payment, loan or transfer of anything of value to or for the benefit of any Government Official, candidate for public office, political party or political campaign, in each case, in violation of applicable AML Laws, for the purpose of (i) influencing any act or decision of such Government Official, candidate, party or campaign, (ii) inducing such Government Official, candidate, party or campaign to do or omit to do any act in violation of a lawful duty, (iii) obtaining or retaining business for or with any

Person, (iv) expediting or securing the performance of official acts of a routine nature or (v) otherwise securing any improper advantage; or

(b)    received written notice from any Governmental Authority alleging that such Person has violated any provision of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1, *et seq.,* or any other applicable anticorruption or anti-bribery Laws (collectively, "AML Laws").

Section 3.25    Project Assets; Studies and Reports.

(a)    The Sellers have delivered to the Buyer true and complete copies of (i) any material final, third party written studies and reports, (ii) with respect to any material third-party, written study or report for which a final version has not yet been delivered to the Sellers and Transferred Subsidiaries, the most recent draft version thereof, in each case, related to the design, development, siting, permitting, construction, commissioning, testing, operation, maintenance or ownership of each Project (other than any Environmental Report) that are in the possession or control of the Sellers or any Transferred Subsidiary or any of their Affiliates, and (iii) any material written report issued under the Asset Management Agreements ("Studies and Reports").

(b)    Each Transferred Subsidiary has good and marketable title to, and sole possession and control of, all of its assets, properties, rights and interests, free and clear of all Encumbrances (other than Permitted Encumbrances).

(c)    The assets, properties, rights and interests owned by the applicable Transferred Subsidiary are all of the assets used by such Transferred Subsidiary, the applicable Seller, or any of their respective Affiliates with respect to the applicable Projects, and such assets are sufficient, taking into account the current stage of development of the applicable Project, to operate the Project in the Ordinary Course of Business.

Section 3.26    NYSERDA Incentive Payments. Except as listed on Section 3.26 of the Disclosure Schedules, none of the Transferred Subsidiaries has received NYSERDA Incentive Payments.

Section 3.27    Surety Bonds. Section 3.27 of the Disclosure Schedules sets forth a complete and accurate list and description (including payee information) of all outstanding Surety Bonds that any of the Sellers or Transferred Subsidiaries has obtained or otherwise procured in connection with the ownership, use or operation of its assets or properties, or in the conduct of its Business (such Surety Bonds, collectively, the "Seller Bonds"). All Seller Bonds are in amounts and forms required pursuant to applicable Laws, Permits and/or Contracts. Except for the Seller Bonds, none of the Sellers or Transferred Subsidiaries is required to obtain or otherwise procure any Surety Bonds in connection with the ownership, use or operation of any of their respective assets or properties, or in the conduct of the Business (excluding with respect to Excluded Assets, and in such case solely to such extent). None of the Sellers or Transferred Subsidiaries have pledged or deposited, and none of the Sellers or Transferred Subsidiaries are required to pledge or deposit, any cash, property or other collateral with any surety or other provider of any of the Seller Bonds in respect thereof, and no Seller or Transferred Subsidiary has been notified by any such surety or other provider that it is required or will be required to pledge or deposit any such cash,

property or other collateral. All premiums payable under the Seller Bonds have been paid, and the Sellers and Transferred Subsidiaries have otherwise complied with the terms and conditions of all of the Seller Bonds (including any indemnity agreements in respect thereof). None of the Sellers or Transferred Subsidiaries has received any written notice of any actual or threatened termination, cancellation, non-renewal or revocation of, premium increase with respect to, or material alteration of coverage under, any of the Seller Bonds. None of the sureties or other providers of any of the Seller Bonds has made any payment under any of the Seller Bonds.

Section 3.28    Exclusivity of Representations and Warranties. None of the Sellers, the Transferred Subsidiaries or any of their Affiliates or Representatives is making, and none of the Buyer or any of its Affiliates or Representatives is relying on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied (including any relating to financial condition or results of operations of the Business or maintenance, repair, condition, design, performance, value, merchantability or fitness for any particular purpose of the Transferred Assets), except as expressly set forth in this Article III (as modified by the Disclosure Schedules), and EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE III (AS MODIFIED BY THE DISCLOSURE SCHEDULES), THE SELLERS HEREBY DISCLAIM, ON THEIR BEHALF AND ON BEHALF OF THEIR AFFILIATES AND REPRESENTATIVES, (A) ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, WITH RESPECT TO SUCH PERSONS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING WITH RESPECT TO (I) EXCEPT IN THE CASE OF FRAUD, THE DISTRIBUTION OR RELIANCE ON ANY INFORMATION, DISCLOSURE OR DOCUMENT OR OTHER MATERIAL MADE AVAILABLE TO THE BUYER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN ANY DATA ROOM, MANAGEMENT PRESENTATION, CONFIDENTIAL INFORMATION MEMORANDUM OR IN ANY OTHER FORM IN EXPECTATION OF, OR IN CONNECTION WITH, THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, OR OTHERWISE RELATING IN ANY WAY TO THE BUSINESS OF THE SELLERS, THE TRANSFERRED ASSETS, THE TRANSFERRED EQUITY, OR THE ASSUMED LIABILITIES, AND (II) ANY ESTIMATES OF THE VALUE OF THE BUSINESS OF THE SELLERS, THE TRANSFERRED ASSETS, OR THE TRANSFERRED EQUITY, (B) ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES, AND (C) EXCEPT IN THE CASE OF FRAUD, ALL LIABILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE AVAILABLE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE BUYER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES (INCLUDING OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO THE BUYER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES). EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, THE PARTIES ACKNOWLEDGE AND AGREE THAT THE BUYER SHALL BE DEEMED TO BE ACQUIRING THE TRANSFERRED ASSETS AND TRANSFERRED EQUITY IN THEIR PRESENT STATUS, "AS-IS," "WHERE-IS," AND "WITH ALL FAULTS." NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE STATEMENTS AND DISCLAIMERS IN THIS SECTION 3.28 SHALL EXPRESSLY SURVIVE THE CLOSING.

**ARTICLE IV.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Sellers as follows:

Section 4.1    Organization. The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be a party.

Section 4.2    Authority. The Buyer has all requisite legal capacity and the full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is or will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and this Agreement has been, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer and assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will constitute, the legal, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with its respective terms, except as enforcement may be limited by the Enforceability Exceptions.

Section 4.3    No Conflict; Required Filings and Consents.

(a)    The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer is or will be a party, and the consummation by the Buyer of the transactions contemplated hereby and thereby, will not:

(i)    conflict with or result in any violation or breach of or default under, the Organizational Documents of such Buyer;

(ii)    conflict with or result in a violation or breach of any Law or Order applicable to the Buyer or by which any property or asset of such Buyer is bound; or

(iii)    conflict with, result in a violation or breach of, constitute (with or without notice or lapse of time or both) a default under, require the Buyer to obtain consent or approval from any Person under the terms of, or give rise to a right of termination, cancellation, acceleration or modification under the terms of any Contract to which such Buyer is a party;

except, in the case of clause (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which have not had and would not reasonably be expected to have a Buyer Material Adverse Effect.

(b)    The Buyer is not required to file, seek or obtain any notice, authorization, approval, Order, Permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary

Agreements to which it is or will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for the entry of the Sale Procedures Order and the Sale Order by the Bankruptcy Court or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

Section 4.4    Brokers. No broker, finder or investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby as a result of an engagement by the Buyer that that would be payable by the Sellers.

Section 4.5    Litigation. There is no Action pending or threatened in writing against the Buyer or Orders outstanding, in each case, which would reasonably be expected to result in a Buyer Material Adverse Effect.

Section 4.6    Purchase for Investment. The Transferred Equity will be acquired by the Buyer for its own account, and not with a view to any distribution thereof, for the purpose of investment, it being understood that the right to dispose of such Transferred Equity shall be entirely within the discretion of the Buyer. The Buyer acknowledges that the Transferred Equity may not be transferred, sold, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act of 1933 (together with the rules and regulations promulgated thereunder) and any other provision of applicable state securities Laws or pursuant to an applicable exemption therefrom.  The Buyer is an informed purchaser, and has engaged advisors, experienced in the evaluation and purchase of businesses such as its acquisition of the Transferred Equity, as contemplated hereunder. The Buyer (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Transferred Equity and is capable of bearing the economic risks of such investment.

Section 4.7    Inspections; No Other Representations. The Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed decision with respect to the execution, delivery and performance of this Agreement. Except as expressly set forth in Article III, or any certificate delivered in connection with the Closing, the Buyer agrees to accept the Transferred Assets (including the Transferred Equity) and the Assumed Liabilities in the condition they are in on the Closing based upon its own inspection, examination and determination with respect thereto as to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to any Seller, including with respect to any information or documents made available to the Buyer or its counsel, accountants or advisors with respect to the Transferred Assets, the Transferred Subsidiaries, the Assumed Liabilities or the Business (excluding with respect to Excluded Assets, and in such case solely to such extent).

Section 4.8    Exclusivity of Representations and Warranties. None of the Buyer or any of its Affiliates or Representatives is making, and none of the Sellers or any of their Affiliates or Representatives is relying on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Article IV, and the Buyer hereby disclaims all Liability and responsibility for any such other representations or warranties,

including any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to the Sellers or their Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to any Seller by any director, officer, agent, consultant or Representative of the Buyer or any of its Affiliates).

## ARTICLE V.
## BANKRUPTCY COURT MATTERS

Section 5.1    Bankruptcy Actions.

(a)    Approval of Termination Payment.

(i)    If this Agreement is validly terminated (x) in accordance with Section 9.1(b)(ii), Section 9.1(c)(x), Section 9.1(c)(xiii) or Section 9.1(e), or (y) in accordance with Section 9.1(c)(i) and within three (3) months following such termination any Seller enters into one or more Alternative Transactions with one or more Persons other than Buyer, then in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Sellers, the Sellers, jointly and severally, shall pay the Buyer, in accordance with the terms hereof and, subject to the entry of and terms of the Sale Procedures Order, a break-up fee in an amount equal to $930,000 (the "Break-Up Fee"). The Break-Up Fee payable due to such a termination shall be paid within three (3) Business Days following (A) the date of the valid termination of this Agreement in the case of a Break-Up Fee payable specified in clause (x) of the preceding sentence or (B) the date the Alternative Transaction is entered into in the case of a Break-Up Fee specified in clause (y) of the preceding sentence.

(ii)    In addition, (1) if this Agreement is validly terminated in accordance with the terms set forth in Section 9.1 (other than (i) any termination pursuant to Section 9.1(a), (ii) any termination pursuant to Section 9.1(b)(i) and the existence of the applicable Legal Restraint is proximately caused by the material breach by the Buyer of its representations, warranties, covenants or agreements set forth in this Agreement, (iii) any termination by any Seller pursuant to Section 9.1(b)(iii), unless, in each case, the Buyer at such time would have been entitled to terminate this Agreement pursuant to Section 9.1, (iv) any termination pursuant to Section 9.1(c)(i), (v) any termination pursuant to Section 9.1(d), or (vi) any termination pursuant to Section 9.1(c)(xi) and the existence of the Material Adverse Effect is proximately caused by the material breach by the Buyer of its representations, warranties, covenants or agreements set forth in this Agreement), and (2) an Alternative Transaction is consummated, then the Sellers, jointly and severally, shall pay to the Buyer in cash not later than three (3) Business Days following the consummation of an Alternative Transaction, an amount equal to the aggregate amount of reasonable and documented out-of-pocket costs, fees and expenses incurred by the Buyer and its Affiliates (including fees and expenses of legal, accounting, financial and other advisors) in connection with this Agreement, any of the Ancillary Agreements, the transactions contemplated hereby and thereby (or other similar pre-Petition Date transactions contemplated by the Buyer and the Sellers) and the approval by the Bankruptcy Court of the foregoing, in an amount not to exceed $500,000 (the "Expense Reimbursement Amount" and, together with the Break-Up Fee, the "Termination Payment"), by wire transfer of immediately available funds to an account specified

by the Buyer to the Sellers in writing. If this Agreement is validly terminated in accordance with Section 9.1(c)(i) and within three (3) months following such termination any Seller enters into one or more Alternative Transactions with one or more Persons other than Buyer, then the Sellers, jointly and severally, shall pay to the Buyer not later than three (3) Business Days following the date of the consummation of an Alternative Transaction, the Expense Reimbursement Amount by wire transfer of immediately available funds to an account specified by the Buyer to the Sellers in writing.

(iii)    In the event that all or any portion of the Termination Payment is not paid by the Sellers to the Buyer on or before the date set forth in this Section 5.1(a), then the Buyer shall also be entitled to immediate reimbursement from the Sellers for all reasonable, documented out-of-pocket fees, costs and expenses incurred by the Buyer or any of its Affiliates to collect such unpaid portion of the Termination Payment, together with interest on such amount at the prime rate published in the Money Rates Section of the *Wall Street Journal* in effect on the date such payment was required to be made through the date of payment (such fees, costs, expenses and interest, the "Collection Costs"). Any obligation to pay the Termination Payment and the Collection Costs hereunder shall be absolute and unconditional; any such payment shall constitute allowed superpriority administrative claims against the Sellers' estates under sections 503(b) and 507(a)(1) of the Bankruptcy Code and shall be payable as specified herein, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.

(iv)    Each of the parties hereto acknowledges that the Termination Payment and Collection Costs are not intended to be a penalty but rather is liquidated damages in a reasonable amount that will compensate the Buyer in the circumstances in which the Termination Payment or Collection Costs are paid, for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. The Parties hereby agree that if the Termination Payment becomes payable pursuant to this Section 5.1, the Termination Payment (along with any Collection Costs, if applicable) is the Buyer's sole recourse in connection with this Agreement and the Ancillary Agreements in the event this Agreement is terminated prior to the Closing.

(v)    Nothing in this Section 5.1(a) or elsewhere in this Agreement shall be deemed to limit, restrict or impair the right of any party to bring any Action or Actions for specific performance, injunctive and/or other equitable relief (including the right of any party to compel specific performance by another party of its obligations under this Agreement) pursuant to Section 10.14 prior to the valid termination of this Agreement. In addition, nothing in this Section 5.1(a) or elsewhere in this Agreement shall affect the rights of the Buyer or any of the Buyer's Related Parties to receive reimbursement for expenses or other adequate protection pursuant to the Interim DIP Order or the Final DIP Order or any Order of the Bankruptcy Court approving the Sellers' use of cash collateral.

(vi)    The Buyer hereby acknowledges that the Sellers' sole obligation upon valid termination of this Agreement pursuant to Section 9.1(e) is payment of the Termination Payment (and Collection Costs, if applicable) in accordance with this Section 5.1(a), and, upon

payment of the Termination Payment (and Collection Costs, if applicable) in full, the Sellers shall have no further obligations under this Agreement.

(b)    Competing Transaction.

(i)    This Agreement is subject to approval of the procedures set forth in the Sale Procedures Order, including with respect to payment of the Termination Payment and the Collection Costs, and the consideration by Sellers of Competing Bids in respect of all or any part of the Transferred Assets and/or the Transferred Subsidiaries in accordance with the Sale Procedures Order. From the date hereof (and any prior time) and until the earlier of (A) the completion of the Auction in accordance with the Sale Procedures Order, or (B) if no Qualified Bids (as defined in the Sale Procedures Order) are received by the Bid Deadline (as defined in the Sale Procedures Order), the Bid Deadline (such period being the "Go-Shop Period"), the Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid, including, to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Transferred Assets (including supplying information relating to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) and the assets of Sellers to prospective purchasers) (the "Go-Shop Actions"); provided, that, from and after the date hereof, the Sellers' consideration of other bids for the Transferred Assets, the Transferred Subsidiaries or the Business (including the taking by the Sellers or any of their respective Representatives and Affiliates of any of the Go-Shop Actions) shall be exercised in compliance with the Sale Procedures (it being understood that, prior to the time at which the Sale Procedures Order is entered by the Bankruptcy Court, the Sellers shall comply with the Sale Procedures as if the Bankruptcy Court had entered the Sale Procedures Order and such order was in effect).

(ii)    Following the Go-Shop Period and until the Closing or the earlier valid termination of this Agreement in accordance with its terms, the Sellers and their Affiliates are neither permitted to, nor permitted to cause their Representatives or Affiliates to, (A) initiate contact with, solicit or knowingly encourage, induce or facilitate any Competing Bid or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid or (B) participate or engage in any discussions or negotiations with any Person regarding, or furnish to any Person any information with respect to, or cooperate in any way with any Person (whether or not a Person making a Competing Bid) with respect to, any Competing Bid or any inquiry or proposal that would reasonably be expected to lead to a Competing Bid.

(c)    Bankruptcy Court Filings.

(i)    As soon as reasonably practicable following the execution of this Agreement and the commencement of the Bankruptcy Cases, Sellers shall file with the Bankruptcy Court a motion seeking entry of the Sale Procedures Order (which shall, among other things, approve and authorize payment of the Termination Payment and any Collection Costs, and shall establish procedures for the conduct of the Auction, and to determine Cure Costs for the Transferred Contracts), and shall diligently prosecute such motion. The Sale Procedures Order shall authorize and direct Sellers to pay any Termination Payment and any Collection Costs due to Buyer from collateral of any secured party. The Sales Procedure Order shall provide that the

Termination Payment and the Collection Costs shall constitute allowed super-priority administrative claims against the Sellers' estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code with priority over all administrative claims against the Sellers' estates. The Sale Procedures Order shall provide for such super-priority administrative expense rights in form and substance satisfactory to the Buyer. Notwithstanding anything to the contrary herein, the Sale Procedure Motion previously provided to the Buyer and the Sale Procedures Order attached hereto as Exhibit B are hereby deemed to meet the requirements of this Section 5.1(c)(i). Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Procedures Order. In the event the entry of the Sale Procedures Order shall be appealed, the Sellers and the Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii)     The Sellers shall: (A)  obtain entry by the Bankruptcy Court of the Sale Procedures Order no later than the date that is thirty (30) calendar days after the Petition Date, (B) ensure that the Auction, if any, which will be conducted in accordance with the Sale Procedures Order, shall be concluded no later than the date that is sixty (60) calendar days after the Petition Date; provided, that the Sellers shall not have to comply with this clause (B) if the Sellers are not required to hold an Auction pursuant to the Sale Procedures Order (as approved by the Sale Procedures Order), (C) if the Auction is cancelled, obtain entry by the Bankruptcy Court of the Sale Order (y) no later than on or before the date that is fifty-seven (57) calendar days after the Petition Date or (z) if the Auction is not cancelled, no later than on or before the date that is seventy-five (75) calendar days after the Petition Date, and (D) subject to the satisfaction or waiver of the conditions precedent contained in this Agreement, consummate the Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Sale Order.

(ii)     Provided Buyer is selected as the winning bidder in respect of the Transferred Assets at the Auction, if any, undertaken in accordance with the Sale Procedures Order, or if no Competing Bid is submitted with respect to the Transferred Assets, the Sellers shall diligently seek entry of the Sale Order and any other necessary orders to close the sale of the Transferred Assets (the "Related Orders") by the Bankruptcy Court in accordance with the terms and conditions of the Sale Procedures Order. The Buyer and the Sellers understand and agree that the consummation of the transactions contemplated by this Agreement is subject to approval by the Bankruptcy Court. The Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order and any Related Orders including a finding of adequate assurance of future performance by the Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Buyer under this Agreement and demonstrating that the Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Buyer shall not, without the prior written consent of the Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Transferred Assets hereunder. In the event the entry of the Sale Order shall be appealed, the Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(iii)     The proposed form Sale Order of the Bankruptcy Court relating to this Agreement to be filed by the Sellers shall be in form and substance reasonably acceptable to the Buyer and Sellers and consistent with the terms of this Agreement. Sellers shall file such

motions or pleadings, in form and substance acceptable to Buyer, as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Sellers from filing such motions, including upon commencement of the Bankruptcy Cases, subject to Section 2.6, to reject any Contracts that are not Transferred Contracts.

(iv)    The Sellers shall use commercially reasonable efforts to provide the Buyer with a reasonable opportunity to review and comment on all draft copies of all motions, notices, statements, schedules, applications, reports and other papers the Sellers prior to filing with the Bankruptcy Court in connection with the Sale Procedures Order or the Sale Order (except to the extent such motions, notices, statements, schedules, applications, reports or other papers relate to any dispute between the Sellers and their Affiliates, on the one hand, and the Buyer and its Affiliates, on the other hand).

(v)    The Sellers covenant and agree that, after the Closing, the terms of any reorganization plan or plan of liquidation they submit to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Sale Procedures Order or the Sale Order.

(d)    Back-up Bidder. Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction, if and only if (i) Buyer submits the second highest or second best bid at the Auction for the Transferred Assets which is memorialized by an acceptable agreement incorporating terms established at the Auction, or the terms of this Agreement constitute the second highest or best bid for the Transferred Assets, and (ii) Sellers give written notice to Buyer on or before the date that is thirty (30) Business Days from the entry of an Order of the Bankruptcy Court approving the winning bidder's definitive agreement, stating that Sellers (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, so long as Buyer has not previously terminated this Agreement in accordance with its terms, Buyer shall promptly consummate the transactions contemplated hereby upon the terms and conditions as set forth herein, or as set forth on the record of the Auction, including the Purchase Price and the Contingent Payment, as the same may be increased by Buyer at the Auction.

## ARTICLE VI.
## COVENANTS

Section 6.1    Conduct of Business Prior to the Closing. From the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms:

(a)    Except (x) as otherwise expressly contemplated by this Agreement, (y) as required by Law, or (z) with the prior written consent of the Buyer, from the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, each of the Sellers shall, and shall cause the Transferred Subsidiaries to:

(i) conduct the Business in the Ordinary Course of Business and use commercially reasonable efforts to preserve its material business relationships with customers, suppliers, partners, licensors, licensees, distributors, Governmental Authorities and others with whom any of the Sellers (solely to the extent in connection with the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Assumed Liabilities) or the Transferred Subsidiaries deal in the Ordinary Course of Business;

(ii) use commercially reasonable efforts to maintain the Transferred Assets in good working condition and repair (normal wear and tear excepted); and

(iii) use commercially reasonable efforts to obtain from Governmental Authorities all Permits required to conduct the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) in the Ordinary Course of Business, including the operation or maintenance of any Project.

(b) Except (x) as otherwise expressly contemplated by this Agreement, (y) as required by Law, or (z) with the prior written consent of the Buyer, from the date of this Agreement until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, each of the Sellers shall not, and shall cause the Transferred Subsidiaries not to:

(i) sell, transfer, lease, sublease, encumber or otherwise dispose of (A) any Transferred Assets or (B) any assets of a Transferred Subsidiary, in each case other than (I) Inventory sold or disposed of in the Ordinary Course of Business or (II) dividends or other distributions of Cash and Cash equivalents made prior to the Cash Cutoff Time;

(ii) issue, sell, grant, pledge, dispose or transfer any Equity Interests in any Seller or Transferred Subsidiary;

(iii) acquire (A) any material assets or properties, tangible or intangible, other than in the Ordinary Course of Business or (B) any corporation, partnership, limited liability company, other business organization or division thereof;

(iv) merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(v) split, combine, consolidate, subdivide or reclassify any capital stock, other Equity Interests of any Transferred Subsidiaries or voting securities, or securities convertible into or exchangeable or exercisable for capital stock or other Equity Interests or voting securities of any Transferred Subsidiaries, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for its capital stock, other Equity Interests or voting securities of any Transferred Subsidiaries or enter into silent partnership agreements granting the silent partner entitlements to its proceeds;

(vi) (1) declare, set aside or pay any dividend or other distribution of any non-cash assets (including stock or property or any combination thereof) in respect of any securities of any Transferred Subsidiary or Seller, or repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any capital stock or voting securities of, or Equity Interests in, any Transferred Subsidiary or Seller or any securities of any Transferred Subsidiary

or Seller convertible into or exchangeable or exercisable for capital stock or voting securities of, or Equity Interests in, any Transferred Subsidiary or Seller, or any warrants, calls, options or other rights to acquire any such capital stock, securities or interests, other than any transfers among Transferred Subsidiaries, among Sellers, or between any Transferred Subsidiary and any Seller or (2) from the Cash Cutoff Time until the Closing, declare, set aside or pay any dividend or other distribution of any Cash or Cash Equivalents;

(vii)    amend the Organizational Documents of any Transferred Subsidiary;

(viii)    enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Transferred Subsidiaries;

(ix)    (1) reject or terminate (other than by expiration in accordance with its terms) any Material Contract or Surety Bond or seek Bankruptcy Court approval to do so, (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Material Contract or Surety Bond, except in each case, to the extent the Buyer has indicated in writing that it wishes the Sellers to reject such Contract, (3) waive, release or assign any material rights or claims under any Material Contract or any Contract that would be a Material Contract if in effect on the date hereof, or (4) enter into any Contract that would have been a Material Contract had it been entered into prior to the date hereof; provided that the restrictions in this Section 6.1(b)(ix) shall be subject to Section 2.6 and shall not apply to Excluded Contracts;

(x)    with respect to any Transferred Asset (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases; or (2) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(xi)    change, make or revoke any Tax election, change any method of accounting with respect to Taxes, file any amended Tax Return, surrender or compromise any right to claim a Tax refund, settle or compromise any audit, claim, notice, audit, assessment or other proceeding related to Taxes, enter into any agreement affecting any Tax Liability or any refund or file any request for rulings or special Tax incentives with any Governmental Authority, enter into any Tax allocation, sharing or indemnity agreement, extend or waive the statute of limitations period applicable to any Tax or Tax Return or take or cause (or cause any other Person to take or cause) any other action that could have a material effect on the amount of Taxes with respect to, attributable to, or due from the Business or due with respect to, attributable to, or as a result of the Transferred Assets;

(xii)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP;

(xiii)   terminate, cancel or fail to renew, other than in the ordinary course of business, any insurance coverage with respect to any Transferred Assets without replacing such coverage with a comparable amount of insurance coverage;

(xiv)   (1) fail to maintain in full force and effect, or allow to lapse, any Permits that are in full force and effect as of the date of this Agreement, (2) cancel, modify or terminate (other than by expiration in accordance with its terms) any Permit or seek Bankruptcy Court approval to do so, or (3) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Permit that is in full force and effect as of the date of this Agreement;

(xv)   make any loans, advances or capital contributions to, or investments in, any other Person (other than to a Seller or Transferred Subsidiary);

(xvi)   incur any Indebtedness for borrowed money or guarantee any such Indebtedness;

(xvii)   enter into any commitment for capital expenditures or otherwise make any capital expenditures except to the extent permitted by the DIP Credit Agreement;

(xviii)   institute, settle or agree to settle any litigation, proceeding or other Action that would reasonably be expected to result in (x) any Seller or any Transferred Subsidiary being enjoined from consummating the transactions contemplated by this Agreement, (y) any adverse effect on the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) or the Transferred Assets (including any Transferred Subsidiary) in any material respect or (z) an Assumed Liability or a Liability of any Transferred Subsidiary;

(xix)   agree to any limitations on any Seller from engaging or competing in any line of business or in any geographic area or location or otherwise with any Person or from soliciting or hiring any Person;

(xx)   hire any employees at any of the Transferred Subsidiaries; or

(xxi)   agree or commit to any of the foregoing.

Section 6.2   Covenants Regarding Information.   From the date hereof until the Closing Date or earlier valid termination of this Agreement in accordance with its terms, upon reasonable request, the Sellers shall afford the Buyer and its Affiliates and each of their respective Representatives (at the Buyer's cost) reasonable access to make investigation of the properties, offices, plants and other facilities, Books and Records (including Tax Books and Records) of the Sellers (solely to the extent related to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Assumed Liabilities) and the Transferred Subsidiaries, and shall furnish the Buyer with such financial, operating and other data and information, and access to all the officers, accountants and other Representatives of the Sellers (solely to the extent related to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets or the Assumed Liabilities) and the Transferred Subsidiaries as the Buyer may reasonably request and to make extracts and copies of such Books and Records. Notwithstanding anything to the contrary in this Agreement, the Sellers

shall not be required to disclose any information to the Buyer or its Representatives or provide such access (i) if such disclosure would cause the forfeiture of any attorney-client or other legal privilege or contravene any applicable Laws, and any such information shall not be included as Books and Records or a Transferred Asset, (ii) if such disclosure would disclose information regarding other bidders or bids in the Auction or any pre-Bankruptcy Case sales process (except to the extent provided under the Sale Procedures Order); (iii) such access or related activities would cause a violation of any Contract to which any Seller is a party, (iv) such disclosure would violate any applicable Laws related to privacy or data privacy, or (v) legal counsel for the Sellers reasonably concludes such disclosure would reasonably be expected to violate applicable antitrust or competition Laws or a protective order or would cause significant competitive harm to the Sellers or the Transferred Subsidiaries if the transactions contemplated by this Agreement are not consummated; provided that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Sellers after consultation with outside counsel) reasonably be likely to cause such violation to occur or such privilege to be undermined with respect to such information; provided further that, (A) the Sellers shall have the right to have one or more of its Representatives present at all times during any visits, examinations, discussions or contacts contemplated hereby, (B) such access to the properties, offices, plants and other facilities shall not materially interfere with the ongoing use and operation of such properties, offices, plants and other facilities of the Sellers or the Transferred Subsidiaries, and (C) the Buyer shall not, without the prior written consent of the Sellers, to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media, including of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing.

Section 6.3    Notification of Certain Matters. The Sellers shall promptly notify the Buyer in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 8.3(a) or Section 8.3(b) becoming incapable of being satisfied.

Section 6.4    Consents and Filings; Further Assurances.

(a)    Subject to Section 5.1(b), each of the Parties shall use reasonable best efforts to take, or cause to be taken, all appropriate actions or non-actions to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement without material delay and the Ancillary Agreements and to confirm the Buyer's ownership of the Transferred Assets as promptly as practicable, including to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from customers and other parties. Without limiting the generality of the previous sentence and subject to Section 5.1(b), the Parties shall (i) use reasonable best efforts to obtain from Governmental Authorities all consents, approvals, authorizations, qualifications and Orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) promptly make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement under applicable Law, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement; and (iii) coordinate and cooperate with each other in exchanging such information and supplying

such reasonable assistance as may be reasonably requested by each in connection with the foregoing.

(b)      From time to time, whether at or following the Closing, the Sellers and the Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall, and shall cause their respective Affiliates to, take such further actions, as may be necessary or appropriate to vest in the Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide the Buyer and the Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements. Subject to Section 5.1(b), each of the Parties will use its commercially reasonable efforts to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.

(c)      The Sellers and the Buyer shall (at the Buyer's cost) reasonably cooperate with each other and, as promptly as practicable after the date of this Agreement, use commercially reasonable efforts to obtain the issuance, transfer or reissuance to the Buyer (or the applicable Transferred Subsidiary) of all Permits necessary to lawfully own and operate the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) and Transferred Assets. The Parties shall use commercially reasonable efforts to respond promptly to any requests for additional information made by such Governmental Authorities or agencies, use their respective commercially reasonable efforts to participate in any presentations, hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Permits, and use respective commercially reasonable efforts to cause approval to be obtained as soon as practicable after the date of filing. Each Party will bear its costs of the preparation and review of any such filing. The Sellers and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection any filings to transfer the Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

Section 6.5      Refunds and Remittances.

(a)      After the Closing: (i) if the Sellers or any of their Affiliates receive any refund, cash, checks with appropriate endorsements, payment of an Account Receivable or other account, trade, note receivable or other payment or other property or asset that is a Transferred Asset or is otherwise properly due and owing to the Buyer in accordance with the terms of this Agreement, the Sellers shall hold such amounts in trust for the Buyer's benefit and accounts and promptly shall remit, or shall cause to be remitted, such amount to the Buyer from time to time as and when received and (ii) if the Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to the Sellers or any of their Affiliates in accordance with the terms of this Agreement, the Buyer shall hold such amounts in trust for the Sellers' benefit and accounts and promptly shall remit, or shall cause to be remitted, such amount to the Sellers. For the avoidance of doubt, except as otherwise provided in this Agreement, following the Closing, if any payments due with respect to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent) are paid to any Seller or

any of their Affiliates, the Sellers shall, or shall cause the applicable Affiliate to, promptly remit by wire or draft such payment to an account designated in writing by the Buyer.

(b)     In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to the Sellers or any of their Affiliates, the Sellers shall, and shall cause their Affiliates to, promptly notify the Buyer and as soon as practicable thereafter, convey, assign, transfer or deliver such Transferred Asset to the Buyer or its designees, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Transferred Asset to the Buyer or its designees or (ii) any Excluded Asset has been conveyed to or is received by the Buyer, then, without any consideration payable to the Buyer or any of its Affiliates, the Buyer shall promptly notify the Sellers and as soon as practicable thereafter, convey, assign, transfer or deliver such Excluded Asset to the Sellers, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Excluded Asset to Sellers or their designees.

Section 6.6     <u>Public Announcements.</u> From and after the date hereof, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither the Buyer nor the Sellers shall make any such press release or any public statement prior to obtaining the Sellers' (in the case of the Buyer) or the Buyer's (in the case of the Sellers) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure is made in any filing made to any court or may be required by applicable Law or by the Bankruptcy Court; <u>provided</u>, <u>further</u>, that nothing in this Agreement shall restrict or prohibit (a) the Sellers, the Buyer or their respective Affiliates from making any announcement to their respective customers and other business relations to the extent that such announcement consists solely of, or is otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any party hereto in accordance with this Agreement, in each case, to the extent such disclosure is still accurate in all material respects (and not misleading) or (b) the Buyer or its Affiliates from making any announcement to their employees or existing or prospective limited partners or other investors, in each case, subject to the terms of the Confidentiality Agreement.

Section 6.7     <u>Seller Confidentiality.</u> Following the Closing, the Sellers shall, and the Sellers shall cause their respective Affiliates and Representatives to, maintain as confidential and not use or disclose, any confidential, proprietary or non-public information or materials relating to (i) the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Subsidiaries, the Transferred Assets, or the Assumed Liabilities or (ii) any materials provided by the Buyer or any of its Representatives to any Seller. In the event any Seller or any of their respective Affiliates or Representatives is required by applicable Law to disclose any such information or materials, such Seller shall to the extent practicable and not prohibited by applicable Law, promptly notify the Buyer in writing of such required disclosure, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with the Buyer, at the Buyer's sole expense, to obtain a protective order and otherwise preserve the confidentiality of such information or materials consistent with applicable Law. At any time that such protective order or remedy has not been obtained, such Seller or such Affiliate or Representative may disclose only that portion of such

information or materials which such Person is required by applicable Law to disclose. Information and materials subject to the confidentiality obligations in this <u>Section 6.7</u> do not include any information or materials which (A) at the time of disclosure is or thereafter becomes generally available to or known by the public (other than as a result of the disclosure of such information or materials by the Sellers or their Affiliates or Representatives in breach of this <u>Section 6.7</u>) or (B) becomes available to any of the Sellers or their Affiliates and Representatives on a non-confidential basis from a Person (other than the Buyer or any of its Affiliates) who is not bound by a confidentiality agreement with the Buyer or any of its Affiliates.

Section 6.8    <u>Buyer Confidentiality.</u> The Buyer shall, and the Buyer shall cause its Affiliates and Representatives to comply with the Confidentiality Agreement in accordance with the terms thereof. At the Closing, the Confidentiality Agreement shall be deemed to have been terminated by the parties thereto as it relates to the confidential information regarding the Business (excluding with respect to Excluded Assets, and in such case solely to such extent), the Transferred Assets, the Transferred Subsidiaries, or the Assumed Liabilities, and shall no longer be binding.

Section 6.9    <u>Intercompany Arrangements.</u> Except as provided on <u>Section 6.9 of the Disclosure Schedules</u>, all intercompany agreements between any Seller or any Affiliate of any Seller (other than any Seller or Transferred Subsidiary), on the one hand, and any Transferred Subsidiary, on the other hand, shall be terminated at or prior to the Closing, without any liability or ongoing obligation.

Section 6.10    <u>No Regulatory Impediments.</u> The Seller and the Companies shall, and shall cause the Transferred Companies, to use commercially reasonable efforts not to (i) make a filing with FERC to sell energy and capacity at wholesale at market-based rates, (ii) fail to maintain or becoming no longer eligible for QF Status, or (iii) fail to maintain or to become no longer eligible for the Regulatory Exemptions or exemptions from regulation under PUHCA. Notwithstanding anything to the contrary, nothing contained in this Agreement shall give the Buyer, directly or indirectly, prior to the Closing, the right to control or direct the operations of the Projects or any of the Transferred Subsidiaries.

Section 6.11    <u>Replacement of Credit Support.</u> Prior to the Closing, the Buyer and the Sellers shall use their commercially reasonable efforts to cooperate in Buyer's efforts to procure, at the Buyer's expense, the return or unconditional release by the applicable counterparty of each guarantee, letter of credit, letter of comfort, Surety Bond or other form of credit support provided by or posted by (as applicable) any of the Sellers or their Affiliates (other than any credit support provided by or posted by the Transferred Subsidiaries with respect to which the Sellers and their Affiliates, immediately following Closing, will not have any Liability from and after Closing) with respect to any Transferred Asset or any Assumed Liability (but excluding all Excluded Liabilities), in each case, set forth on <u>Section 6.11 of the Disclosure Schedules</u> (the "<u>Financial Assurances</u>"), by providing substitute guarantees, furnishing letters of credit, instituting escrow arrangements, posting Surety Bonds or entering or assuming indemnity agreements related to the foregoing. For any Financial Assurance for which the Buyer is not substituted in all respects for the applicable Seller or Affiliate thereof effective as of the Closing, the Buyer shall continue to use commercially reasonable efforts to effect such substitution and release as promptly as practicable after the Closing and the Sellers and their Affiliates shall have no obligation to renew or maintain any such Financial Assurances from and after the Closing. From and after the Closing until the Buyer has

replaced the Financial Assurances, the Buyer shall indemnify and hold harmless the Sellers and their Affiliates from any Loss arising out of any of the Financial Assurances.

Section 6.12    Sale Free and Clear. Except as otherwise expressly set forth in this Agreement, the proposed Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances, against or created by the Sellers, any of their Affiliates, or the bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets and (b) the Buyer is not a successor to any Seller or the bankruptcy estate by reason of any theory of Law or equity, and the Buyer shall not assume or in any way be responsible for any Liability of the Sellers, any of their Affiliates and/or the bankruptcy estate, except as expressly provided in this Agreement. On the Closing Date, the Transferred Assets and Transferred Equity shall be transferred to the Buyer free and clear of all obligations, Liabilities and Encumbrances (other than Permitted Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code.

## ARTICLE VII.
## TAX MATTERS

Section 7.1    Transfer Taxes. Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services, value-added or other similar Taxes payable as a result of or with respect to the sale or transfer of the Transferred Equity or the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") shall be borne and paid one-half by the Sellers and one-half by the Buyer. The Sellers and the Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes. Each Party shall prepare and file all necessary Tax Returns or other documents required to be filed by it with respect to such Transfer Taxes.

Section 7.2    Tax Cooperation. The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes ("Tax Books and Records")) and assistance relating to the Business, the Transferred Subsidiaries, the Transferred Assets and the Assumed Liabilities as is reasonably necessary for determining any Liability for Taxes, the filing of any Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any audit, claim, suit or proceeding relating to any Tax; provided, however, that the Buyer shall not be required to disclose the contents of its Tax Returns to any Person. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 7.2 shall be borne by the Party requesting it.

Section 7.3    Allocation.

(a)    To the extent it is necessary for purposes of this Agreement to determine the allocation of Taxes relating to a Straddle Period between the Pre-Closing Tax Period and the Post-Closing Tax Period, (i) the amount of any such Taxes that are based on or measured by income or receipts or that are sales or use taxes, employment taxes, or withholding taxes and any other Taxes not described in Section 7.3(a)(ii) for the portion of such Straddle Period ending on

the Closing Date shall be determined based on an interim closing of the books as of the close of business at the end of the day on the Closing Date, and (ii) the amount of any property, ad valorem Taxes and any other Taxes imposed on a periodic basis for such Straddle Period that relates to the portion of such Straddle Period ending on the Closing Date shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in such Straddle Period ending as of the close of business on the Closing Date and the denominator of which is the total number of days in such Straddle Period; provided that, exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions computed as if the Closing Date was the last day of the Straddle Period) shall be allocated between the portion of the Straddle Period ending on the Closing Date and the portion of the Straddle Period thereafter in proportion to the number of days in each such portion.

(b)      [Reserved].

Section 7.4    <u>Tax Returns</u>. Sellers shall prepare and timely file with the appropriate Governmental Authority any Tax Returns required to be filed by Sellers or the Transferred Subsidiaries with respect to Taxes relating to the Business, the Projects, the Transferred Subsidiaries, the Transferred Assets and the Assumed Liabilities that are required to be filed on or before the Closing Date (each such Tax Return, a "<u>Pre-Closing Tax Return</u>"); <u>provided</u>, that, Sellers shall submit all Pre-Closing Tax Returns to Buyer no later than 20 days prior to the due date (including extensions) of such Pre-Closing Tax Returns (other than a Pre-Closing Tax Return relating to sales, use, payroll or other Taxes that is required to be filed contemporaneously with, or promptly after, the close of a Tax period, which shall be provided as soon as reasonably practicable before filing) for Buyer's review, comment (which comment shall be taken into account in good faith) and approval, such approval not to be unreasonably withheld, conditioned or delayed. The Sellers shall be responsible for (a) all Income Taxes that are due or become due from or with respect to the Business, the Projects, the Transferred Subsidiaries, the Transferred Assets and the Assumed Liabilities with respect to a Pre-Closing Tax Period and (b) all Asset Taxes that are due or become due from or with respect to the Business, the Projects, the Transferred Subsidiaries, the Transferred Assets and the Assumed Liabilities with respect to a Pre-Closing Tax Period, in the case of this clause (b), to the extent such Taxes are due and payable on or prior to the Closing Date, and, in cases of clause (a) and clause (b), shall pay any such Taxes that are due and payable (including, as shown on such Pre-Closing Tax Returns) to the appropriate Governmental Authority.

Section 7.5    <u>Tax Allocation Contracts</u>. All Tax allocation, Tax sharing or similar Contracts (other than any customary commercial Contract entered into in the ordinary course of business not primarily concerning Taxes) with respect to or involving a Transferred Subsidiary, on the one hand, and any other Person, on the other hand, shall be terminated prior to the Closing, unless otherwise approved by Buyer and, after the Closing Date, none of the Transferred Subsidiaries shall be bound thereby or have any Liability thereunder, and there shall be no continuing obligation after the Closing Date to make any payments under any such Contracts.

Section 7.6    <u>Bulk Sales</u>. Notwithstanding any other provisions in this Agreement, the Buyer and the Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar

Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Buyer.

## ARTICLE VIII.
## CONDITIONS TO CLOSING

Section 8.1    General Conditions. The respective obligations of the Buyer and the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in a joint writing by the Buyer and the Sellers (provided that such waiver shall only be effective as to the obligations of the Sellers, in the case of a waiver by the Sellers, and the Buyer, in the case of the Buyer):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "Legal Restraint").

(b)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

Section 8.2    Conditions to Obligations of the Sellers. The obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by the Sellers in their respective sole discretion:

(a)    Representations and Warranties.

(i)    Each Buyer Fundamental Representation shall be true and correct in all respects (except for de minimis inaccuracies) both as of the date of this Agreement and as of the Closing Date (other than in the case of any Buyer Fundamental Representations that are made as of a specified date, which Buyer Fundamental Representations shall be true and correct in all respects (except for de minimis inaccuracies) as of such specified date).

(ii)    The representations and warranties of the Buyer contained in this Agreement (other than the Buyer Fundamental Representations) shall be true and correct in all respects both as of the date of this Agreement and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all material respects as of such specified date), without giving effect to any limitation or qualification by a materiality standard (including "in all material respects," "material" or "Buyer Material Adverse Effect") set forth therein, except where the failure to be so true and correct has not had or would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect.

(b)    The Buyer shall have, in all material respects, performed or complied with all obligations, agreements and covenants required by this Agreement to be performed or complied with by the Buyer prior to or at the Closing.

(c)     The Sellers shall have received the documents listed in <u>Section 2.9(c)</u>.

Section 8.3     <u>Conditions to Obligations of the Buyer</u>. The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by the Buyer in its sole discretion:

(a)     <u>Representations and Warranties</u>.

(i)     Each Seller Fundamental Representation shall be true and correct in all respects (except for *de minimis* inaccuracies) both as of the date of this Agreement and as of the Closing Date (other than in the case of Seller Fundamental Representations that are made as of a specified date, which Seller Fundamental Representations shall be true and correct in all respects (except for *de minimis* inaccuracies) as of such specified date).

(ii)     The representations and warranties of the Sellers contained in this Agreement (other than the Seller Fundamental Representations) shall be true and correct in all respects both as of the date of this Agreement and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all material respects as of such specified date), without giving effect to any limitation or qualification by a materiality standard (including "in all material respects," "material" or "Material Adverse Effect") set forth therein, except where the failure to be so true and correct has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     The Sellers shall have, in all material respects, performed or complied with all obligations, agreements and covenants required by this Agreement to be performed or complied with by any Seller prior to or at the Closing.

(c)     The Buyer shall have received the documents listed in <u>Section 2.9(b)</u>.

(d)     (i) if a "Maturity Date" (as defined in the DIP Credit Agreement) has occurred, such Maturity Date shall have been reversed by the Bankruptcy Court, and (ii) an "Event of Default" (as defined in the DIP Credit Agreement) shall not have occurred and be continuing.

(e)     From and after the date of this Agreement, there shall not have occurred and be continuing any event, change, condition, occurrence or effect that has, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)     Sellers shall (i) have delivered to the applicable counterparty the notices, and obtained from the applicable counterparty the consents, approvals and authorizations, listed in <u>Section 8.3(f) of the Disclosure Schedules</u>, and (ii) have delivered evidence thereof to the Buyer.

## ARTICLE IX.
## TERMINATION

Section 9.1     <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing (the date on which this Agreement terminates in accordance with its terms):

(a)      by mutual written consent of the Buyer and the Sellers;

(b)      either the Sellers or the Buyer, if:

(i)      a Legal Restraint is in effect that has become final and nonappealable; provided, that the right to terminate this Agreement under this Section 9.1(b)(i) shall not be available to the Sellers or the Buyer, as applicable, if any Seller or the Buyer, as applicable, is then in material breach or violation of this Agreement and such breach or violation is the cause of the Legal Restraint;

(ii)      any Seller enters into a definitive agreement with respect to an Alternative Transaction because the Buyer is not the Successful Bidder at the Auction; provided, however, that if the Buyer is the Back-Up Bidder, then the Buyer may not terminate this Agreement pursuant to this Section 9.1(b)(ii) for a period of thirty (30) Business Days from the entry of an Order of the Bankruptcy Court approving such definitive agreement and the transactions contemplated thereby (for the avoidance of doubt, nothing in this Section 9.1(b)(ii) shall restrict the ability of the Buyer to terminate this Agreement in accordance with any other provision of this Agreement); or

(iii)      the Closing shall not have occurred on or before January 31, 2025 (the "Outside Date"); provided that the right to terminate this Agreement under this Section 9.1(b)(iii) shall not be available to any Party if such Party is then in material breach of this Agreement, and such material breach is the cause of the failure of the Closing to occur prior to such date;

(c)      by the Buyer, if:

(i)      the Buyer is not in material breach of this Agreement such that the conditions in Section 8.2(a) or Section 8.2(b) would not be satisfied, and any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue and such breach or failure or inaccuracy (A) would give rise to the failure of a condition set forth in Section 8.3(a) or Section 8.3(b) and (B) cannot be or has not been cured before the earlier to occur of (I) fifteen (15) Business Days following delivery of written notice to the Sellers of such breach or failure to perform and (II) one (1) day prior to the Outside Date;

(ii)      the Bankruptcy Court has not entered the Sale Procedures Order on or before the date that is thirty (30) calendar days after the Petition Date, or if approval of the Sale Procedures Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iii)      the Sale Hearing is not held (i) if an Auction is not conducted pursuant to the Sale Procedures Order, on or before the date that is fifty-six (56) calendar days after the Petition Date, or (ii) if an Auction is conducted pursuant to the Sale Procedures Order, on or before the date that is seventy (70) calendar days after the Petition Date, or, in each case, if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iv)    the Auction, if any, is not held and closed on or before the date that is sixty (60) calendar days after the Petition Date;

(v)    the Bankruptcy Court has not entered the Sale Order (i) on or before the date that is fifty-seven (57) calendar days after the Petition Date if an Auction is not conducted pursuant to the Sale Procedures Order, or (ii) on or before the date that is seventy-five (75) calendar days after the Petition Date if an Auction is conducted pursuant to the Sale Procedures Order, or, in each case, if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(vi)    if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(vii)    the Sellers withdraw or seek authority to withdraw the Sale Procedures Motion or, after entry of the Sale Procedures Order, the Sellers withdraw the request for authority to sell the Transferred Assets and assume and assign the Transferred Contracts;

(viii)    the Sellers modify or amend the Sale Procedures (as defined in the Sale Procedures Order) in a manner adverse to the Buyer without the prior written consent of the Buyer unless such modification or amendment is permitted by the Sale Procedures Order or required by the Bankruptcy Court;

(ix)    any of the Sellers or any Chapter 11 trustee appointed for any Seller file any pleading with the Bankruptcy Court for relief that would not permit the Closing without the prior written consent of the Buyer; provided, that taking any action in respect of soliciting Competing Bids, or accepting a winning bid, in connection with the Auction shall not entitle the Buyer to terminate this Agreement pursuant to this Section 9.1(c)(ix); or

(x)    upon the consummation of an Alternative Transaction for a portion of the Transferred Assets;

(xi)    from and after the date of this Agreement, a Material Adverse Effect has occurred and cannot be or has not been cured before the earlier to occur of (A) fifteen (15) Business Days following delivery of written notice to the Sellers of the existence of such Material Adverse Effect and (B) one (1) day prior to the Outside Date;

(xii)    the Sellers publicly announce any plan of reorganization or plan of liquidation or support any such plan filed by any third party that (A) adversely affects Sellers' ability to perform their obligations under this Agreement or to consummate the transactions contemplated hereby or (B) that prevents or materially delays the Closing from occurring in accordance with the terms of this Agreement; or

(xiii)    if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Buyer or the Successful Bidder or the Back-Up Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Buyer or the Successful Bidder or the Back-Up Bidder;

(d)    by the Sellers, if the Sellers are not in material breach of this Agreement such that the conditions in Section 8.3(a) or Section 8.3(b) would not be satisfied, and the Buyer shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of the Buyer in this Agreement shall have become untrue and such breach, failure or inaccuracy (i) would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b) and (ii) cannot be or has not been cured before the earlier to occur of (A) fifteen (15) Business Days following delivery of written notice of such breach or failure to perform and (B) one (1) day prior to the Outside Date; or

(e)    automatically, upon the consummation of an Alternative Transaction for all of the Transferred Assets.

The Party seeking to terminate this Agreement pursuant to this Section 9.1 (other than Section 9.1(a)) shall, if such Party is the Sellers, give prompt written notice of such termination to the Buyer, and if such Party is the Buyer, give prompt written notice of such termination to the Sellers.

Section 9.2    Effect of Termination. In the event of termination of this Agreement as provided in Section 9.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (a) for the provisions of Article V (Bankruptcy Court Matters), Section 5.1 (Approval of Termination Payment), Section 6.6 (Public Announcements), Section 10.2 (Fees and Expenses), Section 10.5 (Notices), Section 10.8 (Parties in Interest), Section 10.9 (Governing Law), Section 10.10 (Submission to Jurisdiction) and this Article IX and (b) that no such termination shall relieve any Party from liability for any Fraud.

## ARTICLE X.
## GENERAL PROVISIONS

Section 10.1    Nonsurvival of Representations, Warranties and Covenants. The respective representations, warranties and covenants of the Sellers and the Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.1 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing, which shall survive in accordance with their terms.

Section 10.2    Fees and Expenses. Except as otherwise provided herein (including Section 7.1) or in the Interim DIP Order, the Final DIP Order or the DIP Credit Agreement, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 10.3    Amendment and Modification. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 10.4    <u>Waiver</u>. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.5    <u>Notices</u>. All notices, delivery of documents or information and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via email transmission to the email address(es) given below and the sender does not receive a notice of such transmission being undeliverable to such email address, or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

     (i)     if to the Sellers, to:

OYA Renewables Development LLC
c/o John Shepherd, CRO
Two Houston Center
909 Fannin St., Suite 2450
Houston, TX 77010
Attention: John Shepherd
Email: john.shepherd@ankura.com

with a copy (which shall not constitute notice) to:

Sidley Austin LLP
1000 Louisiana Street, Suite 5900
Houston, TX 77002
Attention: Jessica Adkins; Duston McFaul
Email: jadkins@sidley.com; dmcfaul@sidley.com

     (ii)     if to the Buyer, to:

Radial OYA Energy 1 LLC
1330 Post Oak Blvd., Suite 1175
Houston, TX 77056
Attention: John Bates
Email: jbates@radialpower.com
cc: legal@radialpower.com

with a copy (not constituting notice) to:

White & Case LLP
609 Main Street, Suite 2900
Houston, TX 77002
Attention:  Steven P. Otillar; Charles Koster
Email:  sotillar@whitecase.com; charles.koster@whitecase.com

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention: Adam Cieply
Email: adam.cieply@whitecase.com

Section 10.6    Interpretation. When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement. The term "or" is not exclusive and the use of the word "or" to connect two or more phrases shall be construed as inclusive of all such phrases (*e.g.*, "A or B" means "A or B, or both"). The word "will" shall be construed to have the same meaning and effect as the word "shall." References to days mean calendar days unless otherwise specified. Any reference to any federal, state, provincial, territorial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day. For purposes of this Agreement, the Sellers shall be deemed to have "delivered" or "made available" information and documents if such information or documents were uploaded to the Data Room at least two Business Days prior to the Closing Date.

Section 10.7    Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated

hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 10.8    Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.9    Governing Law. Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the State of Delaware.

Section 10.10    Submission to Jurisdiction. Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (b) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Bankruptcy Case is closed or declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in a Delaware state court or a federal court sitting in Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (i) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the suit, Action or proceeding in any such court is brought in an inconvenient forum, (B) the venue of such suit, Action or proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 10.11    Disclosure Generally. Notwithstanding anything to the contrary contained in the Disclosure Schedules or in this Agreement, the information and disclosures contained in any

Disclosure Schedule corresponding to a Section in <u>Article III</u> of this Agreement shall be deemed to be disclosed and incorporated by reference in any other Disclosure Schedule corresponding to a Section in <u>Article III</u> of this Agreement as though fully set forth in such Disclosure Schedule for which applicability of such information and disclosure is readily apparent on its face. The fact that any item of information is disclosed in any Disclosure Schedule shall not be construed to be an admission by any Party to any third party of any liability or obligation with respect thereto or to mean that such information is material or immaterial, within or outside of the Ordinary Course of Business, or required to be disclosed by this Agreement. Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement. No information set forth in the Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties.

Section 10.12 <u>No Recourse</u>. All Actions, obligations, liabilities, or causes of action (whether in contract or in tort, in Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement or any Ancillary Agreement, or the negotiation, execution, or performance of this Agreement and the other Ancillary Agreements (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against the parties hereto. No Person who is not a party hereto, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any party hereto, or any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any of the foregoing (collectively, the "<u>Non-Party Affiliates</u>"), shall have any Liability (whether in contract or in tort, in Law or in equity, or granted by statute) for any Liabilities or causes of action arising under, out of, in connection with, or related in any manner to this Agreement or the other Ancillary Agreements or based on, in respect of, or by reason of this Agreement or the other Ancillary Agreements or their negotiation, execution, performance, or breach (other than as set forth in the Confidentiality Agreement), and, to the maximum extent permitted by Law, each party hereto hereby waives and releases all such Liabilities and causes of action against any such Non-Party Affiliates (except pursuant to this Agreement or the other Ancillary Agreements to which they are a party). Without limiting the foregoing, to the maximum extent permitted by Law, except to the extent otherwise set forth in the Confidentiality Agreement, each party hereto disclaims any reliance upon any Non-Party Affiliate with respect to the performance of this Agreement or the other Ancillary Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

Section 10.13 <u>Assignment; Successors</u>. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of Law or otherwise, by any Seller without the prior written consent of the Buyer, and by the Buyer without the prior written consent of the Sellers, and any such assignment without such prior written consent shall be null and void; <u>provided</u>, <u>however</u>, that Buyer may assign this Agreement to an Affiliate so long as no assignment shall limit the Buyer's obligations hereunder; <u>provided further</u> that the Sellers may assign its rights and obligations under <u>Section 2.8(b)</u> of this Agreement, in whole or in part, in connection with any Chapter 11 plan of the Debtors confirmed by the Bankruptcy Court. Subject to the preceding sentences, this Agreement will be binding upon,

inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.14  Enforcement. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. Accordingly, (a) each of the Parties shall be entitled to specific performance of the terms hereof or other equitable relief, including an injunction or injunctions, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without proof of damages or otherwise (this being in addition to any other remedy to which any such Party may be entitled under this Agreement) and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor Buyer would have entered into this Agreement. Each of the Parties hereby further waives (i) any defense in any Action for specific performance that a remedy at Law would be adequate and (ii) any requirement under any Law to post security as a prerequisite to obtaining equitable relief.

Section 10.15  Currency. All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 10.16  Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 10.17  Waiver of Jury Trial. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.18  Counterparts. Notwithstanding anything else herein to the contrary, this Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties. Delivery of an executed counterpart of a signature page to this Agreement via electronic mail, portable document format (pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (including DocuSign), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 10.19 <u>No Presumption Against Drafting Party</u>. Each of the Buyer and the Sellers acknowledges that each Party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of Law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting Party has no application and is expressly waived.

*The remainder of this page is intentionally left blank.*

IN WITNESS WHEREOF, the Sellers and the Buyer have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**OYA RENEWABLES CONSTRUCTION HOLDINGS 3 LLC**

By   OYA Renewables Construction and Yield Holdings LLC, its sole member

By _____
    John Shepherd
    CRO

**OYA RENEWABLES CONSTRUCTION HOLDINGS 2 LLC**

By   OYA-Rosewood Holdings LLC, as its sole member

By   OYA Renewables Construction and Yield Holdings LLC, its Managing Member

By _____
    John Shepherd
    CRO

**OYA RENEWABLES EQUIPMENTCO LLC**

By _____
    John Shepherd
    CRO

*Signature page to Stock and Asset Purchase Agreement*

**BUYER:**

**RADIAL POWER, LLC**

By: _____
Name:  John Bates
Title:  Chief Executive Officer

## EXHIBIT A

## FORM OF SALE PROCEDURES

See attached.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1] | Case No. 24-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**BIDDING PROCEDURES FOR THE
SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS
IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS**

On November 6, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors are authorized to continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Set forth below are the bidding procedures (the "Bidding Procedures")[2] to be used with respect to the sale(s) and/or disposition(s) (collectively, the "Sale") of all, substantially all, or any portion of the Debtors' assets (the "Assets").

**Any party interested in bidding on the Assets should contact John Shepherd, Chief Restructuring Officer of the Debtors in these chapter 11 cases (the "Chapter 11 Cases").**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Debtors' Motion for Entry of (I) An Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (C) Scheduling an Auction and a Hearing on the Approval of the Sale(s) of Some, All, or Substantially All of the Debtors' Assets, (D) Authorizing the Debtors to Enter Into the Purchase Agreement(s), (E) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (F) Granting Related Relief; and (II) An Order or Orders (A) Authorizing the Sale of Some, All, or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (B) Approving the Assumption and Assignment of the Potentially Assigned Agreements, and (C) Granting Related Relief* (the "Bidding Procedures Motion") or an order approving the Bidding Procedures Motion (such order, the "Bidding Procedures Order"), as applicable.

1

Copies of the Bidding Procedures Order or any other documents in the Chapter 11 Cases are available upon request to Kroll Restructuring Administration by calling 844.974.2131 (Toll-Free) or 646.937.7796 (International) or by visiting the Debtors' restructuring website at https://cases.ra.kroll.com/oya.

## I.    Summary of Key Sale Process Dates

| Dates | All Scenarios – Deadline/ Event |
|---|---|
| Tuesday, December 3, 2024 at [●] [a.m. / p.m.] (prevailing Eastern Time) (subject to Court availability) | Bidding Procedures Hearing |
| 1 business day after entry of the Bidding Procedures Order | Deadline for Debtors to file the initial Cure Notice and the initial Cure Schedule (each as defined in the Bidding Procedures Motion) |
| 14 calendar days after service of the Cure Notice (or the Supplemental Cure Notice) at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the Debtors' proposed assumption and assignment of the Potentially Assigned Agreements and related Cure Costs (each as defined in the Bidding Procedures Motion) |
| Tuesday, December 17, 2024 at 12:00 p.m. (prevailing Eastern Time) | Bid Deadline (as defined below) |

| Dates | No Auction Scenario – Deadline/ Event |
|---|---|
| Thursday, December 19, 2024 | Deadline to file a notice canceling the Auction (as defined in the Bidding Procedures Motion) and a proposed order approving the Sale (as defined in the Bidding Procedures Motion) to the Stalking Horse Bidder (as defined in the Bidding Procedures Motion) |
| Tuesday, December 24, 2024 at 4:00 p.m. (prevailing Eastern Time) | Deadline to file objections to the proposed order approving the Sale to the Stalking Horse Bidder or the ability of the Stalking Horse Bidder to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance |
| Monday, December 30, 2024 at [●] [a.m. / p.m.] (prevailing Eastern Time) (subject to Court availability) | Sale Hearing (as defined below) |

| Dates | Auction Scenario – Deadline/ Event |
|---|---|
| Thursday, December 19, 2024 at 6:00 p.m. (prevailing Eastern Time) | Deadline to notify Potential Bidders (as defined below) of whether their Bids (as defined below) are Qualified Bids (as defined below) |
| Friday, December 20, 2024 at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time) | Auction |
| 1 business day after conclusion of the Auction | Deadline to file the Notice of Successful Bidder(s) (as defined below) |
| 2 business days after conclusion of the Auction | Deadline to file the proposed order(s) approving the Sale(s) |
| Monday, January 6, 2025 at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the (a) conduct of the Auction, (b) proposed Sale(s) to the Successful Bidder(s) (as defined below), and/or (c) the ability of the Successful Bidder(s) to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance |
| Monday, January 13, 2025 at [●] [a.m. / p.m.] (prevailing Eastern Time) (subject to Court availability) | Sale Hearing |

## II.    Assets to Be Auctioned

The Debtors are seeking to sell all or substantially all of their Assets, or any portion thereof, either as a going concern or as a liquidation. These Assets include, but are not limited to, the Debtors' going-concern business, unexpired leases (the "Unexpired Leases"), executory contracts (the "Executory Contracts" and, with the Unexpired Leases, the "Potentially Assigned Agreements"), equipment, inventory, supplies, intellectual property, insurance proceeds, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances.

The Sale of the Assets shall be subject to a competitive bidding process (the "Bidding Process") as set forth herein and approval by the Court pursuant to sections 105, 363, and 365 of the Bankruptcy Code, rules 2002, 6003, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure, and rules 2002-1, 6004-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. The

Debtors may consider bids for the Assets (or any portion thereof) in a single bid from a single bidder or in multiple bids from multiple bidders.

## III.   Public Announcement of Auction

As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall: (a) serve the Sale Notice by email, if available, or otherwise by first-class mail upon the Sale Notice Parties (as defined in the Bidding Procedures Order); provided, however, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; provided, further that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence; (b) publish the Sale Notice (as defined in the Bidding Procedures Motion), with any modifications necessary for ease of publication, on one occasion in The New York Times (National Edition) or another publication with similar national circulation as soon as practicable after entry of the Bidding Procedures Order; and (c) post the Sale Notice on their case website, https://cases.ra.kroll.com/oya. Further, the Debtors propose that within **1 business day** of the entry of the Bidding Procedures Order, the Debtors shall serve the initial Cure Notice in accordance with the Bidding Procedures Order.

## IV.   Participation Requirements

To participate in the Bidding Process (as defined below) or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets must deliver or have previously delivered to the Debtors and their advisors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance reasonably acceptable to the Debtors;

b.    sufficient information, as reasonably determined by the Debtors and their advisors in their sole discretion, to allow the Debtors to determine that such person or entity (i) has or can reasonably obtain the financial wherewithal to consummate the applicable Sale, and (ii) intends to access the Data Room (as defined below) for a purpose consistent with these Bidding Procedures; and

c.    a statement detailing whether the person or entity is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

After provision of the Preliminary Bid Documents, the adequacy of which the Debtors and their advisors shall determine in their sole discretion, such submitting person or entity shall be deemed a "Potential Bidder."

The Debtors shall promptly inform the Consultation Parties of any entity that becomes a Potential Bidder. For the avoidance of doubt, the DIP Lender, the Prepetition Lenders, the Stalking Horse Bidder, and any of their respective designees shall each be a Potential Bidder.

## V.    Determination by the Debtors

As appropriate throughout the Bidding Process, the Debtors will consult with: (a) any statutory committee appointed in the Chapter 11 Cases, if any (each, a "Committee") and such Committee's counsel; (b) the Prepetition GDEV Agent; (c) the Prepetition CarVal Agent; and (d) any other party the Debtors deem appropriate (collectively, the "Consultation Parties" and each, a "Consultation Party"); provided that, notwithstanding anything to the contrary in these Bidding Procedures, the Debtors shall not consult with a Consultation Party (or its advisors) that is actively participating as a Potential Bidder for the Assets, including, for the avoidance of doubt, by pursuing a Credit Bid (as defined below).

For the avoidance of doubt, if one of the Consultation Parties (or its affiliates, as applicable) is actively participating as a Potential Bidder for the Assets (a "Bidding Party"), then the remaining Consultation Parties and their respective counsel shall continue to be Consultation Parties but shall not provide any information they receive as Consultation Parties to a Bidding Party. Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any party that is not a Potential Bidder or a Consultation Party.

## VI.    Due Diligence

The Debtors have established a confidential electronic data room concerning the Assets (the "Data Room") and will grant each Potential Bidder or Consultation Party, as applicable, access to such Data Room. ***No Potential Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement***.

Up to and including the Bid Deadline, the Debtors shall afford any Potential Bidder or Consultation Party such due diligence access or additional information as may be reasonably requested by the Potential Bidder or the Consultation Party that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances. The Debtors may designate a representative or representatives to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders and/or Consultation Parties, as applicable. In the event that any such due diligence materials are prepared by the Debtors in written form and have not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide access to such materials to: (a) all Potential Bidders; and (b) all Consultation Parties. Each Potential Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person or entity who is not a Potential Bidder or a Consultation Party who does not otherwise comply with the participation requirements set forth above.

5

## VII.    Bid Deadline

A Potential Bidder that desires to make a Bid shall deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) to the following **by no later than Tuesday, December 17, 2024, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"):

  a.  John Shepherd, Chief Restructuring Officer (john.shepherd@ankura.com);

  b.  Duston McFaul (dmcfaul@sidley.com), Maegan Quejada (mquejada@sidley.com), and Ian Ferrell (iferrell@sidley.com); and

  c.  Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com).

The Debtors shall provide to the Consultation Parties copies of each Bid received by the Debtors as soon as reasonably practicable following receipt of such Bid.

The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, in consultation with the Consultation Parties, for all or certain Potential Bidders.

## VIII.    Qualified Bid Requirements[3]

To participate in the Auction, a Potential Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors an irrevocable offer for the purchase of all, substantially all, or some of the Assets (each, a "Bid"), and shall meet the following criteria (collectively, the "Qualified Bid Requirements"), in each case, on or prior to the Bid Deadline:

  a.  **Bid Description and Representations**: Each Bid (other than, for the avoidance of doubt, the Stalking Horse Bid (as defined in the Bidding Procedures Motion)) must be accompanied by a letter or email:

    (i)  fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or their advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating a proposed Sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

    (ii)  setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price;

---

[3] The Debtors will also consider proposals to acquire any and all of the Assets through a chapter 11 plan. Should any such proposal be received prior to the Bid Deadline that the Debtors, in consultation with the Consultation Parties, conclude is in the best interests of the estates and their stakeholders, the Debtors reserve the right to postpone the Auction and proceed toward confirmation of a chapter 11 plan.

(iii)    identifying separately the cash and non-cash components of the purchase price;

(iv)    if such Bid relates to the Assets contemplated to be sold under the Stalking Horse Purchase Agreement, providing for consideration to the Debtors of at least the sum of: (a) the Stalking Horse Bid, (b) the amount of any Stalking Horse Bid Protections, and (c) an incremental overbid of $500,000, which may be adjusted for any Bid relating to Assets not contemplated to be sold under the Stalking Horse Purchase Agreement (such incremental overbid, the "Incremental Overbid"); provided that any such Bid must include a cash component sufficient to satisfy the DIP Obligations (as defined in the DIP Order) and any Stalking Horse Bid Protections in full;

(v)    specifying whether the Bid is conditioned on purchasing all Assets included in the Bid or whether the Bid should be viewed as separate Bids for one or more sets of Assets;

(vi)    indicating the allocation of the purchase price among the applicable Assets; provided that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation;

(vii)    stating with specificity the Assets (including any specific Potentially Assigned Agreements) such Potential Bidder wishes to bid on and the liabilities and obligations (including any applicable cure costs) to be assumed by the Potential Bidder in the Sale;

(viii)    indicating, as applicable, whether the Potential Bidder intends to operate the Debtors' business as a going-concern or to liquidate the Assets;

(ix)    providing that the Bid is not subject to any bidding fee, break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of reimbursement, and including an express waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets;

(x)    containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than **January 31, 2025**, contingent upon receiving the necessary Consent Rights (as defined below), if any;

(xi)    providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(xii)    providing that such Potential Bidder has procured and provided all necessary information required to procure any necessary approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, tag-along rights, or similar rights (including,

7

without limitation, if applicable, any consent that may be necessary from GPC HP II, LLC for the purchase of equity interests in OYA-GPC 2021 Holdco LLC held by ORY-1 and the release of any credit support provided by or on behalf of the seller Debtor parties or their affiliates) (collectively, the "Consent Rights") required for the sale or purchase of Assets contemplated in the Bid, or, in the alternative, the Potential Bidder will endeavor to procure and provide all necessary information required for such Consent Rights by no later than **January 24, 2025**;

(xiii)   containing an acknowledgement that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets, has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid;

(xiv)   agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until after the Debtors and the Successful Bidder(s) consummate the applicable Sale(s); and

(xv)   providing that the Potential Bidder agrees to serve as a back-up bidder (the "Back-Up Bidder") if the Potential Bidder's Qualified Bid (as defined below) is the next highest or best bid after the Successful Bid (as defined below) (the "Back-Up Bid") with respect to the relevant Assets through the Closing Date.

b.   **Qualified Bid Purchase Agreement**: Each Bid must be accompanied by:

(i)   an executed purchase agreement in form and substance reasonably satisfactory to the Debtors (a "Qualified Bid Purchase Agreement"); and

(ii)   a redline of the executed Qualified Bid Purchase Agreement to reflect any proposed amendments and modifications to the Stalking Horse Purchase Agreement (as defined in the Bidding Procedures Motion) or the form purchase agreement (if provided by the Debtors), as applicable, and the applicable schedules and exhibits.

c.   **Adequate Assurance Information**: Each Bid must be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), which may include:

(i)   information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate a proposed Sale;

(ii)   evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid;

(iii)    identify any Potentially Assigned Agreements to be assumed or assumed and assigned in connection with the proposed Sale;

(iv)    provide for the payment of all cure amounts (the "<u>Cure Amounts</u>") related to such Potentially Assigned Agreements by the Potential Bidder;

(v)    provide the following documentation: (1) the legal name of the proposed assignee of Unexpired Leases (the "<u>Proposed Assignee</u>") and any guarantors, as applicable; and (2) financial statements for the calendar or fiscal years ended 2022, 2023 and, if available, 2024 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

(vi)    such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.

By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale(s) and the Consultation Parties in the event that the Debtors determine such bid to be a Qualified Bid (as defined below).

d.    **Good Faith Deposit**: Each Bid must be accompanied by:

(i)    a deposit in the form of a certified check or wire transfer, payable to the order of the Debtors, in the amount of the greater of (1) ten percent (10%) of the cash consideration of the Bid or (2) $500,000, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "<u>Good Faith Deposit</u>"); <u>provided</u> that, to the extent a Bid is modified at or prior to the Auction in any manner that increases the proposed purchase price contemplated by such Bid, the Debtors reserve the right, after consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals the greater of (x) ten percent (10%) of the increased aggregate purchase price or (y) $500,000 promptly and in no event no later than one (1) business day following the conclusion of the Auction; and

(ii)    the Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties, including by requiring Qualified Bidders to provide a Good Faith Deposit for any non-cash consideration based on such Qualified Bidder's estimate of the value of any such non-cash consideration.

e.    **Acknowledgement of Compliance with the Bidding Procedures, the Bidding Order, the Bankruptcy Code, and Non-Bankruptcy Law**: Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the

Bidding Procedures Order, the Bankruptcy Code, and any applicable non-bankruptcy law.

f.  **No Collusion**: The Potential Bidder must acknowledge in writing: (i) that it has not engaged in any collusion with respect to any Bid(s) or any Sale(s); (ii) that it did not agree with any Potential Bidders to control price; and (iii) that it will not engage in any collusion with respect to any Bids, the Auction, or the Sale(s). For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (e-mail shall suffice), in consultation with the Consultation Parties.

g.  **Irrevocable**: Each Bid must state that in the event such Bid is chosen as a Back-Up Bid, it shall remain irrevocable until after the Debtors and the Successful Bidder(s) consummate the applicable Sale(s), or, in the event that the Stalking Horse Bid is selected as a Back-Up Bid, then thirty days after entry of the applicable Sale Order.

h.  **Regulatory Approvals and Covenants**: A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to after **January 24, 2025**, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible).

i.  **Expected Closing Date**: Each Bid must state the Potential Bidder's expected date of closing of the applicable Sale(s) and be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as a Successful Bid, by no later than **January 31, 2025**.

## IX.    Right to Credit Bid

The DIP Lender, the Prepetition GDEV Agent, the Prepetition CarVal Agent, and any other party who has a valid and perfected lien on any Assets of the Debtors' estates (each a "Secured Creditor") and is a Qualified Bidder (as defined below) shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code (a "Credit Bid"); provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; provided further that a Credit Bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full all claims for which there are valid, perfected, and unavoidable liens on any assets included in such bid that are senior in priority to those of the Secured Creditor seeking to credit bid.

Any Credit Bid made by a Secured Creditor will be evaluated by the Debtors and the Consultation Parties as a cash Bid solely for purposes of evaluating Bids (including evaluating Qualified Bids and Subsequent Bids (as defined below)). Notwithstanding anything to the contrary contained herein or the Bidding Procedures Order, all Secured Creditors: (a) shall not be subject

to the Good Faith Deposit requirement (whether for a Credit Bid or otherwise); (b) are hereby deemed Qualified Bidders; and (c) shall have their Bids (including, for the avoidance of doubt, any credit bids) deemed Qualified Bids with respect to the Assets; provided that, such Credit Bid submitted by a Secured Party for Assets included in the Stalking Horse Bid must provide for cash payment of the Stalking Horse Bid Protections and the DIP Obligations (as defined in the DIP Order).

The DIP Lender shall be authorized, and have the unqualified right, to credit the outstanding DIP Obligations (as defined in the DIP Order) towards the purchase price to be paid by it (or any of its affiliates) in connection with the purchase of any Assets; provided that the amount of DIP Obligations that may be credited towards the purchase price (a) shall not exceed $4,500,000 with respect to the purchase of any Assets that constitute Prepetition Carval Collateral (as defined in the DIP Order) and (b) shall not exceed $1,500,000 with respect to the purchase of any Assets that constitute Prepetition GDEV Collateral (as defined in the DIP Order).

## X.    **Evaluation of Qualified Bids**

The Debtors, in consultation with the Consultation Parties, will review each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above. A bid received from a Potential Bidder for any portion of the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder." The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than **Thursday, December 19, 2024, at 6:00 p.m. (prevailing Eastern Time)**. For the avoidance of doubt, the Stalking Horse Bid is deemed a Qualified Bid, and the Stalking Horse Bidder is deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder. The Debtors shall inform the Stalking Horse Bidder of the Qualified Bids received and shall provide copies of the Starting Bid(s) (as defined below) no later than **Thursday, December 19, 2024, at 9:00 p.m. (prevailing Eastern Time)**.

A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent in their reasonable business judgment (in consultation with the Consultation Parties), including, among other things: (a) the amount of the Qualified Bid; (b) the risks and timing associated with consummating the transaction(s) with the Qualified Bidder; (c) any excluded Assets or Potentially Assigned Agreements; (d) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement; (e) the net benefit to the Debtors' estates (including after taking account of the Stalking Horse Bid Protections); (f) the tax consequences of such Qualified Bid; and (g) any other factors that the Debtors, in consultation with the Consultation Parties, reasonably may deem relevant.

The Debtors, in their business judgment, reserve the right to reject any Bid if such Bid, among other things:

    a.     requires any indemnification of the Potential Bidder in any Qualified Bid Purchase Agreement submitted as part of the Bid;

b.     is not received by the Bid Deadline;

c.     does not comport with the Qualified Bid Requirements;

d.     is subject to any contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets; or

e.     does not, in the Debtors' determination (after consultation with the Consultation Parties), include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtors' estates or the Auction.

Any Bid rejected pursuant to the foregoing shall not be deemed to be a Qualified Bid; provided that the Debtors may work with the parties to any rejected Bid to cure any such defect(s). In the event that any Bid is so rejected, the Debtors shall cause the Good Faith Deposit of such Potential Bidder (including all accumulated interest thereon) to be refunded to such Potential Bidder as soon as reasonably practicable, but no later than five (5) business days after the Bid Deadline unless a later date is agreed between the Debtors and the applicable Potential Bidder.

The Debtors may, in consultation with the Consultation Parties, among other things: (a) extend such Bid Deadline with respect to the subject Assets; (b) postpone the Auction; (c) cancel the Auction; or (d) terminate the proposed Sale(s) for the subject Assets.

## XI.   Stalking Horse Bid Protections

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder, is entitled to: (a) a break-up fee in an amount equal to $930,000 (the "Break-Up Fee"), payable as set forth in the Stalking Horse Purchase Agreement; (b) reimbursement for reasonable and documented out-of-pocket costs, fees, and expenses incurred by the Stalking Horse Bidder and its affiliates (including fees and expenses of legal, accounting, financial, and other advisors) in an amount not to exceed $500,000 (the "Expense Reimbursement Amount" and, with the Break-Up Fee, the "Termination Payment"), payable as set forth in the Stalking Horse Purchase Agreement; and (c) in the event the Termination Payment is not paid as set forth in the Stalking Horse Purchase Agreement or the Bidding Procedures Order, reimbursement for all reasonable, documented, out-of-pocket fees, costs, and expenses incurred by the Stalking Horse Bidder or its affiliates to collect such unpaid portion of the Termination Payment, together with interest on such amount as set forth in the Stalking Horse Purchase Agreement (the "Collection Costs" and, with the Termination Payment, the "Stalking Horse Bid Protections").

Any such Stalking Horse Bid Protections are authorized pursuant to the Bidding Procedures Order. For the avoidance of doubt, except for the Stalking Horse Bidder, and as otherwise set forth herein, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, "topping" termination, or similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

## XII.    No Qualified Bids

If no Qualified Bids other than the Bid submitted by the Stalking Horse Bidder (the "Stalking Horse Bid"), are received for the Assets included in the Stalking Horse Bid by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may cancel the Auction with respect to such Assets. If the Stalking Horse Bid is the only Qualified Bid received by the Bid Deadline, the Debtors may decide, in their reasonable business judgment, after consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid as to the applicable Assets and pursue entry of an order approving a Sale with respect to such Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement. The Debtors shall promptly file notice of any cancellation of the Auction and/or designation of the Stalking Horse Bid, where applicable, as the Successful Bid with the Court and request the Sale Hearing as set forth herein.

If only one Qualified Bid is received for the Assets not included in the Stalking Horse Bid by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may designate such Qualified Bidder as the Successful Bidder with respect to such Assets and pursue entry of an order approving a Sale with respect to such Assets. The Debtors shall promptly file notice of any such designation and request approval of such Sale at the Sale Hearing.

## XIII.    Auction

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets by the Bid Deadline, the Debtors shall conduct the Auction to determine the Successful Bidder(s) in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Assets or portion of the Assets. If the Debtors do not receive a Qualified Bid for any particular Asset by the Bid Deadline, the Debtors will not conduct the Auction with respect to such Asset. If one or more Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to the applicable Assets, then the Debtors shall conduct the Auction with respect to such Assets. In addition, the Debtors, in consultation with the Consultation Parties, shall determine which Qualified Bid is the highest or other best Qualified Bid for purposes of constituting the opening bid at the Auction for the relevant Assets (the "Starting Bid(s)"). The determination of which Qualified Bid(s) constitutes the Starting Bid(s) shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates. The Starting Bid(s) will be provided to the Qualified Bidders on or before **Thursday, December 19, 2024, at 9:00 p.m. (prevailing Eastern Time)**.

The Auction, if required, will be conducted on **Friday, December 20, 2024, starting at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time)** at the offices of Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, Texas 77002, or, if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline in accordance with the Bidding Procedures, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Each Qualified Bidder participating in the Auction will be required to confirm, in writing and on the record at the Auction,

13

that (a) it has not engaged in any collusion with respect to the Bidding Process, (b) its Qualified Bid is a good-faith, *bona fide* offer, and (c) that it intends to consummate the applicable Sale(s) if selected as a Successful Bidder. For the avoidance of doubt, the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these Chapter 11 Cases.

Bidding at the Auction for the Assets (or subset thereof) that are subject to Qualified Bids will begin with the Starting Bid(s) and continue, in one or more rounds of bidding, so long as during each round: (a) at least one Qualified Bidder submits a Qualified Bid that improves on such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid"); and (b) the Debtors reasonably determine, in consultation with the Consultation Parties, that such Subsequent Bid is (i) for the first round, a higher or otherwise better offer than the Starting Bid, and (ii) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).

Each Subsequent Bid at the Auction shall provide additional net value to the estates over the Starting Bid or the Leading Bid (as defined below) in an amount equal to or greater than the Incremental Overbid amount. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or otherwise best offer for the subject Assets (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures as set forth below. In any Subsequent Bid by the Stalking Horse Bidder, the amount of the Stalking Horse Bid Protections shall be considered additional consideration being provided in such Bid.

The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bidding Procedures; provided that such rules are disclosed to each Qualified Bidder during the Auction. The bidding at the Auction shall be transcribed and the Debtors shall maintain a transcript of all Bids made and announced at the Auction.

Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, will, for the Assets (or subset thereof) that were subject to the Auction:

a.    determine, consistent with the Bidding Procedures, which bid(s) constitutes the highest or otherwise best bid (the "Successful Bid(s)"); and

b.    notify all Qualified Bidders at the Auction of the subject Assets, prior to its conclusion, of the name(s) of the maker of the Successful Bid(s) (the "Successful Bidder(s)") with respect to the subject Assets, and the amount and other material terms of the Successful Bid(s).

The Debtors may, in consultation with the Consultation Parties, designate the Back-Up Bid(s) and the Back-Up Bidder(s) with respect to the subject Assets in the event that the Successful Bidder(s) does not close the Sale(s). Unless the Court orders otherwise upon application by the Debtors, the Debtors shall not consider any Bids or Subsequent Bids submitted after the conclusion

of the Auction, and any and all such Subsequent Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

**One business day** following the conclusion of the Auction, the Debtors shall file a notice on the Court's docket identifying (with specificity) the Successful Bidder(s) for the Assets (or subset thereof) and any applicable Back-Up Bidder(s) (the "Notice of Successful Bidder(s)").

All bidders at the Auction will be deemed to have consented to the core jurisdiction and constitutional authority of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale(s), and all agreements entered into in connection with any proposed Sale(s).

XIV.  **Sale Hearing**

Each Successful Bid and Back-Up Bid (or if no Qualified Bid other than that of one Qualified Bidder is received with respect to the Assets (or subset thereof), then the Qualified Bid of such Qualified Bidder) shall be subject to approval by the Court. The hearing to approve a Successful Bid and Back-Up Bid (or if no Qualified Bid other than that of one Qualified Bidder is received with respect to the Assets (or subset thereof), then the Qualified Bid of such Qualified Bidder) shall take place on (a) **Monday, December 30, 2024, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction is cancelled, (b) on **Monday, January 13, 2025, at [●] [a.m. / p.m.] (prevailing Eastern Time)**, or (c) as soon as thereafter as counsel and interested parties may be heard (as applicable, the "Sale Hearing").

The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of these Chapter 11 Cases.

For the avoidance of doubt, the Debtors' presentation to the Court for approval of a selected Qualified Bid as a Successful Bid (or a Back-Up Bid) does not constitute the Debtors' acceptance of such Bid. The Debtors will have accepted a Successful Bid only when such Successful Bid has been approved by the Court at the Sale Hearing.

XV.  **Return of the Good Faith Deposit**

The Good Faith Deposits of all Qualified Bidders shall be held in escrow, but shall not become property of the Debtors' estates absent further order of the Court. The Debtors shall retain any Good Faith Deposit submitted by each Successful Bidder. At the closing of a Sale contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposit of any Back-Up Bidder shall be retained until three (3) business days after the date of consummation of the applicable Sale (the "Closing Date"). The Good Faith Deposits of any other Qualified Bidders will be returned as soon as reasonably practicable, but no later than seven (7) business days following the Auction.

If a Successful Bidder (or, if a Sale is to be closed with a Back-Up Bidder, then such Back-Up Bidder) fails to consummate the applicable Sale(s) because of a breach or failure to perform

on the part of such bidder, then, subject to the terms of the applicable Qualified Bid Purchase Agreement (as such agreement may be amended or modified at the Auction) or any other form of purchase agreement reasonably satisfactory to the Debtors, the Debtors and their estates shall be entitled to retain the Good Faith Deposit of such Successful Bidder (or, if a Sale is to be closed with a Back-Up Bidder, then such Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

## XVI.    Reservation of Rights and Modifications

Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, reserves the right to modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Qualified Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Sale Hearing; provided that the Debtors may not amend these Bidding Procedures or the Bidding Process to reduce or otherwise modify its obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court; provided further that notwithstanding anything to the contrary herein, any such modification (including, for the avoidance of doubt, extension of the Bid Deadline, postponement of the Auction, cancellation of the Auction, or termination of the proposed Sale) shall not override any milestones set forth in the DIP Order or the DIP Loan Documents.

The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bidding Procedures; provided, however, that the Debtors shall not be required to consult with any Consultation Party (or its advisors) regarding any particular issue, selection, or determination if the Debtors determine in good faith on advice of counsel that such consultation would be inconsistent with the exercise of their fiduciary duties.

Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith.

Further, for the avoidance of doubt, any rights that the Consultation Parties may have pursuant to the terms of other agreements, any orders of the Court, or the Bankruptcy Code are hereby reserved and shall not in any way be affected by these Bidding Procedures. All rights of the Consultation Parties with respect to the proposed Sale are fully reserved.

## XVII.   Consent to Jurisdiction

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale(s), and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid documents, and any and all other agreements entered into in connection with any proposed Sale, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the Bidding Process, the Auction, the Sale Hearing, or the construction and enforcement of any

agreement or any other document relating to the Sale(s) if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XVIII. Fiduciary Out

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor to take any action or to refrain from taking any action related to any Sale or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

## **EXHIBIT B**

## **FORM OF SALE PROCEDURES ORDER**

See attached.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1] | Case No. 24-_____ (___) |
| Debtors. | (Jointly Administered) |
|  | **Ref: Docket No. _____** |

**ORDER (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF SOME, ALL, OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (D) AUTHORIZING THE DEBTORS TO ENTER INTO THE PURCHASE AGREEMENT(S), (E) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING THE MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF**

Upon the motion ("Motion")[2] of OYA Renewables Development LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"): (a) approving the Bidding Procedures in connection with the Sale of some, all, or substantially all of the Assets and approving the form and manner of notice thereof; (b) authorizing the Debtors to designate the Stalking Horse Bidder and enter into the Stalking Horse Purchase Agreement; (c) scheduling the Auction and the Sale Hearing in conjunction with the Sale; (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtors to enter into and perform under the Purchase Agreement(s); (e) establishing the Assumption and

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Motion.

Assignment Procedures for the Potentially Assigned Agreements and the form and manner of notice thereof; and (f) granting related relief; and this Court having reviewed the Motion and held a hearing to consider the relief requested therein (the "Hearing"); and the Court having considered the arguments of counsel made and the evidence adduced at the Hearing; and upon consideration of the First Day Declaration and the record of the Hearing; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      **Jurisdiction & Venue**. This Court has jurisdiction to consider the Motion and the relief requested pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) as to which the Court has authority to issue a final order consistent with Article III of the United States Constitution. Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      **Statutory Predicates**. The predicates for the relief granted herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9007, and Local Rule 6004-1.

C.      **Notice**. Notice of the Motion and the Hearing as provided therein shall be deemed good and sufficient notice of such Motion, Hearing, and the relief granted herein under the circumstances, and no other or further notice thereof is required.

D.      **Stalking Horse Bidder**. The Debtors have demonstrated compelling and sound business reasons for this Court to approve (i) Radial Power LLC as the Stalking Horse Bidder for

the Assets set forth in the Stalking Horse Bid, (ii) the Debtors' entry into the Stalking Horse Purchase Agreement, and (iii) the Stalking Horse Bid Protections and the payment of any amounts owed to the Stalking Horse Bidder on account of such Stalking Horse Bid Protections on the terms set forth in the Stalking Horse Purchase Agreement. The Stalking Horse Purchase Agreement and the Staking Horse Bid Protections were negotiated in good faith and at arm's-length by the Debtors and the Stalking Horse Bidder.

E.      **Stalking Horse Bid Protections**. The Stalking Horse Bid Protections are material inducements for, and conditions of, the Stalking Horse Bidder's entry into the Stalking Horse Purchase Agreement and agreement to remain obligated to consummate the applicable Sale on the terms set forth therein, or otherwise be bound under the Stalking Horse Purchase Agreement (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures). The Stalking Horse Bid Protections, to the extent payable under the Stalking Horse Purchase Agreement: (i) are an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (ii) are of substantial benefit to the Debtors' estates; (iii) are reasonable and appropriate, including in light of the size and nature of the proposed Sale contemplated under the Stalking Horse Purchase Agreement and the efforts that have been and will be expended by the Stalking Horse Bidder; (iv) have been negotiated by the parties and their respective advisors at arm's-length and in good faith; and (v) are necessary to ensure that the Stalking Horse Bidder will continue to pursue its Stalking Horse Purchase Agreement and the proposed Sale contemplated thereby.

**NOW, THEREFORE,** this Court having determined that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.        The relief requested in the Motion is GRANTED as set forth herein. All objections to the entry of this Order or to the relief provided herein that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled. All withdrawn objections are deemed withdrawn with prejudice.

2.        The Bidding Procedures, attached as **<u>Exhibit 1</u>** to this Order, are hereby approved in their entirety, incorporated by reference as if fully set forth herein, and shall govern all Bids and Bid proceedings relating to the Assets. The Debtors and Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent, are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.        The Debtors will file and serve a proposed Sale Order or proposed Sale Orders on or before:

      a.  in the event the Auction is cancelled, **<u>Thursday, December 19, 2024</u>**; or

      b.  in the event the Auction proceeds, **<u>2 business days after the conclusion of the Auction</u>**.

4.        **<u>Bid Deadline</u>**. **<u>Tuesday, December 17, 2024, at 12:00 p.m. (prevailing Eastern Time)</u>**, unless extended by the Debtors pursuant to the Bidding Procedures, is the deadline by which all Qualified Bids must be **<u>actually received</u>** by the parties specified in the Bidding Procedures (the "<u>Bid Deadline</u>").

5.        **<u>Stalking Horse Bidder and Stalking Horse Bid Protections</u>**. Radial Power LLC (or such affiliate(s) as it may designate in writing) is hereby designated the Stalking Horse Bidder for the applicable Assets. The Debtors are authorized to enter into the Stalking Horse Purchase

Agreement and comply with any and all obligations set forth in the Stalking Horse Purchase Agreement that are intended to be performed prior to entry of the Sale Order(s).

6.       The Stalking Horse Bid Protections are hereby approved in their entirety and shall be payable by the Debtors in accordance with, and subject to the terms of, the Stalking Horse Purchase Agreement. The Debtors are authorized to pay the Stalking Horse Bid Protections in accordance with, and subject to the terms of, the Stalking Horse Purchase Agreement without further order of the Court.

7.       The Stalking Horse Bid Protections, to the extent payable under the Stalking Horse Purchase Agreement, shall constitute an allowed superpriority administrative expense claim against the Debtors' estates pursuant to sections 105(a), 364(c)(1), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code but junior to the professional fee claims.

8.       The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Bid shall be deemed a Qualified Bid for purposes of the Bidding Procedures, which status cannot be abrogated by subsequent amendment or modification by the Debtors of the Bidding Procedures; *provided that* the Stalking Horse Bid may only be considered a Qualified Bid for a subset of the Assets included in the Stalking Horse Purchase Agreement with the Stalking Horse Bidder's consent.

9.       **The Bidding Procedures, the Auction, and the Sale Hearing**. All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court and waived any right to a jury trial with respect to all matters related to the Auction, the Sale(s), the Bidding Procedures, any written indications of interest, preliminary bid documents, the Bids, the Bid documents, and any and all other agreements entered into in connection with any proposed

Sale, as applicable, and consented to the entry of a final order or judgment in any way related to the Bidding Procedures, the bidding process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the Sale(s) if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent consent of the parties. Any party raising a dispute relating to the Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

10.     The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than **Thursday, December 19, 2024, at 6:00 p.m. (prevailing Eastern Time)**.

11.     If no Qualified Bids other than the Stalking Horse Bid is submitted on or before the Bid Deadline, the Debtors will not hold an Auction with respect to the Assets included in the Stalking Horse Bid and will request that this Court approve the Stalking Horse Purchase Agreement at the accelerated Sale Hearing.

12.     If at least two Qualified Bids are received by the Bid Deadline with regard to any particular Assets (whether those Assets are included in the Stalking Horse Bid or not), the Debtors will conduct the Auction. The Auction will take place on **Friday, December 20, 2024, starting at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time)** at the offices of Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, Texas 77002, or, if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline in accordance with the Bidding Procedures, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. For the avoidance of doubt,

the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these Chapter 11 Cases.

13.     Each Qualified Bidder participating at the Auction will be required to confirm in writing and on the record at the Auction that: (a) it has not engaged in any collusion with respect to the bidding process; (b) its Qualified Bid is a good-faith, *bona fide* offer; and (c) that it intends to consummate the transaction(s) if selected as a Successful Bid.

14.     Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid(s) is the Successful Bid(s) for the applicable Assets or subsets thereof. The Debtors, in consultation with the Consultation Parties, may also determine the Back-Up Bid(s) for the applicable Assets or subsets thereof.

15.     Following the Auction, the Debtors will file the proposed form Purchase Agreement(s) and proposed Sale Order(s) of the Successful Bidder(s) and any Back-Up Bidder(s) with this Court.

16.     All objections to approval of the Sale(s), including, for the avoidance of doubt, the ability of the Stalking Horse Bidder or the Successful Bidder(s), as applicable, to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance, must be in writing, state the basis of such objection with specificity, and be filed with this Court and served on or before, in the event the Auction is not held, **4:00 p.m. (prevailing Eastern Time) on Tuesday, December 24, 2024**, or, in the event the Auction proceeds, **4:00 p.m. (prevailing Eastern Time) on Monday, January 6, 2025** (either such date, as applicable, the "Sale Objection Deadline") on the following parties (collectively, the "Notice Parties"):

a.  proposed co-counsel to the Debtors, Sidley Austin LLP, 1000 Louisiana Street, Suite 900, Houston, Texas 77002 (Attn: Duston McFaul (dmcfaul@sidley.com) and Maegan Quejada (mquejada@sidley.com)), and Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603 (Attn: Ian Ferrell (iferrell@sidley.com));

b.  proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801 (Attn: Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com));

c.  counsel to the DIP Lender and the Stalking Horse Bidder, White & Case LLP, 609 Main Street, Houston, Texas 77002 (Attn: Charles Koster (ckoster@whitecase.com) and Amanda Parra Criste (aparracriste@whitecase.com));

d.  counsel to the Prepetition GDEV Agent, Locke Lord LLP, 111 South Wacker Drive, Suite 4100, Chicago, Illinois 60606 (Attn: Aaron C. Smith (asmith@lockelord.com)), and Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 (Attn: Christopher A. Ward (cward@polsinelli.com));

e.  counsel to the Prepetition CarVal Agent, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Brian Greene (brian.greene@kirkland.com), Elizabeth H. Jones (elizabeth.jones@kirkland.com), and Christopher Marcus (christopher.marcus@kirkland.com));

f.  the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: John Schanne (john.schanne@usdoj.gov));

g.  counsel to any statutory committee that has been appointed in these Chapter 11 Cases; and

h.  if applicable, any identified Successful Bidder(s).

17.  This Court shall convene the Sale Hearing on (a) **Monday, December 30, 2024, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction is cancelled, (b) **Monday, January 13, 2025, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction proceeds, or (c) or as soon as thereafter as counsel and interested parties may be heard.

18.  At the Sale Hearing, this Court will consider approval of the Sale(s) to the Successful Bidder(s) or Back-Up Bidder(s) and the entry of the Sale Order(s). At the Sale Hearing, the Debtors will seek the entry of the Sale Order(s) approving and authorizing the Sale(s) to the

Successful Bidder(s) or the Back-Up Bidder(s). Subject to consultation with the Consultation Parties, the Debtors may adjourn the Sale Hearing from time to time without further notice to creditors or other parties in interest other than by announcement of said adjournment at the Sale Hearing or in notice or agenda filed with this Court.

19.     **Assumption and Assignment Procedures**. **Within 1 business day of the entry of this Order**, the Debtors will file a Cure Notice, substantially in the form attached hereto as **Exhibit 3**, which shall include a schedule of cure obligations (the "Cure Schedule") for the Potentially Assigned Agreements, and shall serve such Cure Notice on each of the non-Debtor parties listed therein by email, where available, or otherwise by first-class mail on the date the Cure Notice is filed with this Court. The Cure Schedule will include a description of each Potentially Assigned Agreement potentially to be assumed and assigned by a potential buyer and the amount, if any, necessary to cure or compensate the non-Debtor parties for any defaults under such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs").

20.     To the extent the Debtors, at any time after the filing of the Cure Notice: (a) identify additional Potentially Assigned Agreements that may be assumed and assigned to the Successful Bidder(s); (b) remove any Potentially Assigned Agreement from the Cure Notice; and/or (c) modify the previously stated Cure Costs associated with any Potentially Assigned Agreement, the Debtors shall promptly file with this Court and serve such Cure Notice (the "Supplemental Cure Notice") on each of the affected non-Debtor parties therein by email, where available, or otherwise by first-class mail on the date the Supplemental Cure Notice is filed with this Court. Each Supplemental Cure Notice will include the same information with respect to listed Potentially Assigned Agreements as was included in the Cure Notice.

21.    Objections to the Cure Costs set forth in the Cure Schedule or the assumption and assignment of any Potentially Assigned Agreement (excluding, for the avoidance of doubt, the ability of the Stalking Horse Bidder or the Successful Bidder(s), as applicable, to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance), identified in the Cure Schedule must: (a) be in writing; (b) state with specificity the nature of the objection, and, if the objection pertains to the proposed Cure Amount, state the amount alleged to be to owed, together with any applicable and appropriate documentation in support thereof; (c) be filed with the Clerk of the Court; and (d) be served on the Cure Notice Parties by no later than **4:00 p.m. (prevailing Eastern Time) on the date that is 14 calendar days after the service of the Cure Notice (or the applicable Supplemental Cure Notice)**.

22.    Unless a non-Debtor party to a Potentially Assigned Agreement has timely and properly filed and served an objection to the assumption and assignment of its Potentially Assigned Agreement, such non-Debtor counterparty shall: (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Potentially Assigned Agreement, and the Debtors and the Successful Bidder(s) shall be entitled to rely solely upon the Cure Amount; (b) be deemed to have consented to any assumption and assignment of such Potentially Assigned Agreement; and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder(s) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Potentially Assigned Agreement, or that there is any objection or defense to the assumption and assignment of such Potentially Assigned Agreement. In addition, the Cure Amounts set forth in the Cure Schedule shall be binding upon the non-Debtor parties to the Potentially Assigned Agreements for all purposes in these Chapter 11 Cases and will constitute a final determination of the Cure

Amounts required to be paid by the Debtors in connection with any assumption and assignment of the Potentially Assigned Agreements.

23.     Where a non-Debtor counterparty to a Potentially Assigned Agreement timely and properly files an objection asserting a cure amount higher or different than the proposed Cure Amount (the "Disputed Cure Amount"), then: (a) the cure amount shall be as agreed between the parties; or (b) to the extent the parties are unable to consensually resolve the dispute, then such objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court. All other objections to the proposed assumption and assignment of a Potentially Assigned Agreement will likewise be heard at the Sale Hearing, unless adjourned by agreement of the parties.

24.     **Notice Procedures**. The forms of the Sale Notice and the Cure Notice attached hereto as **Exhibit 2** and **Exhibit 3**, respectively, are hereby approved and are appropriate and sufficient for all purposes, and no other or further notice shall be required. No finding or ruling is made in this Order as to the merits of any motion for approval of the Sale(s).

25.     As soon as practicable after the entry of this Order, the Debtors will serve the Sale Notice by email, if available, or otherwise by first-class mail upon the following; *provided*, *however*, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of this Order; *provided*, *further* that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence: (a) the Office of the United States Trustee for the District of

Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtors; (c) CVI CEF Master Fund I LP, as administrative agent and collateral agent; (d) counsel to the Prepetition CarVal Agent; (e) GDEV OYA Lender I, LLC, in its capacity as administrative agent and collateral agent; (f) counsel to the Prepetition GDEV Agent; (g) counsel to the DIP Lender and the Stalking Horse Bidder; (h) co-counsel to the DIP Lender and the Stalking Horse Bidder; (i) CNB, in its capacity as administrative agent and collateral agent; (j) counsel to CNB; (k) counsel to GREC; (l) the United States Attorney's Office for the District of Delaware; (m) the Internal Revenue Service; (n) all parties who are known by the Debtors to assert liens against the Assets; (o) all non-Debtor parties to the Potentially Assigned Agreements; (p) any party known or reasonably believed to have expressed an interest in acquiring some, all, or substantially all of the Assets; (q) all known and reasonably identifiable creditors of the Debtors; and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

26.    In addition, the Debtors shall publish the Sale Notice once in *The New York Times* (National Edition) or another publication with similar national circulation as soon as practicable after entry of this Order, but no later than three (3) business days after entry of this Order, and post the Sale Notice and this Order on the website of the Debtors' claims and noticing agent: https://cases.ra.kroll.com/oya. Publication of the Sale Notice as described in this Order conforms to the requirements of Bankruptcy Rules 2002(l) and 9008 and is reasonably calculated to provide notice to any affected party, including any Potential Bidder(s), and to afford the affected party the opportunity to exercise any rights affected by the Motion and the relief granted by this Order.

27.    **Other Provisions**. Failure to timely file an objection in accordance with the deadlines set forth in this Order, or any subsequent order of this Court, shall forever bar the assertion of any objection to the Motion, entry of the Sale Order(s), or consummation of the

Sale(s), and shall be deemed to constitute consent to entry of the Sale Order(s) and consummation of the Sale(s) and all transactions related thereto, including, without limitation, for purposes of section 363(f) of the Bankruptcy Code.

28.     All parties (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily: (a) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes relating to the bidding process, the Auction, and/or the Sale(s)) to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution; and (b) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

29.     The Debtors are authorized to revise the Bidding Procedures, the bidding process, and the proposed schedule for the Sale(s) in consultation with the Consultation Parties and as otherwise set forth in this Order and the Bidding Procedures. The Debtors are further authorized, but not directed, in consultation with the Consultation Parties, to conduct multiple Sales and/or Auctions as necessary in substantial conformity with the Bidding Procedures and schedule for the Sale(s) established through this Order.

30.     Notwithstanding anything to the contrary herein or elsewhere, the Debtors are authorized to direct Kroll Restructuring Administration LLC to establish a separate segregated escrow account to hold Good Faith Deposit amounts, which such escrow account will not subject to the control of the DIP Lender or the Prepetition Secured Parties.

31.     The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

32.     In the event there is any conflict between this Order and the Bidding Procedures, the terms and conditions of this Order shall control and govern in all respects.

33.     The requirements set forth in Local Rules 6004-1 and 9013-1 are hereby satisfied, modified, or waived.

34.     Notwithstanding the applicability of Bankruptcy Rules 6004(h), 6006(d), 7052, or 9014, this Order shall be immediately effective and enforceable upon its entry. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.     Nothing in this Order shall be construed as this Court determining or allowing any fees or expenses incurred or requested in connection with the Auction and/or Sale(s), including any fees or expenses of any professionals retained in the Chapter 11 Cases, and the rights of all parties in interest to object to any such fees and expenses are expressly reserved.

36.     This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

**Exhibit 1**

**Bidding Procedures**

## Exhibit 2

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1] | Case No. 24-_____ (___) |
| Debtors. | (Joint Administration Requested) |
| | **Docket Ref. No. __** |

## NOTICE OF AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that on November 6, 2024 (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that on the Petition Date, the Debtors filed the *Debtors' Motion for Entry of (I) An Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, (C) Scheduling an Auction and a Hearing on the Approval of the Sale(s) of Some, All, or Substantially All of the Debtors' Assets, (D) Authorizing the Debtors to Enter Into the Purchase Agreement(s), (E) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (F) Granting Related Relief; and (II) An Order or Orders (A) Authorizing the Sale of Some, All, or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (B) Approving the Assumption and Assignment of the Potentially Assigned Agreements, and (C) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures and Sale Motion"), pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, *inter alia*, entry of an order (the "Bidding Procedures Order"): (a) scheduling an auction (the "Auction") for the sale(s) of all, substantially all, or any portion of the Debtors' assets (the "Assets") on or about **Friday, December 20, 2024, at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784).  The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

**Central Time)**; (b) approving procedures (the "Bidding Procedures")[2] for submitting competing bids for the Assets; (c) authorizing, but not directing, the Debtors to designate the Stalking Horse Bidder and approving the Stalking Horse Bid Protections in accordance with the Stalking Horse Purchase Agreement; (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtors to enter into and perform under the Stalking Horse Purchase Agreement, subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures; (e) approving the form and manner of the notice of the Auction and the Sale Hearing; and (f) establishing procedures for the assumption and assignment of the Potentially Assigned Agreements to any purchaser(s) of the Assets and approving the manner of notice thereof (the "Cure Notice").

**PLEASE TAKE FURTHER NOTICE** that on [●], 2024, the Court entered the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, if at least two (2) Qualified Bids with regard to any Assets (as defined in the Bidding Procedures Order) are received by the Bid Deadline (as defined below), the Debtors will conduct the Auction. The Auction shall be held on **Friday, December 20, 2024, starting at 11:00 a.m. (prevailing Eastern Time) / 10:00 a.m. (prevailing Central Time)**, or such other time as the Debtors shall designate and thereafter notify all Qualified Bidders. Professionals and principals for the Debtors, each Qualified Bidder (including its representative(s), if any), each of the Consultation Parties, any creditors that request access to the Auction prior to the Bid Deadline, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than **Tuesday, December 17, 2024, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") may bid at the Auction. Any party that wishes to submit a Bid (as defined in the Bidding Procedures) for all, substantially all, or any portion of the Assets must submit a Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Auction, if required, will be conducted at the offices of Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, Texas 77002, or, if determined by the Debtors to be necessary or convenient, via teleconference and/or videoconference. For the avoidance of doubt, the Debtors may adjourn the Auction to another date or change the location of the Auction (including making it conducted entirely via teleconference and/or videoconference), in consultation with the Consultation Parties, by filing a notice on the docket of these Chapter 11 Cases.

**PLEASE TAKE FURTHER NOTICE** that the Debtors shall file a notice identifying the Successful Bidder(s) with the Court and serve such notice upon parties in interest by **Thursday, December 19, 2024**, if no Auction is held, or by **1 business day after the conclusion of the Auction** if an Auction is held. The Debtors will file a proposed form of Sale Order or Sale Orders on the docket in these Chapter 11 Cases by **Thursday, December 19, 2024**, if no Auction is held, or by **2 business days after the conclusion of the Auction** if an Auction is held.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures, the Bidding Procedures Order, or the Bidding Procedures and Sale Motion, as applicable.

PLEASE TAKE FURTHER NOTICE that the Sale Hearing to consider approval of the Sale(s) of the Assets to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances will be held before the Honorable [●], United States Bankruptcy Judge, 824 North Market Street, [●], Wilmington, Delaware 19801 on (a) **Monday, December 30, 2024, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction is cancelled, (b) **Monday, January 13, 2025, at [●] [a.m. / p.m.] (prevailing Eastern Time)** in the event the Auction proceeds, or (c) at such other time thereafter as counsel and interested parties may be heard.

PLEASE TAKE FURTHER NOTICE that the Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by including such adjournment on any agenda filed with the Court or by the filing of a notice with the Court.

PLEASE TAKE FURTHER NOTICE that, in the event the Auction is not held, objections to the approval of the Sale(s), including, for the avoidance of doubt, the ability of the Stalking Horse Bidder to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance, must be in writing, state the basis for such objection with specificity, and be filed with the Court and served before **4:00 p.m. (prevailing Eastern Time) on Tuesday, December 24, 2024**, on the following parties (collectively, the "Notice Parties"):

a. proposed co-counsel to the Debtors, Sidley Austin LLP, 1000 Louisiana Street, Suite 900, Houston, Texas 77002 (Attn: Duston McFaul (dmcfaul@sidley.com) and Maegan Quejada (mquejada@sidley.com)), and Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603 (Attn: Ian Ferrell (iferrell@sidley.com));

b. proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801 (Attn: Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com));

c. counsel to the DIP Lender and the Stalking Horse Bidder, White & Case LLP, 609 Main Street, Houston, Texas 77002 (Attn: Charles Koster (ckoster@whitecase.com) and Amanda Parra Criste (aparracriste@whitecase.com));

d. counsel to the Prepetition GDEV Agent, Locke Lord LLP, 111 South Wacker Drive, Suite 4100, Chicago, Illinois 60606 (Attn: Aaron C. Smith (asmith@lockelord.com)), and Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 (Attn: Christopher A. Ward (cward@polsinelli.com));

e. counsel to the Prepetition CarVal Agent, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Brian Greene (brian.greene@kirkland.com), Elizabeth H. Jones (elizabeth.jones@kirkland.com), and Christopher Marcus (christopher.marcus@kirkland.com));

3

f.   the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: John Schanne (john.schanne@usdoj.gov));

g.   counsel to any statutory committee that has been appointed in these Chapter 11 Cases; and

h.   if applicable, any identified Successful Bidder(s).

**PLEASE TAKE FURTHER NOTICE** that, in the event the Auction is held, objections to the approval of the Sale(s), to the conduct of the Auction, or the ability of the Successful Bidder(s) to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance must be in writing, state the basis for such objection with specificity, and be filed with the Court and served before **4:00 p.m. (prevailing Eastern Time) on Monday, January 6, 2025**, on the Notice Parties.

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.**

**PLEASE TAKE FURTHER NOTICE** that this Sale Notice is subject to the fuller terms and conditions of the Bidding Procedures and Sale Motion, the Bidding Procedures Order, and the Bidding Procedures, with such Bidding Procedures Order controlling in the event of any conflict. The Debtors encourage all parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale(s) of the Asset and/or copies of any related document(s), including the Bidding Procedures and Sale Motion, the Bidding Procedures Order, or the Bidding Procedures, may make a written request to Duston McFaul (dmcfaul@sidley.com), Maegan Quejada (mquejada@sidley.com), and Ian Ferrell (iferrell@sidley.com). In addition, copies of the Bidding Procedures and Sale Motion, the Bidding Procedures Order, and the Bidding Procedures are on file with the Clerk of the Court, Third Floor, 824 North Market Street, Wilmington, Delaware 19801 and are available on the Debtors' claims and noticing agent's website free of charge at https://cases.ra.kroll.com/oya.

*[Remainder of page intentionally left blank]*

4

Dated: [●], 2024
Wilmington, Delaware

/s/ *[Draft]*

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Rebecca L. Lamb (Del. Bar No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
         emorton@ycst.com
         kenos@ycst.com
         rlamb@ycst.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**SIDLEY AUSTIN LLP**
Duston K. McFaul (*pro hac vice* pending)
Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone:    (713) 495-4500
Facsimile:    (713) 495-7799
Email:        dmcfaul@sidley.com
              mquejada@sidley.com

Nathan C. Elner (*pro hac vice* pending)
Chelsea M. McManus (*pro hac vice* pending)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        nelner@sidley.com
              cmcmanus@sidley.com

Ian C. Ferrell (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        iferrell@sidley.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**<u>Exhibit 3</u>**

**Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| OYA RENEWABLES DEVELOPMENT LLC, *et al.*,[1] | Case No. 24-_____ (___) |
| Debtors. | (Joint Administration Requested) |
| | **Docket Ref. No. __** |

**NOTICE OF (I) POTENTIAL ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (II) CURE AMOUNTS**

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR
> AFFILIATES MAY BE A COUNTERPARTY TO A CONTRACT OR LEASE WITH OYA
> RENEWABLES DEVELOPMENT LLC AND/OR ONE OF ITS DEBTOR AFFILIATES.
> PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED
> BY THE TRANSACTIONS DESCRIBED HEREIN.

**PLEASE TAKE NOTICE** that on November 6, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] filed a motion seeking approval of the Bidding Procedures for the sale of certain of the Debtors' assets (the "Assets") and approval of the sale(s) of such Assets [Docket No. [●]] (the "Bidding Procedures and Sale Motion") to the highest or best-qualified bidder(s) (the "Successful Bidder(s)"). The Debtors sought the approval of the Court (as defined below) of the proposed Bidding Procedures and the form of this notice at a hearing held on **Tuesday, December 3, 2024, at [●] [a.m. / p.m.] (prevailing Eastern Time)**. The Debtors have further requested that a hearing to approve the sale(s) of the Assets (the "Sale Hearing") for (a) **Monday, December 30, 2024, at [●] [a.m./p.m.] (prevailing Eastern Time)** in the event the Auction is cancelled, (b) **Monday, January 13, 2025, at [●] [a.m./p.m.] (prevailing Eastern Time)** in the event the Auction proceeds, or (c) as soon thereafter as counsel and interested parties may be heard in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures and Sale Motion, the Debtors may assume and assign to the Successful Bidder(s) one or more of those

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are OYA Renewables Development LLC (7738), OYA Renewables Construction and Yield Holdings LLC (9227), OYA Renewables EquipmentCo LLC (6444), OYA Renewables Construction Holdings 3 LLC (2317), OYA-Rosewood Holdings LLC (1673), OYA Renewables Construction Holdings 2 LLC (9296), OYA Renewables Yield-1 LLC (4326), and OYA-OMNI Development Company, LLC (9784). The Debtors' service address is c/o Ankura Consulting Group, LLC, 2 Houston Center, 909 Fannin Street, Suite 2450, Houston, TX 77010, Attn: John Shepherd, Chief Restructuring Officer.

[2] Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures and Sale Motion (as defined herein) or the Bidding Procedures Order (as defined herein), as applicable.

executory contracts and/or unexpired leases listed on **Schedule A** annexed hereto (collectively, the "Potentially Assigned Agreements" and each, a "Potentially Assigned Agreement"), pursuant to section 365 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have indicated on **Schedule A** the cure amounts, if any, that the Debtors believe must be paid to cure any prepetition defaults and pay all amounts accrued under the Potentially Assumed Agreements (in each instance, the "Cure Amount").

**PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the validity of the Cure Amount or to a proposed assignment to the Successful Bidder(s) of any Potentially Assigned Agreement (other than on the basis of adequate assurance of future performance) must file an objection (the "Cure Objection") that: (a) is in writing; (b) states with specificity the nature of the objection, and, if the objection pertains to the proposed Cure Amount, state the amount alleged to be to owed, together with any applicable and appropriate documentation in support thereof; (c) is filed with the Clerk of the Court; and (d) is served on the following parties (collectively, the "Cure Notice Parties") by no later than **4:00 p.m. (prevailing Eastern Time) on the date that is 14 calendar days after the service of this Cure Notice** (the "Cure Objection Deadline"):

a.  proposed co-counsel to the Debtors, Sidley Austin LLP, 1000 Louisiana Street, Suite 900, Houston, Texas 77002 (Attn: Duston McFaul (dmcfaul@sidley.com) and Maegan Quejada (mquejada@sidley.com)), and Sidley Austin LLP, One South Dearborn Street, Chicago, Illinois 60603 (Attn: Ian Ferrell (iferrell@sidley.com));

b.  proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801 (Attn: Edmon L. Morton (emorton@ycst.com) and Kenneth J. Enos (kenos@ycst.com));

c.  counsel to the DIP Lender and the Stalking Horse Bidder, White & Case LLP, 609 Main Street, Houston, Texas 77002 (Attn: Charles Koster (ckoster@whitecase.com) and Amanda Parra Criste (aparracriste@whitecase.com));

d.  counsel to the Prepetition GDEV Agent, Locke Lord LLP, 111 South Wacker Drive, Suite 4100, Chicago, Illinois 60606 (Attn: Aaron C. Smith (asmith@lockelord.com)), and Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 (Attn: Christopher A. Ward (cward@polsinelli.com));

e.  counsel to the Prepetition CarVal Agent, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Brian Greene (brian.greene@kirkland.com), Elizabeth H. Jones (elizabeth.jones@kirkland.com), and Christopher Marcus (christopher.marcus@kirkland.com));

f.  the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: John Schanne (john.schanne@usdoj.gov)); and

g.  counsel to any statutory committee that has been appointed in these Chapter 11 Cases.

**PLEASE TAKE FURTHER NOTICE** that the Debtors shall file a notice identifying the Successful Bidder(s) with the Court and serve such notice upon parties in interest by, in the event no Auction is held, **Thursday, December 19, 2024**, or, alternatively, in the event the Auction is held, by **1 business day after the conclusion of the Auction**. The Debtors shall file a proposed form of Sale Order or Sale Orders by **Thursday, December 19, 2024**, in the event no Auction is held, or, alternatively, by **2 business days after the conclusion of the Auction** in the event the Auction is held.

**PLEASE TAKE FURTHER NOTICE** that unless a Cure Objection is timely and properly filed and served before the Cure Objection Deadline, the non-Debtor party to a Potentially Assigned Agreement shall: (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Potentially Assigned Agreement, and the Debtors and the Successful Bidder(s) shall be entitled to rely solely upon the Cure Amount; (b) be deemed to have consented to any assumption and assignment of such Potentially Assigned Agreement; and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder(s) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Potentially Assigned Agreement, or that there is any objection or defense to the assumption and assignment of such Potentially Assigned Agreement. In addition, the proposed Cure Amount set forth in **Schedule A** hereto shall be binding upon the non-Debtor parties to the Potentially Assigned Agreements for all purposes in these Chapter 11 Cases and will constitute a final determination of the Cure Amounts required to be paid by the Debtors in connection with any assumption and assignment of the Potentially Assigned Agreements.

**PLEASE TAKE FURTHER NOTICE** that where a non-Debtor counterparty to a Potentially Assigned Agreement timely and properly files an objection asserting a Cure Amount higher or different than the proposed Cure Amount (the "Disputed Cure Amount"), then: (a) the Cure Amount shall be as agreed between the parties; or (b) to the extent the parties are unable to consensually resolve the dispute, then such objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court. All other objections to the proposed assumption and assignment of a Potentially Assigned Agreement will likewise be heard at the Sale Hearing, unless adjourned by agreement of the parties.

**PLEASE TAKE FURTHER NOTICE** that a Cure Objection shall not constitute an objection to: (a) the relief generally requested in the Bidding Procedures and Sale Motion; (b) the conduct of the Auction (if one is held); (c) a sale to a Successful Bidder or the Successful Bidder's, including, if applicable, the Stalking Horse Bidder's, ability to provide adequate assurance of future performance as to any Potentially Assigned Contract; or (d) the terms of the proposed Sale Order(s). Parties wishing to object on such grounds must file and serve a separate objection stating with particularity such party's grounds for its objection on each of the Cure Notice Parties listed above and any Successful Bidder(s) identified no later than **4:00 p.m. (prevailing Eastern Time) on Tuesday, December 24, 2024**, if the Auction is not held, or **4:00 p.m. (prevailing Eastern Time) on Monday, January 6, 2025**, if the Auction is held.

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount indicated on **Schedule A** and otherwise do not object to the Debtors' assignment of your lease or contract, you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that the Debtors' decision to assume and assign the Potentially Assigned Agreements is subject to the Court's approval and consummation of the Sale(s) of the Assets.

**Inclusion of any document on the list of Potentially Assigned Agreements shall not constitute nor be deemed to be a determination or admission by the Debtors or the Successful Bidder(s) that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and all rights with respect thereto are expressly reserved.**

*[Remainder of page intentionally left blank]*

Dated: [●], 2024
Wilmington, Delaware

/s/ *[Draft]*
_____

**YOUNG CONAWAY STARGATT &**
**TAYLOR, LLP**
Robert S. Brady (Del. Bar No. 2847)
Edmon L. Morton (Del. Bar No. 3856)
Kenneth J. Enos (Del. Bar No. 4544)
Rebecca L. Lamb (Del. Bar No. 7223)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
         emorton@ycst.com
         kenos@ycst.com
         rlamb@ycst.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**SIDLEY AUSTIN LLP**
Duston K. McFaul (*pro hac vice* pending)
Maegan Quejada (*pro hac vice* pending)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone:    (713) 495-4500
Facsimile:    (713) 495-7799
Email:        dmcfaul@sidley.com
              mquejada@sidley.com

Nathan C. Elner (*pro hac vice* pending)
Chelsea M. McManus (*pro hac vice* pending)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        nelner@sidley.com
              cmcmanus@sidley.com

Ian C. Ferrell (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        iferrell@sidley.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## Schedule A

**Potentially Assigned Agreements**

[●]

## **Exhibit B**

**Stalking Horse Purchase Agreement**

**<u>EXHIBIT C</u>**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

See attached.

Final Form

## EXHIBIT C

## FORM OF

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of [●], by and among (i) OYA Renewables Construction Holdings 2 LLC, a Delaware limited liability company ("ORCH 2"), OYA Renewables Construction Holdings 3 LLC, a Delaware limited liability company ("ORCH 3"), and OYA Renewables EquipmentCo LLC, a Delaware limited liability company ("EquipmentCo" and together with ORCH 2 and ORCH 3, each a "Seller" and collectively, the "Sellers"), and (ii) Radial Power LLC, a Delaware limited liability company (the "Buyer").

WHEREAS, the Sellers and the Buyer have entered into that certain Stock and Asset Purchase Agreement, dated as of November 6, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), providing for, among other things, the terms of the sale, conveyance, assignment, transfer and delivery by the Sellers to the Buyer of the Transferred Assets and the assumption by the Buyer of the Assumed Liabilities;

WHEREAS, the Sellers desire to sell, transfer, assign, convey and deliver to the Buyer, and the Buyer desires to purchase, acquire and accept from the Sellers, all of the Sellers' right, title and interest in, to and under, as of the Closing, the Transferred Assets, free and clear of all Encumbrances other than Permitted Encumbrances, pursuant to the terms of, and in consummation of the transactions contemplated by, the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is required by Sections 2.9(b)(i) and 2.9(c)(i) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by the Sellers and the Buyer, is being delivered as of the date hereof by each party hereto to each other party to be effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, the Sellers and the Buyer hereby agree as follows:

1.    Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.    Transfer of Acquired Assets.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, the Purchase Agreement and in the Sale Order, at the Closing, each Seller does hereby sell, transfer, assign, convey and deliver to the Buyer, and the Buyer does hereby purchase, acquire and accept from each such Seller, all of such Seller's right, title and interest in, to and under, as of the Closing, the Transferred Assets, free and clear of all Encumbrances other than Permitted Encumbrances.

3.    <u>Assignment and Assumption</u>.  On the terms and subject to the conditions set forth in this Agreement, the Purchase Agreement and in the Sale Order, effective as of the Closing, each Seller does hereby irrevocably transfer, assign and convey to the Buyer, and the Buyer does hereby assume the Assumed Liabilities from each such Seller, and from and after the Closing the Buyer shall pay, perform, discharge, or otherwise satisfy the Assumed Liabilities in accordance with their respective terms.

4.    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, the Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets.

5.    <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement, the Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Excluded Liabilities.

6.    <u>Terms of the Purchase Agreement</u>.  This Agreement is executed and delivered pursuant to, and is expressly made subject to the terms of, the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall this Agreement be construed to, amend, supersede, replace, extend, amplify, modify, limit, waive or otherwise alter in any way the terms and conditions of the Purchase Agreement (including any representation, warranty, covenant or obligation contained in the Purchase Agreement or any of the rights, remedies or obligations of the Buyer or the Sellers provided for therein or arising therefrom in any way, all of which shall remain in full force and effect in accordance with their terms), which shall not be merged with or into this Agreement but shall survive the execution and delivery of this Agreement to the extent, and in the manner, set forth in the Purchase Agreement.

7.    <u>Further Assurances</u>.  The terms set forth in Section 6.4(b) (Further Assurances) of the Purchase Agreement are incorporated by reference herein, except that, as applicable, any and all references to "this Agreement" shall mean and refer to this Agreement.

8.    <u>Bulk Sales or Transfer Laws</u>.  Each of the Buyer and the Sellers intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets shall be free and clear of any Encumbrances in the Transferred Assets (including any liens or claims arising out of the bulk transfer laws) except Permitted Encumbrances, and the Buyer and the Sellers shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, the Buyer and the Sellers hereby waive compliance by the parties hereto with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

9.    <u>Miscellaneous</u>. The terms set forth in Section 10.3 (Amendment and Modification), Section 10.4 (Waiver), Section 10.5 (Notices), Section 10.6 (Interpretation), Section 10.8 (Parties in Interest), Section 10.9 (Governing Law), Section 10.10 (Submission to Jurisdiction), Section 10.12    (No    Recourse),    Section 10.13    (Assignment;    Successors),

2

Section 10.14 (Enforcement), Section 10.16 (Severability), Section 10.17 (Waiver of Jury Trial), Section 10.18 (Counterparts) and Section 10.19 (No Presumption Against Drafting Party) of the Purchase Agreement are incorporated by reference herein, *mutatis mutandis*, and as applicable, any and all references to "this Agreement" therein shall mean and refer to this Agreement.

*The remainder of this page is intentionally left blank.*

3

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BUYER:**

**RADIAL POWER LLC**

By: _____
Name:
Title:

**<u>SELLERS</u>:**

**OYA RENEWABLES CONSTRUCTION HOLDINGS 2 LLC**

By: _____
Name:
Title:


By: _____
Name:
Title:


**OYA RENEWABLES CONSTRUCTION HOLDINGS 3 LLC**

By: _____
Name:
Title:


By: _____
Name:
Title:


**OYA RENEWABLES EQUIPMENTCO LLC**

By: _____
Name:
Title:


By: _____
Name:
Title:

## EXHIBIT D

### FORM OF DEWITTVILLE PERMITS UPDATE

| Permitting Status | | | |
|---|---|---|---|
| Progress in Quarter | | | |
| Next Steps | | | |
| Expected Completion Date | | | |
| Key Outstanding Risks | | | |

## SCHEDULE I

## TRANSFERRED SUBSIDIARIES

### OYA Renewables Construction Holdings 2 LLC

| Company Name | Owner(s) | Percentage Ownership |
|---|---|---|
| Omni Otto A Solar, LLC | OYA Renewables Construction Holdings 2 LLC | 100% |
| Omni Otto B Solar, LLC | OYA Renewables Construction Holdings 2 LLC | 100% |
| Omni Otto C Solar, LLC | OYA Renewables Construction Holdings 2 LLC | 100% |
| Omni Cuba Solar, LLC | OYA Renewables Construction Holdings 2 LLC | 100% |

### OYA Renewables Construction Holdings 3 LLC

| Company Name | Owner(s) | Percentage Ownership |
|---|---|---|
| Omni Burt B Solar, LLC | OYA Renewables Construction Holdings 3 LLC | 100% |
| Omni Burt D Solar, LLC | OYA Renewables Construction Holdings 3 LLC | 100% |
| Omni Richland Route 28 North Solar, LLC | OYA Renewables Construction Holdings 3 LLC | 100% |
| Omni Dewittville Solar, LLC | OYA Renewables Construction Holdings 3 LLC | 100% |

**DISCLOSURE SCHEDULES**

to the

**STOCK AND ASSET PURCHASE AGREEMENT**

dated as of November 6, 2024

by and among

**OYA RENEWABLES CONSTRUCTION HOLDINGS 2 LLC,**

**OYA RENEWABLES CONSTRUCTION HOLDINGS 3 LLC,**

**AND**

**OYA RENEWABLES EQUIPMENTCO LLC**,

as the Sellers

and

**Radial Power LLC**,

as the Buyer

*Disclosure Schedules*

These Disclosure Schedules (these "Disclosure Schedules") are made and given pursuant to that certain Stock and Asset Purchase Agreement, dated as of November 6, 2024 (the "Agreement"), by and among (i) OYA Renewables Construction Holdings 2 LLC, a Delaware limited liability company ("ORCH 2"), OYA Renewables Construction Holdings 3 LLC, a Delaware limited liability company ("ORCH 3"),  and OYA Renewables EquipmentCo LLC, a Delaware limited liability company ("EquipmentCo" and together with ORCH 2 and ORCH 3, each a "Seller" and collectively, the "Sellers"), and (ii) Radial Power LLC, a Delaware limited liability company (the "Buyer")Capitalized terms used herein and not otherwise defined herein shall have the respective meanings assigned to such terms in the Agreement.

Notwithstanding anything to the contrary contained in these Disclosure Schedules or in the Agreement, the information and disclosures contained in any Disclosure Schedule corresponding to a Section in Article III of the Agreement shall be deemed to be disclosed and incorporated by reference in any other Disclosure Schedule corresponding to a Section in Article III of the Agreement as though fully set forth in such Disclosure Schedule for which applicability of such information and disclosure is readily apparent on its face. The fact that any item of information is disclosed in any Disclosure Schedule shall not be construed to be an admission by any Party to any third party of any liability or obligation with respect thereto or to mean that such information is material or immaterial, within or outside of the Ordinary Course of Business, or required to be disclosed by the Agreement. Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in the Agreement. No information set forth in these Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties.

**Section 1.1(a)**

**Asset Management Agreements**

None.

**Section 1.1(b)**

**Knowledge Persons**

1.   Taymaz Jahaniaval

2.   Roberto Roberti

3.   Gregory Rossetti

**Section 1.1(c)**

**Transferred Contracts**

*To be completed in connection with the Bankruptcy Case in accordance with Section 2.6 of the Agreement.*

**Section 1.1(d)**

**Deferred Payment Agreements**

1.  Membership Interest Purchase Agreement, dated October 26, 2023, by and between ORCH 2 and AETS Development Holdings, LLC.

2.  Membership Interest Purchase Agreement, dated December 19, 2023, by and between ORCH 3 and NY DRS Finco VIII, LLC.

3.  Membership Interest Purchase Agreement, dated June 13, 2024, by and between ORCH 3 and NY DRS Finco VIII, LLC.

**Section 1.1(e)**

**Permitted Encumbrance**

None.

**Section 2.1(p)**

**Intellectual Property**

None.

**Section 2.1(r)**

**Other Assets**

None.

**Section 2.2(e)**

**Excluded Contracts**[1]

1.  Section 1.1(d) of these Disclosure Schedules is incorporated herein by reference.

2.  That certain Financing Agreement, dated as of November 2, 2022 (as amended or otherwise modified), between OYA Renewables EquipmentCo LLC, and CVI CEF Master Fund I LP, as administrative agent, collateral agent and lender (the "CarVal Credit Agreement," together with the "Financing Documents" (as defined in the CarVal Credit Agreement, the "CarVal Loan Documents")).

---

[1]To be updated in connection with the Bankruptcy Case in accordance with Section 2.6 of the Agreement.

**Section 2.2(g)**

**Excluded Assets**

None.

**Section 2.2(i)**

**Excluded Projects**

None.

**Section 2.9(b)(vii)**

**Agreements to be Terminated at or prior to Closing**

None.

**Section 3.3(a)**

**Conflicts**

None.

**Section 3.3(b)**

**Consents**

1. Consent with respect to the indirect change of control of Omni Otto A Solar, LLC from the County of Cattaraugus Industrial Development Agency, pursuant to the Lease Agreement by and between Omni Otto A Solar, LLC and the County of Cattaraugus Industrial Development Agency dated March 1, 2023.

2. Consent with respect to the indirect change of control of Omni Otto B Solar, LLC from the County of Cattaraugus Industrial Development Agency, pursuant to the Lease Agreement by and between Omni Otto B Solar, LLC and the County of Cattaraugus Industrial Development Agency, dated May 1, 2023.

3. Consent with respect to the indirect change of control of Omni Otto C Solar, LLC from the County of Cattaraugus Industrial Development Agency, pursuant to the Lease Agreement by and between Omni Otto C Solar, LLC and the County of Cattaraugus Industrial Development Agency, dated May 1, 2023.

4. Consent with respect to the indirect change of control of Omni Cuba Solar, LLC from the Allegany County Industrial Development Agency, pursuant to the Lease Agreement by and between Omni Cuba Solar, LLC and the Allegany County Industrial Development Agency, dated October 1, 2022.

**Section 3.4(c)**

**Sufficiency of Transferred Assets and Transferred Subsidiaries**

None.

**Section 3.4(d)**

**Transferred Asset and Transferred Subsidiary Exceptions**

None.

**Section 3.5(a)**

**Equity Interests of Transferred Subsidiaries**

**OYA Renewables Construction Holdings 2 LLC**

| Company Name | Owner(s) | Percentage Ownership |
|---|---|---|
| Omni Otto A Solar, LLC | OYA Renewables Construction Holdings 2 LLC | 100% |
| Omni Otto B Solar, LLC | OYA Renewables Construction Holdings 2 LLC | 100% |
| Omni Otto C Solar, LLC | OYA Renewables Construction Holdings 2 LLC | 100% |
| Omni Cuba Solar, LLC | OYA Renewables Construction Holdings 2 LLC | 100% |

**OYA Renewables Construction Holdings 3 LLC**

| Company Name | Owner(s) | Percentage Ownership |
|---|---|---|
| Omni Burt B Solar, LLC | OYA Renewables Construction Holdings 3 LLC | 100% |
| Omni Burt D Solar, LLC | OYA Renewables Construction Holdings 3 LLC | 100% |
| Omni Richland Route 28 North Solar, LLC | OYA Renewables Construction Holdings 3 LLC | 100% |
| Omni Dewittville Solar, LLC | OYA Renewables Construction Holdings 3 LLC | 100% |

**Section 3.5(b)**

**Jurisdictions of Formation and Registration**

**OYA Renewables Construction Holdings 2 LLC**

| Company Name | Jurisdiction of Formation | Foreign Registrations |
|---|---|---|
| Omni Otto A Solar, LLC | New York | N/A |
| Omni Otto B Solar, LLC | New York | N/A |
| Omni Otto C Solar, LLC | New York | N/A |
| Omni Cuba Solar, LLC | New York | N/A |

**OYA Renewables Construction Holdings 3 LLC**

| Company Name | Jurisdiction of Formation | Foreign Registrations |
|---|---|---|
| Omni Burt B Solar, LLC | New York | N/A |
| Omni Burt D Solar, LLC | New York | N/A |
| Omni Richland Route 28 North Solar, LLC | New York | N/A |
| Omni Dewittville Solar, LLC | New York | N/A |

**Section 3.5(c)**

**Outstanding Equity Options**

None.

**Section 3.6(a)**

**Financial Statements**

1. **Audited Financial Statements Provided**
   a.   None.

2. **Financial Statement Exceptions**
   a.   None.

**Section 3.6(b)**

**Undisclosed Liabilities**

None.

**Section 3.6(c)**

**Indebtedness**

1. Indebtedness incurred under the CarVal Loan Documents.

**Section 3.7**

**Absence of Certain Changes or Events**

None.

**Section 3.8(b)**

**Permits**

The following are incorporated herein by reference:

1. Annex 3.8(b) – ORCH3

2. Annex 3.8(b) – ORCH2

**Section 3.8(e)**

**Pending Permit Applications**

None.

**Section 3.9**

**Litigation**

1.     Ian Finlay, a former employee of OYA Renewables Inc., the Sellers' parent company ("<u>ORI</u>"), served ORI and OYA Renewables Corp., OYA Renewables Development LLC, OYA Renewables Construction and Yield Holdings LLC, OYA Renewables EquipmentCo-2 LLC, OYA Renewables Construction and Yield Holdings 3 LLC, OYA-Rosewood Holdings LLC, OYA Renewables Yield-1 LLC, OYA Renewables Construction Holdings 2 LLC, OYA-GPC 2021 Holdco LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, Omni Cuba Solar, LLC, OYA State Route 122 LLC, OYA Pulaski LLC, OYA Wayside Drive LLC, and OYA Robinson Road LLC (the "<u>OYA-US Entities</u>") with notice of a claim in the Ontario Superior Court of Justice on August 6, 2024, alleging that (a) the OYA-US Entities are part of a company group that employed Mr. Finlay, and (b) ORI has constructively terminated Mr. Finlay's employment relationship (the "<u>Finlay Matter</u>"). The Finlay Matter is ongoing.

2.     Omni Navitas Holdings, LLC ("<u>Omni</u>"), filed a demand for arbitration on June 12, 2024 with the American Arbitration Association against OYA-OMNI Development Company, LLC ("<u>OYA</u>") to enforce Omni's rights under that certain Co-Development Agreement, by and between OYA-OMNI Development Company, LLC and OMNI Navitas Holdings, LLC, dated as of May 14, 2021 (the "<u>Omni Claim</u>"). The Omni Claim has since been dismissed without prejudice to refiling.

**Section 3.11(b)(i)**

**Seller Leases**

None.

**Section 3.11(b)(ii)**

**Transferred Subsidiary Leases, Easements, and Options**

1.   Sections 4 and 5 of Annex 3.15(a) – ORCH3 is incorporated herein by reference.

2.   Sections 6 and 7 of Annex 3.15(a) – ORCH2 is incorporated herein by reference.

**Section 3.11(c)**

**Lease Title**

None.

**Section 3.11(f)**

**Unrecorded Real Property Interests**

None.

**Section 3.11(j)**

**CESIR Reports**

**OYA Renewables Construction Holdings 2 LLC**

| Project | CESIR Reports |
|---------|---------------|
| Omni Otto A Solar | CESIR Report dated November 3, 2020 (new CESIR will be required). |
| Omni Otto B Solar | CESIR Report dated November 3, 2020. |
| Omni Otto C Solar | CESIR Report dated November 3, 2020. |
| Omni Cuba Solar | CESIR Report dated December 15, 2020. |

**OYA Renewables Construction Holdings 3 LLC**

| Project | CESIR Reports |
|---------|---------------|
| OMNI Richland Route 28 North Solar | CESIR Report dated June 14, 2021. |
| Omni Burt D Solar | CESIR Report dated February 5, 2021<br><br>CESIR Restudy dated June 25, 2021 |
| Omni Burt B Solar | CESIR Report dated February 5, 2021<br><br>CESIR Restudy dated June 25, 2021 |
| OMNI Dewittville Solar | CESIR Report dated August 28, 2020. |

**Section 3.11(l)**

**Lease Payment Exceptions**

None.

**Section 3.13**

**Taxes**

None.

**Section 3.15(a)**

**Material Contracts**

1.  Annex 3.15(a) – ORCH3 is incorporated herein by reference.

2.  Annex 3.15(a) – ORCH2 is incorporated herein by reference.

**Section 3.15(b)**

**Material Contract Exceptions**

None.

**Section 3.16**

**Affiliate Transactions**

None.

**Section 3.17**

**Insurance Policies**

| Policy Type | Carrier | Named Insured | Policy No. | Effective Date | Expiration Date | Policy Limit; Deductible |
|---|---|---|---|---|---|---|
| Commercial Umbrella | Federal Insurance Company | OYA Renewables Development LLC | 7819-23-93 | 2/9/2024 | 2/9/2025 | $5,000,000, aggregate $15,000,000; $25,000 |
| General Liability | Federal Insurance Company | OYA Renewables Development LLC | 3606-42-17 DAL | 2/9/2024 | 2/9/2025 | $1,000,000, combined aggregate $10,000,000 |
| Property Insurance | Federal Insurance Company | OYA Renewables Development LLC | 3607-26-90 DAL | 2/9/2024 | 2/9/2025 | Property: $52,240,000<br><br>Business Interruption: $12,031,000;<br><br>Property: $25,000<br><br>Flood: $10,000<br><br>Office: $2,500<br><br>Waiting Period: 480 hours |

**Section 3.18**

**Brokers**

None.

**Section 3.19(a)**

**Inventory Accounting Exceptions**

None.

**Section 3.19(c)**

**Equipment**

1.  Annex 3.19(c) is incorporated herein by reference.

**Section 3.21**

**Bank Accounts**

| Bank | Address | Account Beneficiary | Authorized Person(s) |
|------|---------|---------------------|----------------------|
| TD Bank, N.A. | Wilmington, DE | OYA Renewables Construction Holdings 2, LLC | John Shepherd Eric Millard |
| TD Bank, N.A. | Wilmington, DE | OYA Renewables EquipmentCo LLC | John Shepherd Eric Millard |
| TD Bank, N.A. | Wilmington, DE | OYA Renewables Construction Holdings 3 LLC | John Shepherd Eric Millard |

**Section 3.22(g)**

**NYSERDA Exceptions**

None.

**Section 3.22(i)**

**Project Nameplate Capacity and Incentives**

**OYA Renewables Construction Holdings 2 LLC**

| Project | Eligible Project Size | Total Amount of Eligible Incentives | Total Amount of Incentives Received under Community Solar Program |
|---------|----------------------|-------------------------------------|------------------------------------------------------------------|
| Omni Otto A Solar | 7.49 MWdc | $1,422,720 | $0 |
| Omni Otto B Solar | 7.49 MWdc | $1,422,720 | $0 |
| Omni Otto C Solar | 7.49 MWdc | $1,422,720 | $0 |
| Omni Cuba Solar | 7.49 MWdc | $823,680 | $0 |

**OYA Renewables Construction Holdings 3 LLC**

| Project | Eligible Project Size | Total Amount of Eligible Incentives | Total Amount of Incentives Received under Community Solar Program |
|---------|----------------------|-------------------------------------|------------------------------------------------------------------|
| Omni Burt B Solar | 7.50 MWdc | $1,649,648 | $0 |
| Omni Burt D Solar | 7.50 MWdc | $1,649,648 | $0 |
| Omni Richland Route 28 North Solar | 4.95 MWdc | $1,089,088 | $0 |
| Omni Dewittville Solar | 7.50 MWdc | $1,799,616 | $0 |

**Section 3.22(j)**

**Tariff Letters**

**OYA Renewables Construction Holdings 2 LLC**

| Project | VDER Compensation Letter |
|---------|--------------------------|
| OMNI Otto A LLC | VDER Compensation Letter dated August 2, 2021 with an Eligibility Date for the project of June 30, 2021. |
| Omni Otto B LLC | VDER Compensation Letter dated June 23, 2021 with an Eligibility Date for the project of March 18, 2021. |
| Omni Otto C LLC | VDER Compensation Letter dated August 2, 2021 with an Eligibility Date for the project of June 30, 2021. |
| OMNI Cuba LLC | VDER Compensation Letter dated June 23, 2021 with an Eligibility Date for the project of May 17, 2021. |

**OYA Renewables Construction Holdings 3 LLC**

| Project | VDER Compensation Letter |
|---------|--------------------------|
| Omni Burt B Solar, LLC | VDER Compensation Letter dated June 2, 2022 with an Eligibility date for the project of April 22, 2022. |
| Omni Burt D Solar, LLC | VDER Compensation Letter dated June 16, 2022 with an Eligibility date for the project of April 22, 2022. |
| Omni Richland Route 28 North Solar, LLC | VDER Compensation Letter dated June 22, 2022 with an Eligibility date for the project of April 27, 2022 |
| Omni Dewittville Solar, LLC | VDER Compensation Letter dated August 2, 2021 with an Eligibility Date for the project of March 10, 2021 |

**Section 3.26**

**NYSERDA Incentive Payments**

Section 3.22(i) of these Disclosure Schedules is incorporated herein by reference.

**Section 3.27**

**Surety Bonds**

| Surety | Surety Company | Bond ID | Maturity | Bond Premium | Bond Amount |
|---|---|---|---|---|---|
| Decommissioning Bond | Harco National Insurance Company | 0838968 | 5/4/2025 | $3,750.00 | $150,000.00 |
| Decommissioning Bond | Harco National Insurance Company | 0838969 | 5/4/2025 | $1,716.00 | $68,654.00 |
| Decommissioning Bond | Harco National Insurance Company | 0838970 | 5/4/2025 | $1,708.00 | $68,300.00 |
| Decommissioning Bond | Harco National Insurance Company | 0838971 | 5/4/2025 | $1,709.00 | $68,351.00 |
| Road Use Bond | Harco National Insurance Company | 0838975 | 5/4/2025 | $3,750.00 | $150,000.00 |
| Road Use Bond | Harco National Insurance Company | 0838976 | 5/4/2025 | $11,000.00 | $440,000.00 |

**Section 6.9**

**Intercompany Agreements to Survive Closing**

None.

**Section 6.11**

**Financial Assurances**

1.   Section 3.27 of these Disclosure Schedules is incorporated herein by reference.

**Section 8.3(f)**

**Required Third Party Notices and Consents**

None.

## Annex 3.8(b) – ORCH2: Permits

**Omni Otto A Solar Facility:**

1. Special Use Permit Approval from Town of Otto Planning Board dated October 27, 2020. (expired)
2. Special Use Permit Amendment from Town of Otto Planning Board dated April 7, 2021. (expired)
3. Special Use Permit Approval Extension from Town of Otto Planning Board dated January 16, 2022. (expired)
4. Site Plan and Special Use Permit Amendment and Extension from Town of Otto Planning Board dated June 7, 2022. (expired)
5. GML 239-m Site Plan and Special Use Permit from Cattaraugus County dated March 1, 2021.
6. SEQRA Negative Declaration from Town of Otto Planning Board dated December 22, 2020.
7. SEQRA Negative Declaration from Town of Otto Planning Board dated June 7, 2022.
8. Jurisdictional Determination (federal wetlands) from U.S. Army Corp of Engineers dated April 12, 2021.
9. Verification Letter for Nationwide Permit (federal wetlands) from U.S. Army Corp of Engineers dated October 22, 2021.
10. Natural Heritage Program Report from New York State Department of Environmental Conservation dated May 24, 2021.
11. Letter of No Impact from New York Parks, Recreation and Historic Preservation dated January 14, 2021.
12. Letter of No Jurisdiction from New York State Department of Environmental Conservation dated July 12, 2021.
13. Species on Site Letter (federal species) from U.S. Fish and Wildlife Service dated October 14, 2020.
14. Consistency Letter (federal species) from U.S. Fish and Wildlife Service dated May 28, 2021.
15. Environmental Review (state species) from New York State Department of Environmental Conservation dated April 29, 2021.
16. Letter of No Impact from NY Agriculture and Markets dated February 11, 2021.
17. FAA Letter from Federal Aviation Administration issued May 24, 2021, extended December 14, 2022, and further extended October 29, 2024.
18. Stormwater Pollution Prevention Plan dated November 2021.
19. Stormwater Pollution Prevention Plan Amendment Report dated June 20, 2023.
20. Wetland and Stream Delineation Report, Otto Solar (A) dated January 2021.Phase I Environmental Site Assessment dated June 30, 2023.

**Omni Otto B Solar Facility:**

1. Special Use Permit Approval from Town of Otto Planning Board dated October 27, 2020. (expired)
2. Special Use Permit Approval Extension from Town of Otto Planning Board dated January

16, 2022. (expired)

3. Special Use Permit Approval from Town of Otto Planning Board dated June 7, 2022. (expired)

4. Site Plan Approval from Town of Otto Planning Board dated June 7, 2022. (expired)

5. GML 239-m Site Plan and Special Use Permit from Cattaraugus County Planning Department dated March 1, 2021.

6. SEQRA Negative Declaration from Town of Otto Planning Board dated December 22, 2020.

7. SEQRA Negative Declaration from Town of Otto Planning Board dated June 7, 2022.

8. Jurisdictional Determination (federal wetlands) from U.S. Army Corp of Engineers dated April 14, 2021.

9. Verification of Coverage Under Nationwide Permit (federal wetlands) for NYS from U.S. Army Corp of Engineers dated October 22, 2021.

10. Natural Heritage Program Report from New York State Department of Environmental Conservation dated May 24, 2021.

11. Affirmation of Blanket Section 401 Water Quality Certification (state wetlands) from New York State Department of Environmental Conservation dated September 30, 2021.

12. Letter of No Impact from New York Parks, Recreation and Historic Preservation dated January 15, 2021.

13. Letter of No Jurisdiction (state wetlands) from New York State Department of Environmental Conservation dated July 12, 2021.

14. Species on Site Letter (federal species) from U.S. Fish and Wildlife Service dated October 29, 2020.

15. Consistency Letter (federal species) from U.S. Fish and Wildlife Service dated May 28, 2021.

16. Environmental Review (state species) from New York State Department of Environmental Conservation dated April 29, 2021.

17. Letter of No Impact from NY Agriculture and Markets dated February 11, 2021.

18. FAA letter from Federal Aviation Administration issued May 24, 2021, extended December 14, 2022 and further extended October 29, 2024.

19. Stormwater Pollution Prevention Plan dated November 2021.

20. Wetland and Stream Delineation Report, Otto Solar (B) dated January 2021.

21. Phase I Environmental Site Assessment dated June 30, 2023.

**Omni Otto C Solar Facility:**

1. Special Use Permit Approval from Town of Otto Planning Board dated October 27, 2020. (expired)

2. Amended Special Use Permit Approval from Town of Otto Planning Board dated April 7, 2021. (expired)

3. Special Use Permit Approval Extension from Town of Otto Planning Board dated January 16, 2022. (expired)

4. Special Use Permit Approval from Town of Otto Planning Board dated June 7, 2022. (expired)

5. Site Plan Approval from Town of Otto Planning Board dated June 7, 2022. (expired)
6. GML 239-m Site Plan and Special Use Permit from Cattaraugus County dated March 1, 2021.
7. SEQRA Negative Declaration from Town of Otto Planning Board dated December 22, 2020.
8. SEQRA Negative Declaration from Town of Otto Planning Board dated June 7, 2022.
9. Jurisdictional Determination (federal wetlands) from U.S. Army Corp of Engineers April 12, 2021.
10. Verification of Coverage under Nationwide Permit (federal wetlands) from U.S. Army Corp of Engineers dated October 22, 2021.
11. Affirmation of Blanket Section 401 Water Quality Certification (state wetlands) from NYSDEC dated September 30, 2021.
12. Natural Heritage Program Report from New York State Department of Environmental Conservation dated May 24, 2021.
13. Letter of No Impact from New York Parks, Recreation and Historic Preservation dated January 15, 2021.
14. Letter of No Jurisdiction (state wetlands) from New York State Department of Environmental Conservation dated July 12, 2021.
15. Species on Site Letter (federal species) from U.S. Fish and Wildlife Service dated October 29, 2020.
16. Consistency Letter (federal species) from U.S. Fish and Wildlife Service dated May 28, 2021.
17. Environmental Review from New York State Department of Environmental Conservation dated April 29, 2021.
18. Letter of No Impact from NY Agriculture and Markets dated February 11, 2021.
19. FAA Letter from Federal Aviation Administration issued May 24, 2021, extended December 14, 2022, and further extended October 29, 2024.
20. Stormwater Pollution Prevention Plan dated November 2021.
21. Stormwater Pollution Prevention Plan Amendment Report dated June 22, 2023.
22. Wetland and Stream Delineation Report, Otto Solar (C) dated January 2021.
23. Phase I Environmental Site Assessment dated June 30, 2023.

**Omni Cuba Solar Facility:**
1. Special Use Permit Approval from Town of Cuba Planning Board dated May 19, 2021, and extended on December 13, 2022. (expired)
2. Special Use Permit Approval Extension from Town of Cuba Planning Board dated July 15, 2022. (expired)
3. SEQRA Negative Declaration from Town of Cuba dated May 11, 2021.
4. GML 239-m approval from Allegany County dated June 7, 2021.
5. Natural Heritage Report from New York State Department of Environmental Conservation dated June 1, 2021.
6. Letter of No Impact from New York Parks, Recreation and Historic Preservation dated May 27, 2021.

7. Letter of No Jurisdiction Under 15 and 24 (state wetlands) from New York State Department Environmental Conservation dated September 29, 2021.

8. Species Review (federal species), U.S. Fish and Wildlife Services, dated July 6, 2022.

9. Environmental Review (state species), New York State Department of Environmental Conservation dated June 16, 2021.

10. Environmental Review Extension (state species), New York State Department of Environmental Conservation dated June 13, 2022.

11. FAA Letter from Federal Aviation Administration issued May 24, 2021, extended December 14, 2022, and further extended October 31, 2024.

12. Determination of No Permit Required (federal wetlands), U.S. Army Corps of Engineers dated February 28, 2023.

13. Stormwater Pollution Prevention Plan dated December 2023.

14. Wetland and Stream Delineation Report, Cuba Solar Project dated July 9, 2021.

15. Phase I Environmental Site Assessment dated June 30, 2023.

## Annex 3.8(b) – ORCH3: Permits

**Omni Burt B Facility:**

1. Special Exception Use Permit Approval from Town of Newfane Planning Board dated June 28, 2022. (expired)
2. SEQR Resolution for Town of Newfane dated July 20, 2021.
3. Natural Heritage Report from New York State Department of Environmental Conservation dated June 1, 2021.
4. Jurisdictional Determination from U.S. Army Corps of Engineers dated March 16, 2023.
5. Letter of No Jurisdiction Under 15 and 24 (state wetlands) from New York State Department Environmental Conservation dated September 14, 2021.
6. Letter of No Impact from New York Parks, Recreation and Historic Preservation dated November 5, 2021.
7. Species Review (federal species), U.S. Fish and Wildlife Services, dated April 30, 2021.
8. FAA Letter from Federal Aviation Administration issued May 21, 2021, extended December 12, 2022, and further extended October 29, 2024.
9. Wetland and Stream Delineation Report dated April 2021.
10. Phase I Environmental Site Assessment dated January 14, 2022.
11. DEC Species Concurrence Letter, New York State Department of Environmental Conservation dated May 13, 2021.

**Omni Burt D Facility:**

1. Special Exception Use Permit Approval from Town of Newfane Planning Board dated June 28, 2022. (expired)
2. SEQR Resolution for Town of Newfane dated July 20, 2021.
3. Natural Heritage Report from New York State Department of Environmental Conservation dated June 1, 2021.
4. Jurisdictional Determination from U.S. Army Corps of Engineers dated March 16, 2023.
5. Letter of No Jurisdiction Under 15 and 24 (state wetlands) from New York State Department Environmental Conservation dated September 14, 2021.
6. Letter of No Impact from New York Parks, Recreation and Historic Preservation dated November 5, 2021.
7. Species Review (federal species), U.S. Fish and Wildlife Services, dated April 30, 2021.
8. FAA Letter from Federal Aviation Administration issued May 21, 2021, extended December 12, 2022, and further extended October 29, 2024.
9. Wetland and Stream Delineation Report dated April 2021.
10. Phase I Environmental Site Assessment dated January 14, 2022.
11. DEC Species Concurrence Letter, New York State Department of Environmental Conservation dated April 29, 2021.

**Omni Dewittville Facility:**

1. Special Use Permit Approval (#2022-1) from Town of Chautauqua dated March 21, 2022.

(expired)
2. SEQR Resolution for Town of Chautauqua dated March 14, 2022.
3. County Referral from Chautauqua County Department of Planning and Development dated December 9, 2021.
4. Natural Heritage Report from New York State Department of Environmental Conservation dated May 24, 2021.
5. Preliminary Jurisdictional Determination from U.S. Army Corps of Engineers dated February 8, 2023.
6. Letter of No Jurisdiction Under 15 and 24 (state wetlands) from New York State Department Environmental Conservation dated August 19, 2021.
7. Letter of No Impact from New York Parks, Recreation and Historic Preservation dated April 23, 2021.
8. Species Review (federal species), U.S. Fish and Wildlife Services, dated April 30, 2021.
9. FAA Letter from Federal Aviation Administration issued April 20, 2021, extended March 7, 2023, and further extended November 4, 2024.
10. Final Notice of Intent to Undertake an Action within an Agricultural District from New York Department of Agriculture and Markets dated March 2, 2021.
11. Wetland and Waterway Delineation Report dated July 20, 2021.
12. Phase I Environmental Site Assessment dated January 13, 2022.
13. DEC Species Concurrence Letter, New York State Department of Environmental Conservation dated April 29, 2021.


**Omni Richland Route 28 North Facility:**

1. Special Use Permit Approval from Town of Richland Planning Board dated August 16, 2021. (expired)
2. SEQR Resolution for Town of Richland dated July 19, 2021.
3. County Response Letter (239 Review Referral Response #2021-57) from Oswego County Department of Community Development, Tourism and Planning dated August 6, 2021.
4. Natural Heritage Report from New York State Department of Environmental Conservation dated June 2, 2021.
5. Preliminary Jurisdictional Determination from U.S. Army Corps of Engineers dated February 9, 2022.
6. Letter of No Jurisdiction Under 15 and 24 (state wetlands) from New York State Department Environmental Conservation dated October 26, 2021.
7. Letter of No Impact from New York Parks, Recreation and Historic Preservation dated May 19, 2021.
8. Species Review (federal species), U.S. Fish and Wildlife Services, dated June 10, 2021.
9. FAA Letter from Federal Aviation Administration issued May 20, 2021, extended December 14, 2022 and further extended October 21, 2024.
10. Wetland Delineation Report.
11. Phase I Environmental Site Assessment dated January 13, 2022.
12. DEC Species Concurrence Letter, New York State Department of Environmental Conservation dated October 26, 2021.

**Annex 3.15(a) – ORCH2: Material Contracts**

### 1. Interconnection Agreements

| Project Entity | Description |
| --- | --- |
| Omni Otto A Solar, LLC | New York State Standardized Contract for Interconnection of New Distributed Generation Units with Capacity of 5 MW or Less Connected in Parallel with Utility Distribution Systems between Omni Otto A Solar, LLC and National Grid dated April 14, 2021. |
| Omni Otto B Solar, LLC | New York State Standardized Contract for Interconnection of New Distributed Generation Units with Capacity of 5 MW or Less Connected in Parallel with Utility Distribution Systems between Omni Otto B Solar, LLC and National Grid dated April 14, 2021. |
| Omni Otto C Solar, LLC | New York State Standardized Contract for Interconnection of New Distributed Generation Units with Capacity of 5 MW or Less Connected in Parallel with Utility Distribution Systems between Omni Otto C Solar, LLC and National Grid dated April 14, 2021. |
| Omni Cuba Solar, LLC | New York State Standardized Contract for Interconnection of New Distributed Generation Units with Capacity of 5 MW or Less Connected in Parallel with Utility Distribution Systems between Omni Cuba Solar, LLC and National Grid dated August 16, 2022. |

### 2. Storage Agreements

Letter Agreement dated November 2, 2022 between Borrego Energy, LLC and OYA Renewables EquipmentCo LLC.

Warehousing Agreement dated November 8, 2022 by and between OYA Renewables Corp. (f/k/a OYA Solar Corp.) and Fourth Coast Inc., as amended by Amendment to Warehousing Agreement dated November 28, 2023, and assigned to OYA Renewables Yield-1 LLC as of October 18, 2024.

### 3. Warranty Agreements

| Project Entity | Description |
| --- | --- |
| Omni Otto A Solar, LLC | Warranty Certificate # 463000A049W-WN212A issued to OYA Solar MM1 LLC for OYA Solar, C/o Otto A, Xfmr #1/Otto A by Virginia Transformer Corp., warranty commencement date to be determined. |
| | Warranty Certificate # 463000A049W-WN212B issued to OYA Solar MM1 LLC for OYA Solar, C/o Otto A, Xfmr #2/Otto A by |

Virginia Transformer Corp., warranty commencement date to be determined.

General Warranty granted by Power Electronics USA, Inc.

Limited Warranty Statement Photovoltaic Module Products BIKU&BIHIKU Series of Canadian Solar (USA) Inc.

Omni Otto B Solar, LLC    Warranty Certificate # 463000A049W-WN213A issued to OYA Solar MM1 LLC for OYA Solar, C/o Otto B, Xfmr #1/Otto B by Virginia Transformer Corp., warranty commencement date to be determined.

Warranty Certificate # 463000A049W-WN213B issued to OYA Solar MM1 LLC for OYA Solar, C/o Otto B, Xfmr #2/Otto B by Virginia Transformer Corp., warranty commencement date to be determined.

General Warranty granted by Power Electronics USA, Inc.

Limited Warranty Statement Photovoltaic Module Products BIKU&BIHIKU Series of Canadian Solar (USA) Inc.

Omni Otto C Solar, LLC    Warranty Certificate # 463000A049W-WN214A issued to OYA Solar MM1 LLC for OYA Solar, C/o Otto C, Xfmr #1/Otto C by Virginia Transformer Corp. Warranty commencement date to be determined.

Warranty Certificate # 463000A049W-WN214B issued to OYA Solar MM1 LLC for OYA Solar, C/o Otto C, Xfmr #2/Otto C by Virginia Transformer Corp. Warranty commencement date to be determined.

General Warranty granted by Power Electronics USA, Inc.

Limited Warranty Statement Photovoltaic Module Products BIKU&BIHIKU Series of Canadian Solar (USA) Inc.

Omni Cuba Solar, LLC    Warranty Certificate # 463000A049W-WN215A issued to OYA Solar MM1 LLC for OYA Solar, C/o Cuba, Xfmr #1/Cuba by Virginia Transformer Corp. Warranty commencement date to be determined.

Warranty Certificate # 463000A049W-WN215B issued to OYA Solar MM1 LLC for OYA Solar, C/o Cuba, Xfmr #2/Cuba by Virginia Transformer Corp. Warranty commencement date to be determined.

General Warranty granted by Power Electronics USA, Inc.

Limited Warranty Statement Photovoltaic Module Products
BIKU&BIHIKU Series of Canadian Solar (USA) Inc.

## 4. Rebates

| Project Entity | Description |
| --- | --- |
| Omni Otto A Solar, LLC | NYSERDA Award Letter for Omni Otto A Solar, LLC (as payee), for application 0000299953 dated April 8, 2021. |
| | NYSERDA Award Letter for Omni Otto A Solar, LLC (as payee), for application 0000322568 dated January 9, 2023. |
| | VDER Compensation Letter dated August 2, 2021. |
| Omni Otto B Solar, LLC | NYSERDA Award Letter for Omni Otto B Solar, LLC (as payee), for application 0000299984 dated April 8, 2021. |
| | NYSERDA Award Letter for Omni Otto B Solar, LLC (as payee), for application 0000322571 dated January 9, 2023. |
| | VDER Compensation Letter dated June 23, 2021. |
| Omni Otto C Solar, LLC | NYSERDA Award Letter for Omni Otto C Solar, LLC (as payee), for application 0000299996 dated May 14, 2021. |
| | NYSERDA Award Letter for Omni Otto C Solar, LLC (as payee), for application 0000322572 dated January 9, 2023. |
| | VDER Compensation Letter dated August 2, 2021. |
| Omni Cuba Solar, LLC | NYSERDA Award Letter for Omni Cuba Solar, LLC (as payee), for application 0000308327 dated July 7, 2021. |
| | VDER Compensation Letter dated June 23, 2021. |

## 5. PILOTs

| Project Entity | Description |
| --- | --- |
| Omni Otto A Solar, LLC | Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto A Solar, LLC dated March 1, 2023. |
| | Lease to Agency between County of Cattaraugus Industrial Development Agency and Omni Otto A Solar, LLC, dated March 1, 2023. |

|  | Memorandum of Underlying Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto A Solar, LLC dated March 1, 2023, to be recorded. |
|--|--|
|  | Memorandum of Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto A Solar, LLC dated March 1, 2023, to be recorded. |
|  | Section 875 GML Recapture Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto A Solar, LLC dated as of March 1, 2023. |
|  | Uniform Agency Project Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto A Solar, LLC dated as of March 1, 2023. |
| Omni Otto B Solar, LLC | Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto B Solar, LLC dated May 1, 2023. |
|  | Lease to Agency between County of Cattaraugus Industrial Development Agency and Omni Otto B Solar, LLC, dated May 1, 2023. |
|  | Memorandum of Underlying Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto B Solar, LLC dated May 1, 2023, to be recorded. |
|  | Memorandum of Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto B Solar, LLC dated May 1, 2023, to be recorded. |
|  | Section 875 GML Recapture Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto B Solar, LLC dated as of May 1, 2023. |
|  | Uniform Agency Project Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto B Solar, LLC dated as of May 1, 2023. |
| Omni Otto C Solar, LLC | Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto C Solar, LLC dated May 1, 2023. |
|  | Lease to Agency between County of Cattaraugus Industrial Development Agency and Omni Otto C Solar, LLC, dated May 1, 2023. |

|  | Memorandum of Underlying Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto C Solar, LLC dated May 1, 2023, to be recorded. |
|--|--|
|  | Memorandum of Lease Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto C Solar, LLC dated May 1, 2023, to be recorded. |
|  | Section 875 GML Recapture Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto C Solar, LLC dated as of May 1, 2023. |
|  | Uniform Agency Project Agreement between County of Cattaraugus Industrial Development Agency and Omni Otto C Solar, LLC dated as of May 1, 2023. |
| Omni Cuba Solar, LLC | Community Host Benefit Agreement between the Town of Cuba and Omni Cuba Solar, LLC dated February 2, 2022. |
|  | Lease Agreement between Allegany County Industrial Development Agency and Omni Cuba Solar, LLC dated as of October 1, 2022. |
|  | Lease to Agency Agreement between Allegany County Industrial Development Agency and Omni Cuba Solar, LLC dated as of October 1, 2022. |
|  | Memorandum of Underlying Lease by and between Omni Cuba Solar, LLC and Allegany County Industrial Development Agency dated as of October 1, 2022 recorded April 15, 2024 as Instrument #2024-48068. |
|  | Memorandum of Lease Agreement by and between Allegany County Industrial Development Agency and Omni Cuba Solar, LLC dated as of October 1, 2022 and recorded April 12, 2024 as Instrument #2024-48053. |
|  | Payment in Lieu of Tax Agreement between Allegany County Industrial Development Agency and Omni Cuba Solar LLC dated as of October 1, 2022. |
|  | Section 875 GML Recapture Agreement between Allegany County Industrial Development Agency and Omni Cuba Solar LLC dated as of October 1, 2022. |
|  | Uniform Agency Project Agreement between Allegany County Industrial Development Agency and Omni Cuba Solar LLC dated as of October 1, 2022. |

**6.  Real Property Documents**

<u>PART A: LEASES</u>

| <u>Project Entity</u> | <u>Description</u> |
|---|---|
| Omni Otto A Solar, LLC | Land Lease Agreement (Solar Farm) dated March 19, 2021 between Omni Navitas Holdings, LLC and Ronald J. Solem ("Lessor"). |
| | Assignment of Lease dated March 19, 2021 between Omni Navitas Holdings, LLC and Omni Otto A Solar, LLC. |
| | Supplement to Land Lease Agreement dated June 25, 2021 between Omni Otto A Solar, LLC and Lessor. |
| | First Amendment to Land Lease Agreement dated as of February 2, 2022 between Omni Otto A Solar, LLC and Lessor. |
| | Memorandum of Lease between Lessor and Omni Otto A Solar, LLC dated as of February 2, 2022 recorded on December 16, 2022 as Instrument No. 202225852. |
| Omni Otto B Solar, LLC | Land Lease Agreement (Solar Farm) dated March 19, 2021 between Omni Navitas Holdings, LLC and Ronald J. Solem ("Lessor"). |
| | Assignment of Lease dated March 19, 2021 between Omni Navitas Holdings, LLC and Omni Otto B Solar, LLC. |
| | Supplement to Land Lease Agreement dated June 25, 2021 between Omni Otto B Solar, LLC and Lessor. |
| | First Amendment to Land Lease Agreement dated as of February 2, 2022 between Omni Otto B Solar, LLC and Lessor. |
| | Second Amendment to Land Lease Agreement dated as of March 15, 2022 between Omni Otto B Solar, LLC and Lessor. |
| | Memorandum of Lease between Lessor and Omni Otto B Solar, LLC dated as of March 15, 2022 recorded on December 16, 2022 as Instrument No. 202225853. |

| | |
|---|---|
| Omni Otto C Solar, LLC | Land Lease Agreement (Solar Farm) dated March 19, 2021 between Omni Navitas Holdings, LLC and Ronald J. Solem ("Lessor"). |
| | Assignment of Lease dated March 19, 2021 between Omni Navitas Holdings, LLC and Omni Otto C Solar, LLC. |
| | Supplement to Land Lease Agreement dated June 25, 2021 between Omni Otto C Solar, LLC and Lessor. |
| | First Amendment to Land Lease Agreement dated as of February 2, 2022 between Omni Otto C Solar, LLC and Lessor. |
| | Second Amendment to Land Lease Agreement dated as of March 15, 2022 between Omni Otto C Solar, LLC and Lessor. |
| | Memorandum of Lease between Lessor and Omni Otto C Solar, LLC dated as of March 15, 2022 recorded on December 16, 2022 as Instrument No. 202225854. |
| Omni Cuba Solar, LLC | Land Lease Agreement (Solar Farm) dated February 12, 2021 between Omni Navitas Holdings, LLC and Stephen Butchello ("Lessor"). |
| | Assignment of "Project Rights" dated April 12, 2021 between Omni Navitas Holdings, LLC and Omni Cuba Solar, LLC. |
| | Supplement to Land Lease Agreement dated May 28, 2021 between Omni Cuba Solar, LLC and Lessor. |
| | First Amendment to Land Lease Agreement dated as of February 28, 2022 between Omni Cuba Solar, LLC and Lessor. |
| | Second Amendment to Land Lease Agreement dated as of June 30, 2022 between Omni Cuba Solar, LLC and Lessor. |
| | Memorandum of Lease between Omni Cuba Solar, LLC and Lessor dated as of June 30, 2022 recorded on October 20, 2022 as Instrument #2022-29506. |
| | Third Party Beneficiary Agreement between CATIC Title Insurance Company and Omni Cuba Solar LLC dated October 28, 2022. |

PART B: EASEMENTS

Project Entity                                    Description

| Omni Otto B Solar, LLC | Access, Ingress and Utility Easement Agreement dated February 2, 2022 between Ronald J. Solem and Omni Otto B Solar, LLC and recorded December 12, 2022 as Instrument Number 202225579. |
| Omni Otto C Solar, LLC | Access, Ingress and Utility Easement Agreement dated February 2, 2022 between Ronald J. Solem and Omni Otto C Solar, LLC and recorded December 12, 2022 as Instrument Number 202225578. |

### 7. Miscellaneous

| <u>Project Entity</u> | <u>Description</u> |
|---|---|
| Omni Otto A Solar, LLC | Development Agreement with Road Bond between the Town of Otto and Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, and Omni Otto C Solar, LLC dated June 17, 2022. |
| | Encroachment Agreement between National Fuel Gas Distribution Corporation and Omni Otto A Solar, LLC; Omni Otto B Solar, LLC and Omni Otto C Solar, LLC dated April 22, 2022, recorded on June 28, 2022 as Instrument #2022-18391. |
| | Waiver of Surface Rights Agreement between Empire Energy E&P, LLC and Omni Otto A Solar, LLC dated February 28, 2022. |
| | Memorandum of Waiver of Surface Rights between Empire Energy E&P, LLC and Omni Otto A Solar, LLC dated February 28, 2022 and recorded on February 8, 2023 as Instrument #202302499. |
| Omni Otto B Solar, LLC | Development Agreement with Road Bond between the Town of Otto and Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, and Omni Otto C Solar, LLC dated June 17, 2022. |
| | Encroachment Agreement between National Fuel Gas Distribution Corporation and Omni Otto A Solar, LLC; Omni Otto B Solar, LLC and Omni Otto C Solar, LLC dated April 22, 2022, recorded on June 28, 2022 as Instrument #2022-18391. |
| | Waiver of Surface Rights Agreement between Empire Energy E&P, LLC and Omni Otto B Solar, LLC dated February 28, 2022. |
| | Memorandum of Waiver of Surface Rights between Empire Energy E&P, LLC and Omni Otto B Solar, LLC dated February 28, 2022 and recorded on May 10, 2022 as Instrument No. 202215955. |

| | |
|---|---|
| Omni Otto C Solar, LLC | Development Agreement with Road Bond between the Town of Otto and Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, and Omni Otto C Solar, LLC dated June 17, 2022. |
| | Encroachment Agreement between National Fuel Gas Distribution Corporation and Omni Otto A Solar, LLC; Omni Otto B Solar, LLC and Omni Otto C Solar, LLC dated April 22, 2022, recorded on June 28, 2022 as Instrument #2022-18391. |
| | Waiver of Surface Rights Agreement between Empire Energy E&P, LLC and Omni Otto C Solar, LLC dated February 28, 2022. |
| | Memorandum of Waiver of Surface Rights between Empire Energy E&P, LLC and Omni Otto C Solar, LLC dated February 28, 2022 and recorded on May 10, 2022 as Instrument No. 202215975. |
| Omni Cuba Solar, LLC | Road Use Agreement between the Town of Cuba and Omni Cuba Solar, LLC dated October 6, 2022. |
| | Encroachment Agreement between National Fuel Gas Distribution Corporation and Omni Cuba Solar, LLC dated April 22, 2022 and recorded on August 22, 2022 as Instrument #2022-27001. |

## Annex 3.15(a) – ORCH3: Material Contracts

### 1. Interconnection Agreements

| Project Entity | Description |
| --- | --- |
| Omni Burt B Solar, LLC | New York State Standardized Contract for Interconnection of New Distributed Generation Units with Capacity of 5 MW or Less Connected in Parallel with Utility Distribution Systems between Omni Burt B Solar, LLC and National Grid dated June 27, 2022. |
| Omni Burt D Solar, LLC | New York State Standardized Contract for Interconnection of New Distributed Generation Units with Capacity of 5 MW or Less Connected in Parallel with Utility Distribution Systems between Omni Burt D Solar, LLC and National Grid dated June 27, 2022. |
| Omni Dewittville Solar, LLC | New York State Standardized Contract for Interconnection of New Distributed Generation Units with Capacity of 5 MW or Less Connected in Parallel with Utility Distribution Systems between Omni Dewittville Solar, LLC and National Grid dated April 14, 2021. |
| Omni Richland Route 28 North Solar, LLC | New York State Standardized Contract for Interconnection of New Distributed Generation Units with Capacity of 5 MW or Less Connected in Parallel with Utility Distribution Systems between Omni Richland Route 28 North Solar, LLC and National Grid dated May 17, 2022. |

### 2. Rebates

| Project Entity | Description |
| --- | --- |
| Omni Burt B Solar, LLC | NYSERDA Award Letter for Omni Burt B Solar LLC (as payee), for application 482487, contract 190739 dated August 9, 2022. |
| | VDER Compensation Letter dated June 2, 2022. |
| Omni Burt D Solar, LLC | NYSERDA Award Letter for Omni Burt D Solar LLC (as payee), for application 482504, contract 190909 dated August 10, 2022. |
| | VDER Compensation Letter dated June 16, 2022. |
| Omni Dewittville Solar, LLC | NYSERDA Award Letter for Omni Dewittville Solar LLC (as payee), for application 474324, contract 189289 dated July 28, 2022. |
| | VDER Compensation Letter dated August 2, 2021. |
| Omni Richland Route 28 North Solar, LLC | NYSERDA Award Letter for Omni Richland Route 28 North Solar LLC (as payee), for application 474584, contract 189236 dated July 26, 2022. |

**3. PILOTs**

| Project Entity | Description |
| --- | --- |
| Omni Burt B Solar, LLC | Host Community Agreement between the Town of Newfane and Omni Burt B Solar, LLC dated March 13, 2023. |
| Omni Burt D Solar, LLC | Host Community Agreement between the Town of Newfane and Omni Burt D Solar, LLC dated March 13, 2023. |
| Omni Dewittville Solar, LLC | Community Benefit Agreement between the Town of Chautauqua and Omni Dewittville Solar, LLC dated March 14, 2022. |
| | Preliminary Agreement between County of Chautauqua Industrial Development Agency and Omni Dewittville Solar, LLC dated May 25, 2021. |
| | PILOT Approving Resolution between the County of Chautauqua Industrial Development Agency and Omni Dewittville Solar, LLC dated April 26, 2022. |
| Omni Richland Route 28 North Solar, LLC | PILOT Resolution between the County of Oswego Industrial Development Agency and Omni Richland Route 28 North Solar, LLC dated November 22, 2021. |
| | Final Approving Resolution between the County of Oswego Industrial Development Agency and Omni Richland Route 28 North Solar, LLC dated November 22, 2021. |

**4. Real Property Documents**

PART A: LEASES

| Project Entity | Description |
| --- | --- |
| Omni Burt B Solar, LLC | Land Lease Agreement (Solar Farm) dated February 12, 2021 between Omni Navitas Holdings, LLC and Nouryon Functional Chemicals LLC ("Lessor"). |
| | Assignment of Project Rights dated April 12, 2021 between Omni Navitas Holdings, LLC and Omni Burt B Solar, LLC. |
| | Supplement to Land Lease Agreement dated June 8, 2021 between Omni Burt B Solar, LLC and Lessor. |
| | Memorandum of Lease between Lessor and Omni Burt B Solar, LLC dated as of August 16, 2021 recorded on November 30, 2021 as Instrument No. 2021-25366. |
| Omni Burt D Solar, LLC | Land Lease Agreement (Solar Farm) dated February 12, 2021 between Omni Navitas Holdings, LLC and Nouryon Functional Chemicals LLC ("Lessor"). |

Assignment of Project Rights dated April 12, 2021 between Omni Navitas Holdings, LLC and Omni Burt D Solar, LLC.

Supplement to Land Lease Agreement dated June 8, 2021 between Omni Burt D Solar, LLC and Lessor.

Memorandum of Lease between Lessor and Omni Burt D Solar, LLC dated as of August 16, 2021 recorded on December 1, 2021 as Instrument No. 2021-25375.

| | |
|---|---|
| Omni Dewittville Solar, LLC | Land Lease Agreement (Solar Farm) dated December 30, 2020 between Omni Navitas Holdings, LLC and Robert D. Barnes ("Lessor"). |
| | Assignment of Project Rights dated March 1, 2021 between Omni Navitas Holdings, LLC and Omni Dewittville Solar, LLC. |
| | Supplement to Land Lease Agreement dated May 25, 2021 between Omni Dewittville Solar, LLC and Lessor. |
| | First Amendment to Land Lease Agreement dated January 12, 2023 between Omni Dewittville Solar, LLC and Lessor. |
| | Memorandum of Lease between Lessor and Omni Dewittville Solar, LLC dated as of April 29, 2021 recorded on November 29, 2021 as Instrument No. DE2021008176. |
| | Amended Memorandum of Lease dated January 19, 2023, between Lessor and Omni Dewittville Solar, LLC. |
| Omni Richland Route 28 North Solar, LLC | Land Lease Agreement (Solar Farm) dated March 15, 2021 between Omni Navitas Holdings, LLC and Dean D. Nicholson and Toni L. Nicholson ("Lessor"). |
| | Assignment of Project Rights dated April 12, 2021 between Omni Navitas Holdings, LLC and Omni Richland Route 28 North Solar, LLC. |
| | Supplement to Land Lease Agreement dated June 8, 2021 between Omni Richland Route 28 North Solar, LLC and Lessor. |
| | First Amendment to Land Lease Agreement dated January 12, 2023 between Omni Richland Route 28 North Solar, LLC and Lessor. |
| | Memorandum of Lease between Lessor and Omni Richland Route 28 North Solar, LLC dated as of September 23, 2021 recorded on November 1, 2021 as Instrument No. R-2021-012875. |

PART B: EASEMENTS

None.

### 5. Miscellaneous

| Project Entity | Description |
|---|---|
| Omni Dewittville Solar, LLC | Waiver of Surface Rights Agreement dated March 26, 2021 between Empire Energy E&P, LLC and Omni Dewittville Solar, LLC. |
| | Memorandum of Waiver of Surface Rights dated January 21, 2022, between Empire Energy E&P, LLC and Omni Dewittville Solar, LLC. |
| Omni Richland Route 28 North Solar, LLC | Access, Ingress, and Utility Easement Agreement dated November 14, 2022, between Cynthia L. Atkinson and Omni Richland Route 28 North, Solar. |

Final Version

**Annex 3.19(c): Equipment**

| Project | Description |
|---------|-------------|

Omni Otto A Solar

The following inverters from Purchase Order No. 1044, dated as of November 27, 2020, by and between Power Electronics USA, Inc. and OYA Solar Corp., as amended by that Revision 1, dated as of September 26, 2022, as assigned pursuant to that certain Assignment Assumption and Contribution Agreement, dated as of April 3, 2023, by and between OYA Renewables Corp. (successor to OYA Solar Corp.) and Omni Otto A Solar, LLC and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023, by and among Omni Richland North Solar, LLC, Omni Richland South Solar, LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, OYA Ruhlmann A LLC, OYA Ellisburg Solar LLC, Omni Cuba Solar, LLC and OYA Renewables EquipmentCo LLC:

| Serial Numbers |
|---|
| 32538977 |
| 32553730 |

The following modules from Purchase Order #80189 and 80188 dated July 15, 2022 between Canadian Solar (USA) Inc., and Borrego Solar Systems, Inc., as assigned to OYA Solar Corp. pursuant to an Assignment Agreement effective August 30, 2022, and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment Agreement, dated as of November 2, 2022:

|    | Pallet IDs |
|----|------------|
| 1  | 224810407403 |
| 2  | 224810407402 |
| 3  | 224810407391 |
| 4  | 224810407390 |
| 5  | 224810407388 |
| 6  | 224810407371 |
| 7  | 224810408300 |
| 8  | 224810408288 |
| 9  | 224810408263 |
| 10 | 224810407456 |
| 11 | 224810407430 |
| 12 | 224810407427 |
| 13 | 224810408438 |

| 14 | 224810408408 |
| 15 | 224810408394 |
| 16 | 224810408393 |
| 17 | 224810408339 |
| 18 | 224810408302 |
| 19 | 224810408551 |
| 20 | 224810408532 |
| 21 | 224810408505 |
| 22 | 224810408490 |
| 23 | 224810408478 |
| 24 | 224810408439 |
| 25 | 224810407367 |
| 26 | 224810407363 |
| 27 | 224810407349 |
| 28 | 224810407318 |
| 29 | 224810407315 |
| 30 | 224810407284 |
| 31 | 224810407238 |
| 32 | 224810407130 |
| 33 | 224810407066 |
| 34 | 224810407034 |
| 35 | 224810407024 |
| 36 | 224810406998 |
| 37 | 224810406988 |
| 38 | 224810407247 |
| 39 | 224810407258 |
| 40 | 224810407221 |
| 41 | 224810407207 |
| 42 | 224810407192 |
| 43 | 224810407190 |
| 44 | 224810407176 |
| 45 | 224810407143 |
| 46 | 224910403982 |
| 47 | 224910403988 |
| 48 | 224910403993 |
| 49 | 224910403934 |
| 50 | 224910403936 |
| 51 | 224910403940 |
| 52 | 224910403942 |
| 53 | 224910403946 |
| 54 | 224910403951 |
| 55 | 224910404000 |

| 56 | 224910404007 |
| 57 | 224910404284 |
| 58 | 224910403957 |
| 59 | 224910403965 |
| 60 | 224910403966 |
| 61 | 224910404498 |
| 62 | 224910404495 |
| 63 | 224910404492 |
| 64 | 224910404486 |
| 65 | 224810407403 |
| 66 | 224810407402 |
| 67 | 224810407391 |
| 68 | 224810407390 |
| 69 | 224810407388 |
| 70 | 224810407371 |
| 71 | 224810408300 |
| 72 | 224810408288 |
| 73 | 224810408263 |
| 74 | 224810407456 |
| 75 | 224810407430 |
| 76 | 224810407427 |
| 77 | 224810408438 |
| 78 | 224810408408 |
| 79 | 224810408394 |
| 80 | 224810408393 |
| 81 | 224810408339 |
| 82 | 224810408302 |
| 83 | 224810408551 |
| 84 | 224810407403 |
| 85 | 224810407402 |
| 86 | 224810407391 |
| 87 | 224810407390 |
| 88 | 224810407388 |
| 89 | 224810407371 |
| 90 | 224810408300 |
| 91 | 224810408288 |
| 92 | 224810408263 |
| 93 | 224810407456 |
| 94 | 224810407430 |
| 95 | 224810407427 |
| 96 | 224810408438 |
| 97 | 224810408408 |

| 98 | 224810408394 |
| 99 | 224810408393 |
| 100 | 224810408339 |
| 101 | 224810408302 |
| 102 | 224810408551 |
| 103 | 224810408532 |
| 104 | 224810408505 |
| 105 | 224810408490 |
| 106 | 224910502389 |
| 107 | 224910502392 |
| 108 | 224910502398 |
| 109 | 224910502403 |
| 110 | 224910502417 |
| 111 | 224910502093 |
| 112 | 224910502097 |
| 113 | 224910502103 |
| 114 | 224910502340 |
| 115 | 224910502351 |
| 116 | 224910502359 |
| 117 | 224910502049 |
| 118 | 224910502056 |
| 119 | 224910502063 |
| 120 | 224910502070 |
| 121 | 224910502081 |
| 122 | 224910502087 |
| 123 | 224910502008 |
| 124 | 224910502014 |
| 125 | 224910502018 |
| 126 | 224910502024 |
| 127 | 224910703184 |
| 128 | 224910502033 |
| 129 | 224910502036 |
| 130 | 224910501970 |
| 131 | 224910604496 |
| 132 | 224910604502 |
| 133 | 224910604505 |
| 134 | 224910502452 |
| 135 | 224910502455 |
| 136 | 224910502465 |
| 137 | 224910502467 |
| 138 | 224910502473 |
| 139 | 224910502476 |

| 140 | 224910703116 |
| 141 | 224910703135 |
| 142 | 224910703145 |
| 143 | 224910703074 |
| 144 | 224910703080 |
| 145 | 224910703083 |
| 146 | 224910703093 |
| 147 | 224910703096 |
| 148 | 224910703110 |
| 149 | 224910703044 |
| 150 | 224910703048 |
| 151 | 224910703053 |
| 152 | 224910703057 |
| 153 | 224910703063 |
| 154 | 224910703068 |
| 155 | 224910702912 |
| 156 | 224910502366 |
| 157 | 224910702873 |
| 158 | 224910702864 |
| 159 | 224910702860 |
| 160 | 224910702849 |
| 161 | 224910702842 |
| 162 | 224910702839 |
| 163 | 224910702905 |
| 164 | 224910702901 |
| 165 | 224910702893 |
| 166 | 224910702885 |
| 167 | 224910702881 |
| 168 | 224910702879 |
| 169 | 224910703039 |
| 170 | 224910703035 |
| 171 | 224910703033 |
| 172 | 224910702924 |
| 173 | 224910702919 |
| 174 | 224910702474 |
| 175 | 224910702470 |
| 176 | 224910702456 |
| 177 | 224910702493 |
| 178 | 224910702487 |
| 179 | 224910702508 |
| 180 | 224910703153 |
| 181 | 224910702770 |

| | |
|---|---|
| 182 | 224910602128 |
| 183 | 224910602126 |
| 184 | 224910602123 |
| 185 | 224910602179 |
| 186 | 224910602171 |
| 187 | 224910602168 |
| 188 | 224910602157 |
| 189 | 224910602153 |
| 190 | 224910602149 |
| 191 | 224910604370 |
| 192 | 224910604357 |
| 193 | 224910604348 |
| 194 | 224910602189 |
| 195 | 224910602185 |
| 196 | 224910602182 |
| 197 | 224910604428 |
| 198 | 224910604414 |
| 199 | 224910604411 |
| 200 | 224910604395 |
| 201 | 224910604384 |
| 202 | 224910604380 |
| 203 | 224910604454 |
| 204 | 224910604449 |
| 205 | 224910604447 |
| 206 | 224910604442 |
| 207 | 224910604438 |
| 208 | 224910604434 |
| 209 | 224910604470 |
| 210 | 224910604468 |
| 211 | 224910604464 |
| 212 | 224910604463 |
| 213 | 224910604458 |
| 214 | 224910604456 |
| 215 | 224910604493 |
| 216 | 224910604488 |
| 217 | 224910604485 |
| 218 | 224910604479 |
| 219 | 224910604476 |
| 220 | 224910604475 |
| 221 | 224910602144 |
| 222 | 224910602135 |
| 223 | 224910602132 |

| 224 | 224910501981 |
| 225 | 224910501975 |
| 226 | 224810706535 |
| 227 | 224810706495 |
| 228 | 224810706421 |
| 229 | 224810706556 |
| 230 | 224810707216 |
| 231 | 224810707207 |
| 232 | 224810707206 |
| 233 | 224810707337 |
| 234 | 224810707323 |
| 235 | 224810707289 |
| 236 | 224810707265 |
| 237 | 224810707259 |
| 238 | 224810707232 |
| 239 | 224810707662 |
| 240 | 224810707524 |
| 241 | 224810707474 |
| 242 | 224810707433 |
| 243 | 224810707385 |
| 244 | 224810707383 |
| 245 | 224810708318 |
| 246 | 224810708315 |
| 247 | 224810708286 |
| 248 | 224810708275 |
| 249 | 224810708257 |
| 250 | 224810708241 |
| 251 | 224810708590 |
| 252 | 224810708559 |
| 253 | 224810708498 |
| 254 | 224810708415 |
| 255 | 224810708347 |
| 256 | 224810708333 |
| 257 | 224810708652 |
| 258 | 224810708647 |
| 259 | 224810708628 |
| 260 | 224910501927 |
| 261 | 224910501925 |
| 262 | 224910501919 |
| 263 | 224910501968 |
| 264 | 224910501959 |
| 265 | 224910501951 |

| 266 | 224910501938 |
| 267 | 224910501937 |
| 268 | 224910501929 |
| 269 | 224910502003 |
| 270 | 224910501995 |
| 271 | 224910501987 |
| 272 | 224810503075 |
| 273 | 224810503060 |
| 274 | 224810503265 |
| 275 | 224810503249 |
| 276 | 224810503247 |
| 277 | 224810503245 |
| 278 | 224810503244 |
| 279 | 224810503190 |
| 280 | 224810503372 |
| 281 | 224810503349 |
| 282 | 224810503338 |
| 283 | 224810503335 |
| 284 | 224810503319 |
| 285 | 224810503283 |
| 286 | 224810503509 |
| 287 | 224810503502 |
| 288 | 224810503483 |
| 289 | 224810503468 |
| 290 | 224810503445 |
| 291 | 224810503408 |
| 292 | 224810609399 |
| 293 | 224810609380 |
| 294 | 224810609363 |
| 295 | 224810609329 |
| 296 | 224810609293 |
| 297 | 224810609231 |
| 298 | 224810609703 |
| 299 | 224810609652 |
| 300 | 224810609580 |
| 301 | 224810609490 |
| 302 | 224810609481 |
| 303 | 224810609429 |
| 304 | 224810610074 |
| 305 | 224810609938 |
| 306 | 224810609896 |
| 307 | 224810609860 |

| 308 | 224810609826 |
| 309 | 224810609740 |
| 310 | 224810610296 |
| 311 | 224810610250 |
| 312 | 224810610239 |
| 313 | 224810610226 |
| 314 | 224810610194 |
| 315 | 224810610129 |
| 316 | 224810610498 |
| 317 | 224810610473 |
| 318 | 224810610458 |
| 319 | 224810610393 |
| 320 | 224810610330 |
| 321 | 224810610307 |
| 322 | 224810503037 |
| 323 | 224810503034 |
| 324 | 224810503024 |
| 325 | 224810503010 |
| 326 | 224810502986 |
| 327 | 224810502903 |
| 328 | 224810705452 |
| 329 | 224810705439 |
| 330 | 224810705601 |
| 331 | 224810705685 |
| 332 | 224810706338 |
| 333 | 224810503187 |
| 334 | 224810503160 |
| 335 | 224810503123 |
| 336 | 224810503106 |

The following transformers from Purchase Order No. 1837, dated October 5, 2022, by and between Virginia Transformer Corp. and Omni Otto A Solar, LLC, as assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023, by and among Omni Richland North Solar, LLC, Omni Richland South Solar, LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, OYA Ruhlmann A LLC, OYA Ellisburg Solar LLC, Omni Cuba Solar, LLC and OYA Renewables EquipmentCo LLC:

| VT JOB | Serial Numbers |
|--------|----------------|
| WN212A | 463000A049W-WN212A |
| WN212B | 462000A037W-WN212B |

Omni Otto B Solar

The following inverters from Purchase Order No. 1044, dated as of November 27, 2020, by and between Power Electronics USA, Inc. and OYA Solar Corp., as amended by that Revision 1, dated as of September 26, 2022, as assigned pursuant to that certain Assignment Assumption and Contribution Agreement, dated as of April 3, 2023, by and between OYA Renewables Corp. (successor to OYA Solar Corp.) and Omni Otto B Solar, LLC and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023, by and among Omni Richland North Solar, LLC, Omni Richland South Solar, LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, OYA Ruhlmann A LLC, OYA Ellisburg Solar LLC, Omni Cuba Solar, LLC and OYA Renewables EquipmentCo LLC:

| Serial Numbers |
|----------------|
| 32542801 |
| 32552470 |

The following modules from Purchase Order #80189 and 80188 dated July 15, 2022 between Canadian Solar (USA) Inc., and Borrego Solar Systems, Inc., as assigned to OYA Solar Corp. pursuant to an Assignment Agreement effective August 30, 2022, and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment Agreement, dated as of November 2, 2022:

|    | Pallet IDs |
|----|------------|
| 1  | 224910501487 |
| 2  | 224910501494 |
| 3  | 224910501497 |
| 4  | 224910501503 |
| 5  | 224910501508 |
| 6  | 224910501509 |
| 7  | 224910501456 |
| 8  | 224910501463 |
| 9  | 224910501468 |
| 10 | 224910501473 |
| 11 | 224910501478 |
| 12 | 224910501483 |

| 13 | 224910602104 |
|----|--------------|
| 14 | 224910602111 |
| 15 | 224810510081 |
| 16 | 224910602076 |
| 17 | 224910602079 |
| 18 | 224910602086 |
| 19 | 224910602087 |
| 20 | 224910602095 |
| 21 | 224910602101 |
| 22 | 224910602044 |
| 23 | 224910601921 |
| 24 | 224910502669 |
| 25 | 224910502625 |
| 26 | 224910502568 |
| 27 | 224910501526 |
| 28 | 224910501516 |
| 29 | 224910601960 |
| 30 | 224910601955 |
| 31 | 224910601951 |
| 32 | 224910601945 |
| 33 | 224910601937 |
| 34 | 224910601933 |
| 35 | 224910601992 |
| 36 | 224910601986 |
| 37 | 224910601983 |
| 38 | 224910601981 |
| 39 | 224910601976 |
| 40 | 224910601975 |
| 41 | 224910602016 |
| 42 | 224910602013 |
| 43 | 224910602005 |
| 44 | 224910602001 |
| 45 | 224910601998 |
| 46 | 224910601993 |
| 47 | 224910602042 |
| 48 | 224910602041 |
| 49 | 224910602037 |
| 50 | 224910602033 |
| 51 | 224910602025 |
| 52 | 224910602022 |
| 53 | 224910602068 |
| 54 | 224910602062 |

| 55 | 224910602051 |
| 56 | 224910602050 |
| 57 | 224910602045 |
| 58 | 224910703212 |
| 59 | 224910703214 |
| 60 | 224910703216 |
| 61 | 224910703217 |
| 62 | 224910703219 |
| 63 | 224910703183 |
| 64 | 224910703192 |
| 65 | 224910703204 |
| 66 | 224910703206 |
| 67 | 224910703221 |
| 68 | 224910703223 |
| 69 | 224910703225 |
| 70 | 224910703228 |
| 71 | 224910703229 |
| 72 | 224910702452 |
| 73 | 224910702404 |
| 74 | 224910702409 |
| 75 | 224910702415 |
| 76 | 224910702421 |
| 77 | 224910702427 |
| 78 | 224910702430 |
| 79 | 224910600673 |
| 80 | 224910600669 |
| 81 | 224910600668 |
| 82 | 224910600665 |
| 83 | 224910600664 |
| 84 | 224910600660 |
| 85 | 224910600697 |
| 86 | 224910600693 |
| 87 | 224910600684 |
| 88 | 224910600682 |
| 89 | 224910600677 |
| 90 | 224910600676 |
| 91 | 224910600717 |
| 92 | 224910600714 |
| 93 | 224910600710 |
| 94 | 224910600708 |
| 95 | 224910600703 |
| 96 | 224910600699 |

| 97 | 224910600734 |
| 98 | 224910600731 |
| 99 | 224910600727 |
| 100 | 224910600725 |
| 101 | 224910703124 |
| 102 | 224910703148 |
| 103 | 224910703151 |
| 104 | 224910703230 |
| 105 | 224910703209 |
| 106 | 224910702812 |
| 107 | 224910702808 |
| 108 | 224910702451 |
| 109 | 224910702446 |
| 110 | 224910702442 |
| 111 | 224910702439 |
| 112 | 224910702433 |
| 113 | 224910702477 |
| 114 | 224910702462 |
| 115 | 224910702460 |
| 116 | 224910702492 |
| 117 | 224910702489 |
| 118 | 224910702482 |
| 119 | 224910702479 |
| 120 | 224910702521 |
| 121 | 224910702520 |
| 122 | 224910702514 |
| 123 | 224910702503 |
| 124 | 224910703179 |
| 125 | 224910703177 |
| 126 | 224910703173 |
| 127 | 224910703166 |
| 128 | 224910703162 |
| 129 | 224910703208 |
| 130 | 224910702651 |
| 131 | 224910702688 |
| 132 | 224910702686 |
| 133 | 224910702681 |
| 134 | 224910702679 |
| 135 | 224910702674 |
| 136 | 224910702671 |
| 137 | 224910702718 |
| 138 | 224910702714 |

| | |
|---|---|
| 139 | 224910702705 |
| 140 | 224910702699 |
| 141 | 224910702694 |
| 142 | 224910702690 |
| 143 | 224910702745 |
| 144 | 224910702740 |
| 145 | 224910702736 |
| 146 | 224910702732 |
| 147 | 224910702729 |
| 148 | 224910702723 |
| 149 | 224910702786 |
| 150 | 224910702784 |
| 151 | 224910702780 |
| 152 | 224910702758 |
| 153 | 224910702749 |
| 154 | 224910702804 |
| 155 | 224910702801 |
| 156 | 224910702798 |
| 157 | 224910702795 |
| 158 | 224910702793 |
| 159 | 224910702789 |
| 160 | 224910702834 |
| 161 | 224910702830 |
| 162 | 224910702824 |
| 163 | 224910702819 |
| 164 | 224910702400 |
| 165 | 224910702391 |
| 166 | 224910702388 |
| 167 | 224910702498 |
| 168 | 224910702546 |
| 169 | 224910702542 |
| 170 | 224910702541 |
| 171 | 224910702538 |
| 172 | 224910702533 |
| 173 | 224910702525 |
| 174 | 224910702570 |
| 175 | 224910702566 |
| 176 | 224910702563 |
| 177 | 224910702557 |
| 178 | 224910702553 |
| 179 | 224910702550 |
| 180 | 224910702601 |

| 181 | 224910702599 |
| 182 | 224910702596 |
| 183 | 224910702587 |
| 184 | 224910702583 |
| 185 | 224910702577 |
| 186 | 224910702625 |
| 187 | 224910702620 |
| 188 | 224910702613 |
| 189 | 224910702611 |
| 190 | 224910702607 |
| 191 | 224910702604 |
| 192 | 224910702649 |
| 193 | 224910702647 |
| 194 | 224910702645 |
| 195 | 224910702640 |
| 196 | 224910702635 |
| 197 | 224910702630 |
| 198 | 224910702669 |
| 199 | 224910702664 |
| 200 | 224910702661 |
| 201 | 224910702659 |
| 202 | 224910702656 |
| 203 | 224910600741 |
| 204 | 224910600739 |
| 205 | 224910600735 |
| 206 | 224810706306 |
| 207 | 224810706276 |
| 208 | 224810706272 |
| 209 | 224810706555 |
| 210 | 224810706440 |
| 211 | 224810706384 |
| 212 | 224810706671 |
| 213 | 224810706647 |
| 214 | 224810706616 |
| 215 | 224810706584 |
| 216 | 224810706567 |
| 217 | 224810706751 |
| 218 | 224810706732 |
| 219 | 224810706729 |
| 220 | 224810706703 |
| 221 | 224810706688 |
| 222 | 224810706677 |

| | |
|---|---|
| 223 | 224810706892 |
| 224 | 224810706877 |
| 225 | 224810706857 |
| 226 | 224810706830 |
| 227 | 224810706793 |
| 228 | 224810706774 |
| 229 | 224810707037 |
| 230 | 224810707016 |
| 231 | 224810706961 |
| 232 | 224810706937 |
| 233 | 224810706928 |
| 234 | 224810706910 |
| 235 | 224810707155 |
| 236 | 224810707138 |
| 237 | 224810707122 |
| 238 | 224810707115 |
| 239 | 224810707108 |
| 240 | 224810707050 |
| 241 | 224810707203 |
| 242 | 224810707199 |
| 243 | 224810707165 |
| 244 | 224810705133 |
| 245 | 224910600723 |
| 246 | 224910600720 |
| 247 | 224910600757 |
| 248 | 224910600754 |
| 249 | 224910600745 |
| 250 | 224910404705 |
| 251 | 224910404696 |
| 252 | 224910404687 |
| 253 | 224910404733 |
| 254 | 224910404724 |
| 255 | 224910404719 |
| 256 | 224910404717 |
| 257 | 224910404715 |
| 258 | 224910404711 |
| 259 | 224910404753 |
| 260 | 224910404752 |
| 261 | 224910404746 |
| 262 | 224910404744 |
| 263 | 224910404739 |
| 264 | 224910404734 |

| | |
|---|---|
| 265 | 224910404774 |
| 266 | 224910404770 |
| 267 | 224910404767 |
| 268 | 224910404764 |
| 269 | 224910404761 |
| 270 | 224910404758 |
| 271 | 224910404795 |
| 272 | 224910404794 |
| 273 | 224910404789 |
| 274 | 224910404784 |
| 275 | 224910404783 |
| 276 | 224910404778 |
| 277 | 224910404808 |
| 278 | 224910404806 |
| 279 | 224910404802 |
| 280 | 224810705224 |
| 281 | 224810705209 |
| 282 | 224810705183 |
| 283 | 224810705156 |
| 284 | 224810705134 |
| 285 | 224810705335 |
| 286 | 224810705313 |
| 287 | 224810705311 |
| 288 | 224810705296 |
| 289 | 224810705249 |
| 290 | 224810705231 |
| 291 | 224810705409 |
| 292 | 224810705402 |
| 293 | 224810705378 |
| 294 | 224810705377 |
| 295 | 224810705373 |
| 296 | 224810705348 |
| 297 | 224810705528 |
| 298 | 224810705505 |
| 299 | 224810705485 |
| 300 | 224810705416 |
| 301 | 224810705670 |
| 302 | 224810705667 |
| 303 | 224810705628 |
| 304 | 224810705615 |
| 305 | 224810705614 |
| 306 | 224810705781 |

| | |
|------|-------------|
| 307 | 224810705771 |
| 308 | 224810705759 |
| 309 | 224810705732 |
| 310 | 224810705731 |
| 311 | 224810705883 |
| 312 | 224810705843 |
| 313 | 224810705834 |
| 314 | 224810705833 |
| 315 | 224810705812 |
| 316 | 224810705808 |
| 317 | 224810706037 |
| 318 | 224810706014 |
| 319 | 224810705994 |
| 320 | 224810705968 |
| 321 | 224810705961 |
| 322 | 224810705918 |
| 323 | 224810706138 |
| 324 | 224810706136 |
| 325 | 224810706107 |
| 326 | 224810706085 |
| 327 | 224810706069 |
| 328 | 224810706047 |
| 329 | 224810706246 |
| 330 | 224810706228 |
| 331 | 224810706220 |
| 332 | 224810706197 |
| 333 | 224810706191 |
| 334 | 224810706179 |
| 335 | 224810706353 |
| 336 | 224810706327 |

The following transformers from Purchase Order No. 1836, dated October 5, 2022, by and between Virginia Transformer Corp. and Omni Otto B Solar, LLC, as assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023, by and among Omni Richland North Solar, LLC, Omni Richland South Solar, LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, OYA Ruhlmann A LLC, OYA Ellisburg Solar LLC, Omni Cuba Solar, LLC and OYA Renewables EquipmentCo LLC:

| VT JOB | Serial Numbers |
|--------|----------------|
| WN213A | 463000A049W-WN213A |
| WN213B | 462000A037W-WN213B |

Omni Otto C
Solar

The following inverters from Purchase Order No. 1044, dated as of November 27, 2020, by and between Power Electronics USA, Inc. and OYA Solar Corp., as amended by that Revision 1, dated as of September 26, 2022, as assigned pursuant to that certain Assignment Assumption and Contribution Agreement, dated as of April 3, 2023, by and between OYA Renewables Corp. (successor to OYA Solar Corp.) and Omni Otto C Solar, LLC and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023, by and among Omni Richland North Solar, LLC, Omni Richland South Solar, LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, OYA Ruhlmann A LLC, OYA Ellisburg Solar LLC, Omni Cuba Solar, LLC and OYA Renewables EquipmentCo LLC:

| Serial Numbers |
|----------------|
| 32542805 |
| 32552469 |

The following modules from Purchase Order #80189 dated July 15, 2022 between Canadian Solar (USA) Inc., and Borrego Solar Systems, Inc., as assigned to OYA Solar Corp. pursuant to an Assignment Agreement effective August 30, 2022, and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment Agreement, dated as of November 2, 2022:

|    | Pallet IDs |
|----|------------|
| 1  | 224810602201 |
| 2  | 224810602224 |
| 3  | 224810602226 |
| 4  | 224810602228 |
| 5  | 224810602249 |
| 6  | 224810602261 |
| 7  | 224810510256 |
| 8  | 224910506643 |
| 9  | 224910506646 |
| 10 | 224910506653 |
| 11 | 224810510314 |

| 12 | 224810510246 |
|----|--------------|
| 13 | 224810510307 |
| 14 | 224910506603 |
| 15 | 224910506610 |
| 16 | 224910506622 |
| 17 | 224910506625 |
| 18 | 224910506626 |
| 19 | 224810602442 |
| 20 | 224810602440 |
| 21 | 224810602413 |
| 22 | 224810602352 |
| 23 | 224810602318 |
| 24 | 224810602271 |
| 25 | 224810602812 |
| 26 | 224810602811 |
| 27 | 224810602799 |
| 28 | 224810602488 |
| 29 | 224810602475 |
| 30 | 224810602450 |
| 31 | 224810602866 |
| 32 | 224810602865 |
| 33 | 224810602851 |
| 34 | 224810602845 |
| 35 | 224810602839 |
| 36 | 224810602821 |
| 37 | 224910506634 |
| 38 | 224910506564 |
| 39 | 224910506565 |
| 40 | 224910506571 |
| 41 | 224910506577 |
| 42 | 224910506595 |
| 43 | 224910506602 |
| 44 | 224810602886 |
| 45 | 224810602888 |
| 46 | 224810602902 |
| 47 | 224810602918 |
| 48 | 224810602970 |
| 49 | 224810602996 |
| 50 | 224910506471 |
| 51 | 224910506463 |
| 52 | 224910506460 |
| 53 | 224910506519 |

| 54 | 224910506512 |
| 55 | 224910506503 |
| 56 | 224910506496 |
| 57 | 224910506486 |
| 58 | 224910506476 |
| 59 | 224910506549 |
| 60 | 224910506544 |
| 61 | 224910506538 |
| 62 | 224910506531 |
| 63 | 224910506530 |
| 64 | 224910506525 |
| 65 | 224810604906 |
| 66 | 224810604937 |
| 67 | 224810604160 |
| 68 | 224810604175 |
| 69 | 224810604181 |
| 70 | 224810604205 |
| 71 | 224810604211 |
| 72 | 224810604069 |
| 73 | 224810604081 |
| 74 | 224810604105 |
| 75 | 224810604130 |
| 76 | 224810604139 |
| 77 | 224810604146 |
| 78 | 224810505333 |
| 79 | 224810505337 |
| 80 | 224810505345 |
| 81 | 224810505355 |
| 82 | 224810604057 |
| 83 | 224810604058 |
| 84 | 224810505214 |
| 85 | 224810505236 |
| 86 | 224810505245 |
| 87 | 224810604148 |
| 88 | 224810502628 |
| 89 | 224810502661 |
| 90 | 224810502725 |
| 91 | 224810502771 |
| 92 | 224810502812 |
| 93 | 224810502814 |
| 94 | 224910601821 |
| 95 | 224910601824 |

| 96 | 224910601827 |
| 97 | 224910601799 |
| 98 | 224910601801 |
| 99 | 224910601804 |
| 100 | 224910601812 |
| 101 | 224910601815 |
| 102 | 224910601819 |
| 103 | 224910601781 |
| 104 | 224910601783 |
| 105 | 224910601787 |
| 106 | 224910601789 |
| 107 | 224910601794 |
| 108 | 224910601795 |
| 109 | 224910507334 |
| 110 | 224910507338 |
| 111 | 224910507342 |
| 112 | 224910507346 |
| 113 | 224910507354 |
| 114 | 224910507356 |
| 115 | 224910507306 |
| 116 | 224910507312 |
| 117 | 224910507315 |
| 118 | 224910507319 |
| 119 | 224910507327 |
| 120 | 224910507332 |
| 121 | 224910503049 |
| 122 | 224910503054 |
| 123 | 224910503059 |
| 124 | 224910507291 |
| 125 | 224810604724 |
| 126 | 224810604698 |
| 127 | 224810604690 |
| 128 | 224810604681 |
| 129 | 224810604679 |
| 130 | 224810604276 |
| 131 | 224810604879 |
| 132 | 224810604849 |
| 133 | 224810604831 |
| 134 | 224810604809 |
| 135 | 224810604778 |
| 136 | 224810604725 |
| 137 | 224910500683 |

| 138 | 224910500677 |
|-----|--------------|
| 139 | 224910500673 |
| 140 | 224810604984 |
| 141 | 224810505291 |
| 142 | 224810505319 |
| 143 | 224810505329 |
| 144 | 224810502835 |
| 145 | 224810505148 |
| 146 | 224810505161 |
| 147 | 224810505179 |
| 148 | 224810505196 |
| 149 | 224810505200 |
| 150 | 224910507298 |
| 151 | 224910507305 |
| 152 | 224910503007 |
| 153 | 224910503017 |
| 154 | 224910503025 |
| 155 | 224910503027 |
| 156 | 224910503030 |
| 157 | 224910503038 |
| 158 | 224910502974 |
| 159 | 224910502979 |
| 160 | 224910502981 |
| 161 | 224910502994 |
| 162 | 224910502998 |
| 163 | 224910502999 |
| 164 | 224910502739 |
| 165 | 224910502745 |
| 166 | 224910502750 |
| 167 | 224910502758 |
| 168 | 224910502763 |
| 169 | 224910502767 |
| 170 | 224910502707 |
| 171 | 224910502715 |
| 172 | 224910502717 |
| 173 | 224910502730 |
| 174 | 224910502731 |
| 175 | 224910502737 |
| 176 | 224910502552 |
| 177 | 224910502555 |
| 178 | 224910502561 |
| 179 | 224910502678 |

| 180 | 224910502701 |
| 181 | 224910502705 |
| 182 | 224910502514 |
| 183 | 224910502521 |
| 184 | 224910502523 |
| 185 | 224910502531 |
| 186 | 224910502538 |
| 187 | 224910502543 |
| 188 | 224910502480 |
| 189 | 224910502492 |
| 190 | 224910502493 |
| 191 | 224910502500 |
| 192 | 224910502508 |
| 193 | 224910502509 |
| 194 | 224910500714 |
| 195 | 224910500718 |
| 196 | 224910500726 |
| 197 | 224910500712 |
| 198 | 224910500707 |
| 199 | 224910500701 |
| 200 | 224910500696 |
| 201 | 224910500692 |
| 202 | 224910500689 |
| 203 | 224910500736 |
| 204 | 224910500731 |
| 205 | 224910500727 |
| 206 | 224910403615 |
| 207 | 224910403628 |
| 208 | 224910403635 |
| 209 | 224910403643 |
| 210 | 224910403650 |
| 211 | 224910403585 |
| 212 | 224910403589 |
| 213 | 224910403590 |
| 214 | 224910403593 |
| 215 | 224910403596 |
| 216 | 224910403603 |
| 217 | 224910403325 |
| 218 | 224910403341 |
| 219 | 224910403342 |
| 220 | 224910403349 |
| 221 | 224910403604 |

| 222 | 224910403838 |
|-----|--------------|
| 223 | 224910403829 |
| 224 | 224910403800 |
| 225 | 224910403772 |
| 226 | 224910403769 |
| 227 | 224910403663 |
| 228 | 224910404552 |
| 229 | 224910404543 |
| 230 | 224910403863 |
| 231 | 224910403858 |
| 232 | 224910403847 |
| 233 | 224910403846 |
| 234 | 224910504275 |
| 235 | 224910504273 |
| 236 | 224910403576 |
| 237 | 224910403579 |
| 238 | 224910403274 |
| 239 | 224910403275 |
| 240 | 224910403295 |
| 241 | 224910403307 |
| 242 | 224910403312 |
| 243 | 224910403318 |
| 244 | 224810509494 |
| 245 | 224910403239 |
| 246 | 224910403245 |
| 247 | 224910403248 |
| 248 | 224910403254 |
| 249 | 224910403264 |
| 250 | 224810506605 |
| 251 | 224810506617 |
| 252 | 224810506645 |
| 253 | 224810506657 |
| 254 | 224810506686 |
| 255 | 224810405795 |
| 256 | 224810405817 |
| 257 | 224810405826 |
| 258 | 224810405835 |
| 259 | 224810405837 |
| 260 | 224810405873 |
| 261 | 224910504316 |
| 262 | 224910504323 |
| 263 | 224910504327 |

| 264 | 224910504335 |
| 265 | 224910504343 |
| 266 | 224910504281 |
| 267 | 224810406002 |
| 268 | 224810405967 |
| 269 | 224810405966 |
| 270 | 224810506690 |
| 271 | 224810506485 |
| 272 | 224810506493 |
| 273 | 224810506502 |
| 274 | 224810506527 |
| 275 | 224810506548 |
| 276 | 224810506581 |
| 277 | 224810406810 |
| 278 | 224810406811 |
| 279 | 224810406818 |
| 280 | 224810506460 |
| 281 | 224810506461 |
| 282 | 224810506470 |
| 283 | 224810406709 |
| 284 | 224810406716 |
| 285 | 224810406753 |
| 286 | 224810406761 |
| 287 | 224810406798 |
| 288 | 224810406801 |
| 289 | 224810406596 |
| 290 | 224810406613 |
| 291 | 224810406635 |
| 292 | 224810406648 |
| 293 | 224810406666 |
| 294 | 224810406667 |
| 295 | 224810406486 |
| 296 | 224810406524 |
| 297 | 224810406532 |
| 298 | 224810406546 |
| 299 | 224810406550 |
| 300 | 224810406562 |
| 301 | 224810406315 |
| 302 | 224910504269 |
| 303 | 224910504251 |
| 304 | 224910404588 |
| 305 | 224910404577 |

| 306 | 224910504310 |
| 307 | 224910504304 |
| 308 | 224910504296 |
| 309 | 224910504291 |
| 310 | 224910504289 |
| 311 | 224810405949 |
| 312 | 224810405948 |
| 313 | 224810405874 |
| 314 | 224810406079 |
| 315 | 224810406062 |
| 316 | 224810406031 |
| 317 | 224810406023 |
| 318 | 224810406022 |
| 319 | 224810406003 |
| 320 | 224810406162 |
| 321 | 224810406133 |
| 322 | 224810406132 |
| 323 | 224810406103 |
| 324 | 224810406101 |
| 325 | 224810406083 |
| 326 | 224810406295 |
| 327 | 224810406289 |
| 328 | 224810406256 |
| 329 | 224810406230 |
| 330 | 224810406223 |
| 331 | 224810406183 |
| 332 | 224810406451 |
| 333 | 224810406427 |
| 334 | 224810406401 |
| 335 | 224810406381 |
| 336 | 224810406346 |

The following transformers from Purchase Order No. 1835, dated October 5, 2022, by and between Virginia Transformer Corp. and Omni Otto C Solar, LLC, as assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023, by and among Omni Richland North Solar, LLC, Omni Richland South Solar, LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, OYA Ruhlmann A LLC, OYA Ellisburg Solar LLC, Omni Cuba Solar, LLC and OYA Renewables EquipmentCo LLC:

| VT JOB | Serial Number |
|--------|---------------|
| WN214A | 463000A049W-WN214A |
| WN214B | 462000A037W-WN214B |

Omni Cuba Solar

The following inverters from Purchase Order No. 1044, dated as of November 27, 2020, by and between Power Electronics USA, Inc. and OYA Solar Corp., as assigned pursuant to that certain Assignment Assumption and Contribution Agreement, dated as of April 12, 2021, by and between OYA Solar Corp. and Omni Cuba Solar, LLC and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023, by and among Omni Richland North Solar, LLC, Omni Richland South Solar, LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, OYA Ruhlmann A LLC, OYA Ellisburg Solar LLC, Omni Cuba Solar, LLC and OYA Renewables EquipmentCo LLC:

| Serial Numbers |
|----------------|
| 32542803 |
| 32552471 |

The following modules from Purchase Order #80189 and 80188 dated July 15, 2022 between Canadian Solar (USA) Inc., and Borrego Solar Systems, Inc., as assigned to OYA Solar Corp. pursuant to an Assignment Agreement effective August 30, 2022, and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment Agreement, dated as of November 2, 2022:

|    | Pallet IDs |
|----|------------|
| 1  | 224810510264 |
| 2  | 224810510276 |
| 3  | 224810510286 |
| 4  | 224810510304 |
| 5  | 224810510225 |
| 6  | 224810510187 |
| 7  | 224810510167 |
| 8  | 224810510080 |
| 9  | 224810510097 |
| 10 | 224810510131 |
| 11 | 224910404522 |

| | |
|---|---|
| 12 | 224910403905 |
| 13 | 224910403909 |
| 14 | 224910403914 |
| 15 | 224910403919 |
| 16 | 224910403922 |
| 17 | 224910403932 |
| 18 | 224910403883 |
| 19 | 224910403889 |
| 20 | 224910403890 |
| 21 | 224910403897 |
| 22 | 224910403898 |
| 23 | 224910403903 |
| 24 | 224910403788 |
| 25 | 224910403810 |
| 26 | 224910403821 |
| 27 | 224910403873 |
| 28 | 224910403875 |
| 29 | 224910403877 |
| 30 | 224910403474 |
| 31 | 224910403477 |
| 32 | 224910403480 |
| 33 | 224910403765 |
| 34 | 224910403778 |
| 35 | 224910403783 |
| 36 | 224910403443 |
| 37 | 224910403444 |
| 38 | 224910403447 |
| 39 | 224910403455 |
| 40 | 224910403463 |
| 41 | 224910403469 |
| 42 | 224910404520 |
| 43 | 224910404519 |
| 44 | 224910404518 |
| 45 | 224910404515 |
| 46 | 224910404507 |
| 47 | 224910404533 |
| 48 | 224910404531 |
| 49 | 224910404530 |
| 50 | 224910404529 |
| 51 | 224910404527 |
| 52 | 224910404526 |
| 53 | 224910404583 |

| 54 | 224910404576 |
|----|--------------|
| 55 | 224910404558 |
| 56 | 224910404540 |
| 57 | 224910404538 |
| 58 | 224810407974 |
| 59 | 224810407962 |
| 60 | 224810407938 |
| 61 | 224810407937 |
| 62 | 224810407895 |
| 63 | 224810407893 |
| 64 | 224810601769 |
| 65 | 224810601765 |
| 66 | 224810601745 |
| 67 | 224810407999 |
| 68 | 224810407982 |
| 69 | 224810407980 |
| 70 | 224810601847 |
| 71 | 224810601846 |
| 72 | 224810601809 |
| 73 | 224810601793 |
| 74 | 224810601771 |
| 75 | 224810601770 |
| 76 | 224810601912 |
| 77 | 224910404535 |
| 78 | 224910504362 |
| 79 | 224910504357 |
| 80 | 224910504350 |
| 81 | 224910404598 |
| 82 | 224910404595 |
| 83 | 224910404591 |
| 84 | 224910504399 |
| 85 | 224910504393 |
| 86 | 224910504392 |
| 87 | 224910504381 |
| 88 | 224910504371 |
| 89 | 224910504367 |
| 90 | 224910504433 |
| 91 | 224910504432 |
| 92 | 224910504426 |
| 93 | 224910504418 |
| 94 | 224910504413 |
| 95 | 224910504407 |

| 96 | 224910506003 |
|---|---|
| 97 | 224910506001 |
| 98 | 224910506000 |
| 99 | 224910505991 |
| 100 | 224910505975 |
| 101 | 224910505969 |
| 102 | 224910506026 |
| 103 | 224910506021 |
| 104 | 224910506020 |
| 105 | 224910506009 |
| 106 | 224910506008 |
| 107 | 224910506007 |
| 108 | 224910506930 |
| 109 | 224910506925 |
| 110 | 224910506917 |
| 111 | 224910506041 |
| 112 | 224910506036 |
| 113 | 224910506033 |
| 114 | 224910506963 |
| 115 | 224910506957 |
| 116 | 224910506951 |
| 117 | 224910506946 |
| 118 | 224910506942 |
| 119 | 224910506935 |
| 120 | 224910506993 |
| 121 | 224910506987 |
| 122 | 224910506986 |
| 123 | 224910506982 |
| 124 | 224910506977 |
| 125 | 224910506971 |
| 126 | 224810407882 |
| 127 | 224810407881 |
| 128 | 224810407870 |
| 129 | 224810407850 |
| 130 | 224810407832 |
| 131 | 224810407811 |
| 132 | 224810601895 |
| 133 | 224810601886 |
| 134 | 224810601863 |
| 135 | 224810601858 |
| 136 | 224810601852 |
| 137 | 224910403432 |

| | |
|---|---|
| 138 | 224910403431 |
| 139 | 224910403430 |
| 140 | 224910403429 |
| 141 | 224910403426 |
| 142 | 224910403423 |
| 143 | 224910501615 |
| 144 | 224910501539 |
| 145 | 224910506333 |
| 146 | 224910506416 |
| 147 | 224910506410 |
| 148 | 224910506394 |
| 149 | 224910506448 |
| 150 | 224910506414 |
| 151 | 224910501553 |
| 152 | 224910501649 |
| 153 | 224910501568 |
| 154 | 224910501545 |
| 155 | 224910501646 |
| 156 | 224910501621 |
| 157 | 224910501559 |
| 158 | 224910501659 |
| 159 | 224810602705 |
| 160 | 224910501606 |
| 161 | 224810602640 |
| 162 | 224810602743 |
| 163 | 224910501589 |
| 164 | 224810602673 |
| 165 | 224910506442 |
| 166 | 224910506339 |
| 167 | 224910506350 |
| 168 | 224910506431 |
| 169 | 224910506356 |
| 170 | 224910506381 |
| 171 | 224810602606 |
| 172 | 224910506422 |
| 173 | 224910506440 |
| 174 | 224810602753 |
| 175 | 224810602505 |
| 176 | 224910506368 |
| 177 | 224810602628 |
| 178 | 224810602766 |
| 179 | 224810602621 |

| | |
|---|---|
| 180 | 224810602663 |
| 181 | 224810602590 |
| 182 | 224810602712 |
| 183 | 224910501632 |
| 184 | 224810602619 |
| 185 | 224810602680 |
| 186 | 224910501652 |
| 187 | 224910501636 |
| 188 | 224910600469 |
| 189 | 224910600476 |
| 190 | 224910600480 |
| 191 | 224910600482 |
| 192 | 224910502643 |
| 193 | 224910600466 |
| 194 | 224910600462 |
| 195 | 224910600503 |
| 196 | 224910600500 |
| 197 | 224910600493 |
| 198 | 224910600491 |
| 199 | 224910600490 |
| 200 | 224910600488 |
| 201 | 224910600531 |
| 202 | 224910502671 |
| 203 | 224910601178 |
| 204 | 224910601183 |
| 205 | 224910601116 |
| 206 | 224910601137 |
| 207 | 224910601138 |
| 208 | 224910601139 |
| 209 | 224910601151 |
| 210 | 224910601152 |
| 211 | 224910600637 |
| 212 | 224910600641 |
| 213 | 224910600646 |
| 214 | 224910600647 |
| 215 | 224910600653 |
| 216 | 224910600655 |
| 217 | 224910600619 |
| 218 | 224910600625 |
| 219 | 224910600627 |
| 220 | 224910600629 |
| 221 | 224910600632 |

| 222 | 224910600635 |
|-----|--------------|
| 223 | 224910600563 |
| 224 | 224910600566 |
| 225 | 224910600567 |
| 226 | 224910600613 |
| 227 | 224910506154 |
| 228 | 224910600455 |
| 229 | 224910600457 |
| 230 | 224910600459 |
| 231 | 224910500204 |
| 232 | 224910500212 |
| 233 | 224910502575 |
| 234 | 224910502582 |
| 235 | 224910502585 |
| 236 | 224910502642 |
| 237 | 224810602173 |
| 238 | 224810602191 |
| 239 | 224910500054 |
| 240 | 224910500056 |
| 241 | 224910500075 |
| 242 | 224910500143 |
| 243 | 224810602036 |
| 244 | 224810602052 |
| 245 | 224810602053 |
| 246 | 224810602092 |
| 247 | 224810602093 |
| 248 | 224810602113 |
| 249 | 224810601953 |
| 250 | 224810601987 |
| 251 | 224810601988 |
| 252 | 224810602008 |
| 253 | 224810602030 |
| 254 | 224810602035 |
| 255 | 224810509675 |
| 256 | 224810509713 |
| 257 | 224810509725 |
| 258 | 224810601930 |
| 259 | 224810509536 |
| 260 | 224810509540 |
| 261 | 224810509554 |
| 262 | 224810509578 |
| 263 | 224810509589 |

| | |
|---|---|
| 264 | 224810509621 |
| 265 | 224810407685 |
| 266 | 224810407723 |
| 267 | 224810407782 |
| 268 | 224810509500 |
| 269 | 224810509512 |
| 270 | 224810509516 |
| 271 | 224810407582 |
| 272 | 224810407594 |
| 273 | 224810407614 |
| 274 | 224810407620 |
| 275 | 224810407628 |
| 276 | 224810407670 |
| 277 | 224810509647 |
| 278 | 224810509674 |
| 279 | 224810407457 |
| 280 | 224810407503 |
| 281 | 224910600521 |
| 282 | 224910600519 |
| 283 | 224910600508 |
| 284 | 224910600561 |
| 285 | 224910600558 |
| 286 | 224910600545 |
| 287 | 224910600538 |
| 288 | 224910600535 |
| 289 | 224910600533 |
| 290 | 224910600617 |
| 291 | 224910600616 |
| 292 | 224910601175 |
| 293 | 224910601173 |
| 294 | 224910601167 |
| 295 | 224910601158 |
| 296 | 224910601215 |
| 297 | 224910601209 |
| 298 | 224910601207 |
| 299 | 224910601199 |
| 300 | 224910601192 |
| 301 | 224910601188 |
| 302 | 224910601235 |
| 303 | 224910601230 |
| 304 | 224910601224 |
| 305 | 224910601222 |

| 306 | 224910601218 |
| 307 | 224910601217 |
| 308 | 224910601256 |
| 309 | 224910601250 |
| 310 | 224910601247 |
| 311 | 224910601244 |
| 312 | 224910601241 |
| 313 | 224910601238 |
| 314 | 224810407563 |
| 315 | 224810407546 |
| 316 | 224810407515 |
| 317 | 224810407504 |
| 318 | 224910600525 |
| 319 | 224910600528 |
| 320 | 224910405584 |
| 321 | 224910405583 |
| 322 | 224910405572 |
| 323 | 224910405571 |
| 324 | 224910405569 |
| 325 | 224910405568 |
| 326 | 224910405567 |
| 327 | 224910405565 |
| 328 | 224910405582 |
| 329 | 224910405581 |
| 330 | 224910405578 |
| 331 | 224910405576 |
| 332 | 224910405575 |
| 333 | 224910405574 |
| 334 | 224910405585 |

The following transformers from Purchase Order No. 1834, dated October 5, 2022, by and between Virginia Transformer Corp. and Omni Cuba Solar, LLC, as assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023, by and among Omni Richland North Solar, LLC, Omni Richland South Solar, LLC, Omni Otto A Solar, LLC, Omni Otto B Solar, LLC, Omni Otto C Solar, LLC, OYA Ruhlmann A LLC, OYA Ellisburg Solar LLC, Omni Cuba Solar, LLC and OYA Renewables EquipmentCo LLC:

| VT JOB | Serial Number |
|--------|---------------|
| WN215A | 463000A049W-WN215A |
| WN215B | 462000A037W-WN215B |

Additional inverters

The following inverters from Purchase Order No. 1044, dated as of November 27, 2020, by and between Power Electronics USA, Inc. and OYA Solar Corp., as amended by that Revision 1, dated as of September 26, 2022, as assigned pursuant to that certain Assignment Assumption and Contribution Agreement, dated as of May 5, 2023, by and between OYA Renewables Corp. (successor to OYA Solar Corp.) and OYA Independence North LLC and as further assigned to OYA Renewables EquipmentCo LLC pursuant to that certain Assignment, Assumption and Contribution Agreement, dated as of May 5, 2023:

| Serial Numbers |
|----------------|
| 32504015 |
| 32553732 |